**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**BEAUMONT DIVISION**

**FILED**
U.S. DISTRICT COURT
EASTERN DISTRICT OF TEXAS

**DEC 1 4 2001**

DAVID J. MALAND, CLERK
BY
DEPUTY

| | |
|---|---|
| **JOHN WILLIAM KING,** ) | |
| Petitioner ) | |
| ) | |
| v. ) | |
| ) | **CIVIL ACTION NO. 1:01 CV-435** |
| **JANIE COCKRELL, Director** ) | **Judge Richard A. Schell** |
| **Institutional Division,** ) | |
| **Texas Department of** ) | |
| **Criminal Justice** ) | |
| Respondent ) | |
| ) | |

**SUPPLEMENTAL PRE-FILING REQUEST FOR AUTHORIZATION OF EXPENSES**
**FOR INVESTIGATION AND PRESENTATION OF ISSUES**
**AND MEMORANDUM IN SUPPORT**

Petitioner John William King, who has been found to be an indigent, by and through

undersigned counsel, moves this Honorable Court to enter an order providing and authorizing the

expenditure of funds for expert assistance to assist in the preparation and filing of his application for

a writ of habeas corpus in this Court, and respectfully submits this **Supplemental Pre-filing**

**Request for Authorization of Expenses for Investigation and Presentation of Issues and**

**Memorandum in Support.** This request is made pursuant to the Criminal Justice Act, 18 U.S.C.

§3006A(e)(1) and (e)(3), 21 U.S.C. §848(q)(4)(B), §848(q)(9), *McFarland v. Scott,* 114 S. Ct. 2568

(1994), and the local rules of this Court.

On September 24, 2001, Mr. King filed with this Court his **Motion for Leave to Proceed**

-1-

17

*Ex Parte, In Camera,* **and on a Sealed Record with Regard to Applications for Investigative and Expert Assistance Pursuant to 21 U.S.C. §848(q)(9) and his** *Ex Parte, In Camera* **Detailed Pre-Filing Request Under Seal for Authorization of Expenses for Investigation and presentation of Issues and memorandum in Support.** On December 12, 2001, this Court denied Mr. King's motion for leave to proceed *ex parte,* and because of this, his accompanying *ex parte* request for investigative and expert services. However, this Court stated that it "prefers that King simply state in his future request the tentative claims for which he requests assistance, and the type of assistance he needs (without providing the names of the investigators or experts) and that the Director provide input on whether those tentative claims can be maintained." Order of December 12, 2001, at 3.

In accordance with this ruling, Mr. King will attempt to follow this procedure in this request, served on Respondent (hereafter, the "Director"), re-filed and updated from the previous September submission with new information discovered since that filing, the deletion of the names of the proposed experts, and the information on the tentative claims and assistance needed for their presentation. Mr. King also incorporates by reference his previously filed **Motion for Discovery** and **Supplemental Discovery Motion.**

## I.
## BACKGROUND

Petitioner is indigent, is represented by undersigned counsel of record and is unable to provide funds for any aspect of his representation. Petitioner is currently incarcerated in the Polunsky Unit of the Texas Department of Criminal Justice at Livingston, Texas. Mr. King was

indicted for capital murder in violation of Tex. Penal Code Ann. §19.03(a)(2) (Vernon Supp. 1986) on October 30, 1998. Tr. 4. He was convicted of capital murder (Tr. 248) and sentenced to death on February 25, 1999, in the 1st Judicial District Court of Jasper County, Cause No. 8869, Judge Joe Bob Golden presiding. Tr. 294. On direct appeal, the Texas Court of Criminal Appeals affirmed the conviction and sentence on October 18, 2000 in Cause No. 73,433. *King v. State*, 29 S.W.3d 556 (Tex. Crim. App. 2000).

Petitioner filed a timely state application for post-conviction writ of habeas corpus in state court on July 5, 2000. This application for relief was denied by the Texas Court of Criminal Appeals on June 20, 2001. *Ex Parte John William King,* No. 49,391-01 (unpublished opinion). No evidentiary hearing was held in the state habeas proceedings.

