FILED - CLERK
U.S. DISTRICT COURT

2003 JAN -8 AM 9: 27

IN THE UNITED STATES DISTRICT COURT EASTERN-BEAUMONT
FOR THE EASTERN DISTRICT OF TEXAS
BEAUMONT DIVISION

BY _Frances/Chatma_

| | | |
|---|---|---|
| JOHN WILLIAM KING, | § | |
| Petitioner, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 01-CV-435 |
| | § | (Judge Richard Schell) |
| JANIE COCKRELL, Director, | § | |
| Texas Department of Criminal Justice, | § | |
| Institutional Division, | § | |
| Respondent. | § | |

## RESPONDENT COCKRELL'S ANSWER AND
## MOTION FOR SUMMARY JUDGMENT WITH BRIEF IN SUPPORT

GREG ABBOTT
Attorney General of Texas

BARRY R. McBEE
First Assistant Attorney General

JAY KIMBROUGH
Deputy Attorney General
For Criminal Justice

GENA BUNN
Assistant Attorney General
Chief, Capital Litigation Division

P. O. Box 12548, Capitol Station
Austin, Texas 78711
(512) 936-1600

ATTORNEYS FOR RESPONDENT

ATTENTION
Attachments Not Bound

40

# TABLE OF CONTENTS

**PAGE**

**PETITIONER'S ALLEGATIONS** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

**STATEMENT OF THE CASE** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

**STATEMENT OF FACTS** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

**ANSWER AND MOTION FOR SUMMARY JUDGMENT** . . . . . . . . . . . . . . . . . . . . . 11

**I.**     **Standard of Review** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

**II.**    **Most of King's Claims of Constitutional Error are Unexhausted and Procedurally Barred.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

**III.**   **King's Claims of Constitutional Error are Meritless.** . . . . . . . . . . . . . . . . . . . . 17

      **A.**     **King received the effective assistance of counsel at trial. (King's Claims I, II and XII)** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

           **1.**     **Counsel presented a sound and viable case regarding the future dangerousness special issue. (King's Claim I(a))** . . . . . . . . . . . . . . 19

                **a.**     **This claim is unexhausted and procedurally barred.** . . . . . . . 19

                **b.**     **This claim is unsupported by the record.** . . . . . . . . . . . . . . . 19

           **2.**     **Counsel effectively argued the motion for change of venue. (King's Claim I(b))** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

                **a.**     **This claim is unexhausted and procedurally barred.** . . . . . . . 21

                **b.**     **This claim is unsupported by the record.** . . . . . . . . . . . . . . . 21

           **3.**     **Counsel's decision not to make an opening statement was neither unreasonable nor prejudicial. (King's Claim I(c))** . . . . . . . . . . . . . 22

                **a.**     **This claim is unexhausted and procedurally barred.** . . . . . . . 22

                **b.**     **This claim is unsupported by the record.** . . . . . . . . . . . . . . . 22

## TABLE OF CONTENTS, continued

PAGE

4.  Counsel presented an effective closing argument.
(King's Claim I(d)) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

  a.  This claim is unexhausted and procedurally barred. . . . . . . 23

  b.  This claim is unsupported by the record. . . . . . . . . . . . . . . . 23

5.  Counsel presented a viable case at punishment. (King's Claim I(e))  25

6.  King has failed to demonstrate that testimony of a police officer
concerning King's tattoos was objectionable, thus counsel's decision not
to object to that testimony was neither unreasonable nor prejudicial.
(King's Claim I(f)) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

  a.  This claim is unexhausted and procedurally barred. . . . . . . 26

  b.  This claim is unsupported by the record. . . . . . . . . . . . . . . . 26

7.  King has failed to demonstrate that testimony from the State's
"gang expert" was objectionable, thus counsel's decision not to
object to that testimony was neither unreasonable nor
prejudicial. (King's Claim I(g))  . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

  a.  This claim is unexhausted and procedurally barred. . . . . 29

  b.  This claim is unsupported by the record.  . . . . . . . . . . . . . 29

8.  King has failed to allege any objectionable error at trial, thus counsel's
failure to object in the identified instances was neither unreasonable nor
prejudicial. (King's Claim I(h)) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

  a.  This claim is unexhausted and procedurally barred. . . . . . . 30

  b.  This claim is unsupported by the record. . . . . . . . . . . . . . . . 30

    i.  Brewer's tattoos . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

    ii.  Hearsay  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

## TABLE OF CONTENTS, continued

PAGE

iii.     Instruction regarding good conduct time . . . . . . . . . 31

iv.     Definition of "reasonable doubt" . . . . . . . . . . . . . . . 32

v.     Reference to "fight scene" . . . . . . . . . . . . . . . . . . . . 32

vi.     Prosecutorial argument . . . . . . . . . . . . . . . . . . . . . . 32

9.     Counsel investigated King's mental health and made an informed, strategic decision that such information provided no viable defense; in any event, omission at trial of the evidence identified by habeas counsel did not prejudice King's defense. (King's Claim I(i)) . . . . . . . . . . . 33

10.     Counsel's handling of the coroner's testimony was neither unreasonable nor prejudicial. (King's Claim I(j)) . . . . . . . . . . . . . . . . . . . . . . 34

a.     This claim is unexhausted and procedurally barred. . . . . . . . 34

b.     This claim is unsupported by the record. . . . . . . . . . . . . . . 34

11.     Counsel adequately presented their motion to withdraw. (King's Claim I(k)) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

12.     King has failed to demonstrate that Dr. Gripon's testimony was objectionable, thus counsel's decision not to object to that testimony was neither unreasonable nor prejudicial. (King's Claim I(l)) . . . . . . . 37

a.     This claim is unexhausted and procedurally barred. . . . . . . . 37

b.     This claim is unsupported by the record. . . . . . . . . . . . . . . 37

13.     Counsel investigated, presented and argued all available, credible evidence of innocence. (King's Claim II) . . . . . . . . . . . . . . . . . . . . . 38

a.     This claim is unexhausted and procedurally barred. . . . . . . . 38

b.     This claim is unsupported by the record. . . . . . . . . . . . . . . 38

**TABLE OF CONTENTS, continued**

PAGE

14.   Counsel did utilize mental heath experts to examine King and testify at trial. (King's Claim XII) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

15.   The cumulative effect of counsel's performance did not deprive King of constitutionally effective assistance at trial. (King's Claim I(m)) . . . 47

    a.   This claim is unexhausted and procedurally barred. . . . . . . . 47

    b.   This claim is unsupported by the record. . . . . . . . . . . . . . . 47

B.   King's request for new trial counsel and counsel's motion to withdraw were properly denied by the trial court. (King's Claim III) . . . . . . . . . . . . . . . . 48

C.   Evidence of King's racist beliefs, which was highly relevant to establish motive, was properly admitted at trial. (King's Claim IV) . . . . . . . 58

    1.   This claim is unexhausted and procedurally barred. . . . . . . . . 59

    2.   This claim is foreclosed by circuit and Supreme Court precedent. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

D.   The admission of expert testimony regarding King's future dangerousness was proper and did not violate King's federal constitutional rights. (King's Claim V) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62

    1.   This claim is unexhausted and procedurally barred. . . . . . . . . 62

    2.   This claim is foreclosed by circuit and Supreme Court precedent. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 63

E.   The Texas statutory punishment issues do not violate the Sixth or Fourteenth Amendments. (King's Claim VI) . . . . . . . . . . . . . . . . . . . 68

    1.   This claim is unexhausted and procedurally barred. . . . . . . . . 68

    2.   This claim is meritless. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 69

**TABLE OF CONTENTS, continued**

**PAGE**

F.   Admission of unadjudicated offenses at the punishment phase
     did not violate the Sixth, Eighth or Fourteenth Amendments.
     (King's Claim VII) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 73

     1.   This claim is unexhausted and procedurally barred. . . . . . . . . 74

     2.   This claim is foreclosed by circuit and Supreme Court
          precedent. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 74

G.   King's federal constitutional rights were not violated by the fact that he
     was tried in Jasper County. (King's Claims VIII, IX and X) . . . . . . . 81

     1.   This claim is unexhausted and procedurally barred. . . . . . . . . 81

     2.   This claim is unsupported by the record. . . . . . . . . . . . . . . . . 81

H.   King's complaints regarding the state habeas corpus process are not
     cognizable on federal habeas corpus review. (King's Claim XI) . . . . . 85

     1.   This claim is unexhausted and procedurally barred. . . . . . . . 85

     2.   This claim is foreclosed by circuit precedent. . . . . . . . . . . . . 85

I.   The trial judge death-qualified King's jury in accordance with Supreme
     Court precedent. (King's Claim XIII) . . . . . . . . . . . . . . . . . . . . . . . 91

     1.   This claim is unexhausted and procedurally barred. . . . . . . . . 91

     2.   This claim is unsupported by the record. . . . . . . . . . . . . . . . . 92

J.   There was no deal between the prosecution and State's witness Matthew
     Hoover. (King's Claim XIV) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 94

**TABLE OF CONTENTS, continued**

PAGE

1.    This claim is unexhausted and procedurally barred. . . . . . . . . 94

2.    This claim is unsupported by the record because Hoover was not arrested on the charges at issue until months after testifying at King's trial. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 95

K.    King is not constitutionally entitled to have his jury informed of the effect of a deadlock. (King's Claim XV) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 96

1.    This claim is unexhausted and procedurally barred. . . . . . . . . 96

2.    This claim is foreclosed by circuit precedent. . . . . . . . . . . . . . 97

L.    King received the effective assistance of counsel on direct appeal. (King's Claim XVI) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 100

1.    This claim is unexhausted and procedurally barred. . . . . . . . . 100

2.    This claim is unsupported by the record. . . . . . . . . . . . . . . . . . 100

M.    The application of different capital-sentencing schemes in Texas in *Penry I*'s aftermath has not resulted in the arbitrary and capricious imposition of the death penalty, either generally or in King's case. (King's Claim XVII) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 102

1.    This claim is unexhausted and procedurally barred. . . . . . . . . 102

2.    This claim is foreclosed by circuit precedent. . . . . . . . . . . . . . 102

N.    The death penalty is a constitutionally sound punishment. (King's Claim XVIII) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 105

1.    This claim is unexhausted and procedurally barred. . . . . . . . . 105

2.    This claim is *Teague*-barred and foreclosed by circuit and Supreme Court precedent. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 106

**TABLE OF CONTENTS, continued**

PAGE

O.    **Lethal injection is a constitutionally sound method of execution. (King's Claim XIX)** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 108

    1.    **This claim is unexhausted and procedurally barred.** . . . . . . . . 108

    2.    **This claim is *Teague*-barred and foreclosed by circuit precedent.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 109

P.    **Trial counsel were not operating under a conflict of interest at trial. (King's Claim XX)** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 111

    1.    **This claim is unexhausted and procedurally barred.** . . . . . . . 111

    2.    **This claim is meritless.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 111

        a.    **No conflict existed given that the media contract was not entered into until after the representation had concluded.** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 111

        b.    **Even if the media rights contract resulted in a conflict, Fifth Circuit precedent requires King to prove prejudice under *Strickland*, which he cannot.** . . . . . . . . . . . . . . . . . . . . . 113

        c.    **Even under the *Sullivan* framework, King cannot demonstrate adverse effect.** . . . . . . . . . . . . . . . . . . . . . 114

Q.    **Application of the cumulative error doctrine does not entitle King to relief. (King's Claim XXI)** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 114

    1.    **This claim is unexhausted and procedurally barred.** . . . . . . . . 114

    2.    **This claim is unsupported by the record.** . . . . . . . . . . . . . . . . 114

**CONCLUSION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 115

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
BEAUMONT DIVISION

| | | |
|---|---|---|
| JOHN WILLIAM KING, | § | |
| Petitioner, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 01-CV-435 |
| | § | (Judge Richard Schell) |
| JANIE COCKRELL, Director, | § | |
| Texas Department of Criminal Justice, | § | |
| Institutional Division, | § | |
| Respondent. | § | |

**RESPONDENT COCKRELL'S ANSWER AND
MOTION FOR SUMMARY JUDGMENT WITH BRIEF IN SUPPORT**

Petitioner John William King ("King") was convicted and sentenced to death by a Texas court for the capital murder of James Byrd, Jr. He now challenges the validity of his conviction and sentence in this Court pursuant to 28 U.S.C. §§ 2241 and 2254. However, King has failed to demonstrate that he is entitled to federal habeas corpus relief. His petition must therefore be denied with prejudice. Respondent Cockrell ("the Director") denies all allegations of fact made by King, except those supported by the record[1] and those specifically admitted herein.

---

[1]   Copies of King's state trial, direct appeal and habeas corpus records have previously been provided to the Court. The Director also supplements this previous submission with two additional items contained in the original state court record: (1) color copies of State's Exhibit 1 (photographs of victim's body); and (2) a copy of State's Exhibit 111 (videotape of crime scene).

## PETITIONER'S ALLEGATIONS

In his federal habeas petition, King alleges twenty-one separate constitutional violations (the first with thirteen subparts) during the course of his state capital murder trial and subsequent proceedings.   Specifically, the Director understands King to raise the following grounds for federal relief:

1.    That counsel provided ineffective assistance at trial.

2.    That counsel provided ineffective assistance by failing to present a viable defense of actual innocence at trial.

3.    That King's Sixth and Fourteenth Amendment rights were violated by the trial court's denial of King's pretrial request for new trial counsel and trial counsel's pretrial motion to withdraw.

4.    That King's First and Fourteenth Amendment rights were violated by the admission of evidence relating to his abstract beliefs without a sufficient "nexus" to the crime.

5.    That King's Eighth and Fourteenth Amendment rights were violated by the admission of "unreliable and unscientific" testimony of future dangerousness.

6.    That King's Sixth and Fourteenth Amendment rights to have a jury determine, beyond a reasonable doubt, every fact that operates to increase the punishment authorized, were violated by submission of the Texas special issues.

7.    That King's Sixth, Eighth and Fourteenth Amendment rights were violated by admission of evidence of unadjudicated offenses at the punishment phase.

8.    That King's due process rights were violated by "pervasive and extensive pre-trial publicity."

9.    That King's Fifth, Sixth, Eighth and Fourteenth Amendment rights were violated by "the totality of the prejudicial circumstances and atmosphere surrounding the trial."

10.     That King's Sixth, Eighth and Fourteenth Amendment rights were violated by
        the trial court's denial of his motion for change of venue.

11.     That King was denied meaningful access to the courts, due process of law, and
        competent counsel, in state post-conviction proceedings.

12.     That King's trial counsel rendered ineffective assistance by failing to obtain
        and/or use a confidential defense psychiatric expert at both guilt-innocence
        and punishment phases of trial.

13.     That the trial court erred in death-qualifying the jury, resulting in a jury
        "fundamentally biased" against King.

14.     That the State failed to disclose a deal with a prosecution witness.

15.     That King's Eighth and Fourteenth Amendment rights were violated by Texas'
        statutory prohibition against informing jurors that a single holdout juror will
        result in the imposition of a life sentence.

16.     That King's direct appeal counsel rendered ineffective assistance.

17.     That King's Eighth and Fourteenth Amendment rights have been violated "in
        view of the many different capital sentencing schemes that have been in
        operation in Texas in recent years."

18.     That the death penalty is cruel and unusual punishment in violation of the
        Eighth and Fourteenth Amendments.

19.     That lethal injection is cruel and unusual punishment in violation of the Eighth
        Amendment.

20.     That trial counsel were operating under a conflict of interest in violation of
        King's Fifth, Sixth, Eighth and Fourteenth Amendment rights.

21.     That the cumulative effect of errors at King's trial denied him due process
        under the Fourteenth Amendment.

However, as discussed more fully below, all of King's requests for relief must fail. In particular, King has failed to exhaust the vast majority of his claims in the Texas courts; because the Texas courts would be barred by state procedural rules from reviewing the claims on the merits if presented there now, the claims are procedurally barred from substantive review in this Court as well. *See* Section II., *infra*. But in any event, the claims raised for the first time in this Court are all either unsupported by the record or foreclosed by circuit and Supreme Court precedent. Moreover, with regard to the few claims that King did fully exhaust in the state courts, King has failed to demonstrate that the state court's adjudication of the claims was either contrary to, or involved an unreasonable application of, clearly established Supreme Court precedent. His federal petition for writ of habeas corpus therefore cannot be granted.

## STATEMENT OF THE CASE

In February of 1999, King was tried, convicted, and sentenced to death for the kidnaping and brutal murder of James Byrd, Jr. CR 248, 291, 293-296;[2] *see also* TEX. PENAL CODE ANN. § 19.03(a)(2) (Vernon Supp. 1996). His conviction and sentence were automatically appealed to the Texas Court of Criminal Appeals, which affirmed in a published opinion on October 18, 2000. *King v. State,* 29 S.W.3d 556 (Tex. Crim. App.

---

[2] "CR" refers to the Clerk's Record, which contains the pleadings, orders and other documents filed with the clerk during the course of trial, followed by page numbers. "RR" refers to the Reporter's Record of transcribed trial proceedings, proceeded by volume number and followed by page numbers. "SX" refers to the numbered trial exhibits offered by the State at trial; "DX" refers to the numbered trial exhibits offered by the defense at trial.

2000).  King did not petition the United States Supreme Court for certiorari review.

Concurrent with his direct appeal, King filed a state application for writ of habeas corpus with the trial court on July 5, 2000, in which he raised five claims of constitutional error.  SHCR 2-27.[3]  The Honorable Joe Bob Golden, the same judge who presided over King's trial, also presided over the state habeas corpus proceeding.  On January 8, 2001, having considered King's application and the State's answer, Judge Golden issued an order finding that there were no controverted, previously unresolved facts material to the legality of King's confinement which would require an evidentiary hearing; the court also invited the parties to submit proposed findings of fact and conclusions of law for his consideration.  SHCR 86.  By order of February 21, 2001, Judge Golden adopted the proposed findings of fact and conclusions of law submitted by the State and recommended that the relief sought be denied.  SHCR 177-200.  On June 20, 2001, the Texas Court of Criminal Appeals denied King's application by written order based on the trial court's findings and conclusions.  *Ex parte King*, Writ No. 49,391-01.

By order dated July 17, 2001, this Court appointed King an attorney to assist him in filing a habeas petition pursuant to 28 U.S.C. §§ 2241, 2254.  By order dated March 18, 2002, this Court granted King's request for equitable tolling of the statute of limitations of 28 U.S.C. § 2244(d) such that King's petition would be considered timely filed by the Court if filed by August 19, 2002.  King filed his petition on August 13, 2002.

_____

[3]        "SHCR" refers to the Clerk's Record of pleadings, orders and other documents filed with the court during King's state habeas proceedings, followed by page numbers.

## STATEMENT OF FACTS

The evidence at trial showed that sometime in the pre-dawn hours of June 7, 1998, James Byrd, Jr., a 49-year-old African-American man, was chained by his ankles to the back of Shawn Berry's pickup truck with a 24-foot logging chain and dragged approximately three miles down a dirt logging road and an asphalt country road, Huff Creek Road, and that he was alive and conscious for at least two miles until his body swung off the road and impacted a culvert with enough force to separate his head and right arm from his body. Mr. Byrd's headless body was then dragged another mile to where the truck was turned around in the entrance to a cemetery, and the body was then left in the middle of the road near the cemetery and in front of a country church.[4] Mr. Byrd's shirts, wallet, and shoes were found along the logging road near where the drag marks began. At the end of the logging trail furthest from the paved road was a "scuffle scene" approximately 100 feet in diameter, in which were found a cigarette butt – dropped with the ash still intact – containing Shawn Berry's DNA, a box of Marlboro light cigarettes, a lighter with a Klan symbol and "Possum" (King's nickname) engraved on it about seven feet from the Marlboro cigarette pack, a nut driver engraved "Berry," and several beer bottles, including one containing Lawrence Brewer's DNA.[5] Near the nut driver there was a shoe print, which was photographed and

---

[4]     Blood stains in the road between the head and torso and a ranch entrance suggest that the truck slowed or paused at other locations before depositing Mr. Byrd's body, and the jury certainly could have inferred from the physical evidence that King and his co-defendants gave particular effort to picking the best – and most sensational – location to leave the body.

[5]     The locations of the items as they were found along the logging road and Huff Creek Road are marked on the aerial photos of the area admitted as State's exhibits 4 and 5.

later compared to sandals found at King's apartment.[6]  About thirty feet down the trail from

this scene, at the point where the drag marks began, there was a dinner-plate-sized clump of

blood in the dirt, and nearby were three cigarette butts, each containing the DNA of one of

the three defendants: King, Brewer, and Berry.

When officers searched King's apartment after identifying Berry and King as

suspects, they found four pairs of shoes: tennis shoes marked L.B., which were identified as

Brewer's and which were too small to fit either Berry or King; Shawn Berry's Polo boots;

and two pairs of sandals that were consistent with the shoe print on the logging road.  One

pair of sandals was later identified by Lewis Berry as belonging to his brother Shawn, and

the other pair was identified by Lewis and Keisha Atkins as belonging to King.  Keisha

testified that King was wearing the sandals when he left the apartment that night about 1:30

to 1:45 a.m. with Berry and Brewer.  The F.B.I. lab analyzed the shoes and found splatters

of the victim's blood on the boots, Brewer's sneakers, and one pair of the sandals.  The blood

was on the top and sides of the shoes, not on the bottoms.  King acknowledged in his

jailhouse letter to Brewer, admitted into evidence, that his own sandals had a "dark brown

substance" on them.[7]  Lewis Berry, the fourth occasional occupant of the apartment, testified

---

[6]      The photo of the shoe print was State's exhibit 21-A (17 RR 117), which was
compared to both pairs of sandals found in the apartment; the FBI analyst found that the print could
have been left by either pair.  (19 RR 235-37).

[7]      In this letter, King wrote,

As for the clothes they took from the apt. I do know that one pair of shoes they took
were Shawn's dress boots with blood on them, as well as pants with blood on them.
As far as the clothes I had on, I don't think any blood was on my pants or sweat shirt,

at trial and appeared with his own pair of sandals, which he had bought prior to the offense and which were not in the apartment at the time of the search.[8]

The lighter found at the "scuffle scene" was acknowledged by King as belonging to him in his letter to the Dallas Morning News. Although King claimed to have misplaced the lighter a week before the offense, Keisha Atkins and Lewis Berry both saw King with the lighter in his apartment on Saturday before the offense occurred. Keisha testified that King was smoking Marlboro cigarettes on the day of the offense.

Investigators found the imprint of a large chain in the back of Shawn Berry's truck when it was searched after the offense. Lewis Berry also testified that Shawn Berry had a large chain in the back of the truck that Lewis had used the week before, along with King and Brewer, to pull stumps at a job. Police found a consistent chain hidden in a hole in the woods behind the trailer of King's friend, Tommy Faulk. King and Brewer came out to the

---

but I think my sandals may have had some dark brown substance on the bottom of them.

27 RR, SX 104. King makes much of the fact that the sandals with Mr. Byrd's blood on them were size 10 while King wore a size 9 ½. While such a minor discrepancy would have little if any value in countering the State's overwhelming evidence of King's guilt, it was completely nullified by King's apparent admission in this letter to co-defendant Brewer that those were his sandals.

[8]      Lewis Berry was investigated as a suspect in the case since he had lived in the apartment at one time and some shoes there were consistent with his size. Although the paper on a CD case found on the logging road had a latent print that belonged to Lewis Berry, he gave a statement about his whereabouts on the night of the murder, agents talked to other witnesses who corroborated his statement, he volunteered a swab for DNA testing that was not matched by DNA to any evidence at the scene, and agents eliminated him as a suspect. Testimony revealed that because paper retains prints well, the fingerprint could have been left several days or months before the item was tested.  18 RR 134-136.

trailer on Sunday after the offense and were outside alone long enough to hide the chain. King also admitted in his letter to the Dallas Morning News that they had a chain in the truck on that Saturday night when they went out "riding" at the time of the offense. Dr. Tommy J. Brown testified that the bone-deep lacerations on Mr. Byrd's ankles were consistent with the chain found at Tommy Faulk's property.

