1        A.   Did I tell Tammy that I was going ...

03:53:52   2        Q.   To go to Jasper to see somebody who loved

3    you.

4        A.   You got me confused.  I don't know what

5    you're saying now.

03:53:59   6        Q.   Okay.  Were you talking about Bill King?

7        A.   After we had the fight?

03:54:03   8        Q.   Yes.

9        A.   I didn't tell Tammy I was going to Jasper.

10   I was in Jasper whenever -- if you're referring to

11   the fight with Mr. Byrd?

03:54:11   12       Q.   Talking about the fight with you and Tammy.

13       A.   Oh, when me and Tammy had the fight?

03:54:17   14       Q.   Right.

15       A.   I told her -- we had the fight, and I told

16   her to -- to take me to get my check.  And she

17   said -- she took me down to the -- where my part-time

18   job was; and I got my check for, like, $150.  Told

19   her to take me to the bus station that I was going to

20   Bill King's house.  And she took me to my cousin's

21   house -- well, she took me to get my bus ticket

22   first; and it was, like, two hours.  So I waited over

23   at my cousin's house and she took me to the bus stop.

03:54:49   24       Q.   Why did she take you to your cousin's house

25   if she'd already brought you to the bus station?

1   A.   Because I asked her -- I told her the bus

2   don't run for two hours and I didn't want to sit at a

3   bus station.  So she took me to my cousin's house and

4   I waited for the bus schedule and he brought me to

5   the bus station.

03:55:04   6   Q.   Okay.  If she said you were down on your

7   knees crying and begging her -- if she told that to

8   the FBI, that would not be true?

9   A.   If she told you what?

03:55:12   10   Q.   Listen to me.

11   A.   I'm listening, but you're confusing me.

03:55:16   12   Q.   I'm confusing you?

13   A.   Yes, sir.

03:55:18   14   Q.   Okay.  Let me see if I can unconfuse you,

15   sir.  If Tammy told the FBI the reason she brought

16   you to your cousin's --

17   A.   Yes, sir.

03:55:27   18   Q.   Okay -- was because you were down on your

19   hands and knees begging her --

20   A.   Take me to where?  To my cousin's?

03:55:35   21   Q.   No, sir.  That you were down on your hands

22   and knees begging her not to make you leave, would

23   that would be a true or false statement?

24   A.   Yes.  I -- I asked her not to make me

25   leave.

PAULA K. FREDERICK, CSR
(979) 361-4270

03:55:52  1     Q.   That would a true statement then; is that

2     correct?

3     A.   I told her not to make me leave.  Matter of

4     fact, she had got her Social Security -- or her

5     income tax at that time.

03:56:03  6     Q.   Okay.  We don't need to know about that

7     right yet.

8     A.   I think that's the reason me and her got in

9     and argument because she told me that she was fixing

10    to go out and spend her money, and I told her --

03:56:13  11    Q.   Okay.

12    A.   She wanted --

03:56:15  13    Q.   Hang on a minute.  Let me ask you the

14    question.

15    A.   Okay.

03:56:18  16    Q.   All right.  So that was a true statement

17    about you getting on your hands and knees and begging

18    her not to make you leave; is that right?

19    A.   I wouldn't say hands and knees.  I was

20    crying a lot because I didn't know where I was going,

21    to tell you the truth at that time.

03:56:32  22    Q.   Okay.  Now then, did you tell her that you

23    were going to Jasper to be with someone you loved?

24    A.   I didn't say "love."  I said I was going to

25    Jasper to Bill King's house because I had just called

1    him on the phone, like, two or three weeks prior to

2    that.

03:56:46  3       Q.   So if she said you said that, then she's

4    lying; is that correct?

5       A.   I don't know.  I can't say if she's lying

6    on that.  You would have to ask her.

03:56:54  7       Q.   Well, I'm asking you.  Either you said it

8    or you didn't, sir.

9            MR. BARLOW:  Your Honor, I have to

10   object.  It's improper under the rules to ask one

11   witness whether another witness -- or even potential

12   witness, I guess, in this situation -- is lying.

13           THE COURT:  Objection is overruled.

03:57:11  14      Q.   (BY MR. HARDY)  Would you answer the

15   question, sir?

16      A.   If she said that I was on my hands and

17   knees crying to her because I didn't want to leave

18   her house -- yes, I was crying to her because I

19   didn't want to leave her house.  And she told me I

20   was going to have to pack my stuff and get out.

21   That's it.

03:57:30  22      Q.   Did you tell her you were going to Jasper

23   to be with someone you loved, talking about Bill

24   King?

25      A.   I told her I was going to Jasper, yes, sir.

PAULA K. FREDERICK, CSR
(979) 361-4270

03:57:37  1          Q.   Did you tell her you were --

          2          A.   I didn't say anything about love.

03:57:41  3          Q.   Did you tell her that or not?

          4          A.   I told her I was going -- heading to

          5     Jasper.

03:57:47  6          Q.   Did you tell her that you were going to

          7     Jasper to be with someone you loved, talking about

          8     Bill King?  Either you did or you didn't.

          9          A.   No, sir, I didn't use that statement.

03:57:54 10          Q.   Okay.  You say you didn't say that?

         11          A.   I told her I was going to Jasper to Bill

         12     King's.

03:58:00 13          Q.   That's all you told her?  Okay.

         14          A.   Yes, sir.

03:58:06 15          Q.   And Bill King was your brother; is that

         16     correct?

         17          A.   Bro -- that's what they use in prison.

         18     Gang relations or whatever you call it.

03:58:15 19          Q.   Okay.  When you had your fight with your

         20     girlfriend, you didn't go to your family's house, did

         21     you?

         22          A.   She took my to my cousin's for about two

         23     hours -- I didn't go to my cousin.  Usually I did go

         24     to my cousin's --

03:58:26 25          Q.   Okay.  You didn't go see your son; is that

PAULA K. FREDERICK, CSR
(979) 361-4270

```
 1    correct?
 2         A.    I didn't go see my son.
03:58:30  3       Q.    Didn't go see your parents?
 4         A.    No.
03:58:34  5       Q.    Okay.  You didn't go see any of your
 6    childhood friends; is that correct?
 7         A.    Childhood friends?  I been moved around.  I
 8    don't know where any of my childhood friends are.
03:58:50  9       Q.    Okay.  You didn't go to see anybody but
10    Bill King; is that correct?
11         A.    Yes, sir.
03:58:57 12       Q.    Okay.
13         A.    That's right.
03:58:59 14       Q.    Okay.  Were you on parole at that time?
15         A.    Oh, yes.  Uh-huh.
03:59:20 16       Q.    And you know it was a violation of your
17    parole to be around people that had been in criminal
18    trouble before; is that correct?
19         A.    Yes, sir, I was well aware of that.  But my
20    intentions was going up there for two or three days
21    or maybe a week at the most and then returning back
22    after both me and my girlfriend both cooled off and
23    just like before everything was back to normal after
24    everything.
04:00:14 25       Q.    I'm going to show you what's been entered
```

1    into evidence State's 114.

