**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
BEAUMONT  DIVISION**

| | | |
|---|---|---|
| **JOHN WILLIAM KING,** | § | |
| Petitioner, | § | |
| **v.** | § | Civil Action No. 1:01cv435 |
| **DOUG DRETKE, Director,** | § | |
| **Texas Department of Criminal Justice,** | | |
| **Correctional  Institutions Division,** | § | |
| Respondent. | § | |

**MEMORANDUM  OPINION REGARDING RESPONDENT'S MOTION FOR
SUMMARY JUDGMENT AND PETITIONER'S MOTION TO ABATE**

Petitioner John William King ("King"), an inmate confined to the Texas Department of

Criminal Justice, Correctional Institutions Division, filed an application for a writ of *habeas corpus*

pursuant to 28 U.S.C. §2254, challenging his capital murder conviction and death sentence imposed

by the 1st Judicial District Court of Jasper County, Texas in cause No. 8869, styled as *The State of*

*Texas vs. John William King.*  Respondent Doug Dretke ("the Director") answered the application

and moved for summary judgment on all twenty-one claims in King's application.   One of the

arguments for summary judgment was that many of King's claims were unexhausted. In response,

King moved to stay the proceedings so that he could return to state court and exhaust those claims.

Having considered the pleadings, the record and the applicable law, the court finds for the reasons

set forth below that King's motion is well-taken and it will be granted.  The court also finds that, as

to the claims which were exhausted, the Director's motion is well taken and it will be granted.

1

*Facts*

The evidence at trial showed the following:  George Mahathy, a life-long acquaintance of the victim, James Byrd, Jr., saw him at a party on Saturday night, June 6, 1998.  Byrd left the party around 1:30 or 2:00 Sunday morning.  Byrd asked Mahathy for a ride home, but Mahathy was riding home with someone else.  As Mahathy was leaving the party, he saw Byrd walking down the road towards home, which was about a mile from the party.  Steven Scott, who had known Byrd for several years, also saw him walking down the road that night.  After arriving home a few minutes later, at around 2:30 a.m., Scott saw Byrd pass by in the back of an old-model, step-side pickup painted primer-gray.  Three white people were riding in the cab of the truck.

On June 7, 1998, police officers responded to a call to go to Huff Creek Road in the town of Jasper.  In the road, in front of a church, they discovered the body of an African-American male missing the head, neck, and right arm.  The remains of pants and underwear were gathered around the victim's ankles.  About a mile and a half up the road, they discovered his head, neck and arm by a culvert in a driveway.

A trail of smeared blood and drag marks led from the victim's torso to the detached portion of his body and continued another mile and a half down Huff Creek Road and a dirt logging road.  A wallet found on the logging road contained the identification of James Byrd Jr., a Jasper resident.  Along the route, police also found Byrd's dentures, keys, shirt, undershirt, and watch.  At the end of the logging road, the trail culminated in an area of matted-down grass, which appeared to be the scene of a fight.  At this site and along the logging road, the police discovered a cigarette lighter inscribed with the words "Possum" and "KKK," a nut driver wrench inscribed with the name "Berry," three cigarette butts, a can of "fix a flat," a compact disk, a woman's watch, a can of black

2

spray paint, a pack of Marlboro Lights cigarettes, beer bottles, a button from Byrd's shirt, and Byrd's baseball hat.

The following evening, police stopped Shawn Berry for a traffic violation in his primer-gray pickup truck.  Behind the front seat, police discovered a set of tools matching the wrench found at the fight scene.  They arrested Berry and confiscated the truck. DNA testing revealed that blood spatters underneath the truck and on one of the truck's tires matched Byrd's DNA.  In the bed of the truck, police noticed a rust stain in a chain pattern and detected blood matching Byrd's on a spare tire.

Six tires that were on or associated with Berry's truck were examined.  Three of the four tires on the truck were of different makes.  Tire casts taken at the fight scene and in front of the church where the torso was found were consistent with each of these tires.  An FBI chemist detected a substance consistent with fix-a-flat inside one of the six tires.