On June 28, 2001, Petitioner applied to this Court for appointment of counsel pursuant to 21 U.S.C. §848(q)(4)(B) and *McFarland v. Scott*, 114 S. Ct. 2568 (1994). On July 17, 2001, undersigned counsel was appointed for Petitioner. This is Mr. King's first application for federal habeas corpus relief.

Identified herein are expert witnesses and funding requests directly relating to claims Mr. King intends to present in his federal writ. In order to provide Petitioner with the ability to effectively present these factors to this Court, Mr. King respectfully requests funding for the experts listed below.

## II.
## THE REQUESTED FUNDING IS AUTHORIZED BY STATUTE AND CASE LAW

The Criminal Justice Act enables habeas corpus petitioners to apply to the district court for

funds to "obtain investigative, expert or other services necessary for adequate representation." 18 U.S. §3006A(e)(1). Upon finding that such "services are necessary," the petitioner "is financially unable to obtain them," and "the interests of justice so require," the court must provide the requested funds. *Id.*

Furthermore, 21 U.S.C. §848(q) of the Anti-Drug Abuse Act of 1988 authorizes federal habeas corpus courts to provide funds for all "reasonably necessary" investigative and expert services requested by indigent habeas corpus petitioners challenging the constitutionality of their convictions and death sentences. 21 U.S.C. §848(q)(9).[1] Preparing Mr. King's federal habeas petition and his post-conviction claims will require extensive expert assistance, location of non-expert witnesses, and research that are beyond his financial means. Accordingly, "[u]pon finding that such 'services are necessary,' [that] 'the [petitioner] is financially unable to obtain them,' and 'the interests of justice so require,' the court must provide the requested funds." 1 Liebman, *Federal Habeas Corpus Practice and Procedure, 3rd Ed.,* (1998) §19.3, p. 697, and cases cited therein. *See also Wright v. Angelone,* 151 F.3d 151, 163-64 (4th Cir. 1998) ( under applicable circuit standard, expert should be appointed "when a substantial question exists over an issue requiring expert testimony for its resolution and the defendant's position cannot be fully developed without

---

[1]  ("upon a finding in *ex parte* proceedings that investigative, expert or other services are reasonably necessary for the representation of the defendant, whether in connection with issues relating to guilt or sentence, the court shall authorize the defendant's attorneys to obtain such services..."). *See id.* § 848(q)(4)(B) ("In any post-conviction proceeding under §2254...of title 28 seeking to vacate or set aside a death sentence, any defendant who is or becomes financially unable to obtain ...investigative, expert, or other reasonably necessary services shall be entitled to the ...furnishing of such...services"). *See also McFarland v. Scott,* 512 U.S. 849, 855 (O'Conner, J., concurring in the judgment) ("statute entitles capital defendants not only to qualified counsel, but also to 'investigative, expert or other services...reasonably necessary for the representation of the defendant").

financial assistance"); *Patrick v. Johnson,* 37 F. Supp.2d. 815, 816 (N.D. Tex. 1999) ("The determination of a habeas claim often depends on the full development of factual issues, and experts play an important role in the fact-finding process."); *Lawson v. Dixon,* 3 F.3d 743, 750 (4th Cir. 1993), *cert. denied,* 511 U.S. 1013 (1994) ("appointment of an expert for purposes of mounting a defense at trial is mandatory under Title 18[§ 3006(A)(e)] if the defendant satisfies the statutory perquisites of indigence and necessity."); *Westbrook v. Zant,* 708 F.2d 1487, 1497, fn. 2 (11th Cir. 1988) (before rejecting application for funds under this provision, trial judge must make "'appropriate inquiry' to determine whether the [petitioner] needs such assistance and whether he is financially unable to obtain it" (quoting *Pedrero v. Wainwright,* 590 F.2d 1383 (5th Cir.), *cert. denied,* 444 U.S. 943 (1979)); *Stephens v. Kemp,* 846 F.2d 642, 645-650 (11th Cir. 1988); *Ford v. Wainwright,* 477 U.S. 399 (1986) (due process includes fact-development procedures capable of providing factfinder with all necessary neutral and professional expert assistance).