King also admitted in his letter to the Dallas Morning News that he left the apartment late on Saturday night and went "riding" with Shawn Berry and Brewer in the truck, that he was with them for over two hours, that he was with them when Berry stopped and picked up the victim. He admitted that he and Brewer exchanged places with the victim and let the victim ride in the cab of the truck while they rode in the back, even though multiple witnesses testified that King hated interracial mixing and had left social gatherings that very Saturday rather than remain in the company of black people.

State's witnesses testified that the victim left the family party he had attended to go home at the same time that King, Berry, and Brewer left their apartment and that they picked him up in the truck on MLK Blvd. within 45 minutes of the time he left the party. King claimed in his letter to the Dallas Morning News that he called his ex-girlfriend when he returned to the apartment, but Keisha Atkins testified that he did not call her until 5:00 or 5:30 a.m. that morning.

Compelling evidence of King's racist ideas presented at trial established King's role as the leader in this racial crime. The photographic evidence graphically demonstrated King's collection of white racist and Satanic-themed tattoos, including his extensive

-9-

Confederate Knights of America patch and his tattoo of a black man being lynched. Although the lynching tattoo, considered in context, is almost subtly placed on King's forearm amidst other heavy tattooing, various witnesses, including several teenaged girls, testified that King had pointed the tattoo out to them specifically and seemed proud of it, referring to it as his "little hanging nigger." 20 RR 145.

Tommy Faulk and Lewis Berry both testified that King became angry and left social gatherings on Saturday before the offense, with Lewis testifying that he and King had an altercation over King's racial intolerance shortly before midnight that night.

Most damaging of all are King's own writings and statements regarding his racial hatred and his desire to kill black people. King wrote to various teen-aged girls from prison that he would like to hang black men together with the white women that they socialized with. *See* 26 RR, SX 2 (a)-(c). He drafted membership applications and letters regarding formation of a free-world Jasper chapter of the Confederate Knights of America, which he planned to start one month after this offense. *See* 26 RR, SX 41. He talked to fellow inmate Matthew Hoover about race wars, and predicted that it would take a remarkable racial crime to begin one. He expressed his desire to initiate a gang member by sending him out to "stab somebody or do something." 19 RR 71. King talked to Hoover about his ideas to kill a black person to prove his loyalty to the CKA, and King specifically described to Hoover how he would kidnap a black man, put him in the trunk of a car, take him into the woods, and have the new recruit kill him. 19 RR 72-73; 89-90. In the various drafts of CKA literature found in King's apartment, he had written extensively about his pride in the "Aryan race" and about

-10-

perpetuating a new "southern white civilization." 26 RR, SX 41. After this offense, King

wrote in one of his letters to his co-defendant Brewer, "seriously though, Bro, regardless of

the outcome of this, we have made history and shall die proudly remembered if need be." 27

RR, SX 104.

## ANSWER AND MOTION FOR SUMMARY JUDGMENT

### I.    Standard of Review

A party moving for summary judgment bears the burden of informing the court of the

basis for its motion and identifying pleadings and other record evidence that demonstrate the

absence of any genuine issues of material fact. *Howell Hydrocarbons, Inc. v. Adams*, 897

F.2d 183, 191 (5th Cir. 1990) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).

Once the moving party makes that showing, the burden shifts to the nonmoving party to

show that summary judgment is not appropriate. *Fields v. City of South Houston*, 922 F.2d

1183, 1187 (5th Cir. 1991).

Moreover, under the 1996 amendments to the federal habeas corpus statute embodied

in the Antiterrorism and Effective Death Penalty Act ("the AEDPA"), a state prisoner may

not obtain relief

> with respect to any claim that was adjudicated on the merits in State court
> proceedings unless the adjudication of the claim--
>
> > (1) resulted in a decision that was contrary to, or involved an
> > unreasonable application of, clearly established Federal law, as
> > determined by the Supreme Court of the United States; or
> >
> > (2) resulted in a decision that was based on an unreasonable
> > determination of the facts in light of the evidence presented in

the State court proceeding.

28 U.S.C. § 2254(d) (West 1996).

Thus, the Supreme Court has held that federal courts may not grant the writ merely on a finding of error by a state court, but instead only if a state court "arrives at a conclusion opposite to that reached by this Court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts." *(Terry) Williams v. Taylor,* 529 U.S. 362, 413 (2000), *quoted in Montoya v. Johnson,* 226 F.3d 399, 404 (5th Cir. 2000). Absent a direct conflict with Supreme Court authority, habeas relief is available only if the state-court decision is factually or legally unreasonable. *Montoya v. Johnson,* 226 F.3d at 404. "[A]n *unreasonable* application of federal law is different from an *incorrect* or *erroneous* application of federal law." *Williams v. Taylor,* 529 U.S. at 412 (original emphasis). "Under § 2254(d)(1)'s 'unreasonable application' clause, then, a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Id.* at 411. An "unreasonable application" occurs "if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413. *See also Early v. Packer,* 123 S. Ct. 362 (2002) (summarily reversing Ninth Circuit decision that state-court decision was "contrary to" or "unreasonable application of" Supreme Court precedent as exceeding limits imposed by § 2254(d));

-12-

*Woodford v. Visciotti*, 123 S. Ct. 357 (2002) (same).[9]

In review of a state prisoner's federal habeas petition, "a determination of a factual issue made by a State court shall be presumed to be correct," and the petitioner "shall have the burden of rebutting the presumption by clear and convincing evidence."  28 U.S.C. § 2254(e)(1); *Jackson v. Johnson,* 150 F.3d 520, 524 (5th Cir. 1998).  Moreover, where the petitioner

> has failed to develop the factual basis of a claim in State court proceedings, the court shall not hold an evidentiary hearing on the claim unless the applicant shows that
>
>> (A) the claim relies on
>>
>>> (i) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or
>>>
>>> (ii) a factual predicate that could not have been previously discovered through the exercise of due diligence; and
>>
>> (B) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

28 U.S.C. § 2254(e) (2); *Murphy v. Johnson,* 205 F.3d 809, 815 (5th Cir. 2000).  Thus, in the state courts a petitioner "must be diligent in developing the record and presenting, if

---

[9]    While King spends a great portion of his petition arguing the standard of review of § 2254(d), *see* Petition at 66-100, the provision only has limited applicability to the instant petition given that almost all of King's claims are unexhausted and, thus, were not adjudicated in the state courts.  Therefore, due to King's default, there is in large part no state court adjudication for this Court to defer to.  In any event, these claims are procedurally barred under Fifth Circuit precedent, *see* Section II., *infra*, and in any event meritless, *see* Section III., *infra*.

possible, all claims of constitutional error.  If the prisoner fails to do so, himself or herself

contributing to the absence of a full and fair adjudication in state court, § 2254(e) prohibits

an evidentiary hearing to develop the relevant claims in federal court, unless the statute's

other stringent requirements are met." *(Michael) Williams v. Taylor,* 529 U.S. 420, 437

(2000).

Finally, pre-AEDPA precedent forecloses habeas relief if a claim (1) is procedurally

barred as a consequence of a failure to comply with state procedural rules, *Coleman v.*

*Thompson,* 501 U.S. 722 (1991); (2) seeks retroactive application of a new rule of law to a

conviction that was final before the rule was announced, *Teague v. Lane,* 489 U.S. 288

(1989); or (3) asserts trial error that, although of constitutional magnitude, did not have a

"substantial and injurious effect or influence in determining the jury's verdict." *Brecht v.*

*Abrahamson,* 507 U.S. 619, 637 (1993) (citation omitted).

## II.    Most of King's Claims of Constitutional Error are Unexhausted and Procedurally Barred.

Most of King's federal constitutional complaints have never been presented to the

Texas courts and, in fact, are presented for the first time in the instant federal petition.  These

claims are therefore unexhausted under 28 U.S.C. § 2254(b) and may not serve as the basis

for federal habeas corpus relief.  Furthermore, because King is now precluded from returning

to the state courts under the Texas abuse-of-the-writ statute, these claims are also

procedurally defaulted for purposes of federal habeas corpus review and must be denied on

that basis.

A federal court may not grant a petition for writ of habeas corpus by a state prisoner unless the petitioner "has exhausted the remedies available in the courts of the State." 28 U.S.C. § 2254(b); *see also Martinez v. Johnson*, 255 F.3d 229, 238 (5th Cir. 2001), *cert. denied*, 122 S. Ct. 1175 (2002) ("The law is well established that a state prisoner seeking to raise claims in a federal petition for habeas corpus ordinarily must first present those claims to the state court and must exhaust state remedies"). To exhaust his state remedies, a habeas petitioner must "fairly present[]" the "substance" of his claim to the state courts. *Picard v. Connor*, 404 U.S. 270, 275-76 (1971); *Finley v. Johnson*, 243 F.3d 215, 219 (5th Cir. 2001). The exhaustion requirement is not met if the petitioner presents new legal theories or factual claims in his federal habeas petition. *Anderson v. Harless*, 459 U.S. 4, 6-7 (1982); *Finley*, 243 F.3d at 219. King's allegations of federal constitutional error plainly advance new legal theories that have not been presented to the state courts. Thus, by attempting to raise these additional allegations for the first time in his federal habeas petition, King has clearly failed to exhaust state court remedies as required by section 2254(b). *See Finley*, 243 F.3d at 219; *Jones v. Johnson*, 171 F.3d 270, 276-77 (5th Cir. 1999); *Nobles v. Johnson*, 127 F.3d 409, 419-22 (5th Cir. 1997).

Moreover, King is precluded from returning to the Texas courts by article 11.071, section 5, of the Texas Code of Criminal Procedure, which generally prohibits a successive state habeas application if the applicant urges grounds that could have been raised in the first habeas application. *Finley*, 243 F.3d at 219; *Beazley v. Johnson*, 242 F.3d 248, 264 (5th Cir.), *cert. denied*, 122 S. Ct. 329 (2001); *Jones*, 171 F.3d 277. It is well established that if

-15-

a petitioner fails to exhaust state remedies and the court to which he would be required to return to meet the exhaustion requirement would now find the claim procedurally barred, then the claim is considered defaulted for the purposes of federal habeas corpus review. *Gray v. Netherland*, 518 U.S. 152, 161 (1996); *Coleman v. Thompson*, 501 U.S. 722, 735 n.1 (1991); *Finley*, 243 F.3d at 220.  Likewise, the Fifth Circuit has concluded that Texas' statutory bar on successive state habeas applications constitutes an adequate and independent state procedural ground to bar federal review of a claim. *Beazley*, 242 F.3d at 264; *Jones*, 171 F.3d at 276-77; *Nobles*, 127 F.3d at 422-23; *Emery v. Johnson*, 139 F.3d 191, 194-96 (5th Cir. 1997); *Fearance v. Scott*, 56 F.3d 633, 642 (5th Cir. 1995).  Consequently, the state procedural bar proscribes substantive consideration of King's new claims in federal court. *Finley*, 243 F.3d at 220; *Beazley*, 242 F.3d at 264; *Jones*, 171 F.3d at 276-77; *Nobles*, 127 F.3d at 422-23.

Furthermore, King fails to demonstrate either cause or prejudice for his default.  To the extent that he relies upon the alleged ineffectiveness of direct appeal counsel to constitute cause for his default (which as he concedes would only apply to record-based claims), he has failed to show that he was deprived of the constitutionally effective assistance of counsel on appeal necessary to support a showing of cause. *See* Subsection III.L.2, *infra*.  To the extent that he relies upon the alleged ineffectiveness of state habeas counsel to constitute cause for the default, Fifth Circuit precedent disallows such reliance based on the well-established precept that there is no federal constitutional right to counsel on collateral review. *See Ogan v. Cockrell*, 297 F.3d 349, 356-57 (5th Cir.), *cert. denied*, 123 S. Ct. 582 (2002); *Martinez*

-16-

*v. Johnson*, 255 F.3d 229, 237-41 (5th Cir. 2001), *cert. denied sub nom. Martinez v. Cockrell*, 534 U.S. 1163 (2002); *In re Goff*, 250 F.3d 273, 275-76 (5th Cir. 2001) (per curiam); *Beazley*, 242 F.3d at 271; *Fairman v. Anderson*, 188 F.3d 635, 643 (5th Cir. 1999); *Callins v. Collins*, 89 F.3d 210, 212-13 (5th Cir. 1996). King's claims must therefore be denied.

**III.    King's Claims of Constitutional Error are Meritless.**

    **A.    King received the effective assistance of counsel at trial. (King's Claims I, II and XII)**

In his first ground for federal habeas relief, King complains that his trial attorneys rendered ineffective assistance of counsel at trial.  Again, almost all of King's claims of attorney error are unexhausted and therefore procedurally barred. *See* Section II, *supra*. Furthermore, with regard to the claims of attorney error that King did raise in state court, plenary review of those claims in this Court is foreclosed by the objectively reasonable adjudication of those claims in state court. *See* 28 U.S.C. § 2254(d).  But, in any event, the claims are meritless.

To prevail on a claim of ineffectiveness of counsel, King bears the burden of satisfying the stringent two-part test set out in *Strickland v. Washington* by showing both (1) deficient performance by counsel and (2) resulting actual prejudice.  466 U.S. 668, 687 (1984). *Accord, Williams v. Taylor*, 529 U.S. 362, 390 (2000). *See also Rector v. Johnson*, 120 F.3d 551, 563 (5th Cir. 1997).  An ineffective assistance claim may be rejected for want of either deficient performance or actual prejudice.  Therefore, the absence of either element

-17-

of the claim is dispositive, and a reviewing court is not required to inquire into an element of the claim if the defendant has failed to carry his burden on the other element. *Id.* at 697; *Rector*, 120 F.3d at 563.

To establish deficient performance under *Strickland*, King must show that in light of all the circumstances as they appeared at the time of the conduct, counsel's performance fell below an objective standard of reasonableness. *Williams v. Taylor*, 529 U.S. at 390-91 (citing *Strickland*, 466 U.S. at 688, 694). The Supreme Court has admonished that judicial scrutiny of counsel's performance "must be highly deferential," with every effort made to avoid "the distorting effects of hindsight." *Id.* at 689-90. *See also Rector v. Johnson*, 120 F.3d at 563; *Belyeu v. Scott*, 67 F.3d 535, 538, 540 (5th Cir. 1995). Further, reviewing courts are to "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689; *Rector*, 120 F.3d at 563. Indeed, "[a] conscious and informed decision on trial tactics and strategy cannot be the basis for constitutionally ineffective assistance of counsel unless it is so ill chosen that it permeates the entire trial with obvious unfairness." *Crane v. Johnson*, 178 F.3d 309, 314 (5th Cir. 1999) (quoting *Garland v. Maggio*, 717 F.2d 199, 206 (5th Cir. 1983)); *see also Lamb v. Johnson*, 179 F.3d 352, 358 (5th Cir. 1999). Even if counsel's representation were deficient, King must also affirmatively prove prejudice by demonstrating that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. King cannot meet this standard with

-18-

regard to any of his allegations of ineffective assistance.

**1.     Counsel presented a sound and viable case regarding the future dangerousness special issue. (King's Claim I(a))**

King first complains that trial counsel "presented and allowed the state to present a false, misleading and incoherent framework for the first special issue of 'future dangerousness.'" Petition at 121.

**a.     This claim is unexhausted and procedurally barred.**

King failed to raise this claim either on direct appeal or in state habeas corpus review. Therefore, the claim is unexhausted and procedurally barred as set forth in Section II, *supra*.

**b.     This claim is unsupported by the record.**

Alternatively, the claim is meritless.  In support of this claim, King essentially relies on his current expert, clinical psychologist Mark Cunningham, to second-guess the methodologies of State's expert Dr. Edward Gripon and defense expert Dr. Walter Quijano. *See* Petition at 122-125; King's Exhibit 13 (Cunningham affidavit, dated August 2, 2002). Then he faults trial counsel for failing to rebut Dr. Gripon's testimony and, presumably, for failing to replace Dr. Quijano's allegedly flawed analysis with  the "approach" set forth in Dr. Cunningham's affidavit.[10]

King contends that trial counsel failed to put the future dangerousness into the appropriate context, failed to sufficiently discuss the affects of aging, and failed to inform

---

[10]     Glaringly absent from King's argument, however, is any allegation that Dr. Cunningham was available to testify on these issues at King's trial.

the jury of measures within the prison system intended to prevent violent conduct. Contrary to King's assertions, however, trial counsel presented a sound and viable case regarding the future dangerousness special issue. Trial counsel cross-examined Dr. Gripon effectively based on his failure to examine King face-to-face, his inability to predict future violence with 100 percent certainty, and the fact that he, as a psychiatrist, is no better suited than anyone else to predict future violent behavior.[11] 24 RR 54-56. Furthermore, trial counsel effectively rebutted Dr. Gripon's testimony with Dr. Quijano, who testified for the defense that King's potential for future violence must be assessed in the appropriate context, that is, prison. 24 RR 82, 92. Dr. Quijano, himself the former chief psychologist for TDCJ-ID, testified extensively about the measures at TDCJ-ID's disposal for insuring that inmates – even those who would pose a threat in free society – do not pose a threat in prison. *Id.* at 92-107. He also testified that, given King's prison history, his tattoos and the facts of the instant offense, he would likely be assigned to administrative segregation for the duration of his imprisonment. *Id.* at 94-95. Finally, Dr. Quijano testified specifically about the effects of aging on an individual's likelihood of future dangerousness, and the fact that if sentenced to life, King would not be eligible for parole until the age of 64 when the probability of future dangerousness would be very low. *Id.* at 83. Therefore, trial counsel did not "avoid the issue [of future dangerousness] altogether," as King suggests. *See* Petition at 132. Counsel's handling of the future dangerousness special issue certainly fell within the reasonable bounds

---

[11]     As set forth in subsections III.A.12 and III.D., *infra*, there was no viable basis for counsel to object to the admissibility of Dr. Gripon's testimony.

of acceptable performance.   Furthermore, given that King has failed to identify any information that trial counsel failed to present to the jury, King cannot demonstrate prejudice.   Given the horrific nature of Mr. Byrd's murder, King cannot demonstrate a reasonable probability that, had counsel proceeded as King now suggests, he would not have been sentenced to death.

### 2.   Counsel effectively argued the motion for change of venue. (King's Claim I(b))

King next claims that trial counsel failed to effectively urge their motion for change of venue.  This claim is procedurally barred and meritless.

### a.   This claim is unexhausted and procedurally barred.

King failed to raise this claim either on direct appeal or in state habeas corpus review. Therefore, the claim is unexhausted and procedurally barred as set forth in Section II, *supra*.

### b.   This claim is unsupported by the record.

Alternatively, the claim is without merit.  The record shows that King's trial attorneys filed a motion for change of venue with accompanying affidavits of two individuals stating that the defendant could not obtain a fair and impartial trial in Jasper County due to "widespread, inflammatory and prejudicial publicity." CR 92-98.  At a subsequent hearing on the motion held December 14, 1998, trial counsel presented two witnesses who testified they believed the defendant could not obtain a fair trial in Jasper County due to the current attitude in the community about the case, 3 RR 9-2, as well as a joint exhibit containing all local and statewide newspaper accounts of the case up to the time of the hearing. 3 RR 7-8.

Furthermore, the record indicates that trial counsel had a difficult time locating witnesses willing to testify favorably for the defense at the venue issue, 3 RR 28, and some of the witnesses trial counsel had lined up to testify were unable to testify or did not show up to testify. 3 RR 17, 29.

King has failed to identify any additional witness or piece of evidence (available at the time of the hearing on motion to change venue) that trial counsel was remiss for not presenting. Thus, King has failed to demonstrate either deficient performance or prejudice resulting from counsel's handling of the venue issue. Relief should be denied on this claim.

### 3. Counsel's decision not to make an opening statement was neither unreasonable nor prejudicial. (King's Claim I(c))

King claims that counsel's failure to make an opening statement deprived him of effective assistance of counsel.

#### a. This claim is unexhausted and procedurally barred.

King failed to raise this claim either on direct appeal or in state habeas corpus review. Therefore, the claim is unexhausted and procedurally barred as set forth in Section II, *supra*.

#### b. This claim is unsupported by the record.

Alternatively, the claim is without merit. King fails to acknowledge that the decision of whether to present an opening statement falls with the zone of trial strategy. *Murray v. Maggio*, 736 F.2d 279, 283 (5th Cir. 1984). King has failed to show that trial counsel's decision not to present an opening statement constituted objectively unreasonable performance on counsel's part or that such decision prejudiced King. Therefore, he is not

entitled to relief based on this claim.

### 4. Counsel presented an effective closing argument. (King's Claim I(d))

King next asserts that counsel failed to present an effective closing argument.

#### a. This claim is unexhausted and procedurally barred.

King failed to raise this claim either on direct appeal or in state habeas corpus review.

Therefore, the claim is unexhausted and procedurally barred as set forth in Section II, *supra.*

#### b. This claim is unsupported by the record.

Alternatively, the claim is meritless. A petitioner "cannot manufacture deficient performance by selectively extracting phrases from trial counsel's closing argument and mischaracterizing them." *Dowthitt v. Johnson*, 230 F.3d 733, 750 (5th Cir. 2000) (holding that habeas petitioner had failed to show trial counsel was deficient in presentation of closing argument). Yet this is precisely what King has attempted to do. When examined in context, however, trial counsel's closing arguments at both the guilt-innocence and punishment phases of trial were effective.

At guilt-innocence, trial counsel drove home the points that there was absolutely no evidence of restraint necessary for a finding of kidnaping. 22 RR 26-32. Counsel also highlighted the dearth of evidence that King had actually followed through with any plans to start a free-world racist gang in Jasper. *Id.* at 36. Most significantly, counsel highlighted weaknesses in the State's circumstantial evidence case, including the fact that the cigarette butt found at the scene with King's DNA on it could have come from the ashtray in Shawn

Berry's truck, and the fact that the sandals with the victim's DNA on them were never conclusively shown to be King's, and in fact were consistent with Lewis Berry's shoe size. *Id.* at 38-40. Counsel stressed that the testimony concerning King's tattoos was largely a matter of interpretation, but that, in any event, it had nothing to do with whether King was guilty of capital murder. *Id.* at 42-46, 30.

At punishment, counsel recounted trial testimony that King had not been a racist when he went to prison, but that he was merely a product of prison society. 25 RR 21, 24. Counsel stressed King's lack of violent criminal behavior apart from the instant offense. *Id.* at 19. Importantly, counsel reiterated Dr. Quijano's testimony that King would most likely spend his sentence in administrative segregation and pointed to the measures in place within the prison system to prevent inmate violence; counsel also stressed the fact that, even if sentenced to life imprisonment, King would not even be eligible for parole for forty years. *Id.* at 20. Counsel also noted the pain experienced by King's father, whose emotional, heart-wrenching testimony (24 RR 125-133) was perhaps the most compelling portion of the punishment phase of this trial. 25 RR 21-24.

While this is perhaps not how King, or habeas counsel, or even this Court would have argued this case to the jury, it simply cannot be said that the arguments were constitutionally deficient. Likewise, it cannot be said that, had counsel argued differently, King would not have been found guilty of capital murder or would not have been sentenced to death. King is not entitled to relief based on this claim.

### 5. Counsel presented a viable case at punishment. (King's Claim I(e))

King next complains that counsel failed "to present an viable case at the punishment

phase of trial." Petition at 138. King raised this claim in state habeas corpus review,[12] and

the state courts rejected the claim on the merits. *See* SHCR at 187-191, ¶¶ 49-71. King has

failed to show that the Texas courts' rejection of the claim was objectively unreasonable.

Therefore, King may not obtain relief on this claim. 28 U.S.C. § 2254(d).

This claim appears to be little more than a rehashing of King's Claim I(a), addressed

by the Director in subsection III.A.1., *supra*. Respondent adopts in response to this claim,

without restatement, the response set out in subsection III.A.1., *supra*. In addition, trial

counsel Cribbs, as explained in his affidavit submitted during state habeas corpus

proceedings, SHCR at 140-145, made extensive investigation into King's childhood and

background and obtained numerous mental health opinions in an unsuccessful attempt to find

any evidence he could use to mitigate King's blame for this offense. Significantly, this case

presented defense counsel with a challenge like no other: What could possibly mitigate this

crime? Trial counsel managed to present a viable punishment case through the testimony of

Dr. Quijano. *See* subsection III.A.1., *supra*. Additionally, counsel presented the testimony

of King's father, which even on a cold record is compelling. *See* 24 RR 125-133. King cites

to no authority which would find this diligent effort to be inadequate, and he points to no

---

[12]     The affidavit of Mark Cunningham was not presented to the state courts in support
of this claim. Thus, to the extent that King relies upon the affidavit of Mark Cunningham to support
this claim, it is unexhausted and procedurally defaulted.

evidence which counsel might have found with additional investigation. And given the horrendous facts of this case, King simply cannot show that, had counsel presented any additional evidence in mitigation, he would not have been sentenced to death. This claim should also be denied.