2         A.    Yes, sir.

04:00:20    3         Q.    This is what you wrote in Bill's --

4         A.    Yes, sir.

04:00:23    5         Q.    Bill's book?

6         A.    Yes, sir, that is what I wrote.

04:00:26    7         Q.    Okay.  Now, there was something that your

8    counsel asked you about writing darker here on this

9    that you say you didn't write; is that correct?

10         A.    Writing lighter.  That was in, like, a

11    lighter handwriting than what the rest of this letter

12    was.

04:00:46    13         Q.    Okay.  But this isn't light here, is it?

14         A.    Don't look light right in that particular

15    picture and doesn't look light right up in there, but

16    on that original letter it is -- to my -- best I can

17    see it is in lighter.  That's what caught my

18    attention on the letter.  It doesn't -- that looks

19    dark on this right here but on the original letter --

04:01:07    20         Q.    Well, when you want to bring something out

21    in your letters, do you make it darker?

22         A.    No, sir.

04:01:14    23         Q.    Well, didn't you say you made this -- wrote

24    that swastika?

25         A.    No, sir.

PAULA K. FREDERICK, CSR
(979) 361-4270

04:01:19    1    Q.   Okay.   What about that?   Did you write this

2    up here in that letter, about the Aryans rule this

3    here free world -- or this here world?

4    A.   No.

04:01:27    5    Q.   You didn't write that either?

6    A.   I couldn't see myself writing to a Spanish

7    guy nothing about no white pride or power or swastika

8    or anything of that nature.   Spanish or black guy.

04:01:39    9    Q.   Okay.   Now, did you write this here to Bill

10   King?

11   A.   Yes, sir.

04:01:44   12    Q.   Okay.   And isn't this right here -- "listen

13   closely," isn't the "closely" written darker?

14   A.   Looks like it was gone over two or three

15   times, yes, sir.

04:01:56   16    Q.   And you did that, didn't you?

17   A.   That's my handwriting, yes, sir.

04:02:01   18    Q.   You wanted to get Bill's attention here

19   when you were telling him how you were going to

20   school his young ass, didn't you, Mr. Brewer?

21   A.   I wouldn't say that.

04:02:10   22    Q.   What would you say, Mr. Brewer?

23   A.   I would say I didn't know what to write in

24   that photo album so I viewed everyone else's writing.

25   And I wasn't going to write racial slurs and all that

1    other stuff them other folks wrote.  So that's the

2    reason I wrote that.

04:02:31  3        Q.   You didn't know what you wanted to write

4    but the first three letters was, "listen closely

5    bro"; is that correct?

6        A.   That's correct.

04:03:06  7        Q.   Now, you've stated before this jury that

8    you didn't want to -- your brothers there at Beto I

9    know you had a Hispanic child; is that correct?

10       A.   Yes, sir, that's correct.

04:03:24  11       Q.   Okay.  The bottom line is the CKA meant

12   more to you, Mr. Brewer, than your own child; isn't

13   that correct?

14       A.   Sir, I was in a position --

04:03:32  15       Q.   Would you answer my question, please?

16            MR. WALKER:  Judge, I believe --

04:03:36  17       Q.   (BY MR. HARDY)  -- then you can explain,

18   but I would like an answer.

19            MR. WALKER:  I believe he's trying to

20   answer the question if Mr. Hardy would stop

21   interrupting him.

22            MR. HARDY:  Judge, if he keeps

23   rambling along -- you know, I would like to get a

24   straight answer.

25            THE COURT:  The objection is

252

1    overruled.  Ask your question one more time.

2              And it needs to be answered directly.

3              *THE DEFENDANT:*  Yes, sir.

04:03:55   4    Q.    *(BY MR. HARDY)*  Mr. Brewer, your brothers

5    in the CKA meant more to you than your own child;

6    isn't that correct.

7    A.    At that time, yes, sir, they sure did.

04:04:05   8    Q.    Okay.

9    A.    Yes, sir.

04:04:07  10    Q.    Okay.  Now, you had a job as you stated to

11   the jury; is that correct?

12   A.    I had a job when?  I've --

04:04:19  13    Q.    After you got out of prison.

14   A.    Oh, yes, sir.  I went straight to work.

04:04:23  15    Q.    Okay.

16   A.    Maybe three or four different jobs.

04:04:26  17    Q.    And you quit that job; is that correct?

18   A.    That first one I had?  Yes, sir.

04:04:40  19    Q.    Because it was dirty work?

20   A.    It was outside work, yes, sir.  Constantly

21   outside, yes, sir.  But it wasn't a week after that

22   that I got a job at a laminating place -- cabinet

23   shop.

04:04:46  24    Q.    Okay.  You've also stated to the jury that

25   you didn't like showing off your tattoos; is that

```
 1   correct?

 2       A.   Well --

 3       Q.   Did you state that?

 4       A.   I'm -- I don't recall that.

 5       Q.   Okay.

 6       A.   I went without my shirt a lot of times.

 7       Q.   You didn't mind somebody seeing your

 8   tattoos then; is that right?

 9       A.   I didn't mind no one seeing them?

10       Q.   Yes, sir.

11       A.   No, I didn't mind nobody seeing them.

12       Q.   So if the jury remembers that you said it a

13   little different when Mr. Walker was asking you a

14   question, you're getting that straightened out for

15   them right now; isn't that correct?

16       A.   Well, the one Mr. Walker was referring to

17   was, like, the racial one with the cross burning and

18   the KKK -- that particular one.  That's whenever I

19   was -- I couldn't show that one off, you know, if --

20   if I was wanting to show it off, I would have put it

21   within eye sight, you know.  I'm not going to do that

22   whenever -- you know, whenever you're in prison and

23   you got a black cellmate -- I didn't -- I was new to

24   that type of environment, and I'm not going to put

25   myself out there straight off the bat being there a
```

04:04:54
04:04:59
04:05:03
04:05:08
04:05:13

1    month and getting that patch put on me where I don't

2    know what's fixing to happen to me.

04:06:12   3        Q.   We're not talking about in prison, sir.

4    We're talking about when you got out of prison.

5        A.   When I got out of prison?  Was I ashamed or

6    what?

04:06:18   7        Q.   I didn't ask if you were ashamed.  You've

8    already stated you ran around with your shirt off

9    quite a bit, didn't you?

10        A.   I did, yes.

04:06:24  11        Q.   So you weren't ashamed of them, were you?

12        A.   No.

04:06:27  13        Q.   Okay.  So you're getting that straightened

14    up for the jury if they had any mix-up on the

15    question Mr. Walker asked you; isn't that right?

16        A.   What was the question he asked me?

04:06:35  17        Q.   Well, you just said he asked you whether or

18    not you wanted to hide your tattoos, whether or not

19    you were proud of your tattoos; and you told him you

20    weren't; isn't that right?