Shawn Berry shared an apartment with Lawrence Russell Brewer and petitioner King.  Police and FBI agents searched the apartment and confiscated King's drawings and writings as well as clothing and shoes of each of the three roommates.  DNA analysis revealed that the jeans and boots that Berry had been wearing on the night of the murder were stained with blood matching Byrd's DNA.  An analyst with the FBI lab determined that a shoe print found near a large blood stain on the logging road was made by a Rugged Outback brand sandal.  King owned a pair of Rugged Outback sandals and had been wearing them on the night of the murder.  Shawn Berry also owned a pair of Rugged Outback sandals that were a half-size different from King's. One of the pairs of these sandals confiscated from the apartment bore a blood stain matching Byrd's DNA.  A Nike tennis shoe with the initials "L.B." in the tongue also was stained with blood matching Byrd's.

3

DNA analysis was also conducted on three cigarette butts taken from the fight scene and logging road.  DNA on one of the cigarette butts established King as the major contributor, and excluded Berry and Brewer as contributors, but could not exclude Byrd as a minor contributor. Brewer was the sole contributor of DNA on the second cigarette butt.  The third cigarette butt revealed DNA from both a major and a minor contributor.  Shawn Berry was established as the major contributor of DNA on the third cigarette butt; however, King, Brewer, and Byrd were all excluded as possible minor contributors of the additional DNA.

Tommy Falk testified that Berry, Brewer and King frequented his home and had played paint ball games in the woods behind his trailer. Police conducted a search of these woods and found a large hole covered by plywood and debris.  Underneath the cover, they discovered a 24 foot logging chain that matched the rust imprint in the bed of Berry's truck.

The State presented evidence of King's racial animosity, particularly toward African-Americans.  Several witnesses testified how appellant refused to go to the home of an African-American and would leave a party if an African-American arrived.  In prison, King was known as the "exalted cyclops" of the Confederate Knights of America ("C.K.A."), a white-supremacist gang. Among the tattoos covering King's body were a woodpecker in a Ku Klux Klansman's uniform making an obscene gesture; a "patch' incorporating "KKK," a swastika, and "Aryan Pride"; and a black man with a noose around his neck hanging from a tree.  King had on occasion displayed these tattoos to people and had been heard to remark, "See my little nigger hanging from a tree."

A gang expert reviewed the writings that were seized from the apartment and testified that King had used persuasive language to try to convince others to join in his racist beliefs.  The writings revealed that King intended to start a chapter of the C.K.A. in Jasper and was planning for something

big to happen on July 4, 1998.  The expert explained that to gain credibility King would need to do

something "public."  He testified that leaving Byrd's body in the street in front of a church – as

opposed to hiding it in one of the many wooded areas around town – demonstrated that the crime

was designed to strike terror into the community.

King neither testified nor made a formal statement to police.  But he sent letters concerning

the night of the murder to the Dallas Morning News and to Russell Brewer while he and Brewer

were in jail awaiting trial.  The following portion of the letter to the Dallas Morning News was read

into the record:

> Given a description as to the whereabouts of the dirt trail where an alleged beating
> of the deceased occurred, it's essential to acknowledge the fact that Shawn Berry
> co-inherited a small tract of land adjacent to the train road, which he visited quite
> frequently.
> Therefore, the fact that my cigarette lighter with "possum" inscribed upon it was
> found near the scene of the crime, along with other items – i.e., several hand
> tools with "Berry" inscribed on them, a compact disc belonging to Shawn Berry's
> brother Lewis, and my girlfriend's watch, as well as items of the deceased – are all
> verified facts implementing that these items could have fallen from Shawn Berry's
> truck during a potential struggle with the deceased while on the tram road.
> However, unacknowledged facts remain, that I, along with Russell Brewer and
> Lewis Berry, had been borrowing Shawn Berry's truck to commute to and from an
> out-of-town land clearing job each day.  My girlfriend's watch was kept in Shawn
> Berry's truck for us to keep track of the time.  Lewis Berry had brought along
> several of his C.D.s for our listening pleasure during our hourly drive each morning
> and evening, which he had a tendency to leave in his brother's truck.
> Furthermore, the aforementioned cigarette lighter had been misplaced a week or so
> prior to these fraudulent charges that have been brought against Russell Brewer
> and me.  This, so forth, does not prove the presence of my girlfriend, Lewis Berry,
> Russell Brewer or myself at the scene of the crime, verifiably only the owners of the
> property in question.
> *     *     *
> Several statements and the theories against Shawn Berry, Russell Brewer and
> myself, John W. King, for a prospective motive in this hard crime have been
> presented to the public.  Against the wishes of my attorney, I shall share with you
> objective facts and my account of what happened during the early morning hours
> of June 7th, 1998.