In *McFarland v. Scott, supra,* the Supreme Court held that the right of condemned state prisoners in federal habeas corpus proceedings "necessarily includes a right for that counsel to research and present a defendant's claims." *McFarland,* 114 S. Ct. at 2573. Specifically, the Court noted that 21 U.S.C. §848(q)(4)(B), authorizing the appointment of counsel in habeas proceedings "expressly incorporates 21 U.S.C. §848(q)(9), which entitles capital defendants to a variety of expert and investigative services upon a showing of necessity..." *McFarland,* 114 S. Ct. at 2572; *see also Lawson v. Dixon,* 3 F.3d 743, 751 (4th Cir. 1993), *cert. denied,* 114 S. Ct. 1391 (1994). These expert resources provided under 28 U.S.C. §848(q)(9) "may be critical in the preapplication phase of a habeas corpus proceeding, when possible claims and their factual bases are researched and identified." *McFarland,* 512 U.S. at 855. *See also Patterson v. Johnson,* 2001 WL 1234661 (N.D.

Tex. Aug. 31, 2001).

The full, fair, and adequate preparation, presentation, and litigation of Petitioner's claims in his federal writ depends on the provision of sufficient funds to secure the services of the experts identified herein. Petitioner's court-appointed counsel is unable to independently fund this litigation or advance sufficient funds to prepay the expenses identified in this motion. In separate paragraphs below, Petitioner will identify each area in which the investigation and expert is needed, the lack of state funding that necessitates this request, the specific facts that suggest that a claim of merit may exist, and an itemized list of anticipated expenses for each claim or task.

## III.
## TENTATIVE CLAIMS AND ASSISTANCE NEEDED FOR THEIR PRESENTATION

This case involves a petition for relief from imposition of the death penalty upon Petitioner in the state courts of the State of Texas. Without an authorization of expenses to adequately examine these issues, Petitioner will not be able to present the evidence supporting the tentative claims identified herein.

### A. Ineffective Assistance of Counsel.

As this was the main substance of Mr. King's state writ, presented as claims B, C, D, and E, it is fully exhausted. This claim, in several different sub-parts, will require the vast majority of the services requested herein.

#### i) Need for an investigator to present this claim.

Petitioner requests that a qualified investigator be appointed to assist in the preparation for this and other claims to be presented in his federal writ. It is noteworthy that newspaper accounts

-6-

relate that 175 FBI agents worked on this case, an indication of the tremendous volume of material that must be examined. Due to the short period of time that elapsed between the crime and petitioner's conviction, serious deficiencies in the pre-trial investigation, and the complete lack of any investigation at all in direct appeal or state habeas proceedings, virtually no investigation has been performed in this case to date.

As a result of an initial investigation, counsel has identified numerous witnesses in and around the Jasper County area, in east Texas, in Louisiana, and elsewhere who have either never been interviewed by trial counsel for Mr. King, or, if they were, had perfunctory and inadequate interviews. These would include Ronald King, trial witness and father of petitioner; Chris Thomas, a friend of the petitioner; Roderick Richardson, acquaintance of petitioner; Abdul Rahid, employee of a convenience store in Jasper; Courtney Miller, Lewis Berry's girlfriend; Lewis Berry, brother of defendant Shawn Berry; Christina Smith, a witness and an employee of the Jasper cinema where Shawn Berry worked; Christie Marcontell, Shawn Berry's girlfriend; Steven Scott, trial witness; Doyle Lee Grace, acquaintance of the Berrys and witness to events before the murder; Nina Goins, also a witness to these events; Carol and Louis Spedeccini, sister and brother-in-law of petitioner; Mott and Diane Hough, owners of a residence allegedly visited by petitioner after the events in question; Tommy Faulk, trial witness, at whose house the chain allegedly used in the dragging was found; Patrick Viator, a friend of the Berrys; Brandi Viator Eggleston, a friend of petitioner's and sister of Patrick Viator; Kylie Greeny, a friend of petitioner's; Michelle Chapman, friend of Mr. King's and recipient of his letters, and trial witness; George matathay, trial witness who saw the victim on the night of the crime; Steven Scott, another trial witness who saw the victim that night; Walter Quijano and Deward Gripon, defense and state's witnesses at the punishment phase; William

-7-

Hoover, trial witness; Patrick Lamb, restaurant owner who testified about a burglary allegedly connected to Mr. King; Keisha Atkins, a friend of petitioner's; Sonny Cribbs, Randall Walker, and Brack Jones, attorneys for petitioner; David Schulman, appellate attorney for petitioner; John Heath, state habeas attorney for petitioner; the trial investigator for petitioner; the state prosecutors and U.S. attorneys participating in the trial; and numerous local police personnel and FBI agents.