> **6. King has failed to demonstrate that testimony of a police officer concerning King's tattoos was objectionable, thus counsel's decision not to object to that testimony was neither unreasonable nor prejudicial. (King's Claim I(f))**

King contends that trial counsel rendered constitutionally ineffective assistance by failing to object to the testimony of Jasper County police officer Rich Ford concerning King's tattoos. Petition at 139.

> **a. This claim is unexhausted and procedurally barred.**

King failed to raise this claim either on direct appeal or in state habeas corpus review. Therefore, the claim is unexhausted and procedurally barred as set forth in Section II, *supra*.

> **b. This claim is unsupported by the record.**

Alternatively, the claim is without merit. Rich Ford testified at the guilt-innocence phase of trial concerning King's tattoos. He described the various tattoos and testified regarding his interpretation of the meaning of various tattoos based on his training and research. 18 SR 205. Defense counsel did not object to Ford's testimony, and, in fact, most of Ford's observations could have been made by anyone viewing King's tattoos. *See* SX 107, 108, 109. However, when Ford was asked by the prosecution to go a step further and render an opinion about the existence of a connection between satanic cults and racist

-26-

groups, defense counsel objected.  19 RR 21.  The trial court overruled the objection and allowed Ford to testify as to his opinion on the matter.  *Id.*  It stands to reason that if counsel's objection to this testimony was overruled, an objection to the less controversial testimony essentially describing the tattoos would have been overruled as well.  Because it would have been futile for counsel to object to the testimony, counsel were not ineffective for failing to do so.  *Clark v. Collins*, 19 F.3d 959, 966 (5th Cir. 1994) ("Failure to raise meritless objections is not ineffective lawyering; it is the very opposite."); *Koch v. Puckett*, 907 F.2d 524, 526 (5th Cir. 1990) ("This Court has made clear that counsel is not required to make futile motions or objections.").

Furthermore, contrary to King's assertions, *see* Petition at 140, trial counsel did rebut Ford's testimony regarding the meaning of King's tattoos through both cross-examination and the presentation (and cross-examination) of other witnesses.  Ford conceded on cross-examination by defense counsel that tattoos were "subject to interpretation."  19 RR 5.  He further allowed that in a prison environment, tattoos are often a means of survival and protection.  *Id.* at 8-10.  He admitted that one of King's tattoos – which Ford had identified as a likeness Anton LaVey, the founder of the Church of Satan – also resembled a character portrayed in one of the comic books found in King's belongings.  *Id.* at 10-11.  Finally, Ford conceded that the shape of one of King's tattoos – which he had identified as a "baphomet," a satanic symbol – could also be found in a Congressional Medal of Honor.  *Id.* at 13-14.

Additionally, on cross-examination of State's witness Matthew Hoover, defense counsel elicited testimony that "SS" tattoos – which Rich Ford had identified as indicative

of white supremacist beliefs – did not derive a racist meaning within the prison society.  19 RR 84.  Hoover also testified on cross-examination that the Aryan Brotherhood, another white gang in TDCJ-ID, did not hold any satanic beliefs, and that pentagram tattoos were common in prison.  *Id.* at 85.  John Grady Mosley testified for the defense that he had drawn some of King's tattoos, and that several of the tattoos that Rich Ford had identified as indicative of white supremacist beliefs had no particular significance in prison society.  21 RR 74-76.  Mosley also testified that in prison, inmates get tattoos to intimidate other inmates to reduce the likelihood that they will be victims of assault.  *Id.* at 77-78.

But in any event, the tattoo evidence itself was properly before the jury and essentially speaks for itself.  *See* SX 107, 108, 109.  Moreover, given the wealth of evidence, most significantly from King's own personal writings, demonstrating King's violent racial hatred, Rich Ford's testimony concerning King's tattoos is largely inconsequential.  Therefore, even assuming counsel was deficient in failing to object to or rebut the testimony, and assuming further that the trial court would have sustained an objection to the testimony, King cannot demonstrate prejudice arising from such failure.  This claim should be denied.

> **7.    King has failed to demonstrate that testimony from the State's "gang expert" was objectionable, thus counsel's decision not to object to that testimony was neither unreasonable nor prejudicial. (King's Claim I(g))**

King next complains that trial counsel rendered constitutionally ineffective assistance by failing to object to the testimony of gang expert William Knox.

**a.**     **This claim is unexhausted and procedurally barred.**

King failed to raise this claim either on direct appeal or in state habeas corpus review.

Therefore, the claim is unexhausted and procedurally barred as set forth in Section II, *supra*.

**b.**     **This claim is unsupported by the record.**

Alternatively, the claim is meritless.  King argues essentially that Knox was not

qualified to testify as an expert on gangs and gang behavior.  *See* Petition at 144-145.

However, the record shows that Knox, a consultant for law enforcement and former Houston

police officer of fifteen years, had studied gangs since the mid-1980s. 20 RR 90-91.  He had

participated in numerous seminars, both as a student and as an instructor, on the subject of

gangs, and had written a book on the subject in 1995.  *Id.* at 91-92.  Finally, he had testified

many times in various courts as an expert on gangs.  *Id.* at 92.  In light of Knox's

qualifications, it would have been futile for counsel to object to his testimony, and counsel

were not ineffective for failing to do so.  *Clark*, 19 F.3d at 966 ("Failure to raise meritless

objections is not ineffective lawyering; it is the very opposite."); *Koch v. Puckett*, 907 F.2d

at 526 ("This Court has made clear that counsel is not required to make futile motions or

objections.").  Moreover, given the wealth of other evidence, most significantly from King's

own personal writings, demonstrating King's violent racial hatred and his intention of

starting a free-world chapter of the Confederate Knights of America, Knox's testimony

concerning gangs is largely inconsequential.  Thus, even assuming counsel was deficient in

failing to object to the testimony, and assuming further that the trial court would have

sustained such an objection, King cannot demonstrate prejudice arising from such failure.

This claim should be denied.

> **8.      King has failed to allege any objectionable error at trial, thus counsel's failure to object in the identified instances was neither unreasonable nor prejudicial. (King's Claim I(h))**

Next, King enumerates some instances of alleged trial error (mistakenly characterized by King as "prosecutorial misconduct") which he claims trial counsel were ineffective for not objecting to. *See* Petition at 145-147.

> **a.      This claim is unexhausted and procedurally barred.**

King failed to raise this claim either on direct appeal or in state habeas corpus review. Therefore, the claim is unexhausted and procedurally barred as set forth in Section II, *supra*.

> **b.      This claim is unsupported by the record.**

Alternatively, this claim is meritless. None the six alleged trial errors identified by King were in fact objectionable. Thus, it would have been futile for counsel to object to the testimony, and counsel were not ineffective for failing to do so. *Clark*, 19 F.3d at 966 ("Failure to raise meritless objections is not ineffective lawyering; it is the very opposite."); *Koch v. Puckett*, 907 F.2d at 526 ("This Court has made clear that counsel is not required to make futile motions or objections.").

> **i.      Brewer's tattoos**

Even assuming evidence concerning Brewer's tattoos was objectionable, counsel may have had valid strategic reasons for not objecting to the evidence. It certainly gave the jury the opportunity to view someone else, other than King, as the instigator of what the jury

could view as a racially-motivated murder.

### ii.    Hearsay

Here, King identifies two fleeting instances in which Rich Ford apparently relies upon what others have told him about particular tattoos to interpret the meaning of King's tattoos. *See* 18 RR 220, 221. Even assuming these instances were objectionable on hearsay grounds, King can prove neither deficient performance nor prejudice resulting from counsel's failure to object on this basis given the relative insignificance of the affected testimony.

### iii.    Instruction regarding good conduct time

King contends that counsel were ineffective for failing to object to an instruction in the punishment charge, that if sentenced to life imprisonment, King "may earn time off the period of incarceration imposed through the award of good conduct time." CR 286. However, even assuming such an instruction was erroneous, because King's jury was specifically instructed that he would not be parole-eligible for forty years "*without consideration of good conduct time,*" there is no possibility that it was misled by the erroneous general instruction that was given. *See Galvan v. Cockrell,* 293 F.3d 760, 765 (5th Cir. 2002) (holding that identical instruction in non-capital case, though error under state law, was harmless under *Brecht v. Abrahamson,* 507 U.S. at 623-24, in light of subsequent instruction to disregard the manner in which good conduct time would be applied to defendant). Thus, even if counsel were deficient for not objecting to the instruction, King cannot demonstrate prejudice.

### iv.   Definition of "reasonable doubt"

King claims that the trial court's definition of reasonable doubt as "proof of such a convincing character that you would be willing to rely and act on it without hesitation in the most important of your own affairs" was objectionable. However, his sole citation supporting this claim is *Sullivan v. Louisiana*, 508 U.S. 275 (1993), in which the Court *declined* to find constitutional error in the definitions at issue there (none of which involved the precise language used in King's charge). He provides no other basis for objecting to the definition under either state or federal law. This claim is frivolous.

### v.   Reference to "fight scene"

King complains that trial counsel should have objected to reference by State's witnesses to the cleared space at the crime scene as the "fight scene." King offers no legal support for this claim. Even assuming some basis existed for objecting to the use of the phrase "fight scene," counsel's failure to do so does not constitute deficient performance, and King certainly cannot demonstrate that, had it not been for use of the phrase "fight scene," he would not have been found guilty of capital murder or sentenced to death.

### vi.   Prosecutorial argument

Finally, King faults trial counsel for failing to object to prosecutorial argument which he asserts "improperly injected religion into the trial." Petition at 147. However, the arguments, while colorful, merely invoke reasonable inferences from and summations of evidence presented at trial and were therefore not objectionable.

**9.    Counsel investigated King's mental health and made an informed, strategic decision that such information provided no viable defense; in any event, omission at trial of the evidence identified by habeas counsel did not prejudice King's defense. (King's Claim I(i))**

King next complains that counsel failed to investigate and present available evidence regarding King's mental health. Petition at 148.   King raised essentially the same claim in state habeas corpus review, and the state courts rejected the claim on the merits.   *See* SHCR at 187-191, ¶¶ 49-71. King has failed to show that the Texas courts' rejection of the claim was objectively unreasonable.   Therefore, King may not obtain relief on this claim.   28 U.S.C. § 2254(d).   As set forth in subsection III.A.5., *supra*, counsel acted diligently in investigating King's background.   *See also* SHCR 140-145 (affidavit of attorney Cribbs detailing efforts expended investigating King's background).

The psychological evaluation of Dr. Richard Peck and records from King's prior incarcerations in Jefferson County Residential Services and TDCJ-ID were not presented to the state courts in support of this claim.   Thus, to the extent that King relies on these documents to support this claim, it is unexhausted and procedurally defaulted.   Furthermore, even if this evidence is taken into account, and even if it is assumed that trial counsel were deficient in failing to discover and present it, King cannot demonstrate a reasonable probability that, had his jury heard evidence that he suffered bipolar disorder and had claimed to have attempted suicide on more than one occasion, he would have been sentenced to life rather than death for the brutal killing of Mr. Byrd.

-33-

**10.   Counsel's handling of the coroner's testimony was neither unreasonable nor prejudicial. (King's Claim I(j))**

King faults trial counsel for allowing to go unchallenged the coroner's testimony that Mr. Byrd was alive and conscious until he hit the culvert and was decapitated.

**a.   This claim is unexhausted and procedurally barred.**

King failed to raise this claim either on direct appeal or in state habeas corpus review. Therefore, the claim is unexhausted and procedurally barred as set forth in Section II, *supra*.

**b.   This claim is unsupported by the record.**

Alternatively, the claim is without merit.  King claims that the coroner's testimony "was very critical testimony, both as to the nature of the wounds, and the nature of the crime as a kidnaping" which elevated the crime to capital murder.  Petition at 150.  However, there are two fatal flaws in this argument.  First, the evidence on which he relies to dispute these findings – the findings of another pathologist, Dr. Lloyd Smith, who testified for the defense at Shawn Berry's trial – does not support his theory: While Dr. Smith testified at Berry's trial that he could not determine, as Dr. Brown had, whether the victim was *conscious* when he was dragged behind Shawn Berry's truck, he *agreed* with Dr. Brown that the victim was *alive* until he hit the culvert and was decapitated.  *See* King's Exhibit 22 at 254-262.  Second, even if King could somehow prove that Mr. Byrd was already dead when he was chained to the pickup – even though *all* expert testimony is to the contrary – the requisite kidnaping was accomplished before this, when King and his co-defendants restrained Mr. Byrd, first through deception and then through force, with the requisite intent to hold him in a place

where he was not likely to be found – the logging road – for the purpose of causing him bodily injury, and that in restraining him they also intended to prevent his liberation by using deadly force.  In any event, it certainly would have been a reasonable trial strategy for trial counsel to avoid presenting a defense expert *who agreed with the State's expert* that the victim was alive when he was dragged behind the pickup.  This claim is meritless.

> **11.   Counsel adequately presented their motion to withdraw. (King's Claim I(k))**

Next, King claims that trial counsel was ineffective in urging their pretrial motion to withdraw as counsel.[13]  This claim was adjudicated on the merits in the Texas Court of Criminal Appeals on direct appeal, *see King v. State*, 29 S.W.3d at 565-566, and King has failed to show that the Texas court's rejection of the claim was objectively unreasonable.  Therefore, King may not obtain relief on this claim.  28 U.S.C. § 2254(d).

Although counsel filed and urged a motion to withdraw, that motion is premised upon King's own refusal to cooperate in his defense.  There is nothing in this record to indicate that King had discussed with counsel the concerns regarding the conduct of his case that he raised in his letters to the court.  From the record before this Court, it appears that counsel felt obligated to file the motion by King's refusal to cooperate or participate in his defense. Moreover, after the trial court questioned King regarding the motion and declined to replace appointed counsel, King agreed on the record that he would meet with defense counsel and discuss the case.  The trial court therefore apparently had no further notice that King was

---

[13]       For a summary of the record facts relevant to this claim, *see* subsection III.B., *infra*.

even dissatisfied with counsel's performance.  Although King now complains of defense counsel's lack of enthusiasm in presenting the motion, counsel was presumably aware of the state case law relating to motions to withdraw and was aware that poor interpersonal relations are no basis for removal of counsel.  *Solis v. State,* 792 S.W.2d 95, 100 (Tex. Crim. App. 1990) (Conflicts of personality and disagreements between counsel and client are not automatic grounds for withdrawal.  The trial court is under no duty to search for a counsel until an attorney is found who is agreeable to the accused.).  Counsel presumably recognized his duty to continue to represent King and sought to avoid antagonizing the trial court by refraining from insisting vigorously upon a motion which the State opposed and which counsel knew the court was not obligated to grant.  King has failed to show how counsel was ineffective in urging the motion to withdraw that was filed.

Finally, King contends that he was prejudiced by counsel's failure to pursue more vigorously the motion to withdraw.  King's argument ignores the fact that nothing in the record shows that counsel was even aware of King's claims that he was "in disagreement" regarding King's innocence and that King was unhappy with his perception that counsel intended to concentrate his efforts on avoiding the death penalty. Moreover, King has failed to even allege, and the record does not reveal, how King was harmed by counsel Haden Cribbs' continued representation, especially in view of the fact that Brack Jones, who also served as defense counsel at trial, was also appointed as counsel at the time of King's complaints and presumably would have been ordered by the court to continue as counsel in light of the absence of any complaint by King regarding his representation.  King has failed

to even allege, much less demonstrate from this record, how the result of his trial would have been different had counsel more vigorously urged the motion to withdraw and had counsel Brack Jones continued to represent him without the aid of co-counsel Cribbs. King has failed to demonstrate ineffective assistance of counsel by a preponderance of the evidence.

> **12.   King has failed to demonstrate that Dr. Gripon's testimony was objectionable, thus counsel's decision not to object to that testimony was neither unreasonable nor prejudicial. (King's Claim I(l))**

King next alleges that his counsel were ineffective for failing to object to Dr. Gripon's testimony regarding the likelihood that he would commit future acts of violence.

> **a.   This claim is unexhausted and procedurally barred.**

King failed to raise this claim either on direct appeal or in state habeas corpus review. Therefore, the claim is unexhausted and procedurally barred as set forth in Section II, *supra*.

> **b.   This claim is unsupported by the record.**

As set forth fully in subsection III.D., *infra*, King has failed to show that Dr. Gripon's testimony was objectionable. Therefore, counsel cannot be deemed deficient for not objecting to it, and King suffered no prejudice as a result of that omission. *Clark*, 19 F.3d at 966 ("Failure to raise meritless objections is not ineffective lawyering; it is the very opposite."); *Koch v. Puckett*, 907 F.2d at 526 ("This Court has made clear that counsel is not required to make futile motions or objections."). In fact, the Fifth Circuit recently rejected a virtually identical claim raised by another Texas capital inmate. *Johnson v. Cockrell*, 306 F.3d 249, 253-255 (5th Cir. 2002). King is not entitled to relief on this claim.

### 13.   Counsel investigated, presented and argued all available, credible evidence of innocence. (King's Claim II)

King contends that trial counsel failed to present a viable defense of actual innocence at trial, and that King was thereby deprived of the constitutionally effective assistance of counsel.

### a.   This claim is unexhausted and procedurally barred.

King failed to raise this claim, as currently formulated,[14] either on direct appeal or in state habeas corpus review.  Therefore, the claim is unexhausted and procedurally barred as set forth in Section II, *supra*.

### b.   This claim is unsupported by the record.

Alternatively, this claim is meritless.  King asserts various facets of the State's case that trial counsel allegedly failed to explain or refute.  However, King has failed to identify any credible information or theory that was not actually presented to the jury.  First, King claims that trial counsel failed to "explain" the presence of a cigarette butt with King's DNA on it at the crime scene.  Petition at 157.  However, trial counsel in fact attempted to explore with several State's witnesses the possibility that the evidence did not necessarily indicate that King was present at the crime scene.  *See* 18 RR 48 (defense counsel cross-examining Keisha Atkins on whether King and others put cigarette butts in ashtray of Shawn Berry's truck); 18 RR 136 (testimony of FBI agent elicited on cross-examination by defense counsel

---

[14]     While King raised a claim on state habeas corpus review that trial counsel were ineffective in "failing to properly investigate and present an alibi defense," SHCR at 21, it bears little resemblance to the claim raised in King's instant federal petition.

that he cannot determine when DNA is deposited on an item); 20 RR 45 (testimony of FBI agent elicited on cross-examination by defense that it cannot be determined from DNA analysis when cigarette was smoked and that DNA could remain on cigarette for long period of time if kept in cool, dry place, such as ashtray of automobile); 20 RR 120 (testimony of Heather Hough elicited on cross-examination by defense that items found at scene, such as King's lighter, could have fallen from truck during struggle with victim); 20 RR 164 (testimony of Lewis Berry on cross-examination by defense that King smoked in Shawn Berry's truck when riding to work, but that he could not recall whether King used ashtray). Defense counsel reiterated this flaw in the State's case during closing argument. 22 RR 38-40. King has pointed to no other source of information or evidence available to counsel at the time of trial to further support this theory.

Second, King asserts that trial counsel failed to present to the jury the possibility that the sandals with the victim's DNA on them were Lewis Berry's, not King's. Petition at 158. This assertion is also refuted by the record. Keisha Atkins testified on cross-examination by defense counsel that she could not testify that a particular pair of sandals identified by the State were, in fact, King's; rather, she could only say they looked like King's sandals. 18 RR 32-33. She also testified that Lewis Berry also lived in King's apartment where the identified sandals were found. *Id.* at 33. Defense counsel also elicited testimony on cross-examination of FBI agents that Lewis Berry's driver's licence was found in King's apartment. *Id.* at 91. The same agent also testified that there was not much of a difference between the size 91/2 sandal and the size 10 sandal. *Id.* at 90. Defense also brought out on

cross-examination of this witness that Lewis Berry wore a size 10 shoe, that King wore a size 9 1/2 shoe, and that Lewis Berry had lived in King's apartment at one time. *Id.* at 126-127, 131-132. Tommy Faulk also testified on cross-examination by defense counsel that Lewis Berry sometimes lived in King's apartment and kept clothes, shoes and other personal items there. 19 RR 254-255. Again, defense counsel revisited this flaw in the State's case during closing argument.[15]  22 RR 40.  King has pointed to no other source of information or evidence available to counsel at the time of trial to further support this theory.

Third, King claims that trial counsel failed to present King's version of events as contained in a self-serving statement he has since authored, apparently in response to a civil wrongful death lawsuit filed by Mr. Byrd's family. *See* King's Exhibit 23. But he fails to identify anything that existed at the time of trial, except for King's statement to the media, which was before the jury. *See* SX 105.

Fourth, King claims that while King's letter to Brewer could be construed as an admission of guilt, it could also be construed as an innocuous comment. In this letter, King wrote,

---

[15]    Counsel argued:

And they found sandals, more than one pair. I know one thing that I remember in this about the sandals was old Lewis said, you know, I wear size 11 and my brother wears a size 9 and a half and those bigger ones were John's. But you know when you look at all those photographs, all these people are about the same. I guarantee you Lewis Berry's footprint is not a size 11 on that print, on that shoe thing that the State took or the FBI took.

22 RR 40.

> As for the clothes they took from the apt. I do know that one pair of shoes they took were Shawn's dress boots with blood on them, as well as pants with blood on them. As far as the clothes I had on, I don't think any blood was on my pants or sweat shirt, but I think my sandals may have had some dark brown substance on the bottom of them.

27 RR, SX 104. It was certainly have been reasonable for trial counsel to conclude that bringing additional attention to this letter by arguing for an alternative interpretation could strain their credibility with the jury beyond its bounds.

Fifth, King argues that trial counsel did not attempt to rebut the State's theory that King's racist beliefs translated into racial violence. Petition at 160. But counsel did argue in rebuttal on this point. 22 RR 36, 43, 46.

King also cites the affidavits of his father, Ronald King, and Claudia Womack that trial counsel were never interested in verifying King's version of events or his alibi. The record belies this assertion. Trial counsel Cribbs, in his affidavit filed during state habeas corpus proceedings, confirms that King never gave him sufficient information to permit him to locate the alleged alibi witness. Mr. Cribbs states:

> Just before trial or at the beginning of trial, Mr. King told us that he remembered seeing a young white person sitting out smoking on or near the steps of the apartment complex when he came back to the apartment with Brewer, Berry, and Mr. Byrd on the night of the offense. We sent two investigators out to the apartment complex in an attempt to locate this unknown person, although Mr. King had no other information about his identity. The investigators searched the entire complex area, checked with every apartment, and found no one who could recall having seen Mr. King return that night nor could possibly identify any young person matching the description given by Mr. King living at or visiting anyone in the apartment complex.

SHCR at 144.[16]   Counsel thus made diligent, albeit unsuccessful, efforts to locate the potential witness, and King has failed to prove that his efforts, gauged within the totality of his representation, were less than adequate to afford applicant reasonably effective assistance of counsel.   Moreover, King has failed to even allege what theoretical prejudice counsel's actions in attempting to locate this witness may have caused him; specifically, King has failed to even allege that the witness was capable of being located, nor has he even guessed what the witness' testimony might have been, nor has he even speculated regarding how that testimony might have been helpful.

Finally, King asserts in support of this claim that co-defendant Lawrence Russell Brewer now claims that King was not involved in Mr. Byrd's murder. *See* Petition at 161 (citing King's Exhibit 26).   Aside from the fact that there is nothing to indicate that Brewer would have been willing to testify to this fact at King's trial, this "admission" on Brewer's part is in direct conflict with his testimony at his own capital murder trial that he, King and Shawn Berry (and no one else) were present when Mr. Byrd was murdered. *See* Director's Attachment A.   Brewer's "recantation" is patently incredible.