21        A.   I don't know if I said I wasn't proud of my

22    tattoos.  Some of them -- most of them I am proud of;

23    otherwise, I wouldn't have put them on me.

04:07:12  24        Q.   Now, had you ever met Johnny Rashid before

25    you went to -- before you went to Jasper, Texas?

1       A.   No.

04:07:20  2       Q.   He has no reason to tell any falsehoods to

3   this jury, does he?

4       A.   No, not that I can see.

04:07:27  5       Q.   Okay.  What about the officer from Sulphur

6   Springs?  Did you know him?

7       A.   Said he pulled me over that one time for

8   speeding.

04:07:36  9       Q.   Did you know him?

10       A.   No, I didn't know him.

04:07:39 11       Q.   Okay.  He don't have any reason to lie

12   about you, does he?

13       A.   Not that I can imagine, no.

04:07:47 14       Q.   Okay.  Does rolling a tire mean assaulting

15   a black man, in prison language?

16       A.   I never heard that -- a black person even

17   referred to as a tire until this -- whenever my

18   attorneys asked me, "Are you sure that 'tire' don't

19   mean a black person?"  I told them I hadn't never

20   heard of that term before, referring to a tire as a

21   black person, no.

04:08:22 22       Q.   Okay.  And people in white supremest gangs

23   are referred to as "woods"; is that correct?

24       A.   Don't necessarily have to be in a gang; but

25   if you stand up for what's yours and don't let people

1    run over you as far as take your commissary or tell

2    you get up out of that seat and let me sit down

3    there -- and, you know, if you more or less stand

4    your ground then you're considered a wood.  You know,

5    mind your own business, if you're not off into, you

6    know, what they're doing.  "I'm fixing to tell on

7    you" you're considered --

04:08:55   8        Q.   Okay.

9        A.   In prison you're considered --

04:08:55  10        Q.   And a female girlfriend of a wood is

11    considered featherwood; is that correct?

12        A.   I would assume that that's what they tell

13    me that whites -- males are your woods and your white

14    females are your featherwoods, but I couldn't --

04:09:12  15        Q.   Well, you've referred to your girlfriend as

16    a featherwood, haven't you, sir?

17        A.   Like a figure of speech, but I wouldn't

18    know how a white female -- what she would have to do

19    to be considered a featherwood.

04:09:24  20        Q.   Okay.  Let me ask you this:  You've never

21    referred to any of the girls you've been with as

22    tires, have you?

23        A.   As tires?

04:09:31  24        Q.   Yeah.

25        A.   I don't remember, no.

PAULA K. FREDERICK, CSR
(979) 361-4270

04:09:33    1         Q.    Never did that?

            2         A.    No.

04:09:36    3         Q.    Okay.   Now, you've seen these tennis shoes

            4    with the "LB" in them?

            5         A.    Yes, sir.

04:09:54    6         Q.    Those are your shoes; is that correct?

            7         A.    Them white Nikes?

04:09:59    8         Q.    Yes, sir.

            9         A.    Yes, sir.

04:10:02   10         Q.    Okay.   And those are the shoes you had on

           11    the night this happened with James Byrd; isn't that

           12    correct?

           13         A.    Yes, sir.

04:10:06   14         Q.    Okay.   And you lied to the FBI about that,

           15    didn't you?

           16         A.    I lied to the FBI about what?   About them

           17    shoes?

04:10:15   18         Q.    Yes, sir.

           19         A.    No, I never -- to my knowledge I never

           20    denied them shoes being mine; and I have never

           21    denied, to my knowledge, that I didn't have them

           22    shoes on.   I -- only thing that I lied about to the

           23    FBI and all these other people before now is saying

           24    that I kicked that -- something in the ditch when one

           25    of them beer bottles broke when we was going to them

PAULA K. FREDERICK, CSR
(979) 361-4270

1   girls' houses.

04:10:48   2        Q.   Okay.   You lied about that.   You also said

3   you were never on that logging road, until today,

4   didn't you?

5        A.   Yes, sir.

04:10:49   6        Q.   Okay.   And you also said to the FBI that

7   you were wearing sandals that night and not those

8   tennis shoes; isn't that correct?

9        A.   I don't remember that, now.   I may have,

10   but that doesn't seem right.

04:11:02   11        Q.   Okay.   Well, do you know any reason that

12   you were trying to give this jury the impression

13   those shoes might have belonged to Louis Berry?

14              MR. WALKER:   Your Honor, I'm going to

15   object.   I think that's outside the record.   There's

16   been no testimony from this witness that those shoes

17   did not belong to him.   In fact, I didn't even talk

18   to him about those shoes in direct examination.

19              THE COURT:   You want to rephrase your

20   question?

21              MR. HARDY:   Yes, sir.

04:11:30   22        Q.   You have never wanted this jury to believe

23   that those shoes belonged to Louis Berry; is that

24   correct?

25        A.   No.   Louis Berry was nowhere in sight on

PAULA K. FREDERICK, CSR
(979) 361-4270

1    there on that logging road.  Only four people -- me,

2    Bill King, Shawn Berry, and James Byrd.  That was the

3    only ones out there that night.

04:11:51  4       Q.   Now, in one of the kites that you wrote to

5    Bill King you made the statement that, "What are they

6    going to do?  Take some fingerprints off a rusty ass

7    logging chain"?

8       A.   Yes, sir, I did.

04:12:02  9       Q.   You made that statement?

10       A.   Yes, sir.

04:12:04  11       Q.   Okay.  And that's the only thing you was

12    worried about them getting fingerprints on, wasn't

13    it?

14       A.   I would -- yeah.  Yes, sir.

04:12:17  15       Q.   Okay.  Well, you smoked out there at the

16    scene where this happened, didn't you, sir?

17       A.   Yes, sir.

04:12:25  18       Q.   Okay.  And you threw a cigarette -- some

19    cigarettes?

20       A.   Several of the times.  I mean, I was

21    constantly smoking, yes, sir.

04:12:35  22       Q.   And that was at the scene where this

23    happened with Mr. Byrd?

24       A.   That was everywhere.  Even going out there.

04:12:40  25       Q.   Okay.  And it didn't mean enough to you to

260

1   worry about those cigarette butts, did it?

2        A.   No.  Cigarette butt, just throw it out.

04:12:53  3        Q.   And you drank out there, too, didn't you,

4   sir?

5        A.   Yes, sir.  We was drinking before we even

6   went out there.

04:13:01  7        Q.   And you were drinking out there, too,

8   weren't you?

9        A.   I would say whenever -- on the way out

10  there.  I don't believe that I drank from -- once the

11  fight happened I did not drink, no.

04:13:15  12       Q.   Okay.  Before it happened, what -- did you

13  just throw a beer bottle out there?  I mean, you're

14  not telling the jury the beer bottle with your DNA on

15  it was not yours, are you?

16       A.   No.  I was drinking.  Just on the way out

17  there.

04:13:31  18       Q.   And you didn't say anything about

19  fingerprints on a beer bottle to Mr. King in that

20  letter, did you?