5

After a couple of hours of drinking beer and riding up and down rural roads adjacent to Highway 255 off Highway 63, looking for a female's home, who were expecting Shawn Berry and Russell Brewer, Berry through frivolous anger and fun at first, begun to run over area residents' mail boxes and stop signs with his truck due to negligence in locating the girl's residence.

Becoming irate with our continued failure to locate the female's house, Shawn Berry's behavior quickly became ballistic as he sped through residents' yards in a circular manner and made a racket with his truck's tailpipes managing to sling our ice chest from the back of his truck several times.

During his little conniptions fit, Shawn Berry then stopped just ahead of a mailbox on Highway 255, took a chain from the back of his truck, wrapped it around the post of the mailbox, and proceeded to uproot and drag the mailbox east of Highway 255, stopping yards short of the Highway 63 north intersection, where he then removed his chain, replaced it, and continued to drive to a local convenience store, Rayburn Superette, to try to call the female who was expecting him and Brewer.

Fortunately no one answered at the girl's house after repeated requests from me, as well as complaints from Russell Brewer, of a throbbing toe he injured during recovery of our ice chest, Shawn Berry then agreed to take us to my apartment.

Shawn Allen Berry, driving with a suspended license and intoxicated, while taking Russell Brewer and me home those early morning hours, decided to stop by a mutual friend of ours home located on McQueen Street to inquire as to what the residents and his brother Lewis Berry were doing.  On our way there, we passed a black man walking east on Martin Luther King Drive, whom Shawn Berry recognized and identified as simply Byrd, a man he befriended while incarcerated in the Jasper County Jail and, Berry said, supplied him with steroids.

Shawn Berry then proceeded to stop his truck approximately 10 yards ahead of this individual walking in our direction, exit his vehicle, and approach the man.  After several minutes of conversation, Shawn Berry returned to the truck and said his friend was going to join us because Berry and Byrd had business to discuss later and, thus, Byrd climbed into the back of Shawn Berry's truck and seated himself directly behind the cab.

While continuing on to our friend's residence where supposedly Lewis Berry was to be, we noticed there were neither lights nor signs of activity in the trailer as  we approached.  We decided to proceed on to my apartment; but contrary to Russell Brewer's and my request, Shawn Berry drove to and stopped at another local convenience store, B.J.'s grocery, just east of the Jasper city limits.  Shawn Berry then asked Russell Brewer if he could borrow 50 to $60 because he needed a little extra cash to replenish his juice, steroid supply.

After Brewer gave Shawn Berry the remainder of what money he had to return to Sulphur Springs, Texas, on, Berry asked if Russell Brewer and I could ride in the back of the truck and let his friend sit up front to discuss the purchase and payment of more steroids for Shawn Berry.  Russell Brewer and I obliged on the condition Berry take us to my apartment without further delay, which, after a brief exchange of positions, he did.

6

Once we arrived at my apartment, Shawn Berry informed Russell Brewer and me that he was leaving so that he could take Byrd to get the steroids and then home. He asked if Brewer or I would bring a small cooler of beer down for him and his friend along with a bottle of bourbon Berry had brought a few days prior. Russell Brewer and I went up to my apartment and began to fill a small cooler with approximately six to eight beers.  Realizing I left my wallet and cigarettes in Shawn Berry's truck, I opted to bring the cooler back down to Berry.  After retrieving my wallet, but unable to locate my cigarettes, I then returned upstairs to my apartment, into my bedroom, and proceeded to call an ex-girlfriend before retiring to bed in the predawn hours of June 7th, 1998.

A portion of the note appellant wrote to Brewer was as follows:

As for the clothes they took from the apt. I do know that one pair of shoes they took were Shawn's dress boots with blood on them, as well as pants with blood on them.  As far as the clothes I had on, I don't think any blood was on my pants or sweat shirt, but I think my sandals may have had some dark brown substance on the bottom of them.

*     *     *

Seriously, though, Bro, regardless of the outcome of this, we have made history and shall die proudly remembered if need be. . . .   Much Aryan love, respect, and honor, my brother in arms. . . .  Possum.