This is a far from complete list. It is expected that the investigation of these and other witnesses will be relevant to the exhausted claims of failure to present an insanity defense, failure to present mitigating evidence, failure to present an alibi defense, and the failure to make a full record, and well as possibly a conflict of interest claim (Issue A in the state writ).

Voluminous additional records must be obtained, such as an enormous number of FBI 302 reports ("half a roomful" in the words of trial counsel). It is believed that undersigned counsel may not have all of trial counsel's files. Petitioner's prison records must be located, and a complete social history and background investigation performed.

For the ineffective assistance of counsel claim, and also an actual innocence and *Brady* claim (see *supra*) counsel for Mr. King will have to have both an investigator and access to the prosecution files to see the existence of any prior inconsistent statements by many of the state's witnesses. For example, defense attorney Jones requested at trial "any statements" from crucial witness Tommy Faulk to police officers in cross examination on the stand. 19 RR 252. It appears that either the prosecution did not provide much in the way of discovery prior to trial, or what was provided was not effectively used by trial counsel, or even read by them. *See, e.g.,* 17 RR 135-36; 207; 211. These statements, whether exculpatory or not, should have been tendered sooner. Examination of the prosecution files will show the effect of these statements for these claims.

Discovery of the prosecution files will be need to ascertain any connection of Mr. King to a burglary of a restaurant introduced at the penalty phase. Patrick Lamb was allowed to testify to this without defense objection, despite a lack of evidence to connect King to the burglary of his restaurant. 23 RR 47-52.

An experienced investigator has been assisting counsel in the enormous task of this investigation. She has agreed to perform investigation in this case at her hourly rate of $75.00. She has familiarity with the case and the issues. An initial authorization of one hundred hours, or $7500.00 is requested.

### ii) Need for additional experts to present this claim.

The services and testimony of additional experts will be needed to effectively present petitioner's proposed ineffective assistance of counsel claim. As discussed above, since trial, virtually no investigation has been performed in this case, and that done at the trial was woefully deficient.

**1) A gang and racist groups expert.** Extensive, misleading and highly prejudicial evidence was introduced at petitioner's trial regarding alleged implications of petitioner's so-called "gang" activities, without objection from trial counsel. 20 RR 91-112. This testimony was a central focus of the State's case in the guilt/innocence phase, and also had a tremendous impact as to the penalty phase. William Michael Knox, a former policeman, was allowed to render "expert" opinion as to right-wing and racist gangs that went largely unchallenged by the defense, due to their failure to investigate this crucial area. He was also was allowed to testify as an expert without ever being qualified as such. Knox testified that racist groups are "all violent, all the racist groups promote violence." 20 RR 95. He also stated that the group leader "generally participates in the crimes of

the membership." 20 RR 95. Knox reviewed King's writings and letters, and testified that there was an intent to form a gang in Jasper or group in Jasper. 20 RR 96-97. "It was his intent to create the group and, therefore, get more members." 20 RR 97. Knox also testified that King would have had to "do something that would draw the attention of the community to the concept of whatever group that he's organizing. And often that involves some kind of crime and needs to be public, a public crime. " 20 RR 98. He testified that it would be very important for it to be a public crime.  20 RR 98. All of this testimony was admitted without objection from the defense.

Further speculative and unqualified testimony from Knox included his opinion that the crime scene was consistent with an initiation practice, where the leader would be present and may participate to show he can commit the crime. 20 RR 98. He found it very significant that the body was left in a very public open space, "designed to strike terror into the community, I think." 20 RR 99. Knox testified that "what really distinguishes a gang from any kind of legitimate organization, is that they encourage, promote, and support criminal or delinquent behavior." 20 RR 105.   It was his opinion that King intended to start a street gang once he was out of prison. 20 RR 112. All racist organizations are gangs in his opinion.  20 RR 112.