King has failed to allege or to prove by a preponderance of the evidence facts which would support this claim of ineffective assistance, and he has failed to allege or prove any prejudice.   Indeed, all of the plausible evidence/innuendo of innocence identified by King in his petition was, in fact, before the jury.   The jury simply chose not to credit it.   This claim should also be denied.

---

[16]   This affidavit was credited in state court findings, *see* SHCR 187, ¶ 52, which are entitled to a presumption of correctness in this Court.   28 U.S.C. § 2254(e)(1).

**14.    Counsel did utilize mental heath experts to examine King and testify at trial. (King's Claim XII)**

King argues also that his trial attorneys rendered constitutionally ineffective assistance by failing to obtain and/or use confidential defense psychiatric experts under *Ake v. Oklahoma*, 470 U.S. 71 (1985), to examine King for purposes of both guilt-innocence and punishment phases of trial. Petition at 315. In state habeas corpus review, King raised the claim with regard to the guilt-innocence phase (but not with regard to the punishment phase) and the state courts rejected the claim on the merits. *See* SHCR at 187-191, ¶¶ 49-71. King has failed to show that the Texas courts' rejection of the claim was objectively unreasonable. Therefore, King may not obtain relief on this claim.  28 U.S.C. § 2254(d).

King is apparently arguing to this Court that counsel was *per se* ineffective for using a psychologist, rather than a psychiatrist, as his mental health expert at trial.  No evidence is before this Court from either the trial of this case or this petition that King has or had any mental disorder which would have even raised the issue of his sanity; in fact, the psychologist who did testify on King's behalf in the punishment phase at trial – Dr. Walter Quijano – testified that King had no mental disorder, which Dr. Quijano explained caused King to pose less of a threat of future danger than would an inmate who had a mental disorder that could cause irrational reactions.[17]  24 RR 88-89.  King has not shown any need

---

[17]    King has made no complaint regarding Dr. Quijano's qualification to testify as an expert in assessing future dangerousness.  In fact, Dr. Quijano was well-qualified to assist defense counsel in this regard, having served as the director of psychiatric services and chief psychologist for the Texas Department of Criminal Justice and having testified in over 90 capital murder cases for both the State and the defense.  24 RR 76-80).

for the additional psychiatric expert assistance that he now claims counsel failed to obtain,

and he has therefore failed to raise any issue before this Court.

In addition, trial counsel Haden Cribbs, in his affidavit submitted during state habeas

corpus proceedings, explains that:

> During my preparation for trial I made diligent attempts to discover and develop any evidence of mental illness, insanity, or mental defects which might have excused Mr. King from criminal responsibility or mitigated punishment. I tried without success to obtain favorable psychiatric evidence. I talked to several personal friends who are psychiatrists or psychologists who did not wish to become involved in this case. I was able to obtain the services of Dr. Curtis Wills, a forensic psychologist with the Wilmington Institute, who has had vast experience in criminal defense and prosecution mental health evaluations, and has testified in both state and federal courts, to interview Mr. King and render an opinion regarding his mental condition. Dr. Wills could only advise me that Mr. King was intelligent, able to converse regarding his circumstances, and showed no evidence of any insanity, mental illness or any mental disability. Mr. King also denied to me that he had any mental disability on which I could base a claim of insanity or mitigation. In preparing for trial we searched for and interviewed Mr. King's natural mother, sisters, natural father, step-sister and [talked] on numerous occasions with his adoptive father, Ronald King, and numerous friends. All but his adoptive father and some friends were essentially hostile to Mr. King; and all but the adoptive sister, his adoptive father and some friends refused to testify and refused to offer any testimony that might be helpful at all to him and none of the people I interviewed gave any indication that Mr. King had any insanity or mental illness. All of the family members I talked to indicated that Mr. King had been pampered and protected as [a] child, that he had not been abused, and that he had been protected from the negative consequences of his actions by his adoptive family. I checked his school records, reviewed available history pertaining to his adoptive parents and natural parents, and talked personally to Texas Department of Criminal Justice employees and fellow inmates who had associated with Mr. King; I did not uncover any evidence in any of these interviews that I believed, in my professional judgment, could be helpful to Mr. King's defense. I eventually obtained the services of Dr. Walter Quijano, a forensic psychologist with significant criminal experience, to testify on Mr. King's behalf. He and two associates did an extensive examination of Mr. King and also found no evidence of insanity, mental illness or mental

disability.  Dr. Quijano testified on Mr. King's behalf on punishment.  After interviewing Dr. Wills, we felt that any evidence from Dr. Wills on punishment would not be helpful at all and he was not used.

SHCR 141-144.  Counsel's affidavit reflects that he was diligent in investigating the feasibility of raising an insanity defense or other mental health defense in the instant case and that he was factually unable to raise such a defense in the absence of any evidence that applicant's mental state was questionable.  This is not a situation where counsel conducted "no investigation of any kind" into competency.  *Cf. Bouchillon v. Collins*, 907 F.2d 589, 596-97 (5th Cir. 1990).  Further, counsel has no duty to "believe that another psychiatrist might reach a different conclusion" where the initial evaluation "was consistent with counsel's own perception and observation of the defendant."  *Clark v. Collins*, 19 F.3d 959, 964 (5th Cir. 1994); *see also Dowthitt v. Johnson*, 230 F.3d 733, 748 (5th Cir. 2000), *cert. denied*, 121 S. Ct. 1250 (2001) (holding that "trial counsel was not deficient by not canvassing the field to find a more favorable defense expert").

Moreover, the record affirmatively reflects that counsel – as a matter of trial strategy – was determined to keep the State and its psychiatric experts from examining King, presumably precisely because King was intelligent, had no mitigating mental or social history that would excuse his behavior, and because – as the record reflects – King is an extreme racist with violent views on race relations.  The record reflects that trial counsel filed at least six motions to obtain as much assistance from the trial court as possible to prohibit the State and its experts from communicating with applicant or examining him regarding sanity or future dangerousness, particularly without counsel present to counsel him and buffer his

contact with the State. CR 64, 69, 74, 76, 78, 99. The trial court eventually granted all of these motions, CR 146, 148, 150, 151, 152, 157, and as a result, the State's expert Dr. Gripon testified at punishment without the benefit of interviewing applicant. 24 RR 44-53). In light of the mental health evaluations obtained by counsel in his preparation for trial, described in counsel's affidavit, seeking to present expert psychiatric testimony would have done nothing to assist King's defense and likely would have harmed it. Strategic decisions of this nature are presumptively reasonable and not deficient within the meaning of *Strickland*. *See Crane v. Johnson*, 178 F.3d 309, 313-315 (5th Cir. 1999) (holding that counsel was not ineffective for deciding against an expert because counsel believed that the State would find out that an expert had been appointed and decide to present damaging evidence of future dangerousness in rebuttal); *Williams v. Collins*, 16 F.3d 626, 634 (5th Cir. 1994) (same). Moreover, the presentation or non-presentation of evidence through experts is purely a matter of trial strategy. *Yohey v. Collins*, 985 F.2d 222, 228 (5th Cir. 1993); *Smith v. Black*, 904 F.2d 950, 979 (5th Cir. 1990).

The psychological evaluation of Dr. Richard Peck and records from King's prior incarcerations in Jefferson County Residential Services and TDCJ-ID were not presented to the state courts in support of this claim. Thus, to the extent that King relies on these documents to support this claim, it is unexhausted and procedurally defaulted. Furthermore, even if this evidence is taken into account, and even if it is assumed that trial counsel were deficient in failing to discover and present it, King cannot demonstrate a reasonable probability that, had his jury heard evidence that he suffered bipolar disorder and had

claimed to have attempted suicide on more than one occasion, he would have been sentenced to life rather than death for the brutal killing of Mr. Byrd.

King has failed to allege or prove by a preponderance of the evidence that his counsel was ineffective in determining not to raise mental health issues in this case. He has further failed to allege or prove by a preponderance of the evidence how he was prejudiced by counsel's unspecified and unproven ineffectiveness. This ground for review is meritless.

> **15.    The cumulative effect of counsel's performance did not deprive King of constitutionally effective assistance at trial. (King's Claim I(m))**

Finally, King asserts that the cumulative effect of counsel's performance rendered his trial unfair. However, this claim is procedurally barred and, in any event, meritless.

### a.    This claim is unexhausted and procedurally barred.

King failed to raise this claim either on direct appeal or in state habeas corpus review. Therefore, the claim is unexhausted and procedurally barred as set forth in Section II, *supra.*

### b.    This claim is unsupported by the record.

Alternatively, the claim fails on the merits. It is true that in assessing *Strickland*'s prejudice prong, a reviewing court considers the totality of the evidence. However, such a cumulative assessment presupposes a finding of deficient performance as to each act or omission cumulated. Because, as set forth in the preceding subsections, King has failed to show that his attorneys performed deficiently as to any alleged act or omission, there is essentially nothing to cumulate. In any event, King is not entitled to relief on any of his individual claims of ineffective assistance of counsel, and he is not entitled to relief on his

claim of cumulative error.

**B.    King's request for new trial counsel and counsel's motion to withdraw were properly denied by the trial court. (King's Claim III)**

In his second ground for relief, King contends that the trial court should have appointed him new counsel when his attorneys presented a motion to withdraw to the trial court on January 11, 1999, two weeks before the special venire panel was called for trial in this case. 6 RR. This claim was adjudicated on the merits in the Texas Court of Criminal Appeals on direct appeal,[18] *see King v. State*, 29 S.W.3d at 565-566, and King has failed to show that the Texas court's rejection of the claim was objectively unreasonable. Therefore, King may not obtain relief on this claim. 28 U.S.C. § 2254(d).

In any event, King's constitutional rights were not violated because he is not entitled to make every decision regarding his defense, his motion and his own statements to the court did not indicate an adequate cause to remove both of his appointed attorneys and provide new counsel, and his own statements and those of his attorney at the conclusion of the motion to withdraw hearing appeared to moot the issue.

Although the first action reflected on the docket in this record is the November 24, 1998, arraignment, CR 2, at that arraignment the parties made clear that the instant cause number represented the second re-indictment in this case and that in fact defense counsel Cribbs and Jones had been appointed on the previous indictments, had filed numerous

---

[18] King raised the claim again on state habeas corpus review. The court denied habeas relief, initially, because state law bars re-litigation of claims previously raised and rejected on direct appeal, *see* SHCR at 182, ¶ 17, and alternatively, on the merits. *See* SHCR at 182-186, ¶¶ 22-43.

motions in the old cause numbers as well as in this case, had already undertaken extensive investigation, and had already conducted considerable discovery with the State. 2 RR 4-7; 10; 12-14. Counsel had already obtained and commenced reviewing 3000 pages of discovery at that point, and the trial court entered initial orders and set the December pre-trial with a plan to complete pre-trial in January. 2 RR 9-10.

Although King contends that he first wrote to the trial court requesting new counsel on November 23, 1998, and the letter reflects that date, there is no evidence in the record when that letter was received by the court. CR 161. That letter and a re-written copy of it are filed in the court record with file marks of January 13, 1999. CR 160-61. King does not otherwise refer to any place in the record that would show when King made either his counsel or the court aware of his request, and the State has found none other than the trial court's remark at the hearing on January 11, 1999, that he has received two identical letters from King at some point before that hearing. 5 RR 5-6. At the January 11, 1999, hearing, in addition to the matters quoted by King in his brief, the trial court asked King to make any statement he wished to on the matter, and the following transpired:

| King: | Your honor, I've already written numerous letters explaining the situation. |
|---|---|
| Court: | I've gotten two of them. Have you written more than two? |
| King: | Yes, sir, I've written one prior to those two up in the Livingston Unit. |
| Court: | I haven't gotten but two. |

King:           They all said the same thing.

Court:          Were they photocopies of each other? The two
                that I have are identical.

King:           Yes, sir, they were all the same letter, mailed at different
                times.

Court:          Anything else? . . . .

Mr. Cribbs:     No, sir. I'd like to ask if when I leave here, we're
                going to go over there and talk to him today.  Do
                you want to talk today: I've got some things I
                need to talk to you bad, if you want to talk to me.
                If you don't, I won't take the time to go over.

King:           Yeah.

Mr. Cribbs:     I'll leave and go over there and talk to him; but I
                have nothing else to say on my motion . . . .

5 RR 5-7.

Although King relies upon the complaint letter he supposedly drafted on November

23, 1998, nothing else in the record suggests that he ever brought his concern to the trial

court or to defense counsel before the January 1999 hearings.  Defense counsel's statement

at the January 11, 1999, hearing that King would not cooperate with the defense team, 5 RR

4-5, is supported by the fact that King refused to come out of his cell to participate in the

January 6, 1999, hearing on his motion to disqualify the trial judge.  4 RR 4-5.  In addition,

there was a lengthy pre-trial hearing on various motions, including change of venue and

various discovery motions, on December 14, 1998, but no counsel issues were mentioned at

that time.  3 RR.  King never mentioned co-counsel Brack Jones in his letter to the court, and

he never mentioned any complaint about Jones during the January 11, 1999, hearing or any other proceeding before the court. The motion to withdraw sets out as its sole basis that "defendant is uncooperative and on numerous occasions has refused to talk to his counsels. Defendant has refused to aid and/or cooperate with counsels in the defense of this case. . . ." CR 143.

By the time the motion to withdraw was filed on January 6, 1999 (CR 143), defense counsel had already worked on case preparation for several months and had filed at least thirty motions in the most recent re-indictment cause number (CR 11; 14; 16; 19; 21; 24; 27; 30; 33; 36; 40; 43; 46; 50; 61; 64; 66; 69; 71; 74; 76; 78; 81; 85; 89; 92; 99; 101; 114; 132), the vast majority of which had been ruled upon by the court or by agreement before this motion was filed. *See* orders attached to motions in CR and at CR 117-31; 138; 145-59.

The only other matter in the record to which King refers to support these issues is in his motion for new trial, in which King alleges "I told my attorneys that I had an alibi, that I had been dropped off in town and that there was an eyewitness to this, but my attorney failed to investigate this claim and failed to locate the witness." CR 323. Nothing in the record reflects that King ever gave counsel a name or description of this "eyewitness" that would have enabled counsel or defense investigators to search for him/her, nothing delineates what actions trial counsel did or did not take relating to such witness, nothing in the record reflects that King ever made such a concern known to defense counsel or the trial court before or during trial, and nothing in the record indicates how such a witness would have been material given King's own November 12, 1998, statement to Dallas Morning News

-51-

reporter Judith Hancock in which he acknowledged that he spent "a couple of hours drinking beer and riding up and down rural roads adjacent to highway 255 off Highway 63" on the night of the offense, that he was present in the truck when Berry stopped and picked up the victim, and that he was present when Berry moved the victim to the cab of the truck and had King and Brewer ride in the back. 20 RR 120-25; SX 105.

King's claim is based – according to King's trial assertions – upon his disagreement with his counsel about the strategy of his defense and – according to his trial counsel – upon his refusal to confer or cooperate with counsel. In addition to his general Sixth Amendment right to counsel, the Supreme Court has held that the Sixth Amendment confers upon a defendant limited power to direct the course of his defense. *Jones v. Barnes*, 463 U.S. 745, 751 (1983). Matters ultimately controlled by the defendant include the fundamental matters of: whether to plead guilty; whether to waive a jury; whether to testify; and whether to appeal. *Jones*, 463 U.S. at 751. Defendants also have the right to proceed without counsel. *Faretta v. California*, 422 U.S. 806, 814-36 (1975). When a defendant has counsel, however, his counsel can make decisions regarding the defense that contradict the defendant's own wishes. *Nix v. Whiteside*, 475 U.S. 157, 175-76 (1986)(holding that Whiteside's Sixth Amendment rights did not allow him to force his lawyer to present perjured testimony); *Jones*, 463 U.S. at 751-54 (holding that counsel on appeal need not raise non-frivolous issues identified by the defendant).

The Texas Disciplinary Rules of Professional Conduct recognize similar limits on a criminal defendant's control over secondary issues in a criminal case. The applicable

Disciplinary Rule provides that a lawyer must abide by a defendant's choices as to the plea to be entered, waiving a jury, and testifying. TEX. DISCIPLINARY R. PROF. CONDUCT 1.02(a)(3)(1989), *reprinted in* TEX. GOV'T CODE ANN., tit. 2, subtit. G app. A (Vernon 1998). The comment to this rule explains that, while the defendant is responsible for determining the objectives of the defense, his lawyer "should assume responsibility for the means by which the [defendant's] objectives are best achieved." TEX. DISCIPLINARY R. PROF. CONDUCT 1.02 cmt. 1.

Here, King's rights to due process of law and assistance of counsel were not violated. Criminal defendants represented by counsel do not have a constitutional right to personally determine what defenses are legally viable, which witnesses will support those defenses, or in what order the case will be presented. *See Jones*, 463 U.S. at 751-54. *See also Weisinger v. State,* 775 S.W.2d 424, 427 (Tex. App. – Houston [14 Dist.] 1989, pet. ref'd) (It is the trial counsel's prerogative, as a matter of trial strategy, to decide which witnesses to call and not that of the client.); *cf.* TEX. DISCIPLINARY R. PROF. CONDUCT 1.02(a)(3).

In the instant case King's only complaints to the trial court were that defense counsel would not provide him with information that he wanted and that counsel had told him he planned to concentrate trial strategy on avoiding imposition of the death penalty. CR 160-61. Counsel answered the first complaint at the hearing on January 11, 1999, when he advised the court that King was refusing to communicate with his attorneys and investigators and when King thereafter agreed to talk to counsel. 5 RR 4-7. The statements of counsel and King effectively mooted the motion as far as it concerned King's ability to obtain

-53-

information and communicate with his counsel.

Further, King's disagreement with his counsel regarding the conduct and strategy of trial did not provide any basis for the trial court to be required to remove counsel and appoint new counsel on the eve of trial. The record is silent regarding the context of counsel's discussions with King about the expected course of trial. It is apparent from the text of King's own jail letter to co-defendant Brewer (SX 104) that he was communicating with his attorney before this case was indicted regarding the strength of the physical evidence and progress being made in building the State's case through DNA analysis of the evidence. Counsel presumably talked candidly with King regarding this evidence, his developing evaluation of the case based upon the evidence, and his plans to most effectively represent King in the face of the State's case. Such discussions and decisions are part of effective representation, and the fact that King took offense at counsel's opinions expressed to him in private provides no basis for removing counsel and appointing new counsel who might take a more optimistic view. In this case, the record before the Court demonstrates that counsel had filed numerous motions, obtained extensive discovery to prepare for trial, had filed and urged motions to change venue and recuse the hometown judge in this notorious case, and had otherwise proceeded to diligently represent his client.

As authority for this claim, King cites *Smith v. Lockhart,* 923 F.2d 1314 (8th Cir. 1991), but *Smith* is easily distinguishable from the instant case. In *Smith,* the trial judge appointed the sole local public defender, who was also a municipal judge, to represent Smith. Smith immediately objected, which the trial judge construed as a waiver of counsel, and the

-54-

judge required Smith to proceed *pro se*.  At his pre-trial hearing, Smith advised the court that he did not wish to proceed *pro se* but that he had filed a class-action lawsuit in which his appointed counsel was named as a defendant in his position as municipal judge, and further, that counsel represented him along with a co-defendant in another case pending.  923 F.2d at 1317.  The trial court *refused* to hear any further information about the alleged conflicts, even though trial counsel acknowledged the class-action suit and expressed his own misgivings about an actual conflict of interest.  923 F.2d at 1317-18.  The *Smith* court granted Smith's writ, holding that Smith was not required to show actual prejudice because he was completely denied counsel by being required to proceed *pro se* at a critical stage of proceedings.  923 F.2d at 1321.  The Eighth Circuit Court of Appeals noted its misgivings about the fact that the trial judge was also a defendant in the class-action suit, which the trial judge would have discovered had he not cut Smith off while Smith was trying to explain the conflict.  923 F.2d at 1322 n. 12.

The instant case bears no resemblance to the facts in *Smith*; instead, it is much more akin to *United States v. Hart*, 557 F.2d 162 (8th Cir. 1977), also cited by King in support of his claim.  In *Hart*, the Eighth Circuit Court of Appeals affirmed denial of Hart's application for habeas corpus, holding that there was no showing of either a conflict or ineffective assistance of counsel.  The *Hart* court noted that nothing in the record affirmatively reflected that counsel was ineffective or unprepared, and that the trial court had afforded Hart every opportunity to demonstrate a legal basis for the alleged conflict when the trial court asked Hart to explain the conflict.  557 F.2d at 162-63.  The trial judge told Hart, "I'm listening to

anything you want to add.  You don't have to put it in any legal language, I know you're not a lawyer and all that; you just tell me what the problem is and see if we can't translate it into legal language."   The Eighth Circuit noted that, "We fail to perceive what else the court could have done under the circumstances." 557 F.2d at 163 n. 1.  Like the judge in *Hart*, the trial judge in the instant case asked King for an explanation of his own complaint, but King simply referred the Court to identical letters he had previously sent to the Court.  The Court carefully inquired about whether there might be letters that had not been received but was assured by King that the Court had before it the sum of King's complaint, which did not state a legal basis for conflict of interest and which did not even complain of Mr. Jones' representation.  After hearing out King's complaint, the trial court inquired of the parties whether there was anything further.  Counsel advised that there was not, and King thereafter agreed to meet with defense counsel, thereby disposing of any alleged breakdown in communications.

King cites *Hudson v. Rushen*, 686 F.2d 826 (9th Cir. 1982), as support for a standard of inquiry in cases of claimed defendant-counsel conflicts.  In *Hudson*, the Ninth Circuit Court of Appeals reversed a federal district court recommendation that habeas relief be granted, finding that the state trial court's inquiry was proper.  The *Hudson* court cited three factors to be considered in determining propriety of a trial court's denial of a defendant's motion to substitute counsel: (1) the timeliness of the motion; (2) the adequacy of the trial court inquiry; and (3) the nature and degree of the conflict asserted and whether it would prevent a defendant from receiving an adequate defense. 686 F.2d at 827-29.  The court held

that an inquiry is sufficient where the trial court convened a hearing on the motion, invited the defendant to state his reasons, listened to the merits of the reasons advanced, and denied the motion on its merits. The *Hudson* court specifically noted that the eventual complete breakdown between Hudson and his attorney was occasioned by Hudson's voluntary departure from the courtroom, and the court refused to attribute blame for Hudson's voluntary act to any failure by the trial court to make inquiry. 686 F.2d at 831.

The trial court in the instant case, like the trial court in *Hudson*, permitted a prompt hearing of King's complaint, invited applicant to state his reasons for dissatisfaction, considered the reasons, and denied the motion after applicant agreed to resume communicating with counsel. There is no showing in this record of any eventual breakdown, no showing that any further request for substitution was made, no showing of any legal conflict of interest, and no showing of any ineffectiveness stemming from King's disagreement with his counsel's trial strategy. King has simply failed to demonstrate any deficiency in the trial court's response to his pre-trial complaints.

Under Texas law, it is generally within the discretion of the trial court to determine whether or not trial counsel should be allowed to withdraw from a case. *Green v. State,* 840 S.W.2d 394, 408 (Tex. Crim. App. 1992), citing *Brewer v. State,* 649 S.W.2d 628, 631 (Tex. Crim. App. 1983). "However, the right to counsel may not be manipulated so as to obstruct the judicial process or interfere with the administration of justice." *Green,* 840 S.W.2d at 408, quoting *Wallace v. State,* 618 S.W.2d 67, 70 (Tex. Crim App. 1981). When a defendant files a motion for replacement of counsel, unless the trial court allows new counsel, it must

compel an accused who will not waive counsel and does not assert his right to self-representation to proceed to trial with the lawyer he has, whether he wants to or not. *Burgess v. State*, 816 S.W.2d 424, 429 (Tex. Crim. App. 1991). King failed to demonstrate any legal reason why the court was required to replace counsel, and the trial court did not abuse its discretion in this case in refusing to remove appointed counsel and replace them with new counsel two weeks before trial after months of preparation. This claim does not entitle King to federal habeas relief.