21       A.   No.

04:13:40  22       Q.   Sir, why were you so worried about

23  fingerprints on a logging chain if you didn't even

24  touch that logging chain like you told this jury when

25  you were being asked questions by Mr. Walker?

PAULA K. FREDERICK, CSR
(979) 361-4270

1      A.   I didn't -- I went outside the lake of

2  Jasper and got out there with --

04:13:56  3      Q.   I want you to answer the question about the

4  logging chain.  I don't want to hear anything about

5  anybody in Jasper.

6           MR. WALKER:  Your Honor, once again,

7  I'm going to object to Mr. Hardy not allowing this

8  witness to answer the question.

9           THE COURT:  The objection is

10  overruled.

11      A.   Yes, sir, I did touch the logging chain the

12  next morning as soon as it got daylight.  I went out

13  to that truck looking for cigarettes because I had

14  smoked all them all the way up to daylight because I

15  was trying to calm my nerves down.  And I went

16  through the cab of that truck and I went through the

17  back of that truck, lifted the tire up around the

18  cooler and everything else in the back of that truck.

19  The tools was all scattered out on the floor and I

20  set them all nice and neat on the passenger side of

21  the seat, took out a flashlight and everything.

04:14:38  22      Q.   And you just made that story up, didn't

23  you, Mr. Brewer, because you didn't say that the

24  first time, did you, sir?

25      A.   I don't believe I got to that part the

1 first time.

:14:46 2  Q. Well, you had all the chance in the world.

3 Your attorney was asking you the questions.

4  A. I guess I didn't have time to tell him.

04:15:30 5  Q. Sir, where you had the fight -- is that a

6 fair depiction of where that fight took place, which

7 is State's Exhibit No. 5?

8  A. To me personally I can't -- all that looks

9 like it's a blur and the small pictures on the side I

10 can make out what they are but I can't tell where the

11 trail is or nothing.  I know that we went all the way

12 down and then turned the truck around and stopped and

13 that's where the fight took place right there.  Then

14 we went up some more and Shawn got out and was

15 kicking Mr. Byrd.  And I took --

04:16:09 16  Q. Okay.  Hang on just a second, sir.  If

17 cigarette butts smoked by you was found in this

18 vicinity, you wouldn't argue with that, would you?

19  A. No.

04:16:23 20  Q. And if one smoked by Bill King and Berry

21 was found in this vicinity, you wouldn't argue about

22 that either, would you?

23  A. Cigarette probably all up and down that

24 road.  No, I'm not going to argue with that.

04:16:36 25  Q. And you wouldn't deny the fact that there

PAULA K. FREDERICK, CSR
(979) 361-4270

1    was a blood clump right there, would you?

2         A.   No, I'm not going to argue with that.

04:16:45  3         Q.   Okay.  And you wouldn't deny the fact that

4    right there is where the dragging started either,

5    would you?

6         A.   Right where?

04:16:51  7         Q.   Right here at the edge of this fight scene.

8         A.   No, sir.  That's where the fight took place

9    down there where your thumb is?

04:17:02  10        Q.   No, sir.  The fight took place up here.

11   This is where the dragging started; isn't that

12   correct?

13        A.   No, sir.  The dragging started at where the

14   fight was taking place.

04:17:08  15        Q.   Then how do you explain, sir, that there

16   was three cigarette butts in almost the same

17   vicinity -- one that would go to each of y'all -- and

18   there was a blood clump there and then the

19   dragging -- the drag marks started from there?

20        A.   I don't know, sir.  I'm just --

04:17:27  21        Q.   Would it be because you're lying to this

22   jury again?

23        A.   I'm not lying, sir.  I told you exactly

24   what happened that night, and that's exactly what

25   happened.

PAULA K. FREDERICK, CSR
(979) 361-4270

04:17:38  1      Q.   Is Shawn Berry right handed or left handed?

2      A.   I really couldn't tell you that either.   I

3  know he had a cast on one of his hands at one time

4  but --

04:17:50  5      Q.   Which hand did he have a cast on?

6      A.   I don't know the answer to that.

04:17:53  7      Q.   Did he have a cast on that night?

8      A.   No, he did not have a cast on that night.

04:17:58  9      Q.   Well, then that cast doesn't have anything

10  to do with this, does it?

11      A.   No.

04:18:00  12      Q.   Okay.

13      A.   But I would assume that the hand that was

14  broke was the hand that he writes with.

04:18:05  15      Q.   Okay.  Which hand did he have the knife in

16  that night?

17      A.   I would say his right hand.

04:18:14  18      Q.   Okay.  And how did he cut Mr. Byrd's

19  throat, sir?

20      A.   Whenever Mr. Byrd was holding his hands up

21  like this right here, Berry come in between his hands

22  and made a sweeping motion.  (Indicating)  And the

23  reason I know why -- I'm pretty much sure that he had

24  the knife because I heard the clicking -- the popping

25  sound when he popped it open.  And when Mr. Byrd had

1  his hands like this right here, he stuck his hand in

2  there and made the sweeping motion.  (Indicating)

3  Right then is where Mr. Byrd slid town the truck --

4  on the side of the truck slid down by the back tire.

04:18:49  5      Q.    So you're saying he came across here?

6  (Indicating)

7      A.    I'm saying he come across the center of his

8  throat whenever Mr. Byrd had his hands like this

9  right here and stuck the knife in there and went

10  across his throat.  (Indicating)

04:19:00  11      Q.    Mr. Byrd had his hands like this, and he

12  came in between his hands with the knife?

13  (Indicating)

14      A.    Come in between his hands.  That's exactly

15  the way I seen it.  And I was about from here to

16  these folks here in this jury box.

04:19:13  17      Q.    Okay.  Then how did you get blood on your

18  shoes, sir?

19      A.    That is a very good question.  If I knew

20  there was blood on my shoes, I sure wouldn't have

21  left them for -- you know, I would have tried to get

22  rid of the blood.

04:19:30  23      Q.    Just like you told Jesus Moran, huh, sir?

24  Just like you told him -- if you would have known all

25  this evidence was going to be left -- if you had it

PAULA K. FREDERICK, CSR
(979) 361-4270

1    to do over again, you sure would have done it

2    different, wouldn't you?  That's exactly what you

3    told Mr. Moran, isn't it, sir?

4         A.   I don't remember telling Moran nothing

5    pertaining to the crime scene that I was sent to TDC

6    for.

04:19:52    7         Q.   Well, Mr -- do what?

8         A.   I didn't tell Mr. Moran nothing pertaining

9    to this crime scene right here that I'm sitting in

10   this chair for today -- through the vents or nothing.

11   And even in that letter I told him that I cannot say

12   something pertaining to this case.

04:20:11   13         Q.   Thought you said you never even talked to

14   Mr. Moran.

15         A.   I talked to Mr. Moran, but I did not say

16   nothing pertaining to this case.

04:20:20   17         Q.   So you talked to him through those vents;

18   is that right?