Dr. Tommy Brown, a forensic pathologist, testified that he received Byrd's head, neck and arm separately from the main torso.  The autopsy revealed extensive injuries all over Byrd's body. Nearly all of Byrd's anterior ribs were fractured.  He suffered "massive burn abrasions" over most of his body.  Both testicles were missing and gravel was found in the scrotal sac.  Both knees and part of his feet had been ground down, his left cheek was ground to the jawbone, and his buttocks were ground down to the sacrum and lower spine.  Some of his toes were missing and others were fractured.  Large lacerations of the legs exposed muscle.  But his brain and skull were intact, exhibiting no lacerations, fractures, or bruises.

Brown concluded that the lacerations and abrasions around Byrd's ankles were consistent with the ankles having been wrapped by a chain and that the abrasions all over Byrd's body were consistent with him being dragged by his ankles over a road surface.  Red regions around the area

7

where Byrd's upper and lower body separated indicated that Byrd's heart was still pumping and that

he was alive when his body was torn apart by the culvert.  Therefore, Brown determined that the

cause of death was separation of the head and upper extremity from the rest of the body.  Some of

the wound shapes and patterns indicated that Byrd was conscious while he was being dragged and

was trying to relieve the intense burning pain by rolling and swapping one part of his body for

another.  Also, the absence of injuries to Byrd's brain and skull suggested that he was trying to hold

his head up while being dragged.[1]

### *Procedural history*

On October 30, 1998, King was indicted for capital murder in the First Judicial District Court

of Jasper County, Texas, the killing of Byrd having occurred in the course of his being kidnaped.

On February 23, 1999, King was convicted of that charge.  A punishment determination hearing was

then held, in which the State presented evidence of King's prior criminal record, as well as the

testimony of a psychiatrist that King was likely to be dangerous in the future.  King presented the

testimony of a clinical psychologist that under the proper circumstances, he would not be dangerous

in prison, as well as the testimony of his adoptive father, who asked the jury to spare King's life.

On February 25, 1998, he was sentenced to death.

Appeal to the Texas Court of Criminal Appeals was automatic.  On direct appeal, King raised

the following eight points of error:

> 1. The trial court erred in denying King's request for new counsel and his counsel's motion
> to withdraw.
> 2. King's trial counsel rendered ineffective assistance by failing to support his motion to
> withdraw with any evidence.

---

[1]  This statement of facts was taken from the opinion in *King v. State*, 29 S.W.3d 556,558-62 (Tex. Crim. App.
2000).

3. The trial court erred in sustaining the prosecution's challenge for cause to veniremember James Mallett.

4. The evidence was legally insufficient to establish that Byrd was kidnaped.

5.  The evidence was factually insufficient to establish that Byrd was kidnaped.

6. The evidence was legally insufficient to establish that King was involved in Byrd's killing.

7. The evidence was factually insufficient to establish that King was involved in Byrd's killing.

8. The trial court erred in refusing to conduct an evidentiary hearing on King's motion for a new trial.

On October 18, 2000, the Texas Court of Criminal Appeals affirmed his conviction and sentence.

*King v. State*, 29 S.W.3d 556 (Tex. Crim. App. 2000). King then petitioned the state district court

for post-conviction-relief, raising five claims:

1. The trial court deprived King of due process and the effective assistance of counsel when it denied his request for new counsel.

2. Trial counsel's failure to raise an insanity defense constituted ineffective assistance and denied King due process.

3. Trial counsel's failure to fully investigate mitigating evidence constituted ineffective assistance and denied King due process.

4. Trial counsel's failure to request that bar conferences be recorded constituted ineffective assistance.

5. Appellate counsel's failure to raise the previous claim on appeal constituted ineffective assistance.

On June 20, 2001, the Court of Criminal Appeals denied King's petition for post-conviction

relief.  *Ex Parte John William King*, No. 49,391-01.  On September 6, 2002, King filed an

application for a writ of *habeas corpus* with this court.  On January 8, 2003, the Director moved for

summary judgment.