This unqualified, highly speculative, and misleading testimony was allowed despite the fact that Knox was never qualified as an expert and admitted that he had made television appearances seeking publicity for the promotion of a book he had authored. 20 RR 107. No challenge was raised by the defense to this testimony under *Daubert v. Merrell Dow Pharmaceuticals, Inc,* 509 U.S. 579 (1993) or *Dawson v. Delaware,* 503 U.S. 159, 112 S. Ct. 1093 (1992).    In order to present this claim and the wider claim of failure to present mitigating evidence,  petitioner will be in need of an expert witness conversant with the subject of Knox's testimony.  The scope of this assistance will

-10-

be limited to reviewing this and related testimony and rendering expert opinion on its validity as a part of the ineffective assistance of counsel issue.

**2) A Mitigation Expert on the special issues.**   These proposed services relate to the exhausted claim of failure to present mitigating evidence at the punishment phase of the trial (Issue C in the state writ). King proposes the appointment of an  expert in the evaluation of mitigation evidence and the issue of future dangerousness, as that issue has been interpreted in the Texas death penalty statute.  His or her services will be needed to analyze and evaluate the large amount of mitigating evidence to be presented by Petitioner in his writ, and the failure of the trial attorneys to investigate and use it at trial.    The expert  will address the history and conceptualization of mitigating evidence as well as expert findings regarding future dangerousness. The expert will also prepare a social history of the petitioner.

The defense presented virtually no evidence at the penalty phase.   Only two defense witnesses testified: Dr. Walter Quijano and petitioner's father.  Their total testimony amounted to about 55 transcript pages, including cross-examination by the State.  The assistance will be needed to present for the first time the crucial issue of future dangerousness, which was virtually conceded by the defense expert Dr. Quijano, who was unable to find any mitigating factors save petitioner's prior prison experiences and testified that the one way to ensure he will not be dangerous in the future would be for him to be executed.  24 RR 115, 120.

Even more importantly, the assistance will be needed to show how the defense could easily have discredited  the unscientific and misleading opinions of the State's expert on future dangerousness, Dr. Edward Gripon. This witness, who never personally examined petitioner, offered an opinion that he would be dangerous in the future based on his reading of the State's case and the

-11-

facts of the crime alone. This methodology has been found misleading, inaccurate, and unscientific in virtually every study that has examined it. These services are needed to show how the State's presentation of this crucial issue was fatally flawed and misleading, and the defense's failure to challenge this.

**3) A tattoo expert.** This expert's services relate to ineffective assistance of counsel in general. At petitioner's trial, extensive testimony was received from Rich Ford a detective with the Jasper Police Department, who was allowed to testify without objection from the defense as an expert on tattoos. 18 RR 206-19 RR 26. This incompetent and very prejudicial evidence was not challenged by trial counsel. Mr. Ford was never qualified as an expert, but was allowed to render expert opinions on the alleged meanings of Mr. King's tattoos. Ford was allowed to tie petitioner to Satanism, Naziism, "evil-looking" figures, witchcraft, and other highly prejudicial areas that had nothing to do with his actual beliefs. 18 RR 207-27. He was shown a Congressional Medal of Honor and described it as a baphomet, or satanic symbol, before it was identified as a military decoration. 19 RR 13. He also offered highly inaccurate testimony about links between satanic cults and racist groups such as skin heads. 19 RR 21. Ford also provided highly prejudicial and inaccurate testimony regarding King's intentions to start a racist group upon his release. 19 RR 22-23. This was a central part of the State's case against petitioner.

At the penalty phase, Dr. Edward Gripon, of Beaumont, Texas, also testified as to the meaning of the tattoos, even though he admitted he was not a tattoo expert. 24 RR 46. His unchallenged, non-expert opinion was that from tattoos, "you can get some idea of how the person is trying to hold himself out and the statement they are making." 24 RR 47. Most of King's tattoos were termed "very demonstrative" and "confrontive." (Sic).

-12-

An expert on the interpretation and meaning of petitioner's tattoos is needed to show how this testimony was deliberately misleading, inaccurate, and highly prejudicial, both at the guilt/innocence phase and at the penalty phase of the trial.