      **C.**    **Evidence of King's racist beliefs, which was highly relevant to establish motive, was properly admitted at trial. (King's Claim IV)**

King next complains, in his fourth ground for relief, that his First and Fourteenth Amendment rights were violated by the admission at trial (both guilt-innocence and punishment phases) of evidence of his racist beliefs, including tattoos, personal writings and membership in the Confederate Knights of America. *See* Petition at 174 (citing *Dawson v. Delaware*, 503 U.S. 159 (1992)). King is not entitled to relief on this claim, first, because it is procedurally barred, and, second, because it is meritless.

1.     **This claim is unexhausted and procedurally barred.**

King failed to raise this claim either on direct appeal or in state habeas corpus review.

Therefore, the claim is unexhausted and procedurally barred as set forth in Section II, *supra.*

2.     **This claim is foreclosed by circuit and Supreme Court precedent.**

Alternatively, this claim fails on the merits because, unlike *Dawson*, where the

defendant's affiliation was not related to any issue at trial, here, evidence of King's racist

beliefs was inextricably intertwined with the facts and circumstances of his crime and highly

relevant to establishing motive and thus identifying King as a perpetrator of the crime.[19]

Moreover, the evidence was probative of future dangerousness and, thus, wholly permissible

under *Dawson.*

As the Fifth Circuit observed in *Boyle v. Johnson,*

> While there is no "*per se* barrier to the admission of evidence concerning one's
> beliefs and associations at sentencing simply because those beliefs and
> associations are protected by the First Amendment," the government may not
> admit such evidence indiscriminately. *Dawson v. Delaware*, 503 U.S. 159,
> 165 (1992). The Supreme Court has explicitly held that in order for such
> evidence to be admissible, it must be sufficiently related to the issues involved.

93 F.3d 180, 183 (5th Cir. 1996) (parallel citations omitted).

Nonetheless, in *Dawson*, the Supreme Court held that evidence of a criminal

defendant's association with the Aryan Brotherhood, a white racist prison gang, was

irrelevant to any sentencing issue, and thus its admission at the penalty phase violated the

---

[19]     Defense counsel's repeated objections to evidence of this nature were overruled by
the trial court based on its written "Findings Pertaining to Extraneous Transactions." *See* CR 216.

defendant's First and Fourteenth Amendment rights.  But in *Dawson*, both the murder victim and the defendant were white; consequently, the defendant's membership in a white racist organization was not relevant to any possible motive for the murder.  503 U.S. at 166. Furthermore, because the Aryan Brotherhood evidence consisted solely of a stipulation that Dawson belonged to a racist gang, the Aryan Brotherhood, but no evidence that the Aryan Brotherhood advocated violence against any particular group, the evidence "proved nothing more than Dawson's abstract beliefs."  503 U.S. at 165-166.

By contrast, King's racist beliefs were inextricably intertwined with issues relevant to his conviction and ultimate sentencing in this racially-motivated crime.  The evidence was highly probative, and thus admissible, with respect to the issue of King's identity as a perpetrator of the abduction/murder and to show that he was not merely a casual bystander, unaware of what was going on, but that he was at the very least a party to the capital murder. The introduction of this evidence during the guilt-innocence phase of trial did not violate principles of *Dawson* because it was clearly relevant.

The instant case is more analogous to *Boyle v. Johnson*, in which the Fifth Circuit held that evidence of a capital defendant's sexual habits and drawings was relevant to establish motive for the sexual assault and kidnaping for which he stood accused.  93 F.3d at 185 n.9.  Just as in *Boyle*, King's personal writings were used to demonstrate his violent racial hatred and, thus, a potential motive for this seemingly senseless murder.  Therefore, because this evidence was clearly relevant to issues at trial, its admission did not violate the First and Fourteenth Amendments.  *See also O'Neal v. Delo*, 44 F.3d 655, 661 (8th Cir.

1995) (holding that evidence of white defendant's membership in Aryan Brotherhood was probative with respect to motive in murder of black man and, thus, its admission was not violative of *Dawson*); *Miller-El v. Johnson*, 261 F.3d 445, 455 (5th Cir. 2001) (holding that evidence of defendant's association with Moorish Science Temple was "inextricably intertwined" with conviction and sentence and  relevant to issue of identity, thus its admission did not violate *Dawson*).

Further references to King's racist beliefs made at the punishment hearing merely underscored the facts leading up to the crime.  At the punishment phase, the sentencer is permitted to consider any evidence properly before it in the guilt-innocence phase for purposes of determining punishment.  *See Granviel v. Estelle*, 655 F.2d 673, 675 (5th Cir. 1981) ("[T]he jury in answering the special issues may properly consider all the evidence adduced during both the guilt and punishment phases of the trial.").  Furthermore, evidence of King's racial hatred, particularly the violent views expressed in his own personal writings, was clearly relevant to the future dangerousness special issue.  *Boyle*, 93 F.3d at 185 & n.7 (holding that evidence of capital defendant's violent obsession with sex was relevant to issue of future dangerousness and, thus, not violative of *Dawson*).  Compare the facts in *Dawson*, where no evidence was admitted prior to the punishment hearing regarding the nature of the Aryan Brotherhood affiliation at issue there beyond the general stipulation at the punishment hearing that Dawson was a member of the unpopular prison group, and where no link was established between the gang, or Dawson's group in particular, and violence.  503 U.S. at 165-166.  Admission of evidence of King's violent racial hatred at trial did not infringe upon

-61-

King's First or Fourteenth Amendment rights, and relief should be denied.

> **D.    The admission of expert testimony regarding King's future dangerousness was proper and did not violate King's federal constitutional rights. (King's Claim V)**

King next alleges that the trial court's admission of Dr. Gripon's punishment-phase testimony regarding King's future dangerousness violated his federal constitutional rights. This claim is procedurally barred and foreclosed by Supreme Court precedent; therefore, relief must be denied.

> **1.    This claim is unexhausted and procedurally barred.**

King failed to raise this claim either on direct appeal or in state habeas corpus review. Therefore, the claim is unexhausted and procedurally barred as set forth in Section II, *supra*.

Additionally, King's claim is barred for another independent reason. The record demonstrates that King made no objection at trial to the proffered testimony on the basis presented in his federal habeas petition. Thus, the issue was not preserved for appellate review under the Texas contemporaneous objection rule. *See* TEX. R. APP P. 33.1(a) (requiring that, as a prerequisite for obtaining appellate review, record must show that complaint was made by timely objection stating grounds with "sufficient specificity" to make trial court aware of complaint); *McGinn v. State*, 961 S.W.2d 161, 166 (Tex. Crim. App. 1998) ("It is axiomatic that error is forfeited when the complaint on appeal differs from the complaint at trial"); *Bell v. State*, 938 S.W.2d 35, 54 (Tex. Crim. App. 1996) ("An objection stating one legal basis may not be used to support a different legal theory on appeal") (citation omitted). Consequently, even if this Court were to conclude that the Texas abuse-

of-the-writ rules were inadequate to bar the claim, King's constitutional allegations are defaulted because of his failure to comply with the Texas rules for preserving error. *See Hogue v. Johnson*, 131 F.3d 466, 494-96 (5th Cir. 1997) (concluding that claim was defaulted where state court application of abuse bar was inadequate but where, if the state court had not found the application abusive, it would have found the claim barred by the state's contemporaneous objection rule). Again, if King were required to return to the Texas courts to exhaust his claim, those courts would find his allegations of federal constitutional error procedurally barred. *See* TEX. R. APP P. 33.1(a); *McGinn*, 961 S.W.2d at 166; *Bell*, 938 S.W.2d at 54-55. Thus, his claim is likewise barred for the purposes of federal habeas corpus review. *See Gray*, 518 U.S. at 161; *Coleman*, 501 U.S. at 735 n.1.

Both of these procedural bars preclude federal merits review of this claim.

### 2. This claim is foreclosed by circuit and Supreme Court precedent.

Alternatively, the claim is meritless. Psychiatrist Dr. Edward Gripon testified at the punishment phase of King's trial that, based on his examination of King's tattoos, King's writings, the facts of the offense, the injuries suffered by the victim, and various reports relating to the instant offense as well as King's history, he believed that King would pose a continued threat for future acts of violence. 24 RR 45-50. He had not personally examined King. Dr. Gripon conceded on cross-examination that he could not predict anything with 100 percent certainty. *Id.* at 54. He also told the jury that he agreed with the position of the American Psychiatric Society that psychiatrists are no better suited than any other individual for predicting future danger. *Id.* Finally, Dr. Gripon admitted that his ability to assess a

defendant's mental status is limited when he does not have the opportunity to conduct a face-to-face interview. *Id.* at 56.

In *Barefoot v. Estelle,* the petitioner argued that similar evidence of future dangerousness was unreliable, and that introducing into evidence the answers to hypothetical questions made by one who had not personally examined the defendant was erroneous. The Supreme Court decided the issue adversely to the petitioner. *Barefoot,* 463 U.S. at 896-906. The fact that psychiatric experts had not examined the petitioner went to the weight of their testimony, not to its admissibility. *Id.* at 904 (citing *Barefoot v. State,* 596 S.W.2d 875, 887 (Tex. Crim. App. 1980)). Moreover, the Court specifically refused to convert the American Psychiatric Association's condemnation of psychiatric predictions of future dangerousness into a constitutional rule barring an entire category of expert testimony. *Barefoot,* 463 U.S. at 899; *see also Estelle v. Smith,* 451 U.S. 454, 473 (1981) (stating that the Court was in "no sense disapproving the use of psychiatric testimony bearing on future dangerousness.").

King alleges that the validity of the Supreme Court's decision in *Barefoot v. Estelle* is in question in light of *Daubert v. Merrell Dow Pharm., Inc,* 509 U.S. 579 (1993), state court precedent, and Rules 702 and 705 of the Texas Rules of Evidence.[20] Specifically,

---

[20]   In *Daubert,* which pertained to the federal rules of evidence, the Supreme Court held that scientific testimony or evidence must be relevant and reliable to be admissible. *Daubert,* 509 U.S. at 589. Thus, "the trial judge must determine at the outset . . . whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue." *Id.* at 592. This two-pronged inquiry also applies to the admissibility of scientific testimony under the Texas Rules of Evidence. *Jordan v. State,* 928 S.W.2d 550, 553-55 (Tex. Crim. App.).

according to King, the decision in *Barefoot* does not comport with Rules 702 and 705 with respect to determining the reliability of expert testimony.  King also alleges that Dr. Gripon's testimony did not satisfy *Daubert's* relevancy requirement that expert testimony must aid the jury, because Dr. Gripon's prediction was based on nothing more than common sense, and that *Barefoot* does not take into account this requirement.  Therefore, he claims that any argument that Dr. Gripon's testimony was admissible under *Barefoot* is erroneous given subsequent precedent.

However, King offers no case law indicating that *Barefoot* is no longer sound.  More importantly, this circuit has recently held that psychiatric testimony regarding a defendant's potential for future dangerousness based on a hypothetical set of facts is admissible.[21] *Little v. King*, 162 F.3d 855, 862-63 (5th Cir. 1998).  In fact, in *Little*, the Fifth Circuit specifically addressed the admissibility of similar psychiatric testimony and held that *Barefoot* had already disposed of the petitioner's claim that the testimony was not reliable.  *Id.* at 863. Further, the Fifth Circuit recently declined to "undercut *Barefoot*," despite a similar argument that it had been implicitly overruled by *Daubert*. *Tigner v. Cockrell*, 264 F.3d 521, 526-27 (5th Cir. 2001), *cert. denied*, 122 S. Ct. 1177 (2002).

King points out that, in *Flores v. Johnson*, 210 F.3d 456, 464-65 (5th Cir. 2000), Justice Garza stated in a concurring opinion that psychiatric testimony predicting future

---

[21]     Again, in the instant case, while Dr. Gripon also did not have the benefit of a personal interview with King, he did have the opportunity to examine King's tattoos and his own personal writings.

dangerousness does not pass the *Daubert* test. Petition at 195-196. Yet, the *Flores* majority

noted:

> Our colleague expresses concern over the admissibility of expert testimony regarding the issue of future dangerousness. Flores has been ably represented on this appeal and counsel have not claimed that the judgment should be reversed because this testimony was admitted in the state trial. And properly so. It is clear that any error was not of a constitutional magnitude under the settled law of the Supreme Court and this court. It is the inescapable fact that a lay jury is asked to judge future dangerousness. We cannot then reject as constitutionally infirm the admission into evidence of the same judgment made by a trained psychiatrist.

*Id.* at 457 n.1. Thus, the admission of Dr. Gripon's testimony, even if erroneous, does not

raise a constitutional claim.

Regardless, Texas courts have repeatedly found psychiatric predictions of future

dangerousness to be admissible. Prior to *Daubert*, the Court of Criminal Appeals held that,

under *Barefoot*, "[i]t is settled in this State that psychiatric expert testimony of a defendant's

future dangerousness may be based solely upon hypothetical questions, without the benefit

of an examination of a defendant." *Cook v. State*, 858 S.W.2d 467, 475 (Tex. Crim. App.

1993) (citations omitted); *see also McBride v. State*, 862 S.W.2d 600, 610 (Tex. Crim. App.

1993) ("This Court has long recognized that a trial court may admit, *for whatever value it*

*may have to a jury*, psychiatric testimony concerning the defendant's future behavior at the

punishment phase of a capital murder trial." (emphasis in original)); *Fuller v. State*, 829

S.W.2d 191, 195 n.1 (Tex. Crim. App. 1992) ("Indeed, we have even held, without dissent,

that objection to Dr. Grigson's expert testimony on this issue would amount to a futile act."

(citation omitted)). After *Daubert* was decided, the Court of Criminal Appeals continued to

hold that such testimony was admissible. *Nenno v. State*, 970 S.W.2d 549, 560-62 (Tex. Crim. App. 1998); *Griffith v. State*, 983 S.W.2d 282, 288 (Tex. Crim. App. 1998). In *Nenno*, for example, the Court of Criminal Appeals found expert testimony of future dangerousness to be admissible under Rule 702 *and* to comport with the principles announced in *Daubert*. 970 S.W.2d at 560-62.

King's reliability and relevancy arguments falter given the above precedent. As noted above, the Fifth Circuit has already held that *Barefoot* forecloses any claim of unreliability. *Little*, 162 F.3d at 863. Further, in *Barefoot*, the Supreme Court took note of the potential for unreliability in predicting future dangerousness; however, the Court found that any reliability problems can be corrected when the defendant presents his side of the case, as occurred here. *Barefoot*, 463 U.S. at 899-901.

Likewise, Dr. Gripon's testimony was relevant despite the fact that it was based solely on common sense. In *Jurek v. Texas*, 428 U.S. 262, 275 (1976), Justice Stevens, noting the difficulty of predicting future behavior, stated that "[t]he fact that such a determination is difficult, however, does not mean that it cannot be made. Indeed, prediction of future criminal conduct is an essential element in many of the decisions rendered throughout our criminal justice system." Furthermore, the *Barefoot* Court established that expert testimony pertaining to the issue of future dangerousness was relevant. *Barefoot*, 463 U.S. at 898-99 ("[i]f the jury may make up its mind about future dangerousness unaided by psychiatric testimony, jurors should not be barred from hearing the views of the State's psychiatrists along with opposing views of the defendant's doctors.").

**E.**     **The Texas statutory punishment issues do not violate the Sixth or Fourteenth Amendments. (King's Claim VI)**

Next, King argues that the Texas statutory punishment issues are constitutionally defective in their placement of the burden of proof. This claim is procedurally barred and meritless, therefore relief should be denied.

**1.     This claim is unexhausted and procedurally barred.**

King failed to raise this claim either on direct appeal or in state habeas corpus review. Therefore, the claim is unexhausted and procedurally barred as set forth in Section II, *supra*. Additionally, because King did not object to the punishment charge on this basis at trial, his claim is independently barred under the Texas contemporaneous objection rule. *See* TEX. R. APP P. 33.1(a); *McGinn*, 961 S.W.2d at 166; *Bell*, 938 S.W.2d at 54-55; *Hogue v. Johnson*, 131 F.3d at 494-96 (concluding that claim was defaulted where state court application of abuse bar was inadequate but where, if the state court had not found the application abusive, it would have found the claim barred by the state's contemporaneous objection rule). Both of these procedural bars preclude federal merits review of this claim.

King argues nonetheless that the doctrine of procedural default does not apply to this claim because it is an error of "jurisdictional proportion." *See* Petition at 226-234. Even assuming that some cases of *Apprendi* error are jurisdictional in nature,[22] the *Apprendi* error that King alleges occurred in his case – the placement of the burden of proof – is clearly not

---

[22]     Nonetheless, King's concedes, as he must, that the weight of authority is against him on this issue. *See* Petition at 229-233.

a jurisdictional issue. This claim is procedurally barred.

### 2.     This claim is meritless.

Even if this claim were not procedurally defaulted, review should be denied because

King is not entitled to relief under *Ring v. Arizona*, 122 S. Ct. 2428 (2002), and *Apprendi v.*

*New Jersey*, 530 U.S. 466 (2000), which require that "[i]f a State makes an increase in a

defendant's authorized punishment contingent on the finding of a fact, that fact – no matter

how the State labels it – must be found by a jury beyond a reasonable doubt." *Ring*, 122 S.

Ct. at 2439 (citing *Apprendi*, 530 U.S. at 482-83). King argues that, under the Texas capital

sentencing system, a negative answer to the mitigation special issue is a necessary "finding"

before a death sentence may be imposed. Petition at 208. Contrary to his submission, the

narrow holding of *Ring* and *Apprendi* is that a jury must determine beyond a reasonable

doubt whether *aggravating* factors exist that increase a defendant's punishment beyond the

range authorized by the jury's verdict. The Texas system clearly complies with this

requirement by mandating that the jury determine beyond a reasonable doubt that statutory

aggravating factors exist at both the guilt phase and punishment phase of a capital murder

trial. *See* Tex. Code Crim. Proc. Ann. art. 37.071 § 2(c) (requiring that special issue on

future dangerousness and anti-parties special issue be proved beyond reasonable doubt).[23]

---

[23]     King nonetheless argues that the future dangerousness issue suffers the same flaw because, although it places the burden on the State to prove the special issue "beyond a reasonable doubt," the inclusion of the term "probability" within the special issue somehow lessens this burden. *See* Petition at 215-216. However, King offers no legal support for this assertion. Furthermore, he fails to acknowledge the fact that his jury was instructed specifically on the burden of proof as follows:

King seeks to extend *Apprendi* and *Ring* to encompass the jury's determination that

no sufficient *mitigating* circumstances exist to warrant the imposition of a life sentence rather

than the death penalty.  This proposed extension has no basis in the Supreme Court's Sixth

Amendment jurisprudence, as neither *Ring* nor *Apprendi* contemplates the application of the

Sixth Amendment's "reasonable doubt" requirement to a capital sentencing jury's findings

regarding mitigating factors.[24]  For instance, *Ring* specifically focused on certain judicial

> Issues No. 1 and No. 2 have been submitted to you requiring the State to prove each
> issue beyond a reasonable doubt, and on the issue of reasonable doubt you are
> instructed as follows:
>
> A "reasonable doubt" is doubt based on reason and common sense after a careful and
> impartial consideration of all the evidence in the case.  It is the kind of doubt that
> makes a reasonable person hesitate to act in the most important of his affairs.
>
> Proof beyond a reasonable doubt must be proof of such convincing character that you
> would be willing to rely and act upon it without hesitation in the most important of
> your own affairs.
>
> In the event you have a reasonable doubt as to the issue submitted, you will find
> against the State on Issue No. 1 and No. 2 and not consider the testimony relating to
> those issues for any purpose.

CR 285-286.  King also conclusorily states that the anti-parties issue suffers the same defect, *see*
Petition at 217-218, but this assertion is clearly at odds with the record in this case. *See* CR 284-286,
291.

[24]      Such an extension of *Ring* and *Apprendi* would be barred by the nonretroactivity
principle of *Teague v. Lane*, 489 U.S. 288 (1989).  Contrary to King's assertion, *See* Petition at 218-
226, *Teague* does apply to the claim he raises. *Jones v. Smith*, 231 F.3d 1227, 1237-38 (9th Cir.
2000); *United States v. Lang*, 159 F.Supp.2d 398, 401-02 (N.D. Tex. 2001); *Leopard v. United
States*, 141 F.Supp.2d 1326, 1331-32 (E.D. Okla. 2001), *aff'd*, No. 01-7041, 2002 WL 1472230
(10th Cir. July 10, 2002); *Levan v. United States*, 128 F.Supp.2d 270, 275-77 (E.D. Pa. 2001).  Even
assuming that some cases of *Apprendi* error involve a rule of substantive criminal law as opposed to
a rule of procedural criminal law (though King's concedes, as he must, that the weight of authority
is against him on this issue, *see* Petition at 220-221), the *Apprendi* error that King alleges occurred
in his case – the placement of the burden of proof – is clearly a rule of *procedural* criminal law to
which *Teague* applies.  Furthermore, King's proposed *Apprendi* rule does not fall within the first

-70-

findings regarding aggravating factors. There, the Court emphasized that "Ring's claim [was] tightly delineated" to the issue of whether the Sixth Amendment requires a jury finding on the aggravating circumstances asserted against him, and "ma[de] no Sixth Amendment claim with respect to mitigating circumstances." 122 S. Ct. at 2437 n.4. The Court's ultimate holding was similarly confined. The Court concluded that certain portions of its previous decision in *Walton v. Arizona*, 497 U.S. 639 (1990), were irreconcilable with *Apprendi* and thus "overrule[d] *Walton* to the extent that it allows a sentencing judge, sitting without a jury, to find an aggravating circumstance necessary for imposition of the death penalty. "Because Arizona's enumerated aggravating factors operate as 'the functional equivalent of an element of a greater offense,' the Sixth Amendment requires that they be found by a jury." 122 S. Ct. at 2430 (quoting *Apprendi,* 450 U.S. 494 n.19) (internal citations omitted). The *Ring* Court declined to comment on whether a similar requirement applied to mitigating factors.

Likewise, *Apprendi* specifically noted and reaffirmed the distinction between "facts in aggravation of punishment and facts in mitigation." *Apprendi,* 530 U.S. at 490 n.16. The Court there noted that where a judge finds a fact that allows a defendant to "escape the statutory maximum" attached to a jury verdict, that finding by a judge "neither expose[es]

---

*Teague* exception because, contrary to King's assertions, *see* Petition at 224-226, it does not prohibit "a certain category of punishment to a class of defendants *because of their offense.*" *Graham v. Collins,* 506 U.S. 461, 477 (1993) (emphasis added). King argues that, because *Apprendi* and *Ring* prohibit enhanced punishment without proof of the special issues beyond a reasonable doubt, *Apprendi* and *Ring,* as applied in this case, prohibit the death penalty in these circumstances. Petition at 225. However, if King's argument is taken to its logical conclusion, any alleged trial error would fall within the first *Teague* exception.

the defendant to a deprivation of liberty greater than that authorized by the verdict according to the statute, nor is the judge imposing upon the defendant a greater stigma than that accompanying the jury verdict alone." *Id.* In such a scheme, the concerns animating the holding of *Apprendi* are absent. *Id.*

Finally, King's claim fails under that part of *Walton* that survived *Ring*, in which the Court held that the Eighth Amendment does not bar a state from imposing a burden of proof *on the defendant* to "establish, by a preponderance of the evidence, the existence of mitigating circumstances sufficiently substantial to call for leniency." *Walton*, 497 U.S. at 650, *quoted in Delo v. Lashley,* 507 U.S. 272, 275 (1993). The Court noted that nothing in its Eighth Amendment jurisprudence precluded the States from "specifying how mitigating circumstances are to be proved." *Id.* at 649. Indeed, it noted that in several other capital cases, it had found it constitutional for a state to impose a burden of proof on the defendant to prove issues such as self-defense, insanity, and "the affirmative defense of extreme emotional disturbance." *Id.* at 650 (citations omitted). Under this line of authority, "[s]o long as a State's method of allocating the burdens of proof does not lessen the State's burden to prove every element of the offense charged, or in this case to prove the existence of aggravating circumstances, a defendant's constitutional rights are not violated by placing on him the burden of proving mitigating circumstances sufficiently substantial to call for leniency." *Id.*

Unlike the circumstances presented in *Ring* and *Apprendi*, the Texas mitigation special issue does not operate as the functional equivalent of an element of a greater offense.