19         A.   I wouldn't say through the vents.  Probably

20   through the bars -- standing at the bars.  And I'm

21   not even for sure if it was Mr. Moran because he was

22   showering at the other shower and my -- I showered at

23   the shower next to my cell.  Now, he might have come

24   past my cell and showered in the shower next to my

25   cell; but we never spoke then, you know.  There's,

1   like I said, Spanish people all the way down on the

2   cell blocks.  I don't know who I'm talking to, you

3   know.  I'm talking to a voice that's talking back to

4   me, you know.

04:21:00   5       Q.   So what you're saying is you didn't know

6   Mr. Moran was Spanish, did you, sir?

7       A.   I could tell by his voice, yeah.

04:21:08   8       Q.   Okay.  You could hear him well enough to

9   know what his voice was saying; is that correct?

10       A.   Yeah, I guess you could say that.

04:21:17   11       Q.   So all this stuff Mr. Pelz said about it

12   being impossible for you to talk to Mr. Moran and you

13   were sitting over there with your attorneys -- that's

14   a bunch of hogwash, isn't it?

15       A.   Well, it's impossible to talk through the

16   vents that far.  If you're standing at the bars when

17   everyone is quiet -- like maybe after 10:00 or 11:00

18   o'clock after they stop coming in and showering

19   everyone and feeding everything and movement stops

20   and everything is quieter, then you can talk through

21   the bars, you know.  I couldn't holler way down there

22   at King in 13 or 14 cell -- you couldn't hear that

23   far.

04:22:01   24       Q.   Now, this picture I just showed you and the

25   jury and you said you didn't look like that in

1    prison -- but that's how you looked in Jasper; is

2    that correct?  Is that how you looked in Jasper?

3         A.   Yes, sir.

04:22:14  4    Q.   Okay.  And there's been some pictures of

5    Mr. Berry.  Have you seen those pictures?

6         A.   Yes, sir.

04:22:22  7    Q.   Okay.  That's how Mr. Berry looked; is that

8    correct?

9         A.   On them pictures you were showing up here

10   the other day on the chart?

04:22:32  11   Q.   Yes, sir.

12        A.   That the way he looked, yes, sir, whenever

13   I was up there in Jasper.

04:22:42  14   Q.   Okay.  Now, you're not saying that Mr. Byrd

15   was dead at the scene, are you, sir?

16        A.   Was dead at the scene?

04:22:53  17   Q.   Yes, sir.  Was dead at that picture I just

18   showed you.  Right here.  (Indicating)

19        A.   I'm not saying he was dead.  I'm saying

20   that he appeared to me to be -- he slid down the

21   truck and didn't make no more movements.  Yeah, he

22   appeared to be unconscious or whatever you call that

23   whenever you don't make no movements.

04:23:14  24   Q.   Okay.  Now, you're not saying you couldn't

25   have stopped Mr. Berry, are you?

PAULA K. FREDERICK, CSR
(979) 361-4270

1      A.   With a knife?  No, I wasn't -- there's no

2    way I would approach him -- anybody with no knife,

3    you know.

04:23:31  4      Q.   Well, how many times did he cut Mr. King?

5    Just once?

6      A.   Mr. King?

04:23:36  7      Q.   I'm sorry.  Mr. Byrd.

8      A.   He just made one sweeping motion; and as

9    soon as he made that sweeping motion, he slid down

10    the truck.  And I walked to the front of the truck.

11    I couldn't even look no more, and I went and sit down

12    in the truck.

04:23:51 13      Q.   Okay.  You've seen this logging chain.  You

14    didn't work with this logging chain, had you?  So

15    you're telling this jury that little skinny Shawn

16    Berry was holding his knife and wrapping up all by

17    himself Mr. Byrd's legs with that logging chain to be

18    drug?

19      A.   I don't know.

04:24:08 20      Q.   You're not telling them that, are you?

21      A.   No, sir.

04:24:11 22      Q.   Okay.  So you're trying to tell this jury

23    that the hook and bull of Beto I, of the Confederate

24    Knights of America, the EC -- which is what you were?

25      A.   No, sir.

PAULA K. FREDERICK, CSR
(979) 361-4270

04:24:24  1      Q.    -- who stood up against the wall for two

2      days and didn't get cliqued on by anybody; and the

3      only two that came up, you backed down -- you're

4      telling these people that little, skinny Shawn Berry

5      while he's wrapping a chain around someone's feet to

6      pull you couldn't have stopped him?

7      A.    No, sir.  I was, like, in a state of shock;

8      and I went directly and sit down inside the truck.

9                  And to tell you the truth, I didn't

10     even see him chain -- put the chain on Mr. Byrd at

11     that point.  I heard the chain coming -- rattling out

12     of the back of the truck, and I didn't know what he

13     was doing.

04:25:03  14     Q.    You heard me pull that chain out of that

15     box, didn't you?

16     A.    Yes, sir.  And I don't believe --

04:25:07  17     Q.    Okay.  And you couldn't hear him pulling it

18     out of the back of that truck?

19     A.    I just told you I heard it rattling out of

20     the back of that truck.

04:25:14  21     Q.    Well, then why didn't you go stop him?

22     A.    I didn't know.

04:25:16  23     Q.    If your story is the truth.

24     A.    Yes, sir.  It's the truth.  And I didn't

25     know what he was -- why he was taking the chain out.

PAULA K. FREDERICK, CSR
(979) 361-4270

1   All I know is I was in a state of shock after seeing

2   someone's -- getting -- throat getting cut.

04:25:32   3       Q.   Well, you wasn't in a state of shock when

4   there was three Hispanics just about to beat a white

5   boy to death in the penitentiary, were you?

6       A.   No, sir.  There's a lot of difference

7   believe me.  Once you're in that position, you will

8   know.

04:25:41   9       Q.   There's a lot of difference when it's 15 to

10   8 and if you step in the middle as bad as Beto I is,

11   as everybody has tried to make this jury feel like,

12   there's a lot of difference in that and some little

13   skinny guy that's never been to the penitentiary --

14       A.   Yes, sir.

04:25:55   15       Q.   -- who's trying to wrap a chain by himself

16   around a man's legs?

17       A.   Yes, sir.

04:26:00   18       Q.   There's a big difference?

19       A.   Yes, sir.

04:26:02   20       Q.   That's your story?

21       A.   Yes, sir.

04:26:03   22       Q.   That's your big Aryan warrior story?

23       A.   Yes, sir.

04:26:08   24       Q.   That's not true, though, is it, Mr. Brewer?

25       A.   Yes, sir, it's true.

PAULA K. FREDERICK, CSR
(979) 361-4270

04:26:11  1       *Q.*   The truth is all your letters have placed

2   you as a big hero in your eyes; isn't that right?

3       *A.*   Sir, the reason I was writing them letters

4   to King was more or less -- I wasn't going to say

5   that I'm fixing to tell the truth to King and having

6   to go to prison and having to face the fact I

7   turned --

04:26:33  8       *Q.*   Sir, the truth is you saw you and Bill King

9   as two soaring eagles, didn't you?  And that's what

10   you wrote?