9

*Analysis*

*Standard of review*

Title 28 U.S.C. §2254, generally prohibits granting relief on claims not previously presented to the state courts.  If it appears that the petitioner still may have a right under state law to obtain relief, the federal court will either abate or dismiss the application in order to allow the applicant to present his unexhausted claims in a successive petition to that court.  *See Rhines v. Weber,* 544 U.S. 269 (2005)*.*  If it is entirely clear that the state court will not review the merits of those unexhausted claims, however, the federal court will also refuse to review them unless the applicant can establish both that he had good cause for failing to present his claims and he would be prejudiced by not being given an opportunity to do so, or that a fundamental miscarriage of justice would result from the court's failing to review his claims.  *See Coleman v. Thompson,* 501 U.S. 722, 750 (1991).

Title 28 U.S.C. § 2254 also provides that relief cannot be granted for claims that were adjudicated on the merits in state court proceedings unless the adjudication of that claim resulted in a decision which was contrary to, or involved an unreasonable interpretation of, clearly established federal law, as determined by the Supreme Court of the United States, or was based upon an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. In addition, a state court's determination of a factual issue is presumed correct, and can only be rebutted by clear and convincing evidence. *See* 28 U.S.C. §2254 (d) and (e)(1).  If a claim was fairly presented to the state court but not adjudicated, this court will determine it *de novo,* just as factual issues not determined by the state court are determined *de novo.  See Miller v. Johnson,* 200 F.3d 274, 281 n.4 (5th Cir.), *cert. denied,* 531 U.S. 849 (2000).  Summary judgment is appropriate if a claim is not cognizable in *habeas corpus*, *see e.g.  Abed v. Armstrong,* 209 F.3d

10

63,64 (2d Cir.), *cert. denied,* 531 U.S. 897 (2000), or if the applicant cannot establish at least a

genuine issue as to each element of a cognizable claim. *Guy v. Cockrell,* 343 F.3d 348, 352 (5th Cir.

2003).

*Claims*

King's twenty-one claims for relief are:

1. King was denied effective assistance of counsel throughout the course of his trial and on appeal.  Sub-claims under this general claim include:

> a. presenting and allowing a false and misleading framework for the "future dangerousness" special issue
> b. failing to adequately move to change venue
> c. failing to make an opening argument
> d. making a totally ineffective and harmful closing argument
> e. failing to present a viable defense at the punishment phase
> f. failing to object to unqualified and erroneous "tattoo" testimony by a police officer
> g. failing to object to unqualified and erroneous "gang" testimony by William Knox
> h. failing to object to prosecutorial misconduct and error
> i.  failing to investigate and present mental health information
> j.  failing to challenge the testimony of coroner Dr. Brown
> k. failing to adequately urge their motion to withdraw
> l.  failing to object to the "future dangerousness" testimony of Dr. Gripon
> m. cumulative error

2. Trial counsel's deficient performance in not presenting available evidence showing King's actual innocence constitutes ineffective assistance of counsel and deprived King of his rights under the Sixth and Fourteenth Amendments to the Constitution of the United States.

3. The trial court violated King's rights under the Sixth and Fourteenth Amendments when it denied his request for different counsel and his counsel's motion to withdraw.

4. King's rights under the First and Fourteenth Amendments were violated by the admission of evidence relating to his abstract beliefs, since there was not a sufficient nexus between his beliefs and the crime.

5. The admission of unreliable and unscientific testimony about the likelihood of King's future dangerousness violated King's rights under the Eighth and Fourteenth Amendments.

6.   The Texas special sentencing issues deprived King of his Sixth and Fourteenth Amendment rights to have a jury determine, beyond a reasonable doubt, every fact that operated to increase his sentence from life in prison to death.

7. The State's introduction of evidence of unconvicted offenses and the jury's consideration of that evidence violated King's rights under the Sixth, Eighth and Fourteenth Amendments.

8. King was denied due process and a fair trial by extensive pretrial publicity.

9. King's rights under the Fifth, Sixth, Eighth and Fourteenth amendments were violated by the totality of the prejudicial circumstances and atmosphere surrounding his trial.

10. King was deprived of his rights under the Sixth, Eighth and Fourteenth Amendments by the trial court's denying his motion for a change of venue.

11.  In his state post-conviction proceedings, King was denied his rights to meaningful access to the courts, due process  of law, and the effective assistance of counsel.

12.  King's trial counsel rendered ineffective assistance at both the guilt-determination and punishment-determination phases of his trial by failing to obtain a psychiatric expert witness.