**4) A criminalist and forensic evidence examiner.** This expert's services relate mainly to the exhausted claim of ineffective assistance for failure to investigate and present an alibi defense (Issue D in the state writ).   In petitioner's initial investigation, numerous questions have arisen surrounding the forensic evidence presented at trial. There was non-expert testimony regarding what was repeatedly described as the "fight scene" at trial (e.g., 17 RR 145; 18 RR 197) which implied that a struggle had ensued at this scene, although no eyewitnesses to the alleged struggle testified at trial. There were numerous blood and DNA samples taken which were never tested by the defense, crucial in the State's case as to petitioner's guilt.  Dr. Frank Baechtel gave extensive testimony as to the implications of various DNA samples which allegedly tied petitioner to the crime, and, in order to present his claim of actual innocence of the crime, these items must be tested by a defense expert.   There was ambiguity over the only blood sample which allegedly connected defendant to the crime, that taken from a sandal which was not petitioner's shoe size. Many other questions as to this evidence have arisen, and some of this evidence needs to be examined or tested by an expert.

**5) A coroner.** This expert relates to the exhausted claim of failure to investigate an alibi defense (Issue D in the state writ). Crucial testimony that the victim was alive while being dragged was received unchallenged at petitioner's trial. Dr. Tommy J. Brown, a forensic pathologist who worked at the Jefferson County morgue, and the only State witness actually qualified as an expert, was tendered as an expert in the field of forensic pathology. 21 RR 33. He performed the autopsy on the victim James Byrd, Jr. 21 RR 34. He testified that it was his opinion that the victim was alive

until he hit a culvert, when the lethal wounds occurred. 21 RR 45. He also offered speculative testimony that the victim was probably alive when the head and right arm and shoulder were separated at the culvert. 21 RR 53. Usually, deceased persons do not bruise, Brown testified, and there were bruises on the body. 21 RR 54-55. There were not severe drag marks on the head, according to this witness, indicating that the victim was conscious most of the time he was being dragged. 21 RR 58. The coroner thought that the victim was alive for the two and a half miles until he hit the culvert, basing this on his interpretation of the wounds on the victim's body. 21 RR 60.

This was obviously very important testimony as to both phases of the trial. Petitioner will need to have this evidence examined by an independent coroner in order to determine its validity. Petitioner is seeking the minimum finding for a limited review of the autopsy report and testimony of this witness by a qualified expert.

**6) Psychological testing.** This expert's proposed services also relate to the exhausted claim of ineffective assistance of counsel for failure to present an insanity defense (Issue B in the state writ) and the failure to present mitigating evidence (Issue C). Petitioner is requesting funding for psychiatric and neuropsychiatric testing of petitioner. No such evidence has ever been offered on behalf of petitioner, except for the very limited and flawed testimony of Dr. Quijano, whose inquiry was limited to the issues of future dangerousness and mitigation. There is evidence that petitioner's personality and beliefs underwent a dramatic change during the period of his first incarceration, shortly before the crime for which he was convicted. There are also indications from the record that petitioner had some severe physical altercations in prison which may have been a causative factor in this change in orientation. No effort was made at trial to try to humanize Mr. King, and the State's picture of him as unmitigated evil was presented to the jury unchallenged by the defense.

-14-

7) *Strickland/* **Ineffective assistance of counsel expert.**   These services also relate to the exhausted issue of ineffective assistance of counsel.  Petitioner is requesting that this Court allow funding for an expert on the *Strickland* standards for ineffective assistance of counsel at the guilt/innocence and punishment phases of his trial.  This expert would be an attorney familiar with the trial of Texas capital murder cases, and common practices in Texas  at the time of Petitioner's trial.  The requested investigator's services could assist undersigned counsel in identifying such an expert.  This testimony will be directly relevant to petitioner's ineffective assistance of counsel claim,  and to  this Court's  determination as to whether Petitioner was prejudiced by the failure to present any mitigating evidence at the punishment phase of his trial.  Such an expert would perhaps be the only way in which Petitioner could make the required showing of prejudice as to the harm suffered by Mr.King, the second prong of the *Strickland* test.

### B. Actual Innocence Claim.

It is Petitioner's intent, at this  stage of his investigation into the case,  to present a claim of actual innocence.[2]  Evidence from the trial transcript casts grave doubt on the State's theory of the case and the forensic evidence introduced at Mr. King's trial  has gone unchallenged   to this day.