-72-

King improperly attempts to construe the mitigation special issue as an aggravating factor by suggesting that the absence of sufficient mitigating evidence functionally aggravates his sentence from life to death.  Although he is correct that a Texas capital sentencing jury must specifically answer the disputed issue in the negative to render a death sentence, that special issue plainly inures to the defendant's benefit by allowing the jury a mechanism to give effect to mitigating evidence.  Moreover, King's submission is illogical in that it would require the State to prove a negative, an undertaking that is "never easy." *Elkins v. United States,* 364 U.S. 206, 218 (1960).  Indeed, it is impossible under the Texas system (which leaves it to individual jurors to decide what evidence is mitigating and whether that evidence suggests that mercy be imposed) to prove the absence of mitigating evidence beyond a reasonable doubt.

    **F.**   **Admission of unadjudicated offenses at the punishment phase did not violate the Sixth, Eighth or Fourteenth Amendments. (King's Claim VII)**

In his seventh claim for relief, King contends that the trial court's admission of unadjudicated offense evidence at the punishment phase of his trial violated his right to a reliable sentencing determination under the Eighth and Fourteenth Amendments.[25] Specifically, he suggests that such evidence is unreliable because the trial court failed to

---

[25]Although King expressly articulates an Eighth Amendment violation, where the challenge is to the relevance and/or admission of evidence offered by the state at the punishment phase of a capital murder trial, a due process analysis is appropriate. *See Romano v. Oklahoma,* 512 U.S. 1, 11-12 (1994) ("The Eighth Amendment does not establish a federal code of evidence to supersede state evidentiary rules in capital sentencing proceedings"); *Simmons v. South Carolina,* 512 U.S. 154, 162 n.4 (1994); *Gardner v. Florida,* 430 U.S. 349, 351 (1977).  In any event, the result sought by King is not dictated by either the Eighth Amendment or the due process requirements of the Fourteenth Amendment.

instruct the jurors that they could consider evidence of prior unadjudicated offenses only if they believed beyond a reasonable doubt that King committed those acts.   However, the claim is procedurally barred, *Teague*-barred and foreclosed by circuit precedent.

### 1.    This claim is unexhausted and procedurally barred.

King failed to raise this claim either on direct appeal or in state habeas corpus review. Therefore, the claim is unexhausted and procedurally barred as set forth in Section II, *supra*. Furthermore, because King did not object to the admission of evidence of unadjudicated offenses on this basis at trial, his claim is independently barred under the Texas contemporaneous objection rule.  *See* TEX. R. APP P. 33.1(a); *McGinn*, 961 S.W.2d at 166; *Bell*, 938 S.W.2d at 54-55; *Hogue v. Johnson*, 131 F.3d at 494-96 (concluding that claim was defaulted where state court application of abuse bar was inadequate but where, if the state court had not found the application abusive, it would have found the claim barred by the state's contemporaneous objection rule).   Both of these procedural bars preclude federal merits review of this claim.

### 2.    This claim is foreclosed by circuit and Supreme Court precedent.

The procedural bar aside, this claim fails.  Indeed, this precise claim has been rejected by the Fifth Circuit Court of Appeals.[26]  As the Fifth Circuit recognized in *Harris v. Johnson*, 81 F.3d 535 (5th Cir. 1996),

---

[26]     It should also be noted at the outset that this cannot be characterized as a case in which the "tail wags the dog." Petition at 240. The relatively minor extraneous offenses testified to at the punishment phase of King's trial – disorderly conduct, assault by threat, and burglary – paled in comparison to the facts of the offense for which he stood trial.

> The authorities do not support [the] claim that the Constitution requires that the state prove unadjudicated offenses beyond a reasonable doubt before they may be used during the sentencing phase. Fully aware that the due process clause clearly requires that for conviction the state must prove the elements of the offense charged beyond a reasonable doubt, neither we nor the Supreme Court has stated that a similar burden exists regarding the admission of evidence of unadjudicated offenses in a capital case sentencing hearing.

*Id.* at 541. Indeed, to grant relief based on this claim would require this court to announce and apply a new rule of constitutional law, which is prohibited on federal habeas corpus review by the nonretroactivity principle of *Teague v. Lane, supra. Harris*, 81 F.3d at 541. Thus, circuit precedent compels rejection of this claim as a matter of law.

The Fifth Circuit's opinion in *Harris* does not conflict with Supreme Court precedent. In fact, as the Fifth Circuit accurately noted, there is no support for King's argument that the Eighth Amendment prohibits the admission of unadjudicated offense evidence at the punishment phase of a capital murder trial. The Eighth Amendment supports the admission and jury consideration of all evidence relevant to the sentencing determination, whether aggravating or mitigating, in order to arrive at the most accurate determination possible. A capital defendant's criminal record and prior bad acts are aspects of his character and background that are properly considered by a jury in determining the appropriateness of a death sentence. *Barclay v. Florida*, 463 U.S. 939, 956-58 (1983). Contrary to the premise underlying King's claim, past behavior is an *accurate* predictor of future behavior. *Johnson v. Texas*, 509 U.S. 350, 369 (1993) (citing *Skipper v. South Carolina*, 476 U.S. 1, 5 (1986)) ("[c]onsideration of a defendant's past conduct as indicative of his probable future conduct is an inevitable and not undesirable element of capital sentencing").

Further, the Supreme Court's determination in *Jurek v. Texas* that the state's capital-sentencing statute was constitutional was premised largely on the fact that the jury was allowed to consider all possible information relevant to the punishment phase issues.  428 U.S. at 271, 274-76; *Barefoot v. Estelle,* 463 U.S. at 897.  *See Payne v. Tennessee*, 501 U.S. 808, 820-821 (1991) ("Whatever the prevailing sentencing philosophy, the sentencing authority has always been free to consider a wide range of relevant material").  In upholding the admissibility of psychiatric testimony predicting future dangerousness at the punishment phase of a Texas capital murder trial, the Court in *Barefoot*

> [T]he rules of evidence generally extant at the federal and state levels anticipate that relevant, unprivileged evidence should be admitted and its weight left to the factfinder, who would have the benefit of cross-examination and contrary evidence by the opposing party.

*Id.* at 898; *see also Smith v. State,* 676 S.W.2d 379, 390 (Tex. Crim. App. 1984) ("Article 37.071(a) does not alter the rules of evidence insofar as the manner of proof is concerned").[27] The fact that evidence increases the likelihood that a capital defendant will "be sentenced to death does not render the evidence inadmissible, any more than it would with respect to other relevant evidence against a defendant in a criminal case." *Barefoot,* 463 U.S. at 905-06. As the Supreme Court recognized in approving the Texas death penalty scheme, "[w]hat is essential is that the jury have before it *all possible relevant information* about the individual defendant whose fate it must determine." *Jurek v. Texas*, 428 U.S. at 276 (emphasis added).

---

[27]*See* TEX. R. CRIM. EVID. 404(b), which recognizes that evidence of prior bad acts may be relevant to show motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

Texas' interest in permitting sentencer consideration of the full range of relevant evidence is not merely legitimate but compelling. Admission of unadjudicated offense evidence furthers the state's interest in promoting the accuracy of the sentencer's response to the future dangerousness issue. "The majority of psychiatric experts agree that where there is a pattern of repetitive assaulting and violent conduct, the accuracy of psychiatric predictions of future dangerousness dramatically rises." *Barefoot v. Estelle*, 463 U.S. at 902 (quoting with approval opinion of district court). The same rationale is equally applicable to a capital sentencer's determination of the same issue. Thus, where evidence is relevant, as the testimony of the state's witnesses in King's case was under both state and federal law, the reliability of the evidence is an issue that goes to its weight rather than its admissibility. *Barefoot v. Estelle,* 463 U.S. at 898-99. Thus, the admission of the unadjudicated offense evidence did not deprive King of a reliable sentencing determination under the Eighth Amendment.

In any event, in this context, the Eighth Amendment requires no more of the state than the Due Process Clause requires. And the law is clear that a sentencing body can consider a defendant's participation in criminal conduct for which he has not been convicted without violating due process. *United States v. Grayson,* 438 U.S. 41, 49 (1978) (citing *Williams v. New York,* 337 U.S. 241, 252 (1949)). *Williams,* which was a capital case, permits a criminal sentencer to relax the procedural strictures that the Due Process Clause requires during the guilt stage of the trial. *Gardner v. Florida,* 430 U.S. 349 (1977), does not alter the authority of *Williams* or its application in a capital case.

*Gardner* does not preclude a sentencing body in a capital case from considering a defendant's participation in unadjudicated offenses. The concern in *Gardner* was merely to prevent a sentencer from imposing "the death sentence on the basis of *confidential information which is not disclosed* to the defendant or his counsel." 430 U.S. at 358 (emphasis added). The Supreme Court's decision in *Gardner* engrafted no constitutional reliability predicate onto state rules governing admission of evidence at capital sentencing. Rather, *Gardner* reflects the same reasoning that led the Court to deem it constitutionally permissible to permit psychiatric evidence of future dangerousness -- in the face of a claim that such evidence is generally unreliable and given undue weight by the sentencer. *Barefoot v. Estelle*, 463 U.S. at 896. Both *Gardner* and *Barefoot* stem from the same premise, underlying the American system of criminal justice, that the adversary process and the trier of fact are "competent to uncover, recognize, and take due account" of weaknesses in evidence. *Barefoot v. Estelle*, 463 U.S. at 899. Indeed, the problem in *Gardner* was not alleged inherent unreliability of evidence, which was the issue presented in *Barefoot*. Instead, *Gardner* involved evidence that had been completely removed both from the rigors of adversarial testing at trial and from the scrutiny of appellate review. *Gardner v. Florida*, 430 U.S. at 360-61. In contrast, King was able to test the veracity and credibility of the witnesses, and to challenge the reliability of their testimony, through cross-examination. He had the opportunity, if he was able to do so, to rebut the State's case with evidence of his own. Moreover, King had the opportunity to challenge the testimony of the witnesses on appeal.

Further, unadjudicated offense evidence offered at the punishment phase of a Texas capital murder trial is not subject to the due process requirement of proof beyond a reasonable doubt. The law governing this issue is well-established. "The Due Process Clause requires the prosecution to prove beyond a reasonable doubt all of the elements included in the definition of the offense of which the defendant is charged." *Patterson v. New York*, 432 U.S. 197, 210 (1977); *see also In re Winship*, 397 U.S. 358, 365 (1970) ("The Due Process Clause protects the accused against *conviction* except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged.") (emphasis added). Accordingly, a state legislature's definition of the substantive elements of an offense is ordinarily dispositive in determining the facts that the State must prove beyond a reasonable doubt. *Patterson*, 432 U.S. at 210.

Under Texas law, unadjudicated offense evidence is neither an element of the offense of capital murder nor determinative of punishment. Accordingly, evidence of unadjudicated offenses and bad acts is not subject to the due process requirement of proof beyond a reasonable doubt. The severity of punishment for which a defendant is eligible simply is not determined by the existence or non-existence of other offense evidence, whether adjudicated or unadjudicated. The facts of the capital offense, alone, can suffice to support affirmative answers to the punishment issues. *See, e.g., Russell v. State*, 665 S.W.2d 771, 781 (Tex. Crim. App. 1983); *O'Bryan v. State*, 591 S.W.2d 464, 480-81 (Tex. Crim. App. 1979). On the other hand, evidence of extraneous offenses will not always be sufficient to prove affirmative answers to the special issues beyond a reasonable doubt. *Warren v. State*, 562

S.W.2d 574, 575-76 (Tex. Crim. App. 1978); *O'Bryan v. State*, 591 S.W.2d at 480-81. For the same reasons, the Sixth Amendment also does not compel proof beyond a reasonable doubt of unadjudicated offenses under *Apprendi* and *Ring*.[28] *See* Petition at 244.

As the Texas Court of Criminal Appeals has recognized, two factors limit the jury's consideration of unadjudicated offense evidence in capital cases. First, the jury is guided by relevance of that evidence to the capital sentencing issues. *Harris v. State*, 827 S.W.2d 949, 961 (Tex. Crim. App. 1992); *see also* TEX. CODE CRIM. PROC. ANN. art. 37.071 §2(a)(1) (authorizing admission of evidence relevant to punishment). Obviously, evidence of other crimes and bad acts is relevant to the defendant's propensities for future violent conduct and to the deliberateness of his conduct in committing the capital offense if the defendant is connected to the extraneous conduct. *Harris v. State*, 827 S.W.2d at 961; *Marquez v. State*, 725 S.W.2d 217 (Tex. Crim. App. 1987); *Rumbaugh v. State*, 629 S.W.2d 747 (1982).

Second, the State is required to prove affirmative answers to the first two special sentencing issues beyond a reasonable doubt. *Santana v. State*, 714 S.W.2d 1, 11-12 (Tex. Crim. App. 1986). King's jury was clearly instructed that before either of the first two special issues could be answered in the affirmative, all jurors must be convinced beyond a reasonable doubt that the answer to the issue should be "yes." CR 283. In addition, the punishment-phase charge instructed the jury on the State's burden of proof and the verdict forms themselves incorporated the burden of proof into the first and second special issues.

---

[28]     In support of her position on this issue, the Director hereby incorporates by reference her briefing in subsection III.E.2, *supra*.

CR 285-286, 291. Because the unadjudicated offense evidence did not provide a basis for conviction or a death sentence, but was merely introduced as evidence relevant to the punishment issues, the State was not required to prove the unadjudicated offenses beyond a reasonable doubt. It is certainly clear, then, that it was not error for the trial court to admit the unadjudicated offense evidence without instructing the jury that, before considering the evidence, it must first determine the State had proven the offenses beyond a reasonable doubt. This claim does not provide a basis for granting habeas corpus relief.

**G.   King's federal constitutional rights were not violated by the fact that he was tried in Jasper County. (King's Claims VIII, IX and X)**

In the next three interrelated claims, King argues that his federal constitutional rights were violated by his trial in Jasper County due to the prejudicial atmosphere created by pretrial publicity. However, these claims are procedurally barred and, alternatively, meritless, and thus do not provide a basis for granting relief.

**1.   This claim is unexhausted and procedurally barred.**

King failed to raise this claim either on direct appeal or in state habeas corpus review. Therefore, the claim is unexhausted and procedurally barred as set forth in Section II, *supra*.

**2.   This claim is unsupported by the record.**

Alternatively, King fails to prove that he was denied the right to a fair trial due to pretrial publicity. Not only is King unable to demonstrate that he is entitled to the presumed prejudice rule of *Rideau v. Louisiana,* 373 U.S. 723 (1963), he is also not capable of proving that his trial was "utterly corrupted by press coverage." *Dobbert v. Florida,* 432 U.S. 282,

303 (1977).  Accordingly, habeas relief should be denied.

The Sixth and Fourteenth Amendments entitle an accused to a fair trial before an impartial tribunal. *Murphy v. Florida,* 421 U.S. 794, 799 (1975); *Irvin v. Dowd,* 366 U.S. 717, 722-23 (1961).  The failure to provide such a trial is a denial of due process. *Irvin v. Dowd,* 366 U.S. at 722.  However, the Constitution does not require that jurors be completely ignorant of the facts and issues to be tried. *Dobbert v. Florida,* 432 U.S. at 301; *Murphy,* 421 U.S. at 799-800.  Otherwise qualified venire members who possess preconceptions about the defendant's guilt or innocence are not thereby excludable if they can set aside their opinions and return a verdict based on the trial evidence. *Murphy,* 421 U.S. at 800 (citation omitted).  Moreover, even extensive community knowledge about the crime and the accused is not sufficient to violate constitutional guarantees. *Dobbert,* 432 U.S. at 303.

Rather, a petitioner must demonstrate that "the trial atmosphere [was] utterly corrupted by press coverage." *Id.*; *Andrews v. Collins,* 21 F.3d 612, 632 (5th Cir. 1994).  In determining whether the constitutional guarantee has been met, this Court must presume that the jurors were impartial unless and until the petitioner establishes, under the totality of the circumstances, that the trial setting was inherently prejudicial or the jury selection process permitted an inference of actual prejudice. *Murphy,* 421 U.S. at 803.  A reviewing court is to take into account the degree and kind of publicity surrounding the case.  Relief is not warranted unless the petitioner can show a "trial atmosphere utterly corrupted by press coverage." *Dobbert,* 432 U.S. at 303.

However, King argues that pretrial publicity was so overwhelming that prejudice

-82-

should be presumed under *Rideau v. Louisiana*.  The *Rideau* rule of presumed prejudice is

applicable "where a petitioner adduces evidence of inflammatory, prejudicial pretrial

publicity that so pervades or saturates the community as to render virtually impossible a fair

trial by an impartial jury drawn from that community . . . ."  *Willie v. Maggio,* 737 F.2d

1372, 1386 (5th Cir. 1984) (quoting *Mayola v. State of Alabama,* 623 F.2d 992, 997 (5th Cir.

1980)); *see also Murphy,* 421 U.S. at 798-99; *Moore v. Johnson,* 225 F.3d 495, 504-05 (5th

Cir. 2000), *cert. denied,* 121 S. Ct. 1420 (2001).  In *Rideau,* a film of the defendant's

interrogation *and confession* was shown to an estimated 97,000 of the 150,000 residents of

Calcasieu Parish, Louisiana, within a three day period two weeks before trial.  *Rideau,* 373

U.S. at 724-25.  Only in *Rideau* has the Supreme Court reversed a state court conviction on

the basis of presumed prejudice deriving solely from pretrial publicity.  *Mayola,* 623 F.2d

at 997.

King contends that the news coverage of the case was widespread and extensive.[29]

It cannot be denied that the publicity in this case was extensive throughout the state, the

nation and the world.  *See* 3 RR 19, 42.  But as noted in the State's response to King's

motion for change of venue, "the publicity in Jasper County [was] less inflammatory and

prejudicial than media accounts in the rest of the state."  CR 105; *see also* 3 RR 24-25

(noting that media in Dallas, Houston and Austin had reported specific information about

---

[29]    It should be noted that King himself was responsible in part for the publicity his trial
received.  He granted several interviews with media representatives against the advice of counsel.
3 RR 4.

King's tattoos and the gang he belonged to, while media in Jasper and Beaumont had not).

Furthermore, the jury pool for Jasper County draws from five separate towns – Brookeland,

Jasper, Kirbyville, Buna, and Evadalee – and numerous smaller communities.  CR 108.  As

described by State's witnesses at the hearing on King's motion to change venue, "[Jasper]

county is approximately 90 miles in length and each town has a different personality."  CR

108.  And while pretrial publicity in King's case may have been pervasive, it simply did not

rise to the level of *inflammatory* pretrial publicity that would invoke the presumed prejudice

rule discussed above.[30]  *See* King's Exhibit 14.  Thus, relief is not merited under *Rideau.*

In any event, the constitutional standard of fairness only requires that the accused

"have a panel of impartial, 'indifferent' jurors" who base their decision solely on the

evidence produced in court; it does not require jurors to be wholly ignorant of the case.

*Mayola,* 623 F.2d at 998 (quoting *Murphy,* 421 U.S. at 799-800).  "We cannot expect jurors

to live in isolation from the events and news of concern to the community in which they

live."  *Calley v. Callaway,* 519 F.2d 184, 205 (5th Cir. 1975).  Because virtually every case

of any consequence will be the subject of some press attention, the *Rideau* principle of

presumptive prejudice is rarely applicable.  *Mayola,* 623 F.2d at 997 (citing *Nebraska Press*

*Ass'n v. Stuart,* 427 U.S. 539 (1976)).  The voir dire record in the instant case demonstrates

that issues of potential prejudice on the part of prospective jurors were fully vetted by King's

trial attorneys, 6-16 RR, and King has failed to show that he was deprived of an impartial

---

[30]     The publicity in this case certainly did it involve the presentation of his videotaped confession to the public at large.  *Compare to Rideau,* 373 U.S. at 724-25.

jury.

While King is likely correct in his assertion that the community of Jasper was enraged by this atrocious crime, it must be assumed that any reasonable person, anywhere, confronted with the facts of this case, would be enraged as well.  Considering the coverage and hearing record as a whole, it cannot be said that King's "trial atmosphere . . . [w]as utterly corrupted by press coverage," *Dobbert*, 432 U.S. at 303 (quoting *Murphy*, 421 U.S. at 798), and relief should be denied.

### H.   King's complaints regarding the state habeas corpus process are not cognizable on federal habeas corpus review. (King's Claim XI)

King contends in his eleventh ground for relief that his federal constitutional rights were violated by his state habeas counsel's alleged inadequate performance, thus entitling him to federal habeas relief.  This claim is procedurally barred and foreclosed by circuit precedent.

### 1.   This claim is unexhausted and procedurally barred.

King failed to raise this claim either on direct appeal or in state habeas corpus review. Therefore, the claim is unexhausted and procedurally barred as set forth in Section II, *supra*.

### 2.   This claim is foreclosed by circuit precedent.

Alternatively, King's claim is not cognizable on federal habeas review.  Congress has declared that a federal court "shall entertain an application for writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court *only* on the ground that he is *in custody* in violation of the Constitution or laws or treaties of the United States."

28 U.S.C. § 2254(a) (emphasis added). However, as the Supreme Court recognized more than one-hundred years ago, habeas corpus proceedings are simply not part of the criminal process that resulted in the inmate's detention:

> Proceedings to enforce civil rights are civil proceedings, and proceedings for the punishment of crimes are criminal proceedings. In the present case the petitioner is held under criminal process. The prosecution against him is a criminal prosecution, but the writ of *habeas corpus* which he has obtained is not a proceeding in that prosecution. On the contrary, it is a new suit brought by him to enforce a civil right, which he claims, as against those who are holding him in custody, under the criminal process. If he fails to establish his right to his liberty, he may be detained for trial of the offense; but if he succeeds he must be discharged from custody. The proceeding is one instituted by himself for his liberty, not by the government to punish him for his crime. . . . Such a proceeding on his part is, in our opinion, a civil proceeding, notwithstanding his object is, by means of it, to get released from custody under a criminal prosecution.

*Ex parte Tom Tong*, 108 U.S. 556, 559-60 (1883); *see also Pennsylvania v. Finley*, 481 U.S. 551, 557 (1987) ("[Post-conviction review] is not part of the criminal proceeding itself, and it is in fact considered to be civil in nature") (citation omitted). Thus, by attacking the adequacy of state or federal collateral review rather than the criminal process itself, a petitioner improperly urges the federal courts to exceed the jurisdictional limits imposed by section 2254(a).

On this basis, the law is clear that infirmities in state habeas corpus proceedings do not constitute grounds for relief in federal court. *Rudd v. Johnson*, 256 F.3d 317, 319-20 (5th Cir.), *cert. denied*, 122 S. Ct. 477 (2001); *Beazley v. Johnson*, 242 F.3d 248, 271 (5th Cir.), *cert. denied*, 122 S. Ct. 329 (2001); *Wheat v. Johnson*, 238 F.3d 357, 361 (5th Cir.), *cert. denied*, 532 U.S. 1070 (2001); *Trevino v. Johnson*, 168 F.3d 173, 180 (5th Cir. 1999);

*Hallmark v. Johnson*, 118 F.3d 1073, 1080 (5th Cir. 1997); *Nichols v. Scott*, 69 F.3d 1255,

1275 (5th Cir. 1995); *Duff-Smith v. Collins*, 973 F.2d 1175, 1182 (5th Cir. 1992); *Millard

v. Lynaugh*, 810 F.2d 1403, 1410 (5th Cir. 1987); *Vail v. Procunier*, 747 F.2d 277, 277 (5th

Cir. 1984).  "That is because an attack on the state habeas proceeding is an attack on a

proceeding collateral to the detention and not the detention itself." *Rudd*, 256 F.3d at 320

(citing *Nichols*, 69 F.3d at 1275); *see also Millard*, 810 F.2d at 1410 (same).  King's

challenge to the performance of his state habeas counsel is clearly foreclosed by a long line

of circuit precedent and relief should be denied. *See Rudd*, 256 F.3d at 320.