11       *A.*   I guess you could say that.  I wrote that.

04:26:45 12       *Q.*   That's what you wrote, isn't it?

13       *A.*   To him, yes, sir.

04:26:47 14       *Q.*   I mean, if you could read English, that's

15   what you'd say, isn't it?

16       *A.*   Yes, sir.  I wrote that to him.

17           *MR. GRAY:*  Can we have just a minute,

18   Your Honor?

04:27:30 19       *Q.*   *(BY MR. HARDY)*  Well, let me ask you

20   this:  Were you in shock when you sprayed Mr. Byrd in

21   the face with the paint?

22       *A.*   No, not really because I had just hurt my

23   toe; and I would say the reason I sprayed him in his

24   face was because my toe was, like, a reflex -- I hurt

25   my toe and just -- I wasn't even thinking, to tell

PAULA K. FREDERICK, CSR
(979) 361-4270

273

1   you the truth.  I just did that because my toe was

2   hurting, and I sprayed him in his face.

04:27:57   3        Q.   Well, you -- and you kicked him in the

4   side; is that right?

5        A.   I tried to kick him in the side, yes, sir.

6   That's how I hurt my toe, yes, sir.

04:28:03   7        Q.   And you just can't figure out how you got

8   the blood up on your shoe laces by kicking him in the

9   side, can you, sir?

10        A.   No, sir.  I can't explain the blood.

04:28:13  11        Q.   Well, the reason is because you were

12   kicking him in the head, isn't it?

13        A.   No, sir.  I never even touched nowhere

14   close to his head.

04:28:20  15        Q.   Be kind of hard to break your toe kicking

16   somebody in the side; isn't that true?

17        A.   I'm not even for sure if I hit him or the

18   truck, sir.  All I know is that I was -- my

19   intentions was to kick him to break up the fight.

20   And when I made that one kick, then I went down and

21   was holding my toe.  I reached back up and sprayed

22   the man in the face with the paint, and that's --

23   that's it.  I don't know how the blood got on my

24   shoes.  No, I don't.

04:28:51  25        Q.   It got on the shoe because you were kicking

PAULA K. FREDERICK, CSR
(979) 361-4270

1  him in the face; isn't that true?  Why don't you tell

2  this jury the truth, sir?

3      A.   I tried to kick him in his side.  I did not

4  kick nowhere in his face, nowhere else on his body.

04:29:04  5      Q.   When in your mind did you change from being

6  the hero of the day, the one that was better than

7  Redarm, better than warhead?  When did you change

8  from that to just being there and worried about this

9  and worried -- you expect them to believe you went

10  through Beto I -- this big, bad unit -- and you

11  couldn't handle little, bitty Shawn Berry?

12      A.   That's right, sir.

13           MR. HARDY:  Pass the witness, Judge.

14           MR. WALKER:  We don't have any more

15  questions, Judge.

16           MR. STEVENS:  Wait a second.

17           THE COURT:  You may step down.

18           MR. FEATHERSTON:  Just a second, Your

19  Honor.

20           THE COURT:  You may step down.

21           MR. STEVENS:  Your Honor, there"s some

22  further questions we need to ask this witness if I

23  may, please, sir.

24           THE COURT:  All right.

25           MR. STEVENS:  I'll be brief, sir.

RECROSS EXAMINATION

BY MR. STEVENS:

04:29:54

Q.   Mr. Brewer --

MR. BARLOW:  Your Honor, I think just for the record -- I think we have to object to that, to allow two counsel to question the witness especially after the State has already said they have no further questions.

THE COURT:  I'm going to overrule the objection.

04:30:10

Q.   (BY MR. STEVENS)  Mr. Brewer, this Government's Exhibit 115 -- this Brewer's blood oath.

A.   I can hardly see it.  I know what you're talking about.

04:30:20

Q.   You know which one I'm talking about, "...the enemies of my race and my nation no matter how high and powerful.  I, Lawrence R. Brewer pledge swift and merciless justice when the fullness of day of reckoning shall arrive."  And it's a sworn oath you signed there?

A.   Yes, sir.

04:30:35

Q.   Now, if somebody was going to take that seriously, that could certainly evidence intent to commit an act such as this, wouldn't it?  Wouldn't it?  Those are threatening words.

PAULA K. FREDERICK, CSR
(979) 361-4270

1    A.    Threatening words?  I don't see --

2    Q.    I, Lawrence Brewer pledge swift and

3  merciless justice to the enemies of my race.   And

4  Mr. Byrd in this oath is an enemy of your race, isn't

5  he?  Isn't he?

6    A.    Not -- unless he had done something to me

7  personally he's not no enemy to me, no.  I wouldn't

8  say that.

9    Q.    Somebody would take that seriously,

10  though -- that would show intent to commit this

11  crime, though, wouldn't it?  Those are strong words

12  against a black man, isn't it?

13    A.    You can take it however you want to.   I

14  know then whenever I signed that paper it was just,

15  like, everyone was asked to sign it.   Nothing was

16  meant personally in my heart by it.

17    Q.    This letter, Government's Exhibit 2HH where

18  it's written to Jesus Moran -- would you agree

19  that -- and I believe your testimony is this portion

20  where it says, "<u>DEATH TO ALL NIGGERS</u> HA!   WHITE

21  POWER!!!!!" with the swastika -- you did not write

22  that?  Is that what you're saying to the jury?

23    A.    I can't see myself doing that for the

24  simple fact that I have never wrote or seen a

25  swastika backwards.

04:32:10   1          Q.    Okay.   Would you admit --

2          A.    All the white people that I know that

3    seen -- knows anything about them wouldn't have

4    written nothing like that.

04:32:16   5          Q.    Would you admit it's your practice to write

6    all over a paper when you write?

7          A.    Yes, sir.  Take up all the paper space.

04:32:25   8          Q.    Every part of this is written including

9    this portion that we're talking about?

10          A.    Every part on the paper is written?

04:32:32  11          Q.    Yes, sir.

12          A.    Yes, sir.  That fills in a place on the

13    paper.

04:32:36  14          Q.    You've read and reviewed this letter

15    several times, I'm sure, haven't you?

16          A.    Not until it was brought out the other day.

04:32:43  17          Q.    Okay.  You had a chance to review it then?

18          A.    Yes, sir.  That caught my eye right there.

19    All -- go ahead.

20                I was going to say all that other

21    stuff is -- all that writing on there except that

22    thing on the bottom down there -- that looks like

23    some kind of design or something.  I don't believe I

24    wrote that on there either and I don't believe I

25    wrote that and I don't believe I wrote that on the

PAULA K. FREDERICK, CSR
(979) 361-4270

1   top either.

04:33:09  2      Q.  Do you admit many of the words -- the

3   letters and the words --

4       A.  Some of these letters do look like my

5   handwriting.

04:33:15  6      Q.  Not just look like it but look exactly like

7   it, wouldn't you agree?