13. King's jury was fundamentally biased against him due to errors of the trial court in death-qualifying the jury.

14. The State's failure to disclose a deal it made with a prosecution witness denied King the due process of law.

15. TEX. CRIM. PROC. art. 37.071 (e) & (g)'s prohibition against informing jurors that a single holdout juror will cause the imposition of a life sentence violated King's rights under the Eighth and Fourteenth Amendments.

16. King was denied the right to the effective assistance of appellate counsel in violation of the Sixth, Eighth and Fourteenth Amendments.

17. The death penalty has been arbitrarily imposed in Texas, a violation of King's rights under the Eighth and Fourteenth Amendments.

18. The death penalty as presently administered in Texas is cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments

19. Death by lethal injection constitutes cruel and unusual punishment under the Eighth Amendment.

20. His trial counsel were operating under a conflict of interest in violation of King's rights under the Fifth, Sixth, Eighth and Fourteenth Amendments.

21. The cumulative effect of the errors during King's trial denied him the right to due process under the Fourteenth Amendment.

King's first claim is that he was denied effective assistance of counsel throughout the course of his trial and appeal.  Of the thirteen sub-claims which make up this claim, only one was similar to a claim previously presented to the state courts.  King's sub-claim "i," failing to investigate and offer mental health evidence, is similar to King's second post-conviction claim of failing to raise the insanity defense and his third post-conviction claim of failure to properly investigate his prior mental history.[2]  None of King's other twelve sub-claims were contained in the thirteen claims he presented to the state court in his appeal and his post-conviction application.  Similarly, King's second, fourth, fifth, sixth, seventh, eighth, ninth, tenth, half of his twelfth, his thirteenth, fourteenth, fifteenth, sixteenth,[3] seventeenth, eighteenth, nineteenth, twentieth and twenty-first claims were also not presented to the state court.  *Compare* claims on pp. 11-13 *with* claims on pp. 8-9.

Title 28 U.S.C. § 2254 (b)(1)(A) provides that an application for a writ of *habeas corpus* shall not be granted unless it appears that the applicant has exhausted the remedies available in the courts of the state.  Subsection ( c ) of that statute provides that an applicant shall not be deemed to

---

[2]  Sub-claim "e" of King's first claim, that his trial counsel rendered ineffective assistance by failing to present a viable defense at the punishment phase of his trial, is superficially similar to his third state post-conviction claim, that his trial counsel failed to fully investigate mitigating evidence.  In the state claim, however, King contended that his trial counsel should have raised his mental health problems as a factor in mitigation, a claim which King included in his sub-claim "i."  The other deficiencies of which King complains in his sub-claim "e," such as his counsel's failure to humanize King to the jury, and failing to counter the prosecution's evidence of King's beliefs and of the likelihood of his future dangerousness, were not presented to the State courts.

[3]  King's sixteenth claim, that his appellate counsel rendered ineffective assistance, appears superficially similar to his fifth state post-conviction claim, that his appellate counsel rendered ineffective assistance by not raising his trial counsel's failure to have a record made of the bench conferences which took place at trial.  In his federal claim, however, while King contended that his appellate counsel was ineffective for not raising several other claims, he never complained about his counsel's failure to raise that particular claim.

have exhausted the remedies available in the courts of the state if he has the right under the law of the state to raise, by any available procedure, the questions presented.

King contends that he has the right, under state law, to raise the unexhausted claims in the state court, and has moved the court to hold the case in abeyance while he returns to state court to raise them.   He bases his argument on Tex. Code. Crim. Proc. Art. 11.071 § 5 (a), which provides, in relevant part:

> If an initial application for a writ of *habeas corpus* is untimely or if a subsequent application is filed after filing an initial application, a court may not consider the merits of or grant relief based on the subsequent or untimely initial application unless the application contains specific facts establishing that:
>
>> (2) by a preponderance of the evidence, but for the violation of the United States Constitution no rational juror could have found the applicant guilty beyond a reasonable doubt.

Under Texas law, a petitioner seeking to file a subsequent petition under this subsection must demonstrate that the newly discovered evidence, if true, creates a doubt as to the efficacy of the verdict and that it is probable that the verdict would be different on retrial.  *Ex parte Elizondo*, 947 S.W.2d 202, 206-08 (Tex. Crim. App. 1997).   In determining whether to stay a federal application and allow an applicant to return to state court, however, the federal court does not decide whether the new evidence of actual innocence actually meets the state law standard; instead, it determines only whether it is entirely clear that the Texas courts would find that the evidence does not meet that standard.  Absent such clarity, the federal court must allow the state court to determine whether the newly discovered evidence meets the state law requirement.  *See Wilder v. Cockrell*, 274 F3d 255, 262-63 (5th Cir. 2001).