The United States Supreme Court has recognized that a claim of actual innocence may be introduced in a federal habeas corpus proceeding.  In *Herrera v. Collins,* 506 U.S. 390 (1993), the Court, although not reaching the issue, suggested that it would be a constitutional violation to execute an innocent person. *Id.* at 417; *but see, Robinson v. Johnson,* 151  F.3d 256, 267 (5th Cir.

---

[2]  This claim will probably be presented in two ways: both as ineffective assistance of counsel for the failure to present the alibi defense (Issue D in Mr. King's state writ) and as a stand-alone issue.

-15-

1998). In a concurrence, Justice O'Connor, joined by Justice Kennedy, writes that, "I cannot disagree with the fundamental legal principle that executing the innocent is inconsistent with the Constitution." *Id.* at 419.

A preliminary investigation into the case, necessarily truncated because petitioner's expert funding request has not yet been approved, reveals that numerous witnesses and potential witnesses in and around the Jasper, Texas area were interviewed by local, state and federal law enforcement authorities. The state's theory of the case was that the crime was committed by petitioner in conjunction with two co-defendants; that it was a racial crime motivated by the defendant's racist beliefs; and its motivation was to gain visibility and local members to a racist group entitled the Confederate Knights of America that petitioner proposed to start in the Jasper area. . Investigation to date has established that many witnesses who had different or contradicting views of the events in question were not called at trial, and/or they were questioned in a highly tendentious manner intended to elicit only "facts" that supported the state's version of the case. In addition, a viable alibi and claim of actual innocence on the part of petitioner was never presented at trial, on appeal, or in state habeas proceedings.    Therefore, this court should grant reasonably necessary expert and investigative assistance in order to develop Mr. King's claims of actual innocence.

### C. Conflict of Interest Claim.

This claim is also exhausted, as it was presented as Issue A in the state writ (failure of the trial court to appoint new counsel when requested by petitioner, who made them aware of a conflict of interest).

Before his trial, Mr. King submitted a motion for the court to appoint new counsel, on the

grounds that counsel was not investigating the case, had not kept him informed of case developments, would not investigate the claim of actual innocence, and would not do anything more than try to avoid a death sentence. CR 160, 161. Trail counsel themselves filed a motion with the court asking that they be relieved, citing an "irrevocable conflict of interest with the defendant." CR 143. The trial court, although it allowed Mr. King to speak, did not conduct any inquiry into the conflict when it had a duty to inquire further. 5 RR 5-6; State Writ at 4-9.

Here, an investigator's services will be needed, as outlined above, as well as the *Strickland/* ineffective assistance of counsel expert.

### D. Claim under *Brady v. Maryland*

Here, an investigator's services will be needed to show that numerous documents were never turned over to the defense at trial. There are strong indications from the trial transcript alone that this was the case.

Witnesses already interviewed in Jasper relate that the authorities that spoke to them were only interested in hearing evidence that supported their case. A voluminous amount of documents are contained in the files on this case in the custody of the local district attorney of Jasper County, Mr. Guy James Gray.   Access to these files are imperative in order for Mr. King to have a fair opportunity for him to present his federal constitutional claims in this court.

For a possible *Brady* claim, the actual innocence claim, and the ineffective assistance of counsel claims, counsel for Mr. King will have to have access to the prosecution files to see the existence of any prior inconsistent statements by many of the state's witnesses. For example, defense attorney Jones requested at trial "any statements" from witness Tommy Faulk to police officers in cross examination on the stand. 19 RR 252. It appears that either the prosecution did

-17-

not provide much in the way of discovery prior to trial, or what was provided was not effectively used by trial counsel, or even read by them. *See, e.g.,* 17 RR 135-36; 207; 211. These statements, whether exculpatory or not, should have been tendered sooner. Examination of the prosecution files will show the effect of these statements for these claims.

### E.  Other claims.

It is anticipated that the vast majority of the requested services will relate to the above claims, although others may also be presented in Mr. King's federal writ application that do not require expert services.