Indeed, the federal habeas corpus statute itself specifically provides that "[t]he

ineffectiveness or incompetence of counsel during Federal or State collateral post-conviction

proceedings shall not be a ground for relief in a proceeding arising under section 2254." 28

U.S.C. § 2254(i); *see also Martinez*, 255 F.3d at 245.

Even if King could overcome the jurisdictional limits placed on the federal courts by

§ 2254(a) and the statutory prohibition of § 2254(i), he cannot make a showing of federal

constitutional error.  King simply does not have any right to the effective assistance of

counsel on state habeas review.[31]  The Supreme Court has explicitly held that the federal

constitutional right to counsel does not extend to post-conviction proceedings. *Coleman v.

Thompson*, 501 U.S. 722, 752 (1991); *Murray v. Giarrantano*, 492 U.S. 1, 10 (1989)

(plurality opinion); *Finley*, 418 U.S. at 555.  Rather, that right terminates after a criminal

---

[31]     Additionally, King's claims run afoul of the anti-retroactivity rule announced in
*Teague v. Lane*, 489 U.S. 288 (1989).

-87-

defendant has exhausted direct appellate review. *Finley*, 481 U.S. at 555; *Ross v. Moffitt*, 417 U.S. 600, 616 (1974); *Moore v. Cockrell*, No. 01-41160, 2002 WL 31656274, at *2 (5th Cir. Nov. 26, 2002); *Clark v. Johnson*, 227 F.3d 273, 283 (5th Cir. 2000). Consequently, because a petitioner has no constitutional "right to counsel" in habeas review, he cannot claim that he was denied the *effective assistance* of counsel in those proceedings. *Coleman*, 501 U.S. at 752; *see also Wainwright v. Torna*, 455 U.S. 586, 587-88 (1982) (per curiam) ("Since respondent had no constitutional right to counsel, he could not be deprived of the effective assistance of counsel by his retained counsel's failure to file the application timely").

This Circuit has consistently reaffirmed this principle and rejected claims similarly premised on a "right" to effective habeas counsel. *See Ogan v. Cockrell*, 297 F.3d 349, 356-57 (5th Cir.), *cert. denied*, 123 S. Ct. 582 (2002); *Martinez v. Johnson*, 255 F.3d 229, 237-41 (5th Cir. 2001), *cert. denied sub nom. Martinez v. Cockrell*, 534 U.S. 1163 (2002); *In re Goff*, 250 F.3d 273, 275-76 (5th Cir. 2001) (per curiam); *Beazley*, 242 F.3d at 271; *Fairman v. Anderson*, 188 F.3d 635, 643 (5th Cir. 1999); *Callins v. Collins*, 89 F.3d 210, 212-13 (5th Cir. 1996).

King attempts to circumvent this precedent by noting that the State of Texas has enacted a statute which entitles indigent, death-sentenced habeas petitioners to the assistance of an appointed lawyer. *See* Petition at 288-289. He argues that these statutes effectively elevated the post-conviction process to an appeal as "a matter of right." *Id.* King therefore maintains that, under cases such as *Evitts v. Lucey*, 469 U.S. 387 (1985), he now has a due

-88-

process right to "effective" habeas counsel on a par with the Sixth Amendment.

It is true that the state statute entitled King to the assistance of an attorney in prosecuting a collateral attack on his conviction. *See* TEX. CRIM. PROC. CODE ANN. art. 11.071, § 2(a) (Vernon Supp. 2002). However, contrary to King's argument, that statute simply did not invest him with the same protections as are enshrined in the United States Constitution. Indeed, the federal habeas corpus statute itself specifically provides that "[t]he ineffectiveness or incompetence of counsel during Federal or State collateral post-conviction proceedings shall not be a ground for relief in a proceeding arising under section 2254." 28 U.S.C. § 2254(i); *see also Martinez*, 255 F.3d at 245. Similarly, the Texas courts have concluded that Article 11.071, § 2(a) does not endow petitioners with any right to attack their habeas attorney's performance. *See Ex parte Graves*, 70 S.W.3d 103 (Tex. Crim. App. 2002).

Moreover, in *Finley*, the Supreme Court expressly rejected the notion that a "state-created right" to post-conviction counsel automatically invested an inmate with some constitutional standing to challenge that lawyer's performance:

> [T]he fact that the defendant has been afforded assistance of counsel in some form does not end the inquiry for federal constitutional purposes. Rather, it is the source of that right to a lawyer's assistance, combined with the nature of the proceedings, that controls the constitutional question. In this case, respondent's access to a lawyer is a result of the State's decision, not the command of the United States Constitution.

*Finley*, 451 U.S. at 556. The Court therefore refused the petitioner's invitation to extend the procedures mandated by *Anders v. California*, 386 U.S. 738 (1967), to habeas corpus

proceedings, in spite of the petitioner's argument that *Evitts* demanded that a state comply with those due process requirements once it chose to provide post-conviction counsel. *Finley*, 481 U.S. at 557-59.   Finally, the Fifth Circuit has consistently found that no constitutional right to effective habeas counsel exists, regardless of whether the state chooses to provide the petitioner with an attorney. *Ogan*, 297 F.3d at 357; *Goff*, 250 F.3d at 275-76. Thus, King's argument that the state appointment statute somehow spawned additional constitutional protections is entirely without merit.[32]

King argues that he was deprived of the equal protection guarantee of "meaningful access" to the courts. Petition at 302-303.  He reasons that because he was indigent and dependent on the court to provide competent counsel, the alleged denial of competent counsel deprived him of his ability to prepare an effective writ application.  King thus complains that, unlike a wealthy man who could afford to retain an attorney, he is being deprived of the right to meaningfully challenge his conviction.

King shows no constitutional violation in these circumstances.  The Equal Protection Clause "does not require absolute equality or precisely equal advantages, nor does it require the State to equalize economic conditions." *Ross*, 417 U.S. at 612 (internal quotations marks and citations omitted).  Indeed, the *Ross* Court noted that "[t]he duty of the State under our cases is not to duplicate the legal arsenal that may be privately retained by a criminal

---

[32]     Moreover, given the clear and well accepted precedent contrary to King's position, his argument that the Constitution mandates the effective assistance of habeas counsel in preparing a post-conviction challenge would require the application of a "new rule" of constitutional law in violation of *Teague v. Lane*, 489 U.S. at 310.

defendant in a continuing effort to reverse his conviction, but only to assure the indigent

defendant an adequate opportunity to present his claims fairly in the context of the State's

appellate process." *Id.* at 616. Furthermore, in *Finley,* the Court recognized that a habeas

petitioner is accorded this opportunity during his trial and direct appeal. In rejecting the idea

that the Fourteenth Amendment is violated because the *Anders* procedures were not followed

by the petitioner's state-appointed, post-conviction counsel, the Court wrote:

> Nor was the equal protection guarantee of "meaningful access" violated in this
> case. By the time respondent presented her application for postconviction
> relief, she had been represented at trial and in the Supreme Court of
> Pennsylvania. In *Ross,* we concluded that the defendant's access to the trial
> record and the appellate briefs and opinions provided sufficient tools for the
> *pro se* litigant to gain meaningful access to courts that possess a discretionary
> power of review. 417 U.S. at 614-615. We think that the same conclusion
> necessarily obtains with respect to postconviction review. Since respondent
> has no underlying constitutional right to appointed counsel in state
> postconviction proceedings, she has no constitutional right to insist on the
> *Anders* procedures which were designed solely to protect that underlying
> constitutional right.

*Finley,* 481 U.S. at 557. Just as in *Finley,* King has no underlying constitutional right to

counsel on collateral attack. He therefore cannot complain of the denial of meaningful

access to the courts. Relief should be denied based on this claim.

## I.   The trial judge death-qualified King's jury in accordance with Supreme Court precedent. (King's Claim XIII)

King next claims that the trial judge's death-qualification procedures resulted in a

biased jury in violation of Supreme Court precedent.

### 1.   This claim is unexhausted and procedurally barred.

King failed to raise either on direct appeal or in state habeas corpus review: (1) his

global claim that trial judge's death-qualification procedures resulted in a biased jury; or (2) his individual claims challenging the excusal of prospective juror Nicholaus Dwayne Fountain and the qualification of prospective jurors Larry Pedigo, Herman Marie Rawls, Jo Marie Jones, Larry DeLord, Bartley Rhoad, Craig S. Harding, Steven Wheeler, and James Nobles. Therefore, these portions of the claim are unexhausted and procedurally barred as set forth in Section II, *supra*. Similarly, because King did not object on these bases at trial, his claim is independently barred under the Texas contemporaneous objection rule. *See* TEX. R. APP P. 33.1(a); *McGinn*, 961 S.W.2d at 166; *Bell*, 938 S.W.2d at 54-55; *Hogue v. Johnson*, 131 F.3d at 494-96 (concluding that claim was defaulted where state court application of abuse bar was inadequate but where, if the state court had not found the application abusive, it would have found the claim barred by the state's contemporaneous objection rule). Both of these procedural bars preclude federal merits review of this claim.

### 2.    This claim is unsupported by the record.

Procedural bars aside, this claim is meritless. First, with regard to the exhausted portion of the claim concerning the excusal of venire member James Edward Mallet, this claim was adjudicated on the merits in the Texas Court of Criminal Appeals on direct appeal, *see King v. State*, 29 S.W.3d at 567-568, and King has failed to show that the Texas court's rejection of the claim was objectively unreasonable. Therefore, King may not obtain relief on this claim. 28 U.S.C. § 2254(d).

Second, with regard to the remaining unexhausted (and thus procedurally barred) claims, King has failed to show that these venire members' excusal/qualification violated the

dictates of Supreme Court precedent. Under the Sixth Amendment, a prospective juror may not be excluded for cause merely because he voices general opposition to capital punishment. *Witherspoon v. Illinois*, 391 U.S. 510, 521-522 (1968). However, a prospective juror may be excused for cause if his views regarding the death penalty "would prevent or substantially impair the performance of [his] duties as juror in accordance with [his] instructions and [his] oath." *Adams v. Texas*, 448 U.S. 38, 45 (1980); *accord Wainwright v. Witt*, 469 U.S. 412, 424 (1985). This test is applied primarily by the trial court because determinations of juror bias depend in great degree on the trial judge's assessment of demeanor and credibility and on his impressions as to the juror's state of mind. *See Williams v. Collins*, 16 F.3d 626, 633 (5th Cir. 1994). To this end, *Witt* held that the trial court's determination that a prospective juror could not perform his statutory function faithfully and impartially is a determination of fact, subject to a presumption of correctness on collateral review. *Witt*, 469 U.S. at 428, 430; *see also Fuller v. Johnson*, 114 F.3d 491, 500-501 (5th Cir. 1997) (juror bias finding entitled to presumption of correctness under both former 28 U.S.C. § 2254(d) and amended 28 U.S.C. § 2254(e)(1)).

Implicit in the trial court's sustaining the State's challenge for cause of venire member Fountain is a factual finding of bias; likewise, implicit in the trial court's qualification of venire members Pedigo, Rawls, Jones, DeLord, Rhoads, Harding, Wheeler, and Nobles is a factual finding of absence of bias. *Witt* makes clear that a trial court is not required to write out in a separate memorandum his specific findings on each juror excused. 469 U.S. at 430. Moreover, where the record is silent as to the standard employed by a state trial judge, he is

presumed to have applied the correct standard. *Id.* at 432.   The presumption of correctness

conditionally required under § 2254(e)(1) applies to the trial court's determination regarding

a challenge for cause because "such a finding is based upon determinations of demeanor and

credibility that are peculiarly within a trial judge's province." *Witt*, 469 U.S. at 428, 430.

Moreover, absent "clear and convincing evidence overcoming this presumption," King is not

entitled to relief. *Kelly v. Lynaugh*, 862 F.2d 1126, 1134 (5th Cir. 1988). *See also Fuller*

*v. Johnson*, 114 F.3d at 500-501; *Russell v. Collins*, 998 F.2d 1287, 1293-94 (5th Cir. 1993);

*Drew v. Collins*, 964 F.2d 411, 417 (5th Cir. 1992).   King has failed to rebut this

presumption and he is not entitled to relief.

> ### J.   There was no deal between the prosecution and State's witness Matthew Hoover. (King's Claim XIV)

King next claims that his due process rights were violated by the State's failure to

disclose evidence of a deal between the prosecution and State's witness Matthew Hoover.

His sole evidentiary support for this claim is his own self-serving statement in an answer he

filed apparently in response to a wrongful death lawsuit filed by the victim's family. *See*

King's Petition at 332 (citing Exhibit 23).   This claim is procedurally barred and,

alternatively, frivolous.

> ### 1.   This claim is unexhausted and procedurally barred.

King failed to raise this claim either on direct appeal or in state habeas corpus review.

Therefore, the claim is unexhausted and procedurally barred as set forth in Section II, *supra*.

**2.      This claim is unsupported by the record because Hoover was not arrested on the charges at issue until months after testifying at King's trial.**

Alternatively, the claim fails on the merits because King cannot prove that the State

withheld evidence of a deal with Hoover.  Indeed, the "four felony drug charges" King

claims were the subject of the alleged deal did not arise until months after Hoover testified

at King's trial.[33]  *See* Director's Attachment B.[34]  While the suppression by the prosecution

of material evidence favorable to the accused after his request violates due process, *Brady*

*v. Maryland*, 373 U.S. 83, 87 (1963),[35] such a violation clearly does not occur if nothing

---

[33]      Furthermore, the prosecution was specifically ordered by the trial judge to disclose any agreements with witnesses, CR 123, and Hoover specifically denied at trial that he was promised anything in exchange for his testimony, 19 RR 86.  This entirely unsubstantiated claim cannot provide a basis for relief or an evidentiary hearing.

[34]      Director's Attachment B contains Matthew Hoover's criminal history obtained from PublicData.com.  It indicates that Hoover is currently incarcerated in the Missouri Training Center for Men under sentence for a total of nine charges.  On April 18, 2000, more than a year after King's trial, Hoover was sentenced on four separate drug charges: possession of drug paraphernalia, five-year sentence; manufacture of a controlled substance, seven-year sentence; and two counts of possession of a controlled substance.  The sentences appear to run concurrently.  On October 27, 2000, more than a year and a half after King's trial, Hoover was sentenced for five additional offenses; second-degree burglary, seven-year sentence; stealing, seven-year sentence; first-degree drug trafficking, twelve-year sentence; possession of chemicals with intent to create controlled substance, ten-year sentence; and unlawful use of weapon, five-year sentence.  These sentences also appear to be running concurrently.  These records do not indicate the date of arrest for these charges.  NCIC reports indicate that Hoover was arrested on these charges in May of 1999, two to three months after he testified at King's trial; however, due to restrictions on the use of NCIC reports, the undersigned counsel submitted the PublicData.com information instead.  Counsel for the Director is also attempting to obtain Hoover's penitentiary packet from the Missouri Training Center for Men.

[35]      To be entitled to federal habeas relief on this claim, a petitioner must prove that (1) the prosecutor suppressed or withheld evidence, (2) which was favorable and (3) material to the defense.  *Moore v. Illinois*, 408 U.S. 786 (1972); *United States v. Johnson*, 872 F.2d 612, 619 (5th Cir. 1989); *Brogdon v. Blackburn*, 790 F.2d 1164 (5th Cir. 1986).

existed for the State to disclose.[36]  King has also failed to substantiate his claim that the State

knowingly presented false testimony from Hoover.  *See* Petition at 333 (citing *Napue v.*

*Illinois,* 360 U.S. 264 (1959)).  There is simply nothing to indicate that Hoover testified

falsely.  This claim is utterly unsubstantiated and cannot provide the basis for the grant of

either relief, discovery or an evidentiary hearing.

> **K.**   **King is not constitutionally entitled to have his jury informed of the effect**
> **of a deadlock. (King's Claim XV)**

In his fifteenth ground for relief, King claims that Article 37.071 of the Texas Code

of Criminal Procedure is unconstitutional in that it prohibits instructing a capital jury of the

consequences of its failure to agree on a punishment-phase special issue.  Relying on *Mills*

*v. Maryland,* 486 U.S. 367 (1988), King contends that this prevented jurors from registering

their individual beliefs about the appropriateness of a death sentence and from giving effect

to mitigating evidence.  However, this claim is procedurally barred on federal habeas corpus

review.  In any event, the claim is *Teague*-barred and foreclosed by both Fifth Circuit and

Supreme Court precedent.

> **1.**   **This claim is unexhausted and procedurally barred.**

King failed to raise this claim either on direct appeal or in state habeas corpus review.

Therefore, the claim is unexhausted and procedurally barred as set forth in Section II, *supra.*

Additionally, because King did not object to the punishment charge on this basis at trial, his

---

[36]     King claims that he needs access to the voluminous trial files of the Jasper County
District Attorney's Office to prove this claim.  *See* Petition at 332.  However, the State's trial files
will be of no assistance to King given that these charges did not arise until well after King's trial.

claim is independently barred under the Texas contemporaneous objection rule. *See* TEX. R. APP P. 33.1(a); *McGinn*, 961 S.W.2d at 166; *Bell*, 938 S.W.2d at 54-55; *Hogue v. Johnson*, 131 F.3d at 494-96 (concluding that claim was defaulted where state court application of abuse bar was inadequate but where, if the state court had not found the application abusive, it would have found the claim barred by the state's contemporaneous objection rule). Both of these procedural bars preclude federal merits review of this claim.

### 2.  This claim is foreclosed by circuit precedent.

Alternatively, the claim is completely without merit.  Under Texas law, the jury reaches a verdict on a special issue in one of two ways:  by all the jurors agreeing that the issue should be answered "yes" (or, with regard to the mitigation issue, by all the jurors agreeing that the issue should be answered "no") or by ten or more jurors agreeing that it should be answered "no" (or, with regard to the mitigation issue, by ten or more jurors agreeing that it should be answered "yes"). TEX. CODE CRIM. PROC. ANN. art. 37.071(d)(2), (f)(2).  If the jurors are unable to reach such an agreement on one or more of the special issues, no verdict is returned.  Although the failure of the jury to answer any special issue results in the trial court sentencing the defendant to life imprisonment, *id.*, art. 37.071(g), a single "no" vote on one of the first two special issues or a single "yes" vote on the third special issue still results in a failure to agree:  an incomplete verdict.  Thus, while the jury is not informed of the legal consequence of an incomplete verdict, *id.*, art. 37.071(g), neither is it misled in any way.

The Fifth Circuit has consistently rejected identical claims raised by other Texas

habeas petitioners, based both on the substantive merits of the claim and on the court's

conclusion that to extend *Mills* to grant relief in a Texas case would require the court to

announce and apply a new rule of constitutional law which is prohibited on federal habeas

review by the nonretroactivity principle of *Teague v. Lane. See Alexander v. Johnson,* 211

F.3d 895, 897 (5th Cir. 2000) (relief denied based on *Teague*); *Jacobs v. Scott,* 31 F.3d 1319,

1328-29 (5th Cir. 1994) (relief denied on the merits); *Webb v. Collins,* 2 F.3d 93, 95 (5th Cir.

1993) (relief denied based on *Teague*); *Woods v. Johnson,* 75 F.3d 1017, 1036 (5th Cir.

1996) (relief denied based both on *Teague* and on the merits).  Therefore, circuit precedent

compels rejection of this claim as a matter of law.

Finally, in an analogous case, the Supreme Court recently rejected the theory that a

trial court's failure to instruct the jury as to the consequences of deadlock gives rise to an

Eighth Amendment violation. *Jones v. United States,* 527 U.S. 373, 381 (1999).  In *Jones,*

the capital defendant wished to inform the jury that the trial judge would impose a life

sentence without parole if the jury could not reach a punishment verdict. *Id.* at 380-381.

The Court noted that such issues do not involve the failure to provide the jury with mitigating

evidence, but only whether the jury was misled as to its role in the sentencing process. *Id.*

at 381-382.  In rejecting this contention, the Court held:

> The truth of the matter is that the proposed instruction has no bearing on the
> jury's role in the sentencing process. Rather, it speaks to what happens in the
> event that the jury is unable to fulfill its role . . . . Petitioner's argument . . .
> appears to be that a death sentence is arbitrary within the meaning of the
> Eighth Amendment if the jury is not given any bit of information that might
> possibly influence an individual juror's voting behavior.  That contention has
> no merit.

*Id.* at 2099. As the Court pointed out, "we have long been of the view that '[t]he very object of the jury system is to secure unanimity by a comparison of views, and by arguments among the jurors themselves,'" and "the Government has 'a strong interest in having the jury express the conscience of the community on the ultimate question of life or death.'" *Id.* (citations omitted).

The *Jones* Court cited with approval a Virginia Supreme Court decision in which the court upheld the refusal to give an instruction offered by the defendant which would have told the jury that the court would impose a life sentence if the jury could not reach agreement. The Virginia court stated that "while this was a correct statement of law, it concerned a procedural matter and was not one which should have been the subject of an instruction. It would have been an open invitation for the jury to avoid its responsibility and to disagree."*Justus v. Virginia,* 266 S.E.2d 87, 92-93 (Va. 1980). In citing *Justus* with approval, the Supreme Court reiterated its long-held view that the government has a strong interest in having a jury both reach a verdict and put forth the community conscience on the ultimate question of life or death. *Jones,* 527 U.S. at 382.

While recognizing that a jury cannot be affirmatively misled regarding its role in the sentencing process, *Romano v. Oklahoma,* 512 U.S. 1, 9 (1994), the Court specifically rejected the contention that the refusal to give the proposed instruction was affirmatively misleading to the jury. Instead, the Court found that the proposed instruction had no bearing on the jury's role in the sentencing process, since it dealt only with the situation of the jury

-99-

being unable to fulfill its role. *Jones,* 527 U.S. at 382.   Recognizing that a capital jury has

never been entitled to all information that might possibly influence an individual juror's

voting behavior, the Court reiterated that the Eighth Amendment does not require that a jury

be instructed as to the consequences of its failure to reach a verdict. *Jones,* 527 U.S. at 382.

Certainly, in light of the foregoing Supreme Court and Fifth Circuit authority, King

is not entitled to relief based on this claim.

### L.   King received the effective assistance of counsel on direct appeal. (King's Claim XVI)

King next asserts that he was deprived of the effective assistance of counsel on direct

appeal. This claim is procedurally barred and, alternatively, meritless; thus relief should be

denied.

### 1.   This claim is unexhausted and procedurally barred.

King failed to raise this claim on state habeas corpus review. Therefore, the claim is

unexhausted and procedurally barred as set forth in Section II, *supra.*

### 2.   This claim is unsupported by the record.

Alternatively, the claim is meritless. The appellate-level right to counsel is guaranteed

by the Due Process Clause of the Fourteenth Amendment to an accused pursuing a direct

appeal as of right. *Evitts v. Lucey,* 469 U.S. 387 (1985). The proper standard for evaluating

a claim that appellate counsel was ineffective is that enunciated in *Strickland v. Washington,*

466 U.S. 668 (1984). *Smith v. Robbins,* 528 U.S. 259, 285 (2000) (applying *Strickland* to

claim of attorney error on appeal). King must first show that his counsel was objectively

unreasonable in failing to raise certain issues on appeal – that is, that counsel unreasonably failed to discover nonfrivolous issues and to file a brief raising them. *Smith v. Robbins, supra.* Appellate counsel, however, does not have to advance every argument, regardless of merit, urged by the defendant. *See Jones v. Barnes*, 463 U.S. 745, 754 (1983). Indeed, counsel may omit even colorable issues from a brief in order to narrow the focus of the reviewing court on the claims having the best chance of success. *Id.* at 752. If King succeeds in such a showing, he then has the burden of demonstrating prejudice. That is, he must show a reasonable probability that, but for his counsel's unreasonable failure to brief an issue, he would have prevailed on his appeal. *Smith v. Robbins, supra.*

King can demonstrate neither deficient performance nor prejudice. In support of this ground for relief, King merely lists the claims raised in his federal petition then asserts that direct appeal counsel were ineffective for not raising them. *See* Petition at 352-354, 360. But as demonstrated in this brief, the claims raised by federal habeas counsel, which direct appeal counsel did not raise, are all either foreclosed by precedent or unsupported or even belied by the record. Thus, it cannot be said that appellate counsel were objectively unreasonable in choosing not to raise them. For the same reasons, King also cannot show a reasonable probability that he would have prevailed on appeal had these issues been raised. King is not entitled to relief on this claim.