8       A.  Yes, sir.  Close enough to where I would

9   say that someone traced my handwriting and put that

10   particular --

04:33:27 11      Q.  Somebody would have had to do a dramatic

12   tracing job?

13       A.  Yes, but it's not impossible.  Believe me.

04:33:34 14      Q.  Would you agree that if this were true --

15   if this statement were carried out truthfully, then

16   that would certainly show intent to commit this crime

17   against Mr. Byrd, wouldn't it?

18       A.  Well, it would --

04:33:45 19      Q.  Certainly would look like an intent to

20   commit a crime against Mr. Byrd, wouldn't it?

21       A.  I don't know about Mr. Byrd but a pretty

22   strong statement used in a letter sent to someone

23   that I can't -- you know --

04:33:58 24      Q.  And the letter that we've talked about,

25   Government's Exhibit 2AA, about rolling the tire

1   anyway "...ASK HIM IF HE REMEMBERS WHEN WE WERE

2   DISCUSSING MATTERS ON THE TIRE HE WANTED TO ROLL THE

3   HILL & WHAT I WANTED TO DO -- HA."  Well, certainly

4   if somebody looked at that and saw you writing about

5   rolling a tire -- that certainly could imply an

6   intent to enjoy committing a crime like that.  The

7   word "ha" is in there; right?

8       A.   I don't believe that I wrote that I was

9   going to roll a tire or I was intending to roll a

10  tire.

04:34:39  11       Q.   Yeah.  The part about rolling the tire.

12       A.   The other guy was wanting to do when we got

13  out?

04:34:47  14       Q.   Yes.

15       A.   That's what he was wanting to do.

04:34:51  16       Q.   Yes.  If some --

17       A.   I wasn't trying to make anyone think that

18  that was code or anything.  If that was in code, I

19  would have said the tire inside the tire, but I had

20  never even heard tire being expressed for a black

21  person being associated with a tire until it got read

22  in court.

04:35:14  23       Q.   But you do write about rolling a tire in

24  that --

25       A.   In that particular letter, yes, sir.

PAULA K. FREDERICK, CSR
(979) 361-4270

04:35:16  1    Q.   And that concerns a black man being killed

2    and put in a tire, isn't it?

3    A.   No.   That's what that Redarm guy -- that's

4    what he wanted to do when he got out, was put a black

5    guy inside a tractor trailer and roll him down the

6    hill with a VCR camera filming it.

04:35:32  7    Q.   So you felt the need to repeat that in a

8    letter?

9    A.   So even though that I was referring to what

10   I wanted to do as far as doing that sex stuff, yes,

11   sir.

04:35:46  12   Q.   Sir, just want to ask a couple of

13   questions.   You had mentioned something about working

14   at Lowe's.

15   A.   Yes, sir.

04:35:53  16   Q.   And you said you had been fired -- I'm

17   sorry.   You said you quit working at Lowe's.

18   A.   I was working at Lowe's through a temporary

19   service; and Lowe's had called the temporary service

20   and said that since my past records showed that I had

21   criminal arrests, then I couldn't be working at those

22   big warehouse.   So the temporary service said that I

23   couldn't work out at Lowe's no more.   So they just

24   put me on the job list, I guess, for other jobs.   I

25   guess they run a criminal background.

PAULA K. FREDERICK, CSR
(979) 361-4270

04:36:32   1          Q.   The fact of the matter is your application

2   for employment, right here -- do you --

3          A.   Where was that to?

04:36:41   4          Q.   To Lowe's.  Do you notice that?

5          A.   Yeah, I filled out an application because

6   if you work, like, 90 days through this temporary

7   service at Lowe's they give you an opportunity to

8   work there.  As a matter of fact, how I got this

9   application -- the supervisor is the one that handed

10   me this and told me to fill it out because the work

11   that I was doing there was good they was going to

12   hire me on in 90 days.

04:37:12  13          Q.   Okay.

14               MR. STEVENS:  The next number?

15               THE COURT REPORTER:   118.

04:37:12  16          Q.   (BY MR. STEVENS)  Call this 118.  This

17   appears to be a copy of your --

18          A.   Can I read that again?

04:37:15  19          Q.   Sure.  Does that appear to be a copy of

20   your job application to Lowe's -- I'm sorry.  I think

21   it's the application to the temporary agency.

22          A.   Instaff Personnel -- that is the name of

23   the application.

04:37:39  24          Q.   Is that an application you filled out for

25   them?

PAULA K. FREDERICK, CSR
(979) 361-4270

282

04:38:09

          1        A.    Does it look like it?

          2        Q.    Those two pages right there in your left

          3    hand -- do those look like portions of your

          4    application?

          5        A.    Yes, sir.  That's my handwriting.

04:38:15   6        Q.    There's not a doubt about it?

          7        A.    I was just -- I was looking at these dates

          8    when is -- that's the date that they sent you this,

          9    July 30th?

04:38:25  10        Q.    Okay.

         11        A.    Yes, sir.  Seems to be right.

04:38:27  12        Q.    Is that -- we'll, we'll call this 118.  If

         13    you'll just refer to this.  I'm not going to admit,

         14    but I'll just ask you if that's okay -- in this

         15    application it asks, "Have you ever been convicted of

         16    a felony?"  Right there.  And I notice "no" is

         17    circled.

         18        A.    Yes, sir.  I -- I put "no" on it.

04:39:01  19        Q.    Got caught in a false statement there,

         20    didn't you?

         21        A.    I got caught, yes, sir.  That's --

04:39:05  22        Q.    That's why you got fired, wasn't it?

         23        A.    From where?

04:39:09  24        Q.    From --

         25        A.    That's where I got fired?  No.  See, that's

                         PAULA K. FREDERICK, CSR
                           (979) 361-4270

1    the Instaff Personnel application.  They sent me out

2    on a jobsite at Lowe's Warehouse; and Lowe's is the

3    one, I guess, run a check on me and said -- called

4    them and told them that I cannot work out there at

5    that company.

04:39:26   6         Q.   But is this a false statement that you put

7    on the application?

8         A.   It is a false statement that I put on that

9    application.  I didn't get fired from the temporary

10   service.  I got fired from working out at Lowe's that

11   that temporary service sent me to -- in other words,

12   they would have send me out on another jobsite.

04:39:42   13        Q.   This is not true and you put that down?

14        A.   Yes, sir, that -- I put "no" on there as --

15   that's my, handwriting.

04:39:54   16        Q.   Would you say Beto I -- you consider it a

17   tough place and a very mean place?

18        A.   I would say it was a whole lot tougher and

19   meaner than the Hilltop Unit, you know; and I have

20   never -- on TV -- I guess, about the same as the way

21   TV puts it as far as the door slamming --

22             THE COURT:  This is getting

23   repetitious.  We've covered that.

04:40:16   24        Q.   (BY MR. STEVENS)  When you came to Jasper

25   in your testimony -- in direct testimony is it fair

1   to state that you admitted that you burglarized --

2   you assisted in burglarizing Patrick's Steak House of

3   the meat?