14

King has offered the following newly discovered evidence:  One of the other perpetrators, Lawrence Brewer, has now stated  in a letter to King's counsel that it was Lewis Berry, not King, who was present at the time Byrd was dragged to death.  Brewer had testified at his own trial that King was present; he now claims that he committed perjury about this fact on the advice of his attorney, who told him that it was necessary that he falsely implicate King in order to avoid receiving the death penalty for his own part in the killing.  King also contends that he himself wears a size 9 shoe, Shawn Berry a 9 ½ and Lewis Berry a size 10.  The two pairs of sandals introduced as evidence were size 9 ½ and size 10, and although Lewis Berry testified at trial that the sandals belonged to Berry and King, and that he did not own any sandals, King has produced the affidavit of Kylie Milburn, who stated that she saw Lewis Berry wearing sandals before the date of the killing.

Based on this evidence, the court cannot say that it is entirely clear that the state court would not review the merits of King's unexhausted claims were he to present those claims in a subsequent petition to that court.  Accordingly, the court will deny the Director's motion for summary judgment as to King's unexhausted claims and grant King's motion to stay the case in order to allow him the opportunity to present those unexhausted claims and sub-claims to that court.[4]

---

[4]    In *Sterling v. Scott*, 57 F.3d 451, 456-58 (5th Cir. 1995), *cert. denied*, 516 U.S. 1050 (1996), the Fifth Circuit construed 21 U.S.C. Sec. 848, which provided, *inter alia*, that federally appointed counsel must represent a condemned inmate through all subsequent proceedings.  The court interpreted the word "all" to mean only all federal proceedings, not all federal and all state proceedings.  Accordingly, it held that attorneys appointed by the federal courts to represent inmates in federal *habeas corpus* proceedings are not entitled to payment by the federal court for returning to state court to exhaust claims.  A necessary corollary of that holding, however, is that federally appointed counsel cannot be required to represent an inmate through subsequent state proceedings.  While the court will stay this case in order for King to exhaust his claims by presenting them to the state court, it will not pay his current counsel to represent him in state court, and it will not require counsel to represent King *pro bono*.

Regarding the remaining claims, sub-claim "i" of King's first claim is that his trial counsel rendered ineffective assistance.  To establish a claim for ineffective assistance of counsel, a petitioner must show both that his counsel's performance fell below what would be objectively reasonable for a competent attorney, and that, had his counsel not performed deficiently, there is a reasonable probability that the result in his case would have been different.  *Strickland v. Washington*, 466 U.S. 668, 687 (1984).  If the court finds that a petitioner cannot establish one of the two prongs of the test, it is unnecessary for the court to analyze whether petitioner can establish the other.  *Id.*  In reviewing trial counsel's performance, the court presumes that counsel acted reasonably, and it will generally defer to counsel's strategic and tactical decisions.  *Id.* at 689-90.

King contends specifically that his trial counsel failed to investigate and present mental health information.  Before the murder of Byrd, King had been diagnosed as clinically depressed and bi-polar and had taken anti-depressant medicine.  King had apparently attempted suicide on more than one occasion before the killing.  In King's state post-conviction proceedings, his counsel stated by affidavit that he asked a forensic psychologist to evaluate King, and that after he (the psychologist) did so, he told King's counsel that he saw no evidence of mental illness.  Counsel also stated that King denied having any mental illness and no members of his family gave any indication that King had any form of mental illness.

Based upon this evidence, the state court found that King's counsel's performance was not deficient.  The court also found that, even had King's counsel done a more thorough job of investigating his mental state, there was not a reasonable probability that the result in the guilt-determination or punishment-determination phases of his trial would have been different.  As stated previously, the court cannot grant relief on a claim that was adjudicated on the merits in state court

proceedings unless the adjudication of that claim resulted in a decision which was contrary to, or involved an unreasonable interpretation of, clearly established federal law, as determined by the Supreme Court of the United States, or was based upon an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.   In light of the negative answers trial counsel received from his forensic psychologist and from King during counsel's initial investigation into the possibility of King being afflicted with mental illness, the court cannot find unreasonable the state court's determination that King's trial counsel's failure to further investigate this possibility did not constitute deficient performance. The court will grant  the Director's motion for summary judgment as to subsection "i" of King's first claim.