### F.  <u>Total Requested</u>:

**1) Investigator.**

As detailed above, 100 hours @ $75.00 per hour:                        **$7500.00**

### 2)  Mitigation Expert:

Records review: 10 hours
Telephone interviews: 2 hours
Preparation of a detailed report:   8 hours
Attorney conference:   2 hours

Total: 22 hours @ $200.00 per hour:                        **$4400.00**

### 3) Tattoo expert

Records and case review: 4 hrs.
Attorney consultation:      2 hrs.
Report preparation: 3 hours Total:  9 hours @ $100/hr.
Total:                        **$900.00**

### 4) Criminalist and forensic evidence examiner:

-18-

Document review: 4 hours
Attorney consultation: 2 hours
Report preparation: 4
Total:   10 hours @ $200.00                                          **$2000.00**

### 5) A coroner

Review of records, preparation time, atty. consult: $2000.00

Total:                                                                **$2000.00**

### 6) Psychological testing

Record review, consultation, travel time, testing:                   **$3000.00**
(Estimates)

### 7) *Strickland*-ineffective assistance of counsel expert.

Record review, attorney consultation,
preparation, estimate of 10 hours @ $150.00/hr.                      **$1500.00**

**GRAND TOTAL:**                                                     **$21,300.00**


## IV.
## CONCLUSION

Petitioner respectfully requests the above funding for the expert services detailed above, so

that he can for the first time effectively challenge the State's flawed case.  Without these services,

Petitioner will be unable to make a meaningful case for post-conviction relief and will therefore be

denied "an adequate corrective process for the hearing and determination of claims in violation of

federal constitutional guarantees." *Case v. Nebraska*, 381 U.S. 336,337 (1965).  The expert

assistance requested is not only reasonably necessary but essential for counsel's ability to represent

Petitioner in this proceeding.

WHEREFORE, for the following reasons, Petitioner John William King   respectfully

-19-

requests that this Honorable Court grant him approval for the expenditure of funds in the above amounts.

A proposed order is attached to this motion.

DATED: December 13, 2001

Respectfully submitted,

A. Richard Ellis
Texas Bar No. 06560400
75 Magee Avenue
Mill Valley, CA 94941
(415) 389-6771
FAX: (415) 389-0251

## CERTIFICATE OF SERVICE

I, A. Richard Ellis, counsel of record for Petitioner, do hereby certify that a  copy of the above and  foregoing **Supplemental Pre-filing Request for Authorization of Expenses for Investigation and Presentation of Issues and Memorandum in Support** was served on Respondent  by placing  the same by U.S. Mail, 1st Class,   postage-prepaid, this 13th day of December, 2001,  addressed to:

> Ms. Gena Blount Bunn
> Capital Litigation Division
> Office of the Attorney General, State of Texas
> P.O. Box 12548, Capitol Station
> Austin, Texas 78711

_____

A.  RICHARD ELLIS
COUNSEL FOR PETITIONER

## CERTIFICATE OF CONFERENCE

I, A. Richard Ellis, counsel for Petitioner John William King, in accordance with Local Rule 7.1(b) hereby certify that in accordance with the Court's order of December 12, 2001, the Respondent has been requested to "provide input on whether [the]...tentative claims can be maintained." Hence, Respondent will notify the Court of her position on this motion.

A. RICHARD ELLIS

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN  DISTRICT OF TEXAS
### BEAUMONT  DIVISION

| | | |
|---|---|---|
| **JOHN WILLIAM KING,** | ) | |
| **Petitioner** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | **CIVIL ACTION NO. 1:01 CV -435** |
| **JANIE COCKRELL, Director** | ) | **Judge Richard A. Schell** |
| **Institutional Division,** | ) | |
| **Texas Department of** | ) | |
| **Criminal Justice** | ) | |
| **Respondent** | ) | |
| | ) | |

## ORDER

IT IS HEREBY ORDERED that the Petitioner's **SUPPLEMENTAL PRE-FILING**

**REQUEST FOR AUTHORIZATION OF EXPENSES FOR  INVESTIGATION AND**

**PRESENTATION OF ISSUES**  is granted in the following amounts:

_____

for a total of _____.

Mr. King's  counsel is hereby authorized to incur additional reasonable investigative

expenses on the understanding that requests for further funding will be forthcoming upon the proper

motion to this Court.

DATED this _____ day of _____, 2001.


_____

UNITED STATES DISTRICT  JUDGE


-23-