**M.**  **The application of different capital-sentencing schemes in Texas in *Penry I*'s aftermath has not resulted in the arbitrary and capricious imposition of the death penalty, either generally or in King's case. (King's Claim XVII)**

King argues in his seventeenth claim for relief that his death sentence was arbitrarily obtained in violation of the Eighth and Fourteenth Amendments because there have been approximately six different capital-sentencing schemes in operation in Texas since the early 1970s. This claim is procedurally barred and meritless.

**1.**  **This claim is unexhausted and procedurally barred.**

King failed to raise this claim either on direct appeal or in state habeas corpus review. Therefore, the claim is unexhausted and procedurally barred as set forth in Section II, *supra*. Additionally, because King did not object on this basis at trial, his claim is independently barred under the Texas contemporaneous objection rule. *See* TEX. R. APP P. 33.1(a); *McGinn*, 961 S.W.2d at 166; *Bell*, 938 S.W.2d at 54-55; *Hogue v. Johnson*, 131 F.3d at 494-96 (concluding that claim was defaulted where state court application of abuse bar was inadequate but where, if the state court had not found the application abusive, it would have found the claim barred by the state's contemporaneous objection rule). Both of these procedural bars preclude federal merits review of this claim.

**2.**  **This claim is foreclosed by circuit precedent.**

The procedural bars aside, the claim is meritless. King's own allegations reflect that there have been only two statutory capital-sentencing schemes in effect in Texas in the post-*Furman* era. First, the special issues formerly codified at TEX. CODE CRIM. PROC. ANN. art.

37.071(b) (Vernon 1981), including deliberateness, future dangerousness, and provocation questions, are given in any capital-sentencing proceeding where the offense was committed before September 1, 1991.[37] Second, crimes committed on or after September 1, 1991, such as King's, are governed by the special issues codified in 1991: the future dangerousness issue was retained, while the deliberateness and provocation issues were replaced with an issue directed to the defendant's role in the offense and an issue pertaining to mitigating evidence. TEX. CODE CRIM. PROC. ANN. art. 37.071(b), (e) (Vernon Supp. 1994).

Any differences between the statutory schemes is a permissible consequence of the legitimate legislative decision to amend the statute in the wake of the Supreme Court's decision in *Penry v. Lynaugh*, 492 U.S. 302 (1989). It does not render sentences under either statute unconstitutionally arbitrary.[38] The variations of supplemental mitigation instructions that have been given do not reflect that similarly situated capital defendants are disparately treated and arbitrarily sentenced.[39] The Supreme Court has stated that, where the sentencer's

---

[37] For any trials or retrials occurring after August 29, 1993, the three former special issues are given, along with a fourth mitigation issue. *See* TEX. CODE CRIM. PROC. ANN. art. 37.0711 (Vernon Supp. 1993).

[38] Aside from the 1991 and 1993 amendments to article 37.071 of the Texas Code of Criminal Procedure, King merely cites to examples of supplemental mitigation instructions given in attempts to accommodate the *Penry I* decision in capital-sentencing proceedings that occurred prior to the effective date of legislative amendments to the statute.

[39] In any event, even if King demonstrated that a handful of defendants received a grant of mercy, which the State denies, such occasional acts of grace would not render the remaining sentences unconstitutionally arbitrary. *Gregg v. Georgia*, 428 U.S. 153, 196-97 (1976) (joint opinion). *See also Zant v. Stephens*, 462 U.S. at 875-76. Furthermore, because King is among those capital defendants who received a mitigation instruction, it is difficult to surmise how he could demonstrate that he was prejudiced by any alleged arbitrary action.

finding of aggravating circumstances is a separate and distinct determination, that determination rationalizes the death sentence.[40] *Pulley v. Harris*, 465 U.S. 37, 50 (1984) (citing *Zant v. Stephens*, 462 U.S. 862, 875-76 (1983)).  Further, even with respect to constitutionally mandated narrowing, the Court has not authorized the review of state court decisions to ascertain whether an aggravating circumstance has been consistently applied. *Arave v. Creech*, 507 U.S. 463, 477 (1993). *See also Spaziano v. Florida*, 468 U.S. 447, 464 (1984) (recognizing each individual state's ability to craft its own capital-sentencing procedures).

The logical extension of King's argument is that constitutional error occurs when two capital defendants are convicted under two independent, constitutionally adequate, but different, statutes.  Such a rule would invalidate all prior (and still constitutionally valid) convictions and all subsequent (and still constitutionally valid) convictions any time a state legislature changes its sentencing law.  The Constitution does not require such an illogical result.  In reviewing a similar claim, the Fifth Circuit has suggested, without deciding, that such claim "would not likely overcome the bar of *Teague v. Lane* or survive a review on its merits. . . ." *Hicks v. Johnson*, 186 F.3d 634, 637 (5th Cir. 1999) (ultimately denying certificate of appealability based on procedural bar arising from Hicks' failure to raise claim in state court).

---

[40]   In Texas, of course, the jury's verdict that the defendant is guilty of capital murder constitutes its finding of the existence of an aggravating circumstance. *Jurek v. Texas*, 428 U.S. 262, 270-74 (joint opinion).

Finally, King's trial occurred in 1999, almost eight years after the effective date of the legislative amendments to Texas' capital-sentencing statute. Even assuming there was a period of time when it could be said that Texas' capital-sentencing scheme ran the risk of producing arbitrary results, that time has long passed. King has not demonstrated that the Texas capital-sentencing scheme is applied arbitrarily, much less that it was applied arbitrarily to him. This claim is meritless and cannot provide a basis for the vacation of his death sentence.

### N.  The death penalty is a constitutionally sound punishment. (King's Claim XVIII)

In his eighteenth claim for relief, King argues that the death penalty, as currently administered in Texas, is cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments. However, this claim is procedurally barred on federal habeas corpus review. In any event, the claim is *Teague*-barred and foreclosed by precedent. As the Supreme Court observed in *Gregg v. Georgia*, the death penalty "is an extreme sanction, suitable to the most extreme of crimes." 428 U.S. 153, 187 (1976) (plurality opinion). None can question that this case fits that description.

#### 1.  This claim is unexhausted and procedurally barred.

King failed to raise this claim either on direct appeal or in state habeas corpus review. Therefore, the claim is unexhausted and procedurally barred as set forth in Section II, *supra*. Furthermore, because King did not object on this basis at trial, his claim is independently barred under the Texas contemporaneous objection rule. *See* TEX. R. APP P. 33.1(a);

*McGinn*, 961 S.W.2d at 166; *Bell*, 938 S.W.2d at 54-55; *Hogue v. Johnson*, 131 F.3d at 494-96 (concluding that claim was defaulted where state court application of abuse bar was inadequate but where, if the state court had not found the application abusive, it would have found the claim barred by the state's contemporaneous objection rule). Both of these procedural bars preclude federal merits review of this claim.

> **2.      This claim is *Teague*-barred and foreclosed by circuit and Supreme Court precedent.**

Alternatively, the claim is *Teague*-barred and foreclosed by precedent. King appears to rely on two alternative legal theories to support his contention that Texas' death penalty scheme, and, by implication, all death penalty schemes, are unconstitutional. First, he claims that the death penalty is cruel and unusual because it is inconsistent with "evolving standards of decency that the mark the progress of a maturing society." Petition at 368-369. Second, he relies upon Justice Blackmun's dissent to the denial of certiorari review in *Callins v. Collins*, 510 U.S. 1141 (1994), to support his argument that all death penalty schemes are unconstitutional "because they are the product of paradoxical constitutional commands: on the one hand, jurors must be free to consider any and all types of constitutionally relevant mitigating evidence[41], while, on the other hand, there must be 'structured discretion' in sentencing, as required by *Furman* [*v. Georgia*, 408 U.S. 238 (1972)]." Petition at 370-

_____

[41]      *See Lockett v. Ohio*, 438 U.S. 586 (1978) (plurality opinion), and *Eddings v. Oklahoma*, 455 U.S. 104 (1982).

371.[42]        Neither of these theories supports King's claim. "It is apparent from the text of the Constitution itself that the existence of capital punishment was accepted by the Framers." *Gregg v. Georgia*, 428 U.S. at 177.[43] The *Gregg* Court further rejected a claim that the death penalty violates "evolving standards of decency" based in part on the fact that thirty-five state legislatures had enacted capital-sentencing schemes in *Furman*'s wake.[44] *Id.* at 187. Moreover, the Supreme Court has held that the Texas death penalty scheme in particular fulfills Eighth Amendment requirements. *Jurek v. Texas*, 428 U.S. 262, 269-271 (1976). *See also Penry v. Johnson*, 532 U.S. 782, 803 (2001) (citing with approval current Texas death penalty statute, under which King was sentenced). The scheme both genuinely narrows the class of death-eligible defendants, thus guarding against arbitrary and capricious imposition of the death penalty, and provides for individualized sentencing based on the

---

[42]        King also appears to challenge the death penalty based on alleged racial discrimination in its assessment in Texas. *See* Petition at 371. However, King's citation to studies showing "that a capital murderer of a white person is as much as five times more likely to receive a death sentence than a person who murders a black" is puzzling given the facts of this case. But, in any event, the Supreme Court in *McCleskey v. Kemp*, 481 U.S. 279 (1987), rejected such an argument, concluding that a similar study of Georgia's death penalty at most indicated a discrepancy that appeared to correlate with race, not a constitutionally significant risk of racial bias affecting the capital-sentencing process itself, and thus did not demonstrate a violation of Eighth Amendment. *Id.* at 313.

[43]        *See also Callins v. Collins*, 510 U.S. 1141, 1141 (1994) (Scalia, J., concurring in the denial of certiorari) ("The Fifth Amendment provides that 'no person shall be held to answer for a capital . . . crime, unless on a presentment or indictment of a Grand Jury . . . nor be deprived of life . . . without due process of law.' This clearly permits the death penalty to be imposed, and establishes beyond doubt that the death penalty is not one of the 'cruel and unusual punishments' prohibited by the Eighth Amendment.").

[44]        Currently, thirty-eight states and the federal government have the death penalty, although Illinois has a moratorium in place.

character of the individual and the circumstances of the crime.[45]

King has shown no valid basis for overturning these decisions. Indeed, given the decisions in *Gregg* and *Jurek*, it is clear that current Supreme Court precedent does not "dictate" the result King seeks. Accordingly, federal habeas relief is barred under *Teague v. Lane*, 489 U.S. 288 (1989). King is not entitled to relief based on this claim.

**O.   Lethal injection is a constitutionally sound method of execution. (King's Claim XIX)**

King next claims that lethal injection is a cruel and unusual method of punishment. Again, this claim is procedurally barred and foreclosed by precedent.

**1.   This claim is unexhausted and procedurally barred.**

King failed to raise this claim either on direct appeal or in state habeas corpus review. Therefore, the claim is unexhausted and procedurally barred as set forth in Section II, *supra*. Additionally, because King did not object on this basis at trial, his claim is independently barred under the Texas contemporaneous objection rule. *See* TEX. R. APP P. 33.1(a); *McGinn*, 961 S.W.2d at 166; *Bell*, 938 S.W.2d at 54-55; *Hogue v. Johnson*, 131 F.3d at 494-96 (concluding that claim was defaulted where state court application of abuse bar was inadequate but where, if the state court had not found the application abusive, it would have

---

[45]     While recognizing the dichotomy between the seemingly at odds *Furman* and *Lockett-Eddings* principles of its Eight Amendment jurisprudence, *see McCleskey v. Kemp*, 481 U.S. 279, 304 (1987), the Supreme Court has repeatedly cited the Texas procedure as an exemplary accommodation of both principles, in part because it effectively insulates the eligibility and selection decisions from one another. *See, e.g., Franklin v. Lynaugh*, 487 U.S. 164, 182 (1988); *Johnson v. Texas*, 509 U.S. at 373; *Lowenfield v. Phelps*, 484 U.S. at 245-46; *Zant v. Stephens*, 462 U.S. at 875-76 n.13 (1983); *Adams v. Texas*, 448 U.S. 38, 46 (1980).

found the claim barred by the state's contemporaneous objection rule).   Both of these

procedural bars preclude federal merits review of this claim.

> **2.      This claim is *Teague*-barred and foreclosed by circuit precedent.**

Alternatively, the claim is *Teague*-barred and foreclosed by precedent.   The Eighth

Amendment requires that "punishment must not involve the unnecessary and wanton

infliction of pain." *Gregg v. Georgia*, 428 U.S. 153, 173 (1976).   The Fifth Circuit has

repeatedly upheld the use of lethal injection for capital punishment under the Eighth

Amendment. *Kelly v. Lynaugh*, 862 F.2d 1126, 1135 (5th Cir. 1988), *cert. denied*, 492 U.S.

925 (1989); *Woolls v. McCotter*, 798 F.2d 695, 697-98 (5th Cir.), *cert. denied*, 478 U.S.

1031 (1986).   In *Woolls*, the court held that, even if it were true that a "botched" lethal

injection would produce "a sense of shortness of breath and suffocation over a two to three

minute period," or "a sensation of multiple electric shocks over the entire body with erratic

muscle twitching followed by acute paralysis and suffocation," the court still did not believe

that this would be sufficient to state an Eighth Amendment claim.[46] *Id.*   Thus, King's claim

is foreclosed by circuit precedent.[47]

It is unclear whether King argues that lethal injection is in all instances an

---

[46]      Justice Scalia has observed that "death-by-injection . . . looks pretty desirable next to . . . some of the other cases currently before us . . . for example, the case of the 11-year-old girl raped by four men and then killed by stuffing her panties down her throat. How enviable a quiet death by lethal injection compared with that!" *Callins v. Collins*, 510 U.S. 1141, 1142-43 (1994) (Scalia, J., concurring in the denial of certiorari).   The same could surely be said for the tortuous, excruciatingly painful death Mr. Byrd endured.

[47]      Indeed, because current precedent does not "dictate" the result King seeks, federal habeas relief is barred under *Teague v. Lane,* 489 U.S. 288 (1989).

unconstitutional means of execution, or merely that the methods and procedures utilized by TDCJ-ID are so inadequate that they have led to unnecessary infliction of pain. In any event, despite the fact that members of the news media observe and report on *every* execution which occurs in Texas, King is only able to cite to a single execution out of 289 since 1982 in which reporters recounted difficulties: gasping, coughing, rearing, and groaning (Justin Lee May). *See* Petition at 381. Even assuming that these symptoms were caused by inadequate execution procedures, a single incident is insufficient to render the system of execution unconstitutional. King does attempt to refer to other executions which he calls botched, but he fails to present anything to support them. However, even if the additional instances are considered, they amount only to one other instance of physical difficulties (Stephen McCoy), an instance of a mechanical failure (Raymond Landry), and some instances of delay while appropriate veins were found (which, contrary to King's assertions, would seem to be instances of care being exercised prior to the execution in order to avoid problems during the execution caused by poor veins or incorrect insertion of the catheters). Petition at 380-381. Again, however, it must be kept in mind that every execution is monitored and reported by the media, and these three instances, plus the problems of finding veins, are the *only* allegedly "botched" executions King has been able to come up with. Again, this is a minimal number out of the 289 executions in the last twenty years and is insufficient to show that unnecessary pain is being inflicted under the Constitution. King is not entitled to relief based on this claim.

**P.     Trial counsel were not operating under a conflict of interest at trial. (King's Claim XX)**

In his twentieth claim for relief, King argues that his trial counsel were operating under an actual conflict of interest arising from a media rights contract entered into on the day King was sentenced to death, thus violating his Sixth Amendment right to counsel. This claim is procedurally barred and meritless.

**1.     This claim is unexhausted and procedurally barred.**

King failed to raise this claim either on direct appeal or in state habeas corpus review. Therefore, the claim is unexhausted and procedurally barred as set forth in Section II, *supra*.

**2.     This claim is meritless.**

**a.     No conflict existed given that the media contract was not entered into until after the representation had concluded.**

First, King has failed to demonstrate that any conflict arose, given that the contract was not entered into until after the representation had concluded. The execution of literary and media rights fee arrangements between attorneys and their clients *during the pendency of a representation* have been uniformly denounced by courts, scholars and organizations of the bar. *Beets v. Scott*, 65 F.3d 1258, 1273 n.19 (5th Cir. 1995) (en banc) (citing *United States v. Hearst*, 638 F.2d 1190 (9th Cir. 1980); Mark R. McDonald, *Literary-Rights Fee Arrangements in California: Letting the Rabbit Guard the Carrot Patch of Sixth Amendment Protection and Attorney Ethics?*, 24 Loy. L. A. L. Rev. 365 (1991); American Bar Ass'n, Standards for Criminal Justice, Standard 4-3.4 (2d ed. 1980); American Bar Ass'n, Model Code of Professional Responsibility, DR 5-104(B); American Bar Ass'n, Model Rules of

Professional Conduct, Rule 1.8(d)).  The Texas Disciplinary Rules of Professional Conduct

provide that

> Prior to the conclusion of all aspects of the matter giving rise to the lawyer's
> employment, a lawyer shall not make or negotiate an agreement with a client,
> prospective client, or former client giving the lawyer literary or media rights
> to a portrayal or account based in substantial part on information relating to
> the representation.

TEX. DISCIPLINARY R. PROF'L CONDUCT 1.08(c), *reprinted in* TEX. GOV'T CODE ANN., tit.

2, subtit. G app. A (Vernon Supp. 1997) (TEX. STATE BAR R. art. X, § 9).

But the agreement at issue here does not suffer the same flaw.  As the Fifth Circuit

noted in *Beets*, "a media rights contract is offensive because it may encourage counsel to

misuse the judicial process for the sake of his enrichment and publicity-seeking. . . ."  65

F.3d at 1273.  *See also* TEX. DISCIPLINARY R. PROF'L CONDUCT 1.08(c) cmt. 4 ("Measures

suitable in the representation of the client may detract from the publication value of an

account of the representation.").  Thus, in a case such as this, where the agreement did not

exist until after the trial was over, there is no basis to infer that counsel's performance at trial

was compromised by the agreement.[48]

Moreover, the agreement clearly was not part of any fee or a condition of accepting

the case, given that trial counsel represented King pursuant to a court appointment.  Indeed,

the agreement provided that any proceeds from the media rights would be divided equally,

---

[48]      In *Beets*, by contrast, the petitioner had signed a contract transferring all literary and
media rights in her case to her attorney's son, shortly after her trial commenced and after negotiations
fell through to obtain the attorney's fee from Beets' children.  65 F.3d at 1261-62.

one-third each, among the two trial attorneys and King's father. King's Exhibit 37 at 2.

Thus, it is likely that the agreement was entered into, as set forth, for "the mutual benefits

of the parties." *Id.* at 1. For a share of the proceeds, King's trial attorneys would essentially

act as agents with regard to media rights. King's father would receive a share of the

proceeds as well as the benefit of having someone more qualified act as agent in promoting

those rights.[49] The contract simply did not create any conflict of interest.

> **b.** **Even if the media rights contract resulted in a conflict, Fifth Circuit precedent requires King to prove prejudice under *Strickland*, which he cannot.**

Second, even if such contract did somehow operate retroactively to "conflict" counsel

in their representation of King, the Fifth Circuit has held that, in cases involving media rights

contracts, a petitioner must establish prejudice under *Strickland* and may not rely upon the

presumed-prejudice framework of *Cuyler v. Sullivan*, 446 U.S. 335 (1980). *Beets v. Scott*,

65 F.3d 1258, 1272 (5th Cir. 1995) (en banc).

As set forth in Section III.A., *supra*, King has failed to demonstrate that he was

prejudiced by any action or inaction of his trial attorneys. Particularly with regard to

counsel's handling of King's "version of events" and mental health evidence, which King

claims was adversely affected by the media rights contract, *see* Petition at 387-388, trial

counsel explained the efforts they took in these areas and the tactical reasons for the

---

[49]     While King repeatedly asserts that his trial attorneys "coerced" him into signing the contract, *see* Petition at 387 & n. 348, there is absolutely nothing in the record to support that assertion, and, in fact, the terms of the agreement itself belie that assertion.

-113-

decisions they made in an affidavit submitted during state habeas corpus proceedings. *See* SHCR 140-145. This affidavit was credited in state court findings, *see* SHCR 187, ¶ 52, which are entitled to a presumption of correctness in this Court. 28 U.S.C. § 2254(e)(1).

**c.    Even under the *Sullivan* framework, King cannot demonstrate adverse effect.**

Finally, even if *Sullivan* applied, King cannot show that counsel's performance was adversely affected by the alleged conflict. The record does not demonstrate that the contract induced trial counsel to compromise their zealous representation of King in favor of their own pecuniary interest. *See* Section III.A., *supra*.

**Q.    Application of the cumulative error doctrine does not entitle King to relief. (King's Claim XXI)**

King contends, in his twenty-first and final ground for relief, that he is entitled to relief, even if no single error that he has alleged is significant enough to warrant reversal of his conviction. He asserts that the cumulative effect of all of the errors together is a trial that denied him due process and calls for reversal of his conviction. This claim is without merit

**1.    This claim is unexhausted and procedurally barred.**

King failed to raise this claim either on direct appeal or in state habeas corpus review. Therefore, the claim is unexhausted and procedurally barred as set forth in Section II, *supra*.

**2.    This claim is unsupported by the record.**

As argued above, none of King's claims have merit and, therefore, there can be no cumulative effect. Noting that cumulative error is an infinitely expandable concept, and that granting habeas relief for aggregated non-constitutional errors may too easily conflict with

-114-

established limits on the scope of federal habeas relief, the Fifth Circuit pointed out that such a claim is not favored. *See Derden v. McNeel*, 978 F.2d at 1457-58 (also noting, "[o]ur research has revealed only two cases in which federal habeas relief was granted because of an accumulation of trial court errors"). The court then required that any such claim only refer to errors in the trial court of constitutional dimension and that the errors complained of must not have been procedurally barred on federal habeas review. *Id.* at 1458; *see also Nichols v. Scott*, 69 F.3d 1255 (5th Cir. 1995). Finally, the federal court must review the record as a whole to determine whether errors more likely than not caused a suspect verdict. *Id.*

These requirements in themselves preclude the consideration of most of King's claimed errors, even if those errors *were* found to have merit. In any case, however, none of the alleged errors could have cumulatively caused a suspect verdict, due to the fact that the individual claims of error lack merit. Because the individual points of error lack merit, the cumulative error claim also lacks merit, and this claim should be denied.

### CONCLUSION

As established *supra,* King has failed to demonstrate that the state courts' adjudication of these claims resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law. Nor has he proven that the state courts made an unreasonable determination of the facts in light of the evidence presented below with regard to any of the claims raised in the instant federal habeas petition. As such, King is not entitled to relief and his petition for writ of habeas corpus should be denied. Further, King

-115-

has not made a substantial showing of the denial of a federal constitutional right concerning

any of his claims.  This Court should therefore also deny him a certificate of appealability

on all of the issues raised in the instant proceeding.  28 U.S.C. § 2253(c)(2).

WHEREFORE, PREMISES CONSIDERED, the Director respectfully requests that

her motion for summary judgment be granted, that King's federal petition for writ of habeas

corpus be summarily denied with prejudice, and that no certificate of appealability issue with

regard to any of the claims raised in the instant federal habeas petition.

Respectfully submitted,

GREG ABBOTT
Attorney General of Texas

BARRY R. McBEE
First Assistant Attorney General

JAY KIMBROUGH
Deputy Attorney General
for Criminal Justice

*GENA BUNN
Chief, Capital Litigation Division
Assistant Attorney General
*Attorney-in-charge
State Bar No. 00790323

P.O. Box 12548, Capitol Station
Austin, Texas  78711-2548
(512) 936-1600
(512) 320-8132 (Fax)

ATTORNEYS FOR RESPONDENT

-116-

## CERTIFICATE OF SERVICE

I, Gena Bunn, Assistant Attorney General of Texas, do hereby certify that a true and correct copy of the above and foregoing **Answer and Motion for Summary Judgment with Brief in Support** has been served by overnight delivery on this the 7th day of January, 2003, addressed to:

A. Richard Ellis
75 Magee Avenue
Mill Valley, California 94941

GENA BUNN
Assistant Attorney General

-117-