4       A.   That steak house I'm not for sure.  I know

5   we --

04:40:34  6       Q.   You burglarized a steak house?

7       A.   Yes.

04:40:37  8       Q.   And I think y'all --did you burglarize a

9   motel room?

10       A.   It wasn't a motel room.  It was, like -- I

11   guess it's the lobby part of the motel.  I know we,

12   like, jumped over a rail and went -- it was at a

13   motel because I know the rooms and all that; but it

14   was, I guess, the main lobby -- it wasn't the main

15   lobby.  It was the lobby next to the pool.  It was,

16   like, a small room is what I'm trying to say -- like

17   a concession stand room.

04:41:01  18       Q.   But you had to break into it; right?

19       A.   We opened the door and went in.  Yes,

20   that's breaking and entering; but there was no glass

21   broken.  Just found a way in.

04:41:13  22       Q.   And you also admit to stealing some

23   equipment, I think, when you went to Wildwood?

24       A.   The chain saw and the weed eater, yes.

25           MR. STEVENS:  One other thing, Your

1    Honor.

04:41:44   2        Q.    Show you what's been marked as Government's

3    Exhibit 119.  If you will, look at that.  Please tell

4    us is that your handwriting?  Is that a letter to

5    your wife Sylvia Brewer?  Does it look like your

6    handwriting, sir?

7        A.    Yes, that looks like my handwriting.

04:42:11   8        Q.    Is it signed on the back "Russell Brewer"?

9        A.    On the -- there's the back page right

10   there?

04:42:20  11        Q.    Yes, sir.

12       A.    That's right.  Russell Brewer.

04:42:22  13        Q.    Is that your handwriting, sir, on those

14   pages?

15       A.    Yes, sir.

04:42:26  16        Q.    Do you remember writing that letter?

17       A.    Well, I would have to read it; but that's

18   my handwriting.  I'm not -- can't deny that it's my

19   handwriting.

04:42:35  20        Q.    Would you have written that letter before

21   June 7th, 1998, to Sylvia?

22       A.    Yes, sir.

04:42:44  23        Q.    No doubt in your mind?

24       A.    I imagine because I haven't wrote her in --

04:42:49  25        Q.    A long time?

PAULA K. FREDERICK, CSR
(979) 361-4270

1      A.     Since -- yes, sir.

2             MR. STEVENS:  Your Honor, we're going

3    to move into evidence Government's Exhibit 119,

4    please.

5             MR. BARLOW:  No objection, Your Honor.

6             THE COURT:  It's admitted.

04:43:03  7      Q.     (BY MR. STEVENS)  This letter was written

8    before?

9      A.     Does it have a date on there?  I'm sorry.

10   I should have looked at it.

11            Says Sunday 17 '93?  It says Sunday,

12   17 '93.  I suppose that's -- it's not giving a month.

13   Sunday 17 -- of '93 -- yes, sir, wrote in '93 is what

14   that says according to this.

04:43:43  15      Q.     There's no doubt it was written before

16   June 7th, 1998?  It was written before the death of

17   Mr. Byrd?

18      A.     Oh, yes, sir.

04:44:07  19      Q.     Read a portion of the bottom of Page 2

20   beginning here, "Please understand how hurt I am.  I

21   feel as tho Ive been drug 120 miles chained by feet

22   to the bumper of corvette doing 90 miles an hour."

23   And further more -- later on, "I'm already going to

24   send one individual to where he should have been

25   years ago.  To hell.  Please dont make me send

PAULA K. FREDERICK, CSR
(979) 361-4270

1    another."  That's what you wrote to your wife --

2        A.    Yes, sir.

04:45:02
3        Q.    -- before the death of Mr. Byrd?  And

4    wouldn't you call that a most unusual coincidence

5    that Mr. Byrd happened to die in the manner that you

6    wrote in this letter to Sylvia Brewer?

7        A.    Yes, sir, that is a very unusual, whatever

8    you say, coincidence or whatever.  That is unusual,

9    yes.

04:45:28  10      Q.    One could even read this as being the

11    intent to put Mr. Byrd and chain him up was yours,

12    sir -- you originated that thought.  It is shown in a

13    letter to your wife years ago.  That's what one could

14    read from this, couldn't -- from your own words,

15    couldn't they, sir?

16      A.    Depends on who's reading it and what you're

17    wanting to interpret because from what I just read it

18    said that I felt as though -- that's feel as though I

19    was chained.  Doesn't -- I didn't say that I was

20    wanting to do anybody that way or any -- to me I -- I

21    take it that that's just a figure of speech at that

22    time that I made in my letter.

04:46:10  23      Q.    Mr. Byrd was killed chained by his feet to

24    a vehicle just like you wrote in here, wasn't he?

25      A.    Six, seven years -- eight years after that

288

 1   letter was wrote, yes, sir.

 2        Q.   Yes, sir.  Before that happened your

 3   thoughts were, on this paper, about the way Mr. Byrd

 4   ended up dying?

 5        A.   According to them two or three lines you

 6   read, yes, sir.

 7             MR. STEVENS:  We pass the witness now.

 8                  REDIRECT EXAMINATION

 9   BY MR. WALKER:

10        Q.   Russell, did you intend to cause the death

11   of James Byrd?

12        A.   No, sir.

13        Q.   Is your story a bunch of hogwash?

14        A.   No, sir, it's the truth; and that's the

15   reason why I'm telling it like -- the way it

16   happened, and that's it.  I can't help what I wrote

17   seven -- six, seven, eight years ago explaining how I

18   felt at that time because I was in jail fixing to do

19   90-day violation back in the prison system.

20        Q.   Did you start planning an incident such as

21   this back in 1993?

22        A.   No, sir.

23        Q.   Was that because Sylvia was seeing somebody

24   else during that period of time?

25        A.   Well, at the time she was in Sulphur

                PAULA K. FREDERICK, CSR
                   (979) 361-4270

1   Springs.  She went back to Fort Worth, been in the

2   house two months' rent to do my 90 days, get out, get

3   back with her.  And when the baby was born -- and

4   that's why I married her.  And then married her and

5   turned myself in for my violation and went to jail

6   expecting to do 90 days and get out, I guess live the

7   family life.  And after I went to jail in Sulphur

8   Springs she took off and went back to Fort Worth

9   the father of the little girl that she had before I

10  met her, and that's -- I imagine that's that last

11  statement he read -- that's what I was referring to

12  because I was upset because she was going back to

13  that guy that got her pregnant with her little girl

14  she had before me with that first statement.

15           I guess that was just the way I was

16  feeling, like I was hurt because she was -- she had

17  left me in a situation where she was back with her --

18  father of that little girl.

19           MR. WALKER:  Thank you.  Pass the

20  witness.

21           MR. STEVENS:  Nothing further, Your

22  Honor.

23           THE COURT:  You may step down.

24           MR. BARLOW:  Defense rests, Your

25  Honor.