King's third claim is that the trial court violated his rights under the Sixth and Fourteenth Amendments when it denied his request for different counsel and his counsel's motion to withdraw. King contends that the trial court should have inquired more deeply into the bases for the request and motion before denying them.  The Texas Court of Criminal Appeals found that the trial court did not abuse its discretion in denying the requests.  *See King v. State,* 29 S.W.3d 556, 566 (2000).  The issue for this court is whether that finding is contrary to, or is based upon an unreasonable application of clearly established federal law, as determined by the United States Supreme Court. King, however, has cited no authority from that court which provides guidance as to how thoroughly a trial court must inquire into the grounds for counsel's withdrawal or removal.  Accordingly, King cannot establish that the state court's finding was contrary to or an unreasonable application of Supreme Court precedent.  The court will grant  the Director's motion for summary judgment as to King's third claim.

King's eleventh claim is that in his state post-conviction proceedings, he was denied his rights to meaningful access to the courts, due process of law, and the effective assistance of counsel. This claim was not presented to the state courts, but it is not barred under the doctrine of procedural default because it could not have been presented until after those proceedings were completed. *See* 28 U.S.C. § 2254 (b)(1)(B)(i).  Complaints as to the adequacy of state post-conviction proceedings, however, are not cognizable in federal *habeas corpus.  See Millard v. Lynaugh*, 810 F.2d 1403, 1410 (5th Cir.), *cert. denied,* 484 U.S. 838 (1987).  The court will grant the Director's motion for summary judgment as to this claim.

King's twelfth claim is that his trial counsel rendered ineffective assistance at both the guilt-determination and punishment-determination phases of his trial by failing to obtain a psychiatric expert witness.  As the court explained in its analysis of King's first claim, to prevail on a claim for ineffective assistance of counsel under *Strickland v. Washington*, King must establish both that his counsel's performance was deficient and that, had his counsel performed properly, there is a reasonable probability that the result in his case would have been different.  As explained in the analysis of that claim, the state court found that counsel did have a psychologist examine King prior to trial, and the psychologist found no evidence of mental illness.  King has cited no Supreme Court authority that the Constitution requires that counsel consult a psychiatrist, rather than a psychologist, to determine whether mental health issues are viable, and Fifth Circuit authority is to the contrary. *See, e.g., Hogan v. Estelle*, 537 F.2d 238 (5th Cir. 1976), *cert. denied*, 429 U.S. 1065 (1977).  As to King's sub-claim regarding the guilt-determination phase of the trial, the court finds that King's trial counsel's actions in relying on his psychologist's opinion that King exhibited no signs of mental disease or defect does not constitute deficient performance.  Because King cannot establish this first

18

element of the *Strickland* test, it is unnecessary to analyze whether King was prejudiced by his counsel's actions.

The other sub-claim in this claim is directed to the punishment-determination phase of his trial. King contends that his counsel rendered deficient performance by offering the expert testimony of a clinical psychologist because that witness' opinions were more harmful than beneficial. As to whether there was a probability that King would commit future acts of criminal violence which would constitute a continuing threat to society, the witness testified in essence that King would not, as long as the system did not give him a chance to do so. On cross-examination, the witness conceded that there was a probability that King would commit such acts in prison if given the opportunity.

This sub-claim was never presented to the state courts, so the court will allow King to exhaust that claim. The court will grant the Director's motion for summary judgment as to the first sub-claim of King's twelfth claim, deny the motion as to the other sub-claim of that claim, and Grant King's motion to hold the case in abeyance while he exhausts this sub-claim.

### *Conclusion*

For the above reasons, the court will grant the director's motion for summary judgment as to sub-claim "i" of King's first claim, his third claim, his eleventh claim, and the first sub-claim of his twelfth claim. As to King's remaining claims and sub-claims, the court will grant King's motion to hold this case in abeyance while he presents them to the appropriate state court. An order to this effect will be entered.

**SIGNED this the 29th day of March, 2006.**

19

RICHARD A. SCHELL
UNITED STATES DISTRICT JUDGE