IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
BEAUMONT DIVISION

| | | |
|---|---|---|
| JOHN WILLIAM KING, | § | |
| Petitioner, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 1:01cv435 |
| | § | |
| RICK THALER, | § | |
| Director, Texas Department of | § | |
| Corrections, Correctional | § | |
| Institutions Division, | § | |
| Respondent. | § | |

## RESPONDENT'S ANSWER WITH BRIEF IN SUPPORT

Petitioner John William King was properly convicted and sentenced to die for the particularly brutal kidnaping and dragging death of James Byrd, Jr.[1]  He now challenges that presumptively valid conviction and sentence in this Court pursuant to 28 U.S.C. §§ 2241 & 2254.  For the reasons discussed below, King fails to demonstrate that he is entitled to federal habeas relief.

## KING'S ALLEGATIONS

The Director understands King to raise the following grounds for federal habeas corpus relief:

1.      Counsel was constitutionally ineffective pretrial and during both the guilt/innocence and punishment trials.

---

[1]      King visited this brutality on Mr. Byrd along with Shawn Berry and Lawrence Brewer.  Having been found guilty of capital murder, Berry was sentenced to life in prison.  Brewer was also found guilty of capital murder; he was sentenced to death and executed on September 21, 2012.

2.   Counsel was constitutionally ineffective for failing to present an actual innocence defense.

3.   King's Sixth and Fourteenth Amendment rights were violated by the trial court's denial of King's pretrial request for new counsel and trial counsel's motion to withdraw.

4.   King's First and Fourteenth Amendment rights were violated by the admission of evidence relating to his abstract—racist—beliefs without a sufficient "nexus" to the crime.

5.   King's Eighth and Fourteenth Amendment rights were violated by the admission of "unreliable and unscientific" testimony regarding future dangerousness.

6.   King's Sixth and Fourteenth Amendment rights to have the jury determine beyond a reasonable doubt, every fact that operates to increase the punishment authorized, were violated by the submission of Texas's special issues.

7.   King's Sixth, Eighth and Fourteenth Amendment rights were violated by the admission of unadjudicated offenses during the punishment trial.

8.   King's due process rights were violated by "pervasive and extensive pretrial publicity."

9.   King's Fifth, Sixth, Eighth and Fourteenth Amendment rights were violated by "the totality of prejudicial circumstances and atmosphere surrounding the trial."

10.  King's Sixth, Eighth and Fourteenth Amendment rights were violated by the trial court's denial of his motion for change of venue.

11.  King was denied meaningful access to the courts, due process of law and competent counsel during the state habeas proceedings.

12. King's trial counsel were constitutionally ineffective for failing to obtain and/or use a confidential defense psychiatric expert at both the guilt/innocence and punishment trials.

13. The trial court erred in death-qualifying the jury, resulting in a jury that was "fundamentally biased" against King.

14. The State failed to disclose a deal with a prosecution witness.

15. King's Eighth and Fourteenth Amendment rights were violated by Texas's statutory prohibition against informing jurors that a single holdout juror will result in the imposition of a life sentence.

16. King's appellate counsel was constitutionally ineffective.

17. King's Eighth and Fourteenth Amendment rights were violated "in view of the many different capital sentencing schemes that have been in operation in Texas in recent years."

18. The death penalty is cruel and unusual punishment in violation of the Eighth Amendment.

19. Lethal injection is cruel and unusual punishment in violation of the Eighth Amendment.

20. Trial counsel were operating under a conflict of interest in violation of King's Fifth, Sixth, Eighth and Fourteenth Amendment rights.

21. The cumulative effect of these errors denied King due process under the Fourteenth Amendment.

But as demonstrated below—where the claims are properly exhausted—King has not established that the state courts were objectionably unreasonable in their rejection of his claims.  In any event, all of King's claims are without

merit.  The Director denies all allegations of fact made by King except those supported by the record and those specifically admitted herein.[2]

## STATEMENT OF THE CASE

Having been indicted on charges of capital murder, King was convicted and sentenced to death for the particularly brutal murder of James Byrd, Jr. Clerk's Record (CR) 248, 291, 293-96.  The Court of Criminal Appeals upheld King's conviction and death sentence.  *King v. State*, 29 S.W.3d 556 (Tex. Crim. App. 2000).

While his direct appeal was pending, King sought state habeas relief. SHCR-01[3] 2-27.  The state habeas court entered findings of fact and conclusions of law denying relief, *id.* at 86, which the Court of Criminal Appeals adopted.  *Ex parte King*, No. 49,391-01 (Tex. Crim. App. June 20, 2001) (unpublished order).  Thereafter, King filed a federal habeas petition in this Court.  Docket Entry (DE) 30.  Because most of the claims he was raising had not been presented to the state courts, this Court stayed the proceedings and allowed King to return to state court.  DE 66.  King's second state habeas

---

[2]      Copies of King's state court records have been previously filed with the Court. However, because that was ten years ago and because King's second writ needs to be filed, the Director will be filing new copies of the complete state court records in electronic form.

[3]      "SHCR" refers to the state habeas clerk's record, the transcript of documents and pleadings filed during King's state habeas proceedings, proceeded by volume number (where applicable) and followed by page number.  "SHCR-01" refers to the first state habeas proceedings; "SHCR-02" refers to the second state habeas proceedings.

application was dismissed pursuant to Texas Code of Criminal Procedure Article 11.071, Section 5. *Ex parte King*, No. 49,391-02 (Tex. Crim. App. Sept. 12, 2012). King then returned to federal court and filed an amended petition. DE 75.

## STATEMENT OF FACTS

### I.  Facts Relating to Guilt/Innocence

Sometime in the pre-dawn hours of June 7, 1998, James Byrd, Jr., a forty-nine-year-old African-American man, was chained by his ankles—with a twenty-four-foot logging chain—to the back of Shawn Berry's pickup truck. He was then dragged approximately three miles down a dirt logging road and asphalt country road, Huff Creek Road. For at least two miles, Mr. Byrd was alive and conscious until his body swung off the road, impacting a culvert with enough force to separate his head and right arm from his body. Mr. Byrd's headless body was then dragged another mile, at which point, the truck turned around in the entrance to a cemetery. Mr. Byrd's body was left in the middle of the road near the cemetery and in front of a country church.

The Court of Criminal Appeals summarized the facts adduced at trial relating to King's role in this brutality as follows:

> … George Mahathy, a life-long acquaintance of the victim, James Byrd, Jr., saw him at a party on Saturday night, June 6, 1998. Byrd left the party around 1:30 or 2:00 in the morning. Byrd asked Mahathy for a ride home, but Mahathy was riding home with someone else. As Mahathy was leaving the party, he

saw Byrd walking down the road towards home, which was about a mile from the party. Steven Scott, who had known Byrd for several years, also saw him walking down the road that night. After arriving home a few minutes later, at around 2:30 a.m., Scott saw Byrd pass by in the back of an old model, side-step pickup truck painted primer gray. Three white people were riding in the cab of the truck.

On June 7, 1998, police officers responded to a call to go to Huff Creek road in the town of Jasper. In the road, in front of a church, they discovered the body of an African-American male missing the head, neck, and right arm. The remains of pants and underwear were gathered around the victim's ankles. About a half mile up the road, they discovered the head, neck, and arm by a culvert in a driveway.

A trail of blood and drag marks led from the victim's torso to the detached upper portion of the victim's body and continued another mile and a half down Huff Creek Road and a dirt logging road. A wallet found on the logging road contained identification for James Byrd, Jr., a Jasper resident. Along the route, police also found Byrd's dentures, keys, shirt, undershirt, and watch. At the end of the logging road, the trail culminated in an area of matted-down grass, which appeared to be the scene of a fight.[4] At this site and along the logging road, the police discovered a cigarette lighter engraved with the words "Possum" and "KKK," a nut driver wrench inscribed with the name "Berry," three cigarette butts, a can of "fix-a-flat," a compact disk, a woman's watch, a can of black spray paint, a pack of Marlboro Light cigarettes, beer bottles, a button from Byrd's shirt, and Byrd's baseball cap.[5]

The following evening, police stopped Shawn Berry for a traffic violation in his primer-gray pickup truck. Behind the

---

[4]  This area is referred throughout the record as the "fight scene" or "scuffle scene."

[5]  Chemical analysis revealed a substance on the victim's shirts and cap consistent with black spray paint.

front seat, police discovered a set of tools matching the wrench found at the fight scene.  They arrested Berry and confiscated the truck.  DNA testing revealed that blood splatters underneath the truck and on one of the truck's tires matched Byrd's DNA.[6]  In the bed of the truck, police noticed a rust stain in a chain pattern and detected blood matching Byrd's on a spare tire.

Six tires that were on or associated with Berry's truck were examined.  Three of the four tires on the truck were different makes.  Tire casts taken at the fight scene and in front of the church where the torso was found were consistent with each of these tires.  An FBI chemist detected a substance consistent with fix-a-flat inside one of the six tires.

Shawn Berry shared an apartment with Lawrence Russell Brewer and [King].  Police and FBI agents searched the apartment and confiscated [King's] drawings and writings as well as clothing and shoes of each of the three roommates.  DNA analysis revealed that the jeans and boots Berry had been wearing on the night of the murder were stained with blood matching Byrd's DNA.  An analyst with the FBI lab determined that a shoe print found near a large stain of blood on the logging road was made by a Rugged Outback brand sandal.  [King] owned a pair of Rugged Outback sandals and had been seen wearing them on the night of the murder.  Shawn Berry also owned a pair of Rugged Outback sandals that were a half size different from [King's].[7]  One of the pairs of sandals confiscated from the apartment bore a blood stain matching Byrd's DNA.  A Nike tennis shoe with the initials "L.B." in the tongue also was stained with blood matching Byrd's.[8]

---

[6]   The probability that an African-American's DNA would match the DNA on the various items tested in this case ranged from one in 5,700 to one in 300,000.

[7]   The FBI analyst could not determine the exact size of the sandal.

[8]   Although Shawn Berry's brother, Lewis Berry, stayed at the apartment from time to time and shares the same initials with Lawrence Brewer, Lewis Berry testified that the shoes were not his and demonstrated that his foot was significantly larger than Brewer's.

DNA analysis was also conducted on the three cigarette butts taken from the fight scene and logging road. DNA on one of the cigarette butts established [King] as the major contributor, and excluded Berry and Brewer as contributors, but could not exclude Byrd as a minor contributor.[9]  Brewer was the sole contributor of DNA on the second cigarette butt. The third cigarette butt revealed DNA from both a major and a minor contributor. Shawn Berry was established as the major contributor of DNA on the third cigarette butt; however, [King], Brewer, and Byrd were all excluded as possible minor contributors of the additional DNA.

The State presented evidence of [King's] racial animosity, particularly toward African-Americans.    Several witnesses testified about [King] refusing to go to the home of an African-American and would leave a party if an African-American arrived.  In prison, [King] was known as the "exalted cyclops" of the Confederate Knights of America (CKA), a white supremacist gang.   Among the tattoos covering [King's] body were a woodpecker[10] in a Ku Klux Klansman's uniform making an obscene gesture; a "patch" incorporating "KKK," a swastika, and "Aryan Pride," and a black man with noose around his neck hanging from a tree.[11]

A gang expert reviewed the writings that were seized from the apartment and testified that [King] had used persuasive language to try to convince others to join in his racist beliefs. The writings revealed that [King] intended to start a chapter of the CKA in Jasper and was planning for something big to happen on July 4, 1998. The expert explained that to gain credibility [King]

---

[9]    The FBI forensic examiner explained that a minor contributor deposits less DNA than a major contributor.  This occurs, for instance, when another person takes a "drag" off of a cigarette.

[10]    A cult expert testified at trial that a "woodpecker" or "peckerwood" is the term used in prison for whites.

[11]    [King's] drawings depicted similar scenes.  One drawing depicted three Klansman riding horses with a noose hanging from a saddle.  Another drawing depicted a white man in a KKK robe, along with a black man, woman and baby kneeling, and a black man hanging.

would need to do something "public."  He testified that leaving
Byrd's body in the street in front of a church—as opposed to
hiding it in one of the many wooded areas around town—
demonstrated that the crime was designed to strike terror in the
community.

[King] neither testified nor made a formal statement to
police.  But he sent letters concerning the night of the murder to
the Dallas Morning News and Russell Brewer while he and
Brewer were in jail awaiting trial.  The following portion of the
letter to the Dallas Morning News was read into the record:

> Given a description of the whereabouts of the dirt trail
> where an alleged beating of the deceased occurred, it's
> essential to acknowledge the fact that Shawn Berry co-
> inherited a small tract of land adjacent to the tram road,
> which he visited quite frequently.

> Therefore, the fact that my cigarette lighter with
> "Possum" inscribed upon it was found near the scene of
> the crime along with other items—i.e., several hand tools
> with "Berry" inscribed on them, a compact disk belonging
> to Shawn Berry's brother Lewis, and my girlfriend's
> watch, as well as items of the deceased—are all verified
> facts implementing that these items could have fallen
> from Shawn's truck during a potential struggle with the
> deceased while on the tram road.

> However, unacknowledged facts remain, that I, along
> with Russell Brewer and Lewis Berry, had been borrowing
> Shawn Berry's truck to commute to and from an out-of-
> town land clearing job each day.  My girlfriend's watch
> was kept in Shawn Berry's truck for us to keep track of
> time. Lewis Berry had brought along several of his C.D.s
> for our listening pleasure during our hourly drive each
> morning and evening, which he had a tendency to leave in
> his brother's truck.

> Furthermore, the aforementioned cigarette lighter had
> been misplaced a week or so prior to these fraudulent
> charges that have been brought against Russell Brewer

and me.  This, so forth, does not prove the presence of my girlfriend, Lewis Berry, Russell Brewer nor myself at the scene of the crime, verifiably only the owners of the property in question.

* * *

Several statements and theories against Shawn Berry, Russell Brewer, and myself, John. W. King, for a prospective motive in this hard crime have been presented to the public.  Against the wishes of my attorney, I shall share with you objective facts and my account of what happened during the early morning hours of June 7th, 1998.

After a couple of hours of drinking beer and riding up and down rural roads adjacent to Highway 255 of Highway 63, looking for a female's home, who were expecting Shawn Berry and Russell Brewer, Berry through [sic] frivolous anger and fun at first, begun [sic] to run over area residents' mail boxes and stop signs with his truck due to negligence in locating the girl's residence.

Becoming irate with our continued failure to locate the female's house, Shawn Berry's behavior quickly became ballistic as he sped through area residents' yards in a circular manner and made a racket with his truck's tailpipes managing to sling our ice chest from the back of his truck several times.

During his little conniption fit, Shawn Berry then stopped just ahead of a mailbox on Highway 255, took a chain from the back of the truck, wrapped it around the post of the mailbox, and proceeded to uproot and drag the mailbox east on Highway 255, stopping yards short of the Highway 63 north intersection, where he then removed his chain, replaced it, and continued to drive to a local convenience store, Rayburn Superette, to try to call the female who was expecting him and Brewer.

Fortunately no one answered at the girl's house and after repeated requests from me, as well as complaints

~ 10 ~

from Russell Brewer, of a throbbing toe he injured during a recovery of our ice chest, Shawn Berry then agreed to take us to my apartment.

Shawn Allen Berry, driving with a suspended license and intoxicated, while taking Russell Brewer and me home those early morning hours, decided to stop by a mutual friend of ours home located on McQueen Street to inquire as to what the residents and his brother Lewis Berry were doing.  On our way there, we passed a black man walking east on Martin Luther King Drive, whom Shawn Berry recognized and identified as simply Byrd, a man he befriended while incarcerated in the Jasper County Jail and, Berry stated, supplied him with steroids.

Shawn Berry then proceeded to stop his truck approximately 10 yards ahead of the individual walking in our direction, exit his vehicle, and approach the man. After several minutes of conversation, Shawn Berry returned to the truck and said his friend was going to join us because Berry and Byrd had business to discuss later and, thus, Byrd climbed into the back of Shawn Berry's truck and seated himself directly behind the cab.

While continuing on to our friend's residence where supposedly Lewis Berry was to be, we noticed there were neither lights on nor signs of activity in the trailer as we approached.  We decided to proceed on to my apartment; but contrary to Russell Brewer's and my request, Shawn Berry drove to and stopped at another local convenience store, B.J.'s Grocery, just east of the Jasper city limits. Shawn Berry then asked Russell Brewer if he could borrow 50 to $60 because he needed a little extra cash to replenish his juice, his steroid supply.

After Brewer gave Shawn Berry the remainder of what money he had to return to Sulphur Springs, Texas, on, Berry asked if Russell Brewer and I could ride in the back of the truck and let his friend sit up front to discuss the purchase and payment for more steroids for Shawn Berry. Russell Brewer and I obliged on the condition Berry take

~ 11 ~

us to my apartment without further delay, which, after a brief exchange of positions, he did.

Once we arrived at my apartment, Shawn Berry informed Russell Brewer and me that he was leaving so he could take Byrd to get the steroids and then home.  I asked if Brewer or I would bring a small cooler of beer down for him and his friend along with a bottle of Bourbon Berry had bought a few days prior.

Russell Brewer and I went up to my apartment and began to fill a small cooler with approximately six to eight beers.  Realizing I left my wallet and cigarettes in Shawn Berry's truck, I opted to bring the cooler back to Berry. After retrieving my wallet, but unable to locate my cigarettes, I then returned to my apartment, and proceeded to call an ex-girlfriend before retiring to bed in the predawn hours of June 7th, 1998.

A portion of the note [King] wrote to Brewer was as follows:[12]

As for the clothes they took from the apt. I do know that one pair of shoes they took were Shawn's dress boots with blood on them, as well as pants with blood on them.  As far as the clothes I had on, I don't think any blood was on my pants or sweatshirt, but I think my sandals may have had some dark brown substance on the bottom of them.

* * *

Seriously, though, Bro, regardless of the outcome of this, we have made history and shall die proudly remembered if need be…. Much Aryan love, respect, and honor, my brother in arms…. Possum.

Dr. Tommy Brown, a forensic pathologist, testified that he received Byrd's head, neck, and arm separately from the main torso.  The autopsy revealed extensive injuries all over Byrd's

---

[12]   A prison guard intercepted and copied [King's] note, which had been transmitted through other inmates.

body.   Nearly all of Byrd's anterior ribs were fractured.   He
suffered "massive brush burn abrasions" over most of his body.
Both testicles were missing and gravel was found in the scrotal
sac.   Both knees and part of his feet had been ground down, his
left cheek was ground to the jawbone, and his buttocks were
ground down to the sacrum and lower spine.   Some of his toes
were missing and others were fractured.   But his brain and skull
were intact, exhibiting no lacerations, fractures, or bruises.

Dr. Brown concluded that the lacerations and abrasions
around Byrd's ankles were consistent with having been wrapped
by a chain and that the abrasions all over Byrd's body were
consistent with him being dragged by his ankles over a road
surface.   Red regions around the area where Byrd's upper and
lower body separated indicated that Byrd's heart was still
pumping and that he was alive when his body was torn apart by
the culvert.[13]   Therefore, Brown determined that the cause of
death was separation of the head and upper extremity from the
rest of the body.   Some of the wound shapes and patterns
indicated that Byrd was conscious while he was being dragged
and was trying to relieve the intense burning pain by rolling and
swapping one part of his body for another.   Also, the absence of
injuries to Byrd's brain and skull suggested that he was trying to
hold his head up while being dragged.

*King v. State*, 29 S.W.3d at 558-62 (footnotes in original).

## II.   Facts Relating to Punishment

### A.   The State's case for future dangerousness

In addition to the horrific facts surrounding Mr. Byrd's kidnaping and

murder and evidence of King's racist views, the jury learned that this was not

King's first brush with the law.   They also learned that "all options [were]

tried and administered … to rehabilitate him, other than finally sending him

---

[13]    The head, neck, and arm were apparently severed by the force of hitting the
culvert.

to the penitentiary." 23 Reporter's Record (RR) 26. But he "just didn't care." *Id*. at 44. Indeed, King had been confined in one way or another "most of his adult life." *Id*. at 30.

In 1992, King, seventeen years old at the time, was convicted twice of burglary of a building. *See* State's Exhibits (SX) 144, 145. King and a friend "rummaged through [a metal storage building], took several items, including a 12-gauge shotgun with a folding stock, some keys, pocket knives, some Mexican moneybags, Mexican money, a few tools, bracelet with Mr. Elam's [the owner of the building] name engraved on it, and just - - a Mercedes hood ornament which was broken off of a Mercedes Benz that was in the building, and just other odds and ends, Corona beer." 23 RR 7. When the police found King and the missing items, they "also observed where it looked like a shotgun had discharge[d] in the building. Found a spent hull. Also was a hole in the couch and a hole in the building." King told his sister, who he was staying with at the time and in whose house he had been found, that the shotgun had "accidentally discharged." *Id*. at 7-8. King pled guilty to the charge of burglary of a building (a second-degree felony at the time), and was sentenced to ten years deferred adjudication. Less than four months later, he burglarized yet another building. On that night, he had taken his sister's car without her permission, picked up two friends (one of whom was Shawn Berry), and went to "Neal's TV, ... . And Bill had dropped Shawn and Bobby

Perego off. … Bobby knew a way to get into the building.  Shawn and Bobby got out.  A witness observed this take place." *Id.* at 9-10.  Again, King pled guilty to the charge of second-degree burglary, but this time, he was sentenced to ten years' probation.  *Id.* at 11; *see also id.* at 17; SX 146, 146A.

Before starting probation, King's probation officer explained that King was sent to boot camp for seventy-five days.  *Id.* at 18.  Boot camp is "highly structured, a lot of confidence courses, things of this nature.  So that it would serve two purposes.  Hopefully, they won't go back to the penitentiary but also kind of motivate them so they can get a job, they can get an education, positive reinforcement when they come back." *Id.* at 17-18.  But less than four months after King began serving probation for the second burglary-of-a-building charge, he was arrested for disorderly conduct, "hot rodding around the school.  King's probation was not revoked, although it could have been; he "understood, said he wouldn't do it again." *Id.* at 18, 19.

Less than a year later, however, King was arrested for assault by threat.  Again, King's probation was not revoked.  But this time, he was sent to a restitution center.  "Generally, it's a place in Beaumont we send them down there to look for employment.  It's run by the Jefferson County Probation Department.  It helps them with their education, but primarily to find a job."  But having been there about two and a half weeks, King "absconded … [He] left without permission and did not return." *Id.* at 32-33.

~ 15 ~

In addition to that, the jury learned that he committed a number of violations of the restitution center's rules.  In the two weeks before he absconded, King's file indicated that

> he has been a poor resident.  He's been unwilling to follow the rules and policies of the center.  He's shown disrespect and disregard for center policies and staff.  He's immature and acts likes a little child when he doesn't get his way by throwing temper tantrums.  He has a feeling that he's too good for this place and should be allowed to do whatever he wants to do.

> ***

> Mr. King has been a problem resident since the day he arrived. He's already been to the Jefferson County boot camp as a result of being negatively terminated from the center last year.  Mr. King informed me that the he did not get anything from the boot camp; it was a waste of his time.  Mr. King has an extremely negative attitude towards the center, the boot camp, and the criminal justice system.  It is very apparent that he does not have any intentions of putting forth the effort and desire to successfully complete the restitution center program.  It is my recommendation that Mr. King be placed in the Institutional Division of the Texas Department of Criminal Justice.

*Id.* at 33, 35, 43; *see also id.* at 36-42 (detailing the specific violations);  SX 147.

Because King was "not successful," he was sent to the Liberty County Community Center, where he was given 800 hours of community service.  *Id.* at 20-22.  But less than five months later, King was again sent to Jefferson County Boot Camp, "a six month boot camp."  King was then sent back to the Jefferson County restitution center, and again, he was unsuccessful.  This

time, a motion to revoke was filed and granted, and King was sentenced to eight years in prison. *Id.* at 22-23. He was released after serving two years. *Id.* at 23.

During the search of King's apartment (in connection with Mr. Byrd's murder), police discovered "some packaged meat." *Id.* at 55; *see* SX 149 (depicting a case of flounder, case of chicken, chicken breasts and other meat). Eventually, they connected that meat with the burglary of Patrick's Steak House, which had occurred just days before Mr. Byrd was kidnaped and brutally murdered. 23 RR 52.

The jury also heard from Royce Smithey, the chief investigator for the special prosecution unit, the office that, when a felony has been committed by a prisoner, takes the case (once TDCJ has completed its own internal investigation), does "any follow-up investigation that may need to be done, present[s] it to the grand jury, and then at that time prepare[s] it for trial, if it goes to trial." 24 RR 3. Mr. Smithey explained how a convicted defendant is processed into the prison system, in particular what would happen if King was sentenced to death. *Id.* at 5-10. Importantly, at the time of King's trial, Death Row was still on the Ellis Unit, and those inmates had "every classification that the rest of the prison system has." *Id.* at 6. Mr. Smithey also explained that King would have contact with civilians, and that TDCJ employs African-American medical personnel and guards. *Id.* at 8.

If King was ultimately sentenced to life, the intake process would not be much different, but "there are certain things that will be looked at because of the nature of his offense. … [T]here will be some restrictions that he will have simply because he's there on a violent offense; but then once he gets into the system, depending on his abilities to work and what he can do, then there are a vast number of units throughout the system that he can be placed on. There are vast levels of custody that he can be housed, and eventually he could be housed with a felony DWI or be working right next to a felony DWI." *Id.* at 8-9. And an inmate with a life sentence would have "more contact … with guards, nurses and other inmates versus a person with who had the death sentence." *Id.* at 10.

Mr. Smithey described the types of weapons that had been found over years: "everything from bombs to zip guns to homemade - - homemade knives, what are referred to as shanks, … actual firearms." He explained that shanks can be made of anything from Plexiglass to plastic or metal spoons to push rods taken from porcelain toilets (still found on the older units at the time of King's trial). *Id.* at 11-12. He further testified that the crimes committed in prison range from murder to simple assault, but "[t]he bottom line in the penitentiary if an individual wants to be violent he can be. The Texas prison system is probably the best prison system in the United States to handle violence simply because they certainly had a lot of experience at it;

but no matter how good you get at, there's no way that you can totally control that inmate 24 hours a day.  If he wants to hurt somebody, he can hurt somebody." *Id.* at 12, 14-15.

Finally, he explained to the jury that the prison system is not immune to gang activity. *Id.* at 15-16.  Mr. Smithey specifically said that if someone like King "wanted to join a gang for protection," "[h]is choice would probably be the Aryan Brotherhood of Texas.  That's probably the most organized white disruptive group that there is in the prison system." *Id.* at 16.

The State's second expert was psychiatrist Dr. Edward Gripon.  First, he explained to the jury his work involving white supremacists and prison gangs. *Id.* at 45-46.  He told them that a person's tattoos can provide "a better idea of what the person is trying to project or what kind of image they're trying to demonstrate by that. … [Y]ou can certainly see how they're trying to hold themselves out and what type of statement they might be making by what they have tattooed on to skin.  Because that can be very graphic, and it can certainly give you some window into certain aspects of an individual[.]" *Id.* at 47.  With respect to King's many tattoos—covering "a substantial portion of his body, 60, 65 percent"—Dr. Gripon described them as "demonstrative" and "confrontive." *Id.*  This told him that King wanted to "make a statement, to make himself someone to either be feared or not to be messed with, that sort of thing." *Id.* at 47-48.

Dr. Gripon also reviewed a number of King's letters and told the jury that it was his opinion that they had not been written with the understanding that they might be later used in trial or read by someone other than the intended recipient.  Thus, they provided "a way to see and understand something about how that person thinks, what statements they make." *Id.* at 49-50; *see also id.* at 52 (letters establishing that King was trying to organize a white supremacist group once he was released from prison).

Then Dr. Gripon opined that King would be a future danger.  He based this on his review of the FBI's reports detailing "interviews [with] quite a number of inmates, friends, and acquaintances" of King, King's letters and tattoos, as well as his past history and "the sheer magnitude of [the] offense[] [as it was] so extreme and so dramatic that it remove[d] all doubt as to what [he] was capable of." *Id.* at 48, 50-52.  Dr. Gripon explained that King would be a future danger in or out of prison because King's racist views were "not going to just dramatically go away[.]  [He] would be potentially dangerous in any number of settings." *Id.* at 52; *see also id.* at 53 (testimony that King would continue his attempts to persuade others to his beliefs).

Finally, the jury heard about King's attitude and behavior while in jail during the trial.  First, Jasper County Sheriff's Investigator Joe Sterling described an exchange he had with King when King refused to come to the

courthouse:  "I just advised Mr. King that it was nothing personal from the officers, but if the judge required him and put out an order for him to be at the Courthouse that he would have to be at the Courthouse. …  He then looked at me and told me that it was nothing personal, but assault on a peace officer was not shit because it did not ‑ ‑ he did not have anything to lose."  *Id.* at 40.   Second, Jasper County Jailer Kenneth Primrose described a night when, having heard a "ruckus" coming from the direction of King's cell and gone to investigate, King "said, if you think that's a loud noise, that's nothing and reached and picked up his TV and throwed it against the stool."  *Id.* at 62;  *see also* SX 142, 143.  And during the subsequent search of King's cell, a hangman's noose and a shank were found.  24 RR 66‑67;  *see also* SX 140, 141.

### B.   The defense's case in mitigation

The defense's case in mitigation began during its cross‑examination of the State's witnesses.  First, the jury learned that none of the violations committed by King during his second stay in the restitution center were violent.  23 RR 45.  They also learned that there was no violence connected to Patrick's Steak House break in.  *Id.* at 51.  Second, King would have to serve "a minimum of 40 years" before he was even eligible for parole.  24 RR 37.  Third, King generally caused no other problems (aside from the incident with the television and the radio and the verbal threat) while in jail awaiting or during the trial.  *Id.*  at 42.   Fourth, on the day King destroyed the radio and

the television, he had gotten a letter from his girlfriend indicating that she was living with another man and was pregnant by him, and that after the hangman's noose and the shank were found in his cell, he was placed on suicide watch. *Id.* at 68, 69. Finally, Dr. Gripon admitted on cross-examination that there is really no way to predict future dangerousness and that the American Psychiatric Society's (APA) position "is that psychiatrists are no better than any other individual with equal intelligence [and] the same information, that we have no special talent where that's concerned." *Id.* at 54. And Dr. Gripon reiterated that the best way to form an opinion regarding a defendant's future dangerousness is through an actual interview. *Id.* at 55-56; *see also id.* at 50 (admitting as much during the State's direct examination).

The defense's case-in-chief began with the testimony of clinical psychologist Dr. Walter Quijano. He explained to the jury that his assessment of King's future dangerousness consisted of an interview, a review of medical records, jail records and TDCJ records; he interviewed King's father, and he spoke with King's lawyers. *Id.* at 80-81. Dr. Quijano then discussed the factors that should be considered in assessing future dangerousness.

First, a person's history of violence is important. And in this case, he told the jury that there was "very little evidence of true assaultive behavior.

There was some incident with a sister; but other than that, there is no pattern chronic history of assaultive behavior." *Id.* at 82-83.  Second, King's age was important because King would be sixty-four before even being eligible for parole, and "the probability of 64 year old people committing acts of violence is very low." *Id.* at 83.   Third, the simple fact of King's gender made it more likely that he would commit future acts of violence because "men are more violent and more prone to violent behaviors than women." *Id.* at 84.   Fourth, one has to consider socio-economic status and employment, which in the instant case established that King "has had a reasonable stable job situation, and in prison there is no need for employment."   Next, while substance abuse is also something to consider, there was no evidence that King had such a problem. *Id.* at 84-85; *see also id.* at 88.  Likewise, there was no evidence that King had "abusively used weapons." *Id.* at 88.

Dr. Quijano then discussed the "environmental factors," family, friends, employment, and the victim pool that might influence a criminal defendant's future dangerousness.  With respect to family, King was not exposed to any abuse.  With respect to his friends, though, King associated "with people who advocate violence, who do violence, and who cheer people on when they do violence," thus making him potentially more dangerous. *Id.* at 85-86.  And again, King had a good work record. *Id.* at 86.  Finally, the victim pool was both random and narrow, but knowing "what his victim pool is[, the prison

system] will take the necessary steps to isolate him from his victim pool[.]" *Id.* at 87.

Dr. Quijano testified that there was "no issue of mental illness" and "no evidence that [King met] the criteria of antisocial personality disorder, although he has features of it." *Id.* at 89-90.

Also necessary for a determination of future dangerousness were the "specificity of the offense," the "deliberateness," and the defendant's remorse,[14] "post[-]conduct charge continuing crimes," and whether he had "fun after" committing the offense.[15]  It was also explained that the "personal factors" surrounding the offense must be considered.  *Id.* at 90-92.

Dr. Quijano testified further that his prediction of future dangerousness would be effected by "prolonged incarceration."  Thus, one has to look at what the prison system does to create a safe environment both for the inmates and its employees.  *Id.* at 92-93; *see also id.* at 94-105.  In the instant case, Dr. Quijano opined that King would never be placed in general population, "[n]ot with his racist ideas, with the tattoos that would invite attacks from other groups, not because of the nature of the crime." *Id.* at 105.

---

[14]    On cross-examination, Dr. Quijano admitted that King had "expressed absolutely and completely no remorse for his actions."  24 RR 115.

[15]    Dr. Quijano was also forced to admit that he knew that King "went out and had a high ho time playing volleyball and having a barbecue" within a day or two of the horrific murder of Mr. Byrd.  *Id.* at 116.

Ultimately, Dr. Quijano explained that King did not constitute a future danger *if* imprisoned.  *Id.* at 106.  He also told the jury that King's life did not indicate he would become the racist that drove him to kidnap and brutally Mr. Byrd.  Until he went to prison and was assaulted on his first day there, "and that traumatized him and changed him dramatically." *Id.* at 106-07.

The last witness to testify was King's father, Ronald King.[16] He told the jury that he had adopted King when he was three months old.  *Id.* at 126, 127.  King's mother died just two days before his sixteenth birthday, and it was the next year that he started getting trouble.  *Id.* at 128, 129.  Before King went to prison, he was not a racist.  *Id.* at 129.  Finally, he implored the jury to sentence his son to life rather than death.  *Id.* at 132-33.

## STANDARD OF REVIEW

Confined pursuant to a presumptively valid state court judgment, King is entitled to relief "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a). Thus, any claims King raises that are based solely on alleged violations of state law should be denied as a matter of law.

Habeas relief is also inappropriate for claims that are either unexhausted and procedurally defaulted, or claims that are exhausted yet were dismissed in a successive state habeas application and, thus, are also

---

[16]     King refused to be present for his father's testimony.  24 RR 123-25.

procedurally defaulted.  Indeed, under the AEDPA, a federal habeas petition
shall not be granted unless:

    (A)   the applicant has exhausted the remedies available in the
           courts of the State; or

    (B)   (i)    there is an absence of available State corrective
                  process; or

             (ii)   circumstances exist that render such process
                  ineffective to protect the rights of the applicant.

28 U.S.C. § 2254(b)(1).  Moreover, a writ may be denied on the merits,
notwithstanding any failure to exhaust available state court remedies.  28
U.S.C. § 2254(b)(2).

     Regarding exhausted claims that were adjudicated on the merits,
federal habeas relief cannot be granted unless that adjudication:

    (1)    resulted in a decision that was contrary to, or involved an
           unreasonable application of, clearly established Federal
           law, as determined by the Supreme Court of the United
           States; or

    (2)    resulted in a decision that was based on an unreasonable
           determination of the facts in light of the evidence presented
           in the state court proceeding.

28 U.S.C. § 2254(d).  The Supreme Court has explained that a state court
decision is "contrary to" clearly established federal law if the state court
"applies a rule that contradicts the governing law set forth in [the Supreme
Court's] cases," or confronts facts that are "materially indistinguishable" from

relevant Supreme Court precedent but reaches an opposite result.[17] (*Terry*) *Williams*, 529 U.S. at 405-06.

A "run-of-the-mill" state court decision applying the correct Supreme Court rule to the facts of a particular case is to be reviewed under the "unreasonable application" clause. *Id.* at 406. To this end, a state court unreasonably applies Supreme Court precedent *only if* it correctly identifies the governing precedent but unreasonably applies it to the facts of the particular case. *Id.* at 407-09. And as the Court recently described this deferential standard, in order to determine if the state court made an unreasonable application, a federal court "must determine what arguments or theories supported or … *could have supported*, the state court's decision; and then it must ask *whether it is possible fairminded jurists could disagree* that those arguments or theories are inconsistent with the holding in a prior decision of this Court." *Harrington v. Richter*, 131 S. Ct. 770, 786 (2011) (emphasis added). Indeed, this is the "only question that matters under § 2254(d)(1)." *Id.*

---

[17]   "Clearly established Federal law" refers to the holdings, as opposed to the dicta, of the Supreme Court's decisions as of the time of the relevant state court decision. *Lockyer v. Andrade*, 538 U.S. 63, 71 (2003) (citing (*Terry*) *Williams v. Taylor*, 529 U.S. 362, 412 (2000)). "In other words, 'clearly established federal law' under § 2254(d)(1) is the governing legal principle or principles set forth by the Supreme Court that the time the state court reaches its decision." *Id.* at 71-72 (citing (*Terry*) *Williams*, 529 U.S. at 405, 413, and *Bell v. Cone*, 535 U.S. 685, 698 (2002)).

Thus, "a state court's only decision that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree'" on the correctness of the state court's decision. *Id.* (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2002)); *see also Woodford v. Visciotti*, 537 U.S. 19, 27 (2002) (federal habeas relief is only merited where the state court decision is both incorrect *and* objectively unreasonable, "whether or not [this Court] would reach the same conclusion"). Moreover, "evaluating whether a rule application was unreasonable requires considering the rule's specificity. The more general the rule, the more leeway the courts have in reaching outcomes in case-by-case determinations." *Alvarado*, 541 U.S. at 644. This is particularly true when reviewing a state court's application of *Strickland v. Washington*, 466 U.S. 668 (1984), that when analyzed in conjunction with § 2254(d) creates a difficult and "doubly" deferential assumption in favor of the state court denial. *Richter*, 131 S. Ct. at 786.

Under this standard, even a strong case for relief does not mean the state court's contrary conclusion was unreasonable. *Id.*

> If this standard is difficult to meet, that is because it was meant to be. As amended by AEDPA, § 2254(d) stops just short of imposing a complete bar on federal litigation of claims already rejected in state court. It preserves the authority to issue the writ in cases where there is *no possibility fairminded jurists could disagree* that the state court's decision conflicts with [the Supreme] Court's precedents. It goes no farther. [28 U.S.C. §] 2254(d) reflects the view that habeas corpus is a "guard against

> *extreme malfunctions* in the state court criminal justice systems,
> *not a substitute for ordinary error correction through appeal.*"

*Id.* (emphasis added, internal citations omitted).

Further, it is a state court's "ultimate decision" that is to be tested for unreasonableness," "not every jot of its reasoning." *Santellan v. Cockrell*, 271 F.3d 190, 193 (5th Cir. 2001); *see also Neal v. Puckett*, 286 F.3d 230, 246 (5th Cir. 2002) (en banc) (holding that a federal court's "focus on the 'unreasonable application' test under [§] 2254(d) should be on the ultimate legal conclusion the state court reached and not on whether the state court considered and discussed every angle of the evidence"); *Catalan v. Cockrell*, 315 F.3d 491, 493 (5th Cir. 2002) ("[W]e review on the state court's decision, not its reasoning or written opinion[.]").   And a state court's decision need not expressly cite any federal law or *even be aware of* applicable Supreme Court precedent in order to be entitled to deference.  *Mitchell v. Esparza*, 540 U.S. 12, 16 (2003); *Early v. Packer*, 537 U.S. 3, 8 (2002) (state court decision must be upheld so long as the result does not contradict Supreme Court precedent). A state court's decision also need not specifically address the federal constitutional claim.  *See Johnson v. Williams*, 133 S. Ct. 1088, 1096 (2013) ("When a state court rejects a federal claim without expressly addressing the claim, a federal court must presume that the federal claim was adjudicated

on the merits—but that presumption can in some limited circumstances be rebutted.").

If the Supreme Court has not "broken sufficient legal ground to establish [a] … constitutional principle, the lower federal courts cannot themselves establish such a principle with clarity sufficient to satisfy the AEDPA bar" under either the "contrary to" or "unreasonable application" standards. (*Terry*) *Williams*, 529 U.S. at 381; *see also Marshall v. Rodgers*, 133 S. Ct. 2446, 1450-451 (2013) ("Although an appellate panel may, in accordance with its usual law-of-the-circuit procedures, look to circuit precedent to ascertain whether it has already held that the particular point in issue is clearly established Supreme Court precedent, …, it may not canvass circuit decisions to determine whether a particular rule of law is so widely accepted among the Federal Circuits that it would, if presented to this Court, be accepted as correct." (citations omitted)).  Stated differently,

> As a condition for obtaining habeas corpus relief from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there *was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.*

*Richter*, 131 S. Ct. 786-87 (emphasis added).  And a federal court must be wary of circumstances where it must "extend a [legal] rationale" of the Supreme Court "before it can apply it to the facts at hand" because such a

process suggests the proposed rule is not "clearly established." *Alvarado*, 541 U.S. 666.

Regarding questions of fact, federal courts must presume correct the factual findings of the state courts unless the petitioner "rebut[s] the presumption of correctness by clear and convincing evidence." 28 U.S.C. §2254(e)(1). "This presumption not only applies to explicit findings of fact, but it also applies to those unarticulated findings which are necessary to the state court's conclusions of mixed law and fact." *Valdez v. Cockrell*, 274 F.3d 941, 948 n.11 (5th Cir. 2001).

Additionally, except for the narrow exceptions contained in § 2254(e)(2), the evidence on which a petitioner would challenge a state court finding must have been presented to the state court. *Cullen v. Pinholster*, 131 S. Ct. 1388, 1398 (2011) (explaining that § 2254(d)(1) "refers in the past tense, to a state court adjudication that 'resulted in' a decision that was contrary to, or 'involved' an unreasonable application of, [clearly] established law. This backward-looking language requires an examination of the state-court decision at the time it was made. It follows that the record under review is limited to the record in existence at the time, i.e., the record before the state court."). Further, because a federal habeas court is also prohibited from granting relief unless a decision was based on an "unreasonable determination of the facts in light of the evidence *presented in the state court*

*proceeding*," it follows that demonstrating the incorrectness of a state court finding of fact based on evidence not presented to the state court would be of no use to a habeas petitioner.  28 U.S.C. § 2254(d)(2) (emphasis added).

Finally, where a habeas petitioner has failed to fully develop the factual bases of his claims in state court, he is precluded from further factual development in federal court unless (1) his claims rely on a new rule of constitutional law or a factual predicate previously undiscoverable through the exercise of due diligence; *and* (2) he establishes by clear and convincing evidence that, but for constitutional error, no reasonable fact finder would have found him guilty.  28 U.S.C. § 2254(e)(2).  A failure to meet this standard of "diligence" will bar a federal evidentiary hearing in the absence of a convincing claim of actual innocence that can only be established by newly discovered evidence.  (*Michael*) *Williams v. Taylor*, 529 U.S. 420, 436 (2000); *Beazley v. Johnson*, 242 F.3d 248, 272-73 (5th Cir. 2001).  For example, a petitioner's failure to present controverted, previously unresolved factual issues to the state court is sufficient to constitute "failure" under the plain meaning of § 2254(e)(2).  (*Michael*) *Williams*, 529 U.S. at 433; *Beazley*, 242 F.3d at 273.  But even if a petitioner can meet the foregoing standard, it is within this Court's discretion to deny a hearing if sufficient facts exist to make an informed decision on the merits.  *See Schriro v. Landrigan*, 550 U.S. 465, 474-75 (2007) ("It follows that if the record refutes applicant's factual

allegations or otherwise precludes habeas relief, a district court is not required to hold an evidentiary hearing."); *see also Clark v. Johnson*, 227 F.3d 273, 284-85 (2000).

## PROCEDURAL DEFAULT

Because many of the claims raised in the instant petition were dismissed as an abuse of the writ, King argues that he has established cause under *Martinez v. Ryan*, 132 S. Ct. 1309 (2012).[18] Petition at 136-99. But the Fifth Circuit has determined that *Martinez* does not apply to Texas:

> The [Court of Criminal Appeals] made clear that a state habeas petition is the preferred vehicle for developing ineffectiveness claims. *Robinson v. State*, 16 S.W.3d 808, 809-10 (Tex. Crim. App. 2000). Yet Texas defendants may first raise ineffectiveness claims before the trial court following conviction via a motion for new trial, when practicable, and the trial court abuses its discretion by failing to hold a hearing on an ineffectiveness claim predicated on matters not determinable from the record. *Holden v. State*, 201 S.W.3d 761, 762-63 (Tex. Crim. App. 2003). A prisoner who develops such a record through a new trial motion can of course pursue the denial of an ineffectiveness claim through direct appeal, but the [Court of Criminal Appeals] has indicated that a motion for new trial is neither a sufficient nor necessary condition to secure review of an ineffectiveness claim on direct appeal. Indeed, an ineffectiveness claim may simply be

---

[18] *Martinez* carved out a limited—and equitable as opposed to constitutional—exception to the general rule that ineffective assistance of state habeas counsel will not constitute cause to excuse a procedurally defaulted claim. 132 S. Ct. at 1319. The Court held that where state law provides that "initial-review collateral proceedings" are the first place ineffective-assistance-of-counsel claims may be raised, a petitioner may allege counsel at that stage was ineffective. *Id.* at 1318. The Court was careful to emphasize, though, that this rule "does not extend to attorney errors in any proceedings beyond the first occasion the State allows a prisoner to raise a claim of ineffective assistance at trial, even though that initial-review collateral proceeding may be deficient for other reasons." *Id.* at 1320.

> raised on direct appeal without the benefit of a motion for new
> trial. *Robinson*, 16 S.W.3d at 813. As a result, both Texas
> intermediate courts and the [Court of Criminal Appeals]
> sometimes reach the merits of ineffectiveness claims on direct
> appeal. *Thompson v. State*, 9 S.W.3d 808, 813-14 (Tex. Crim.
> App. 1999). Where they do not, Texas habeas proceedings remain
> open to convicted defendants. *Ex parte Nailor*, 149 S.W.3d 125,
> 129, 131 (Tex. Crim. App. 2004). In short, Texas procedures do
> not mandate that ineffectiveness claims be heard in the first
> instance in habeas proceedings, and they do not deprive Texas
> defendants of counsel- and court-driven guidance in pursuing
> ineffectiveness claims.

*Ibarra v. Thaler*, 687 F.3d 222, 227 (5th Cir. 2012); *see also In re Sepulvado*,

707 F.3d 550 (5th Cir. 2013) (reiterating *Ibarra*'s holding even after the grant

of certiorari review in *Trevino*);[19] *Adams v. Thaler*, 679 F.3d 312, 317 n.4 (5th

Cir. 2012).

The Director acknowledges that the holding in *Ibarra* is squarely before

the Supreme Court in *Trevino*. But even if the Court was to decide in favor of

Trevino and hold that *Martinez* should be applied to either Texas death-

sentenced inmates or to claims of ineffective assistance of counsel on direct

appeal, King must still establish that any ineffective-assistance-of-trial-

counsel was "substantial." *Martinez*, 132 S. Ct. at 1320. None of his claims

rise to this level. In any event, this Court need not address whether

*Martinez* excuses any procedural default because none of the claims that

---

[19]     *Trevino v. Thaler*, 133 S. Ct. 524 (Oct. 29, 2012) (pet. for cert. granted).

might fall within *Martinez*'s purview has any merit.  *See Sprouse v. Thaler*, 2013 WL 1285468 at *7, No. 3:10cv00317 (N.D. Tex. March 29, 2013).

## I.   King Received Constitutionally Effective Assistance of Counsel.

In his first claim, King alleges he was denied constitutionally effective assistance of counsel pre-trial and at both the guilt/innocence and punishment trials.  Petition at 200-58.  But as discussed below, many of these claims are procedurally defaulted, and even where they are not, they are without merit.  Thus, King is not entitled to federal habeas relief.

The Sixth Amendment, together with the Due Process Clause, guarantee a defendant both the right to a fair trial and the right to effective assistance of counsel at that trial.  *Strickland*, 466 U.S. at 684-86.  A defendant's claim that he was denied constitutionally effective assistance requires him to affirmatively prove both that (1) counsel rendered deficient performance, and (2) his actions results in actual prejudice.  *Id.* at 687-88, 690.  Importantly, failure to prove either deficient performance or resultant prejudice will defeat an ineffective-assistance-of-counsel claim, making it unnecessary to examine the other prong.  *Id.* at 687.

In order to demonstrate deficient performance, King must show that, in light of the circumstances as they appeared at the time of the conduct, "counsel's representation fell below an objective standard of reasonableness," i.e., "prevailing professional norms."  *Id.* at 689-90; *see also Nix v. Whiteside*,

475 U.S. 157, 165 (1986).  The Supreme Court has admonished that judicial scrutiny of counsel's performance "must be highly deferential," with every effort made to avoid "the distorting effect of hindsight."[20]  *Strickland*, 466 U.S. 689-90; *see also Richter*, 131 S. Ct. at 788 ("It is 'all too tempting' to 'second-guess counsel's assistance after conviction or adverse sentence.'"); *Yarborough v. Gentry*, 540 U.S. 1, 6 (2003) ("The Sixth Amendment guarantees reasonable competence, not perfect advocacy judged with the benefit of hindsight.") (citations omitted).  Accordingly, there is a "strong presumption" that the alleged deficiency "falls within the wide range of reasonable professional assistance."  *Strickland*, 466 U.S. at 689.  If there is *any* "reasonable argument that counsel satisfied *Strickland*'s deferential standard," the state court's denial will be upheld.  *Richter*, 131 S. Ct. at 788.

Even if deficient performance can be established, King must still affirmatively proved prejudice that is "so serious as to deprive [him] of a fair trial, a trial whose result is reliable."  *Strickland*, 466 U.S. at 687.  This requires him to show a reasonable probability that but for counsel's deficiencies, the result of the proceeding would have been different."  *Id.* at

---

[20]   "Representation of a capital defendant calls for a variety of skills.  Some involve technical proficiency connected with the science of  law.  Other demands relate to the art of advocacy.  The proper exercise of judgment with respect to the tactical and strategic choices that must be made in the conduct of a defense cannot be neatly plotted in advance by appellate courts."  *Stanley v. Zant*, 697 F.2d 955, 970 & n.12 (11th Cir. 1983).

694. A "reasonable probability" is one sufficient to undermine confidence in the outcome. *Id.* And as recently explained by the Supreme Court: The question in conducting *Strickland*'s prejudice analysis "is *not* whether a court can be certain counsel's performance had no effect on the outcome or whether it is possible a reasonable doubt might have been established if counsel [had] acted differently." *Id.* at 791-92 (emphasis added and citations omitted). Rather, "[t]he likelihood of a different result must be substantial, not just conceivable." *Id.* at 792 (citation omitted).

Finally, with respect to errors at the sentencing phase of a death penalty trial, the relevant prejudice inquiry is "whether there is a reasonable probability, that absent the errors, the sentencer [] would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Strickland*, 466 U.S. at 695; *see also Riley v. Cockrell*, 339 F.3d 308, 315 (5th Cir. 2003) ("If the petitioner brings a claim of ineffective assistance with regard to the sentencing phase, he has the difficult burden of showing a reasonable probability that the jury would not have imposed the death sentence absent errors by counsel.") (internal quotation marks omitted). "In assessing prejudice, [the reviewing court] reweigh[s] the evidence in aggravation against the totality of available mitigating evidence." *Wiggins v. Smith*, 539 U.S. 510, 534 (2003).

~ 37 ~

### A.   Counsel were not ineffective regarding the experts who testified during the punishment trial.  (Claim I(a)).

By this claim, King charges counsel with ineffectiveness because both the defense expert, Dr. Quijano, and the State's expert, Dr. Gripon, were allowed to present "a false, misleading and incoherent expert's framework for the first special issue of 'future dangerousness.'"  Petition at 208-28.  As an initial matter, this claim is procedurally barred because it was dismissed as an abuse of the writ.  *Ex parte King*, Application No. 49,391-02 at Order at 2. And regardless of the application of *Martinez*, King cannot establish he was denied constitutionally effective assistance.  Indeed, as the Supreme Court observed in *Richter*,

> Even under *de novo* review, the standard for judging counsel's representation is a most deferential one.   Unlike a later reviewing court, the attorney observed the relevant proceedings, knew of materials outside the record, and interacted with the client, opposing counsel, and with the judge.   It is "all too tempting" to "second-guess counsel's assistance after conviction or adverse sentence."  …   The question is whether an attorney's representation amounted to incompetence under "prevailing professional norms," not whether it deviated from best practices or most common custom.

131 S. Ct. at 788 (citation omitted).

In support of this claim, King essentially relies on his current expert, clinical psychologist Mark Cunningham, to second-guess the methodologies of

State's expert Dr. Edward Gripon and defense expert Dr. Walter Quijano.[21]
Petition at 208-28; Petitioner's Exhibit (PX) 13.   Then he faults counsel for
failing to rebut Dr. Gripon's testimony and, presumably, for failing to replace
Dr. Quijano's allegedly flawed analysis with the "approach" set forth in Dr.
Cunningham's affidavit.[22]

        In broad strokes, King contends that trial counsel failed to put future
dangerousness into the appropriate context, failed to sufficiently discuss the
effects of aging, and failed to inform the jury of measures within the prison
system intended to prevent violent conduct. Petition at 217-26.   Contrary to
these assertions, however, trial counsel presented a sound and viable case
regarding future dangerousness.

        Counsel effectively cross-examined Dr. Gripon based on his failure to
conduct a face-to-face interview with King, his inability to predict future

---

[21]       Notably, the state habeas court specifically found that Dr. Quijano was "well-
qualified to assist defense counsel in this regard[.]"  SHCR-01 at 187 (¶51).

[22]       Glaringly absent from King's argument, however, is any allegation that Dr.
Cunningham was available to testify on these issues at the time of trial.   Such is
necessarily fatal to his claim. *See Day v. Quarterman*, 566 F.3d 527, 538 (5th Cir.
2009) ("This Court has repeatedly held that complaints of uncalled witness are not
favored in federal habeas review because the presentation of testimonial evidence is
a matter of trial strategy and because allegations of  what a witness would have
stated are largely speculative. … Thus, to prevail on an ineffective assistance claim
based on counsel's failure to call a witness, the petitioner must name the witness,
demonstrate that the witness was available to testify and would have done so, set
out the content of the witnesses proposed testimony, and show that the testimony
would have been favorable to the particular defense." (citations omitted)).

violence with 100 percent certainty, and the fact that he, as a psychiatrist, is no better suited than anyone else to predict future behavior.[23]  24 RR 54-56. Further, counsel effectively rebutted Dr. Gripon's testimony with the testimony of Dr. Quijano, who testified that King's potential for future violence must be assessed in the appropriate context, that is, prison.  *Id.* at 82, 92.  Dr. Quijano, himself the former chief psychologist for TDCJ, testified extensively about the measures at TDCJ's disposal for insuring that inmates—even those would pose a threat in free society—do not pose a threat in prison.  *Id.* at 92-107.  He also explained that given King's prison history, his tattoos and the facts of the crime, he would likely be assigned to administrative segregation for the duration of his imprisonment.  *Id.* at 94-95.  Finally, Dr. Quijano testified specifically about the effects of aging on the likelihood of future dangerousness, and that fact that if sentenced to life, King would not be eligible for parole until the age 64, when the probability of future dangerousness would be very low.  *Id.* at 83.  Therefore, trial counsel did not "avoid[] the issue [of future dangerousness] altogether," as King suggests.  Petition at 227.  Indeed, counsel's handling of the future dangerousness special issue certainly fell within the bounds of reasonable

---

[23]    As discussed in more detail below, Section I(L), there was no basis on which counsel could have objected to Dr. Gripon's testimony.

and acceptable performance.   Finally, King has failed to identify any information that defense counsel failed to present to the jury.

Given the horrific nature of Mr. Byrd's murder, King certainly cannot demonstrate that counsel was constitutionally ineffective such that "[t]he likelihood of a different result [is] substantial, not just conceivable." *Richter*, 131 S. Ct. at 792 (citation omitted).  Therefore, this claim must fail.[24]

### B.  Counsel were not ineffective regarding the motion for change of venue. (Claim I(b))

Here, King challenges counsel's presentation of the motion for change of venue.   Specifically, he castigates counsel for not calling witnesses "regarding the well-publicized glare of world-wide publicity that had engulfed Jasper, the town's need to secure a guilty verdict in order to avoid the 'racist' label, and the need to avoid racial strife in Jasper through convictions and death sentences" as Brewer's counsel had done. Petition at 228-31.   As an initial matter, this claim is procedurally barred because it was dismissed as an abuse of the writ.  *Ex parte King*, Application No. 49,391-02 at Order at 2.

---

[24]    In arguing against counsel's effectiveness, King relies heavily on *Coble v. State*, 330 S.W.3d 253 (Tex. Crim. App. 2011).  Petition at 211-17.  *Coble* is of no avail.  First, it was decided more than a decade after King's trial, at which time, no Court of Criminal Appeals opinion had held that testimony such as Dr. Gripon's might be inadmissible.  Second, and more importantly, *Coble* specifically rested on state law grounds.  330 S.W.3d at 270 ("In point of error five, appellant asserts that this type of evidence fails to meet the heightened reliability requirement of the Eighth Amendment, but the United States Supreme Court, in *Barefoot v. Estelle*, [463 U.S. 880 (1983)], rejected this argument, and we are required to follow binding precedent from that [C]ourt on federal constitutional issues.")  (footnotes omitted).

But as discussed below, regardless of *Martinez*'s application, this claim is entirely without merit.

The record shows that King's trial attorneys filed a motion for change of venue that was accompanied by the affidavits of two Jasper County residents stating that the defendant could not obtain a fair and impartial trial due to "widespread, inflammatory and prejudicial publicity."  CR 92-98. At a subsequent hearing on the motion, defense counsel presented two witnesses who testified that they believed the defendant could not obtain a fair trial in Jasper County  due to the current attitude in the community about the case, 3 RR 9-28, as well as a joint exhibit containing all the local and statewide newspaper accounts of the case up to the time of the hearing. *Id.* at 7-8.  But the record also indicates that counsel had a difficult time locating witnesses willing to testify favorably for the defense, *id.* at 28, and some of the witnesses trial counsel had lined up to testify either were  unable to testify or did not show up.  *Id.* at 17, 29.

King has failed to identify any additional witnesses or evidence (available at the time of the hearing on the motion for change of venue) that trial counsel was remiss for not presenting.  This includes the fact that his co-defendant, Lawrence Russell Brewer, was granted a change of venue; Brewer's trial was held six months *after* King's.  More importantly—and even if counsel could be shown to have been deficient—King has entirely

~ 42 ~

failed to establish that had his defense counsel secured a change of venue, his trial would have ended differently. *See Richter*, 131 S. Ct. at 792 ("The likelihood of a different result must be substantial, not just conceivable." (citation omitted)); *see also Jordan v. Dretke*, 416 F.3d 363, 371 (5th Cir. 2005) (reiterating that burden of affirmatively proving prejudice rests with petitioner; it is not state's burden to disprove prejudice). Indeed, Brewer was convicted and sentenced to death just as King was, notwithstanding the change of venue.

For these reasons, this claim must fail.

### C.   Counsel were not ineffective for failing to make an opening statement.  (Claim I(c))

Saying little more than "[o]pening statement is a crucial part of any trial," King baldly asserts that counsel were deficient for failing to make an opening statement.  Petition at 232-33.  As an initial matter, this claim is procedurally barred because it was dismissed as an abuse of the writ. *Ex parte King*, Application No. 49,391-02 at Order at 2.  But as discussed below, even if King could show that he is entitled to the application of *Martinez*, he is still not entitled to federal habeas relief.  Indeed, he has failed to show how his attorney's decision not to present an opening statement—presumed reasonable—prejudiced him in any way.

~ 43 ~

The Fifth Circuit has long recognized that the decision of whether to present an opening statement falls squarely within "the zone of trial strategy." *Murray v. Maggio*, 736 F.2d 279, 283 (5th Cir. 1984) (citation omitted); *see also Martinez v. Dretke*, 426 F.Supp.2d 403, 468-69 (W.D. Tex. 2006) (where petitioner has alleged no facts showing how failure to make an opening statement prejudiced him and where evidence was "overwhelming," no "reasonable probability that, but for the failure of petitioner's trial counsel to make an opening statement …, the outcome of the guilt-innocence phase of petitioner's trial would have been different[]"). The burden is on King to demonstrate *both* deficient performance *and* resultant prejudice. *Strickland*, 466 U.S. at 687; *Jordan*, 416 F.3d at 371. It is well-established that his broad generalizations and conclusory statements do not come close to establishing *either*. *See*, *e.g.*, *Miller v. Johnson*, 200 F.3d 274, 282 (5th Cir. 2000) (holding that "conclusory allegations of ineffective assistance of counsel do not raise a constitutional issue in a federal habeas proceeding"); *Ross v. Estelle*, 694 F.2d 1008, 1011 (5th Cir. 1983) (finding "mere conclusory allegations do not raise a constitutional issue in a habeas proceeding"). As such, this claim must fail.

**D.  Counsel's closing arguments were not "totally ineffective and harmful" at either the guilt/innocence or punishment trials. (Claim I(d))**

King next attacks counsel's effectiveness with respect to closing arguments at both the guilt/innocence and punishment trials. Petition at

233-34.  As an initial matter, this claim is procedurally barred because it was dismissed as an abuse of the writ.  *Ex parte King*, Application No. 49,391-02 at Order at 2.  But even if this Court was to allow King to overcome the bar under *Martinez*,  King is nonetheless not entitled to federal habeas relief because this claim is meritless.

King cannot "manufacture deficient performance by selectively extracting phrases from trial counsel's closing argument and mischaracterizing them."  *Dowthitt v. Johnson*, 230 F.3d 733, 750 (5th Cir. 2000).  Yet this is precisely what King has attempted to do.  When examined in context, however, trial counsel's arguments at both the guilt/innocence and punishment phases were effective, especially considering that counsel was defending their client "in the face of a very bad set of facts."  *Id.* at 751 (internal quotation marks omitted).

### 1.    Guilt/innocence

Counsel first focused on the State's evidence that a kidnapping had taken place, driving home the point that there was absolutely no evidence establishing that James Byrd had been restrained.  22 RR 26-32.  Counsel also highlighted the dearth of evidence that King had actually followed through with any plans to start a free-world racist gang in Jasper.  *Id.* at 36. Most significantly, counsel highlighted weaknesses in the State's circumstantial case, including the fact that the one of the cigarette butts

found at the scene with King's DNA on it could have come from the ashtray in Shawn Berry's truck, and the fact that the sandals with Byrd's DNA on them were conclusively shown to be King's, and in fact were consistent with Lewis Berry's shoe size.  *Id.* at 38-40.  Counsel also stressed that the testimony regarding King's tattoos was largely a matter of interpretation, but that, in any event, it had nothing to do with whether King was guilty of capital murder.  *Id.* at 42-46, 30.

## 2.   Punishment

Counsel recounted trial testimony that King had not been a racist when he went to prison; rather, he was merely a product of prison society.  25 RR 21, 24.  Counsel stressed King's lack of violent criminal behavior apart from James Byrd's murder.  Importantly, counsel reiterated Dr. Quijano's testimony that King would most likely spend his sentence in administrative segregation and pointed to the measures in place within the prison system to prevent inmate violence; counsel also stressed the fact that, even if, sentenced to life in prison, King would not be eligible for parole for forty years.  *Id.* at 20.  Counsel also noted the pain experienced by King's father, whose emotional, heart-wrenching testimony (24 RR 125-33) was perhaps the most compelling part of the punishment trial.  25 RR 21-24.

While these might not be the choices King or habeas counsel or even this Court would have made, it simply cannot be said that either of these

arguments was somehow constitutionally deficient. *See Richter*, 131 S. Ct. at 788.  Likewise, it cannot be said that had counsel argued differently, King would not have been found guilty and/or sentenced to death. *See id.* at 792; *see also Jordan*, 416 F.3d at 371.

### E.   Defense counsel did present a viable case at punishment. (Claim I(e))

King next complains that counsel "failed to present any viable claim at the punishment phase of trial."  Petition at 234; *see also id.* at 234-36.  This claim was raised and rejected during the first state habeas proceedings.  *See* SHCR-01 at 187-191 (¶¶47-91).  As discussed below, King has failed to show that the state court's rejection was objectively unreasonable.

As an initial matter, this claim appears to be little more than a rehashing of claim I(a), addressed by the Director above, and he adopts his response to that claim in response to this claim without restatement.

In any event, lead counsel C. Haden Cribbs explained in an affidavit submitted during the state habeas proceedings, SHCR-01 140-45, that he conducted an extensive investigation into King's childhood and background and obtained numerous mental health opinions in an unsuccessful attempt to find any evidence to mitigate the brutality of James Byrd's murder. Importantly, this case presented defense counsel with a challenge like no other:  What could possibly mitigate *this* crime?  But as discussed in response

~ 47 ~

to King's first ineffective-assistance claim, a viable punishment case *was presented* through the testimony of Dr. Quijano.  Additionally, the jury heard compelling testimony from King's father.  *See* 24 RR 125-33.

King argues that counsel "total[ly] failed to even attempt to humanize [him] to the jury," Petition at 235, and that he was "never allowed to present his version of the events to them," *id.*, but in the face of the horrendous facts of this murder and the fact that jury did in fact hear King's version of events during the guilt/innocence trial, these criticisms amount to nothing more than tilting at windmills.

For all of these reasons, this claim must fail.

### F.    Counsel was not ineffective for failing to object to the testimony of Jasper County Police Officer Rich Ford regarding the meaning of King's tattoos.  (Claim I(f))

During the guilt/innocence trial, the State presented the testimony of Jasper County Police Officer Rich Ford.  He explained to the jury—based on his training and research—the meaning of King's many tattoos.  18 RR 212-22; *see also* SX 107A-107GG (pictures of King's tattoos). During cross-examination, defense counsel questioned Ford's testimony, *see*, *e.g.*, 19 RR 5 (admitting that the tattoos "could have several different interpretations[]"), and during its case-in-chief, the defense presented the testimony of John

Grady Mosely to rebut Ford's testimony.[25]  21 RR 72-85.  In spite of this, King

now argues that counsel should have objected to Ford's testimony.   Petition

at 237-41.

As an initial matter, this claim is procedurally barred because it was

dismissed as an abuse of the writ.   *Ex parte King*, Application No. 49,391-02

at Order at 2.  But as discussed below, even if King was given the benefit of

*Martinez*, federal habeas relief is still not warranted.  This claim is baseless.

Rich Ford testified during the guilt/innocence trial concerning King's

tattoos.     He described the various tattoos and testified regarding his

interpretation of their meanings based on his training and research.   18 RR

205.   Defense counsel did not object to this testimony, and, in fact, most of

Ford's observations could have been made by anyone viewing King's tattoos.

*See* SX 107-09.  However, when Ford was asked on direct to go a step further

and render an opinion about the existence of a connection between satanic

cults and racist groups, defense *did* object, which objection was overruled.  19

RR 21.  It stands to reason that if counsel's objection to this testimony was

---

[25]     To the extent King argues that counsel were ineffective for failing to use Roy
Birnbaum, that claim must fail.  Indeed, King does not even acknowledge that
counsel provided rebuttal testimony.  *See* Petition at 238-39; PX 15.  In any event,
the presentation of witnesses is largely a matter of trial strategy.  *See, e.g., Richter*,
131 S. Ct. at 788; *Pape v. Thaler*, 645 F.3d 281, 291 (5th Cir. 2011) ("[C]ounsel's
decisions regarding examination and presentation of witness and testimony … fall
within [the] category of trial strategy[,] which enjoys a strong presumption of
effectiveness.").

overruled, an objection to the less controversial testimony essentially describing the tattoos would have been overruled as well.  Where an objection would be futile, counsel is not constitutionally ineffective for failing to make one.  *Clark v. Collins*, 19 F.3d 959, 966 (5th Cir. 1994) ("Failure to raise meritless objections is not ineffective lawyering; it is the very opposite."); *Koch v. Puckett*, 907 F.2d 524, 526 (5th Cir. 1990) ("This Court has made clear that counsel is not required to make futile motions or objections.").

Moreover, contrary to King's assertions otherwise, *see* Petition at 241, trial counsel *did* rebut Ford's testimony both through effective cross-examination and the presentation (and cross-examination) of other witnesses. On cross-examination, Ford conceded that the tattoos were "subject to interpretation."  19 RR 5.  He further allowed that in a prison environment, tattoos are more often a means of survival and protection.  *Id.* at 8-10.  And he admitted that one of King's tattoos—identified by Ford as a likeness of Anton LaVey, the founder of the Church of Satan—also resembled a character portrayed in one of the comic books found in King's belongings.  *Id.* at 10-11.  Finally, Ford conceded that the shape of one of the tattoos—which he had identified as a "baphomet," a satanic symbol—could also be found in the Congressional Medal of Honor.  *Id.* at 13-14.

Additionally, when cross-examining Matthew Hoover, defense counsel elicited testimony that "SS" tattoos–identified by Ford as indicative of white

supremacist beliefs—did not derive a racist meaning within the prison system.  *Id.* at 84.   Hoover also explained that the Aryan Brotherhood, another white prison gang, did not hold any satanic beliefs, and that pentagram tattoos were common in prison.  *Id.* at 85.   Testifying for the defense, John Mosley explained that he had drawn some of King's tattoos, and that several of the tattoos identified by Ford as indicative of white supremacist beliefs had no particular significance in prison.  21 RR 74-76. Mosley also testified that inmates get tattoos to intimidate other inmates, thus reducing the likelihood that they will be the victims of assault.  *Id.* at 77-78.

In any event, the tattoo evidence was properly before the jury and essentially speaks for itself.  *See* SX 107-09.   And given the wealth of evidence—most significantly from King's personal writings—demonstrating his violent racial hatred, Ford's testimony about King's tattoos was largely inconsequential. *See Gonzales v.  Quaterman*, 458 F.3d 384, 394-95 (5th Cir. 2006) (tattoo evidence not "critical to conviction" and "open to interpretation" thus no "reasonable probability that the result of the trial would have changed with expert testimony or argument challenging the meaning of the tattoos").  King's argument that this testimony was the "foundation as to the State's theory of the crime," Petition at 241, is, therefore, an overstatement of its importance.

Because King cannot establish either deficient performance or prejudice, this claim must fail.  *See Richter*, 131 S. Ct. at 792;  *see also Jordan*, 416 F.3d at 371.

### G.   Counsel was not ineffective for failing to object to the testimony of William Knox.  (Claim I(g))

During its case-in-chief, the State offered the testimony of William Knox on the subject of gangs; generally, he explained how gangs operate and their mentality.  20 RR 89-100.   King contends that defense counsel should have objected to this testimony.  Petition at 242-45.  As discussed below, this claim is procedurally barred and, in any event, without merit.

Initially, this claim is procedurally barred because it was dismissed as an abuse of the writ.  *Ex parte King*, Application No. 49,391-02 at Order at 2. But as discussed below, even if King was given the benefit of *Martinez*, his is not entitled to federal habeas relief because this claim is without merit.

King specifically argues that Knox was not qualified to testify as an expert on gangs or gang behavior.  Petition at 242-45. However, the record establishes otherwise.  Knox, a consultant for law enforcement and former Houston police officer of fifteen years, had studied gangs since the mid-1980s. 20 RR 90-91.  He had participated in numerous seminars, both as a student and as an instructor, on the subject of gangs, and had written a book on the subject in 1995.  *Id.* at 91-92.  Finally, Knox had testified as an expert on

~ 52 ~

gangs many times in various courts. *Id.* at 92. In light of Knox's testimony, it would have been futile for counsel to object to his testimony, and counsel were not ineffective for failing to do so. *Clark*, 19 F.3d at 966; *Koch*, 907 F.2d at 526. Moreover, given the wealth of other evidence demonstrating King's violent racial hatred and his intention of starting a free-world chapter of the Confederate Knights of America—most significantly from King's own personal writings—Knox's testimony concerning gangs is largely inconsequential. Thus, even assuming counsel was deficient for failing to object to the testimony, and assuming further that the trial court would have sustained the objection, King cannot demonstrate prejudice arising from such failure. *See Richter*, 131 S. Ct. at 792.

### H.    Counsel was not ineffective for failing to object to prosecutorial misconduct, trial error and hearsay.  (Claim I(h))

King next asserts that defense counsel failed to object to "numerous instances of trial error[.]" Petition at 245-48. First, this claim is procedurally barred because it was dismissed as an abuse of the writ. *Ex parte King*, Application No. 49,391-02 at Order at 2. But even *Martinez* was applied here, this claim is patently meritless. Thus, King is not entitled to federal habeas relief.

Second, none of the six alleged trial errors identified by King were in fact objectionable. Thus, it would be have been futile for counsel to object.

~ 53 ~

*Clark*, 19 F.3d at 966; *Koch*, 907 F.2d at 526.  But as discussed below, even if counsel should have objected, King cannot establish resultant prejudice.  And that alone dooms his claims.  *See Richter*, 131 S. Ct. at 792; *see also Jordan*, 416 F.3d at 371.

### 1.    Brewer's tattoos

Even assuming that evidence about Brewer's tattoos was objectionable, counsel may have had valid strategic reasons for not objecting to the evidence.  It certainly gave the jury the opportunity to view someone else— someone other than King—as the instigator of what the jury could rationally view as a racially-motivated murder.  And as the Supreme Court has recently reiterated, if there is *any* "reasonable argument that counsel satisfied *Strickland*'s deferential standard," federal habeas relief must be denied.  *See Richter*, 131 S. Ct. at 788.

### 2.    Hearsay

Here, King identifies two fleeting instances in which Rich Ford apparently relied on what others had told him about particular tattoos to interpret the meaning of King's tattoos.  *See* 18 RR 220, 221.  Even assuming an objection could have been made on hearsay grounds, King can establish neither deficient performance nor resultant prejudice given the relative insignificance of the affected testimony.  *Cf. Woodfox v. Cain*, 609 F.3d 816-17 (5th Cir. 2010) ("Because the testimony was cumulative of other evidence,

we cannot hold that but for counsel's failure to object, the results of the trial would have been different."); *Burnett v. Collins*, 982 F.2d 922, 930 (5th Cir. 1993) ("failure to object to leading questions and the like is generally a matter of trial strategy as to which we will not second guess counsel").

### 3.    Reference to "fight scene"

King complains that trial counsel should have objected to reference by the State's witnesses to the cleared space at the crime scene as the "fight scene."  But he offers no legal support for his claim.  *See* Petition at 247. Even assuming some basis existed for objecting to the phrase "fight scene," counsel's failure to do so does not constitute deficient performance, and King certainly cannot establish that, had it not been for the use of the phrase "fight scene," he would not have been found guilty of capital murder or sentenced to death. *Richter*, 131 S. Ct. 792 (explaining that the "likelihood of a different result must be substantial, not just conceivable[]") (citation omitted).

### 4.    Prosecutorial argument

Finally, King faults trial counsel for failing to object to prosecutorial argument which he asserts "improperly injected religion into the trial." Petition at 247.  However, the arguments, while colorful, merely invoke reasonable inferences from, and summations of, the evidence presented at trial and were therefore not objectionable.  *See, e.g., Cantu v. State*, 842

S.W.2d 667, 690 (Tex. Crim. App. 1992) (counsel is afforded wide latitude in

drawing inferences from the record as long as they are reasonable and offered

in good faith).   Indeed, a review of the portion of the State's argument shows

that is exactly what it was.

Pointing to State's Exhibit 42 (one of King's own notebooks), the

prosecutor argued as follows:

> This is a bapomet with three riders coming out of it, which
> amounts to three robed riders coming straight out of hell; and
> that's exactly what there was that night.  Instead of a rope, they
> used a chain, and instead of horses, they were using a pickup
> truck.  And, ladies and gentlemen, the satanic part of that comes
> in that after they drag this poor man and tore his body to pieces,
> they dropped it right in front of  a Church and a cemetery to show
> their defiance of God, to show their defiance of Christianity and
> to show their defiance of everything that most people in this
> county stand for and most people in this State and in this
> Country.

22 RR 22.  Moreover, King has entirely failed to show how counsel's failure to

object—assuming he should have—to this one portion of the State's closing

argument prejudiced him in any way.   As such, this claim must fail.   *See*

*Richter*, 131 S. Ct. at 792;  *see also Jordan*, 416 F.3d at 371.

### I.      Counsel was not ineffective regarding their investigation regarding King's mental health. (Claim I(i))

King acknowledges that this Court previously granted the Director's

motion for summary judgment and denied relief as to this claim.  *See* Petition

at 248;  *see also* DE 64 at 16-17; DE 65 at 2.

**J.   Counsel was not ineffective for failing to object to the medical examiner's testimony. (Claim I(j))**

Pointing to the testimony of Dr. Lloyd White as offered during Shawn Berry's trial, King contends that had defense counsel challenged Dr. Tommy Brown's testimony, the result of *his* trial would have also resulted in a life sentence.   Petition at 249-52; PX 22.   But this claim is procedurally barred because it was dismissed as an abuse of the writ.   *Ex parte King*, Application No. 49,391-02 at Order at 2.   And even this Court applies *Martinez* to this claim, King is still not entitled to federal habeas relief because this claim is wholly meritless.

As an initial matter, King's allegation of *Strickland* prejudice is nothing more than rank speculation.   On that basis alone, this claim must fail.   *See*, *e.g.*, *Richter*, 131 S. Ct. at 792.   That aside, as discussed below, Dr. White's testimony would not have been as helpful as King suggests.

Dr. Brown, the medical examiner, testified that James Byrd, Jr., was alive and conscious until he hit the culvert and was decapitated.   21 RR 45. King contends that defense counsel should not have allowed this testimony to go unchallenged because it "was very critical testimony, both as to the nature of the wounds, and the nature of the crime as a kidnaping."   *Id.* at 249; *see also id.* at 249-52.   This argument has two fatal flaws.

~ 57 ~

First, the evidence on which he relies to dispute Dr. Brown's testimony—the findings of another pathologist who testified for the defense at Shawn Berry's trial—does not support his theory:  While Dr. White testified at Berry's trial that he could not determine, as Dr. Brown had, whether Mr. Byrd was *conscious* when he was dragged behind Berry's truck, he *agreed* with Dr. Brown that Mr. Byrd was *alive* until he hit the culvert and was decapitated.  *See* PX 22.  Second, even if King could somehow prove that Mr. Byrd was already dead when he was chained to the pickup—even though *all* expert testimony is to the contrary—the requisite kidnaping was accomplished before this. It was accomplished when King and his co-defendants restrained Mr. Byrd, first through deception and then through force, with the requisite intent to hold him in a place where he was not likely to be found—the logging road—for the purpose of causing him bodily injury, and that in restraining him, they also intended to prevent his liberation by using deadly force.  In any event, it certainly would have been reasonable trial strategy for trial counsel to avoid presenting a defense expert *who agreed with the State's expert* that Mr. Byrd was alive when he was  chained to the pickup and then dragged down the dirt and gravel logging road.

The burden is on King to demonstrate *both* deficient performance *and* resultant prejudice.  *Strickland*, 466 U.S. at 687; *Jordan*, 416 F.3d at 371.

His broad generalizations and conclusory statements do not come close to establishing *either*.  As such, this claim must fail.

### K.   Counsel were not ineffective regarding the motion to  withdraw. (Claim I(k))

Next, King claims that trial counsel were ineffective in urging their pretrial motion to withdraw as counsel.  Petition at 253-54.  This claim was raised and rejected on direct appeal.[26]  *King v. State*, 29 S.W.3d at 565-66.  As discussed below, King has failed to show that this rejection was objectively unreasonable; therefore relief must be denied.  28 U.S.C § 2254(d).

In rejecting King's claim on direct appeal, the Court of Criminal Appeals wrote:

> Two weeks before jury selection was scheduled to begin, C. Haden Cribbs filed a motion to withdraw as [King's] counsel.[27] At a hearing held January 11, 1999, counsel explained to the court that he and [King] were experiencing personality conflicts

---

[26]    Therefore, even though it was also dismissed as an abuse of the writ because King also raised it in his second state habeas application, the Director does not rely on the procedural default.

[27]    The substance of counsel's motion is as follows:

Defendant is uncooperative and on numerous occasions has refused to talk with his counsels.  Defendant has refused to aid and/or cooperate with counsels in the defense of this cause.  Defendant refuses to follow counsel's advice, including the granting of interviews making statements concerning the case.  Accordingly, Counsels have an irreconcilable conflict of interest with the defendant which requires their withdrawal from the case.

Co-counsel Brack Jones, Jr., joined in the motion.

and that [King] would not speak with him.[28]   [King] then informed the court that he had sent the court three identical letters explaining why he wanted different counsel.  In these letters, [King] expressed his dissatisfaction with counsel's failure to provide him with updates and certain other unspecified information.   [King] also stated that defense counsel "is in disagreement of my innocence, and on several occasions, has acknowledged that he plans to do no more in my defense than try to ensure I do not receive a death sentence." [King] contends that these letters demonstrate good cause for switching counsel.

The letters are the only indication in the record that [King] was dissatisfied with counsel's performance.  Towards the end of the hearing, [King] agreed to meet with counsel later to discuss the case.  Further, at a lengthy pre-trial hearing conducted on December 14, 1998, [King] mentioned nothing about wanting different counsel.

The trial court has discretion to determine whether counsel should be allowed to withdraw from a case.[]  "However, the right to counsel may not be manipulated so as to obstruct the judicial process or interfere with the administration of justice."[] Further, personality conflicts and disagreements concerning trial strategy are typically not valid grounds for withdrawal.[]  A trial court has no duty to search for counsel agreeable to the defendant.[]

The record reflects that by the time the motion to withdraw was filed on January 11, 1999, counsel had worked on the case for several months, reviewed most of the discovery, and filed more than thirty pre-trial motions.  Given the amount of work that counsel had already invested in the case, substitution of counsel could have necessitated delay of the trial.  Moreover, although [King] was given the opportunity at the hearing to expand on his reasons for dissatisfaction with counsel, [King] failed to do so and simply referred the trial court to his letters. Given these circumstances, [King] has not shown that trial court abused its discretion in refusing to the motion to withdraw.

---

[28]   [King's] failure to cooperate was evidenced by his refusal to leave his cell to attend a July 6, 1999, hearing to disqualify the judge.

Similarly, [King] has not demonstrated ineffective assistance of counsel for  failing to present evidence to support the motion for withdrawal.  As noted above, counsel's motion to withdraw was premised on [King's] unwillingness to cooperate.  When [King] agreed during the hearing to meet with counsel, counsel apparently determined not to pursue his motion further––especially since no basis was given to withdraw except personality conflicts.  Nor has [King] indicated how counsel's alleged failure to pursue the motion to withdraw undermined confidence in the jury's verdict.  Accordingly, [King] has demonstrated neither that counsel's performance deviated from prevailing professional norms nor that counsel's continued representation prejudiced his trial.[]

*King v. State*, 29 S.W.3d at 565-66 (citations omitted; footnotes in original).

Although counsel filed and urged a motion to withdraw, that motion was premised on King's own refusal to cooperate in his own defense.  Nothing in the record indicates that King had discussed with counsel the concerns regarding the conduct of his case that he raised in his letters to the trial court.  Indeed, from the record before this Court and the state court, it appears that counsel felt obligated to file the motion by King's refusal to cooperate with or participate in his defense.  Moreover, after the trial court questioned King regarding the motion and declined to replace appointed counsel, King agreed on the record that he would meet with defense counsel and discuss the case.  The trial court therefore apparently had no further notice that King was even dissatisfied with counsel's performance.

Although King now complains of defense counsel's lack of enthusiasm in presenting the motion, counsel was presumably aware of the state law relating to motions to withdraw and was aware that poor interpersonal relations are no basis for removal of counsel. *See Solis v. State*, 792 S.W.2d 95, 100 (Tex. Crim. App. 1990) ("Conflicts of personality and disagreements between counsel and client are not automatic grounds for withdrawal. The trial court is under no duty to  search for counsel until an attorney is found who is agreeable to the accused.") (citations omitted); *cf. United States v. Gonzalez*, 548 U.S. 140, 144 (2006) (right to counsel of choice does not extend to defendants who require counsel be appointed for them). Moreover, counsel presumably recognized his duty to continue to represent King and sought to avoid antagonizing the trial court by refraining from insisting vigorously on a motion which the State opposed and which counsel knew the trial court was not obligated to grant. As such, King cannot demonstrate deficient performance.

King also cannot establish prejudice. King's arguments ignore the fact that nothing in the record shows that counsel was even aware  of King's claims that he was "in disagreement" regarding King's innocence and that King was unhappy with his perception that counsel intended to concentrate his efforts on avoiding the death penalty. Moreover, King has failed to even allege, and the record does not reveal, how King was harmed by defense

~ 62 ~

counsel's representation.  Thus, this claim must fail.  *Strickland*, 466 U.S. at 687; *Jordan*, 416 F.3d at 371.

### L.     Counsel were not constitutionally ineffective for failing to object to Dr. Gripon's testimony. (Claim I(l))

Here again, King challenges the testimony of Dr. Gripon.  Petition at 254-56.  But this claim is procedurally barred because it was dismissed as an abuse of the writ.  *Ex parte King*, Application No. 49,391-02 at Order at 2. And even if King is given the benefit of *Martinez*, he is still not entitled to federal habeas relief because this claim, as discussed repeatedly throughout the Director's answer, is entirely without merit.

As set forth in subsection I(A), above, and Section V, below, King has failed to show that Dr. Gripon's testimony was objectionable.  Therefore, counsel cannot be deemed constitutionally ineffective for not objecting to it. *Clark*, 19 F.3d at 966; *Koch*, 907 F.2d at 526.  In fact, the Fifth Circuit has rejected a virtually identical claim raised by another Texas death-sentenced inmate.  *Johnson v. Cockrell*, 306 F.3d 249, 253-55 (5th Cir. 2002) (holding that "precedent from the Supreme Court, Fifth Circuit, and Texas Court of Criminal Appeals unanimously support the conclusion that an objection to [such testimony] would have been frivolous[]").

For these reasons, this claim must fail.

**M.      Because there are no errors to cumulate, the cumulative error doctrine does not apply. (Claim I(m))**

Finally, King asserts that these errors when cumulated, entitle him to federal habeas relief.  Petition at 256-58.  Initially, this claim is procedurally barred because it was rejected as an abuse of the writ.  *Ex parte King*, No. 49,391-02, Order at 2.  But even if King could overcome the procedural bar, he is still not entitled to federal habeas relief.[29]

It is true that in assessing *Strickland*'s prejudice prong, a reviewing court considers the totality of the evidence.  However, such a cumulative assessment presupposes a finding of deficiency as to each act or omission cumulated.  Because King has failed to show deficiency as to any alleged act or omission, there is nothing to cumulate.

"Federal habeas relief is only available for cumulative errors that are of a constitutional dimension." *Coble v. Dretke*, 444 F.3d 345, 355 (5th Cir. 2006) (citing *Livingston v. Johnson*, 107 F.3d 297, 309 (5th Cir.1997)).  As discussed above, King's claims are procedurally barred and/or without merit. Thus, there are no errors to cumulate. *See Westley v. Johnson*, 83 F.3d 714, 726 (5th Cir. 1996) (holding that "[m]eritless claims or claims that are not prejudicial [or claims that are procedurally barred] cannot be cumulated,

---

[29]      It is unclear whether *Martinez* would apply to a claim of cumulative error.

regardless of the total number raised") (citation omitted).  Therefore, the

Court should deny relief on King's claim of cumulative error

## II.   Counsel Was Not Constitutionally Ineffective for Failing to Argue King Was Actually Innocent.  (Claim II)

King next alleges that defense counsel essentially failed to challenge

the State's case in any way and, more importantly, "failed to investigate and

present [his] version of events, and his alibi, as he did not testify at trial.

They failed to show the jury that he is actually innocent of this notorious and

horrific crime."  Petition at 259; *see also id.* at 259-307.   But as discussed

below, this claim is both procedurally barred and wholly without merit.

This claim was dismissed as an abuse of the writ.[30]  *Ex parte King*, No.

49,391-02, Order at 2.  As such it is procedurally barred from federal habeas

review.   And *Martinez* does not help King here because this claim is not

"substantial."   Further, to the extent he argues a free-standing claim of

actual innocence in the alternative, or that this claim should by itself

demonstrate a fundamental miscarriage of justice has been established, *see*

Petition at 299-307, such must fail.  It is well-established that free-standing

claims of actual innocence are not cognizable on federal habeas review. *See*

---

[30]     A portion of this claim, regarding counsel's efforts to locate an alibi witness, was raised and reasonably rejected during the first state habeas proceedings.  *See* SHCR-01 at 193-95 (¶¶78-90).  It was also raised (as a claim that the trial court improperly denied an evidentiary hearing on his motion for new trial) and reasonably rejected on direct appeal.  *See King v. State*, 29 S.W.3d at 568-69.

*Herrera v. Collins*, 506 U.S. 390, 400 (1993) ("Claims of actual innocence based on newly discovered evidence have never been held to state a ground for federal habeas relief absent an independent constitutional violation occurring in the underlying state criminal proceeding."); *see also House v. Bell*, 547 U.S. 518, 554-55 (2006) (reiterating that "the threshold for any hypothetical freestanding innocence claim is 'extraordinarily high[]'" (citation omitted)).  And because this claim has no merit in any event, it cannot serve as a gateway through which other procedurally defaulted claims can pass. *House*, 547 U.S. at 536-39.  Regardless of whether King can overcome the procedural bar, he is nonetheless not entitled to federal habeas relief because this claim is patently meritless.

King asserts that various facets of the State's case went unchallenged by defense counsel; however, King has failed to identify any credible information or theory that was not actually presented to the jury.  First, King claims that trial counsel failed to "explain" the presence of a cigarette butt with King's DNA on it at the crime scene.  Petition at 260.  But the record establishes that trial counsel in fact attempted to explore the possibility that the evidence did not necessarily indicate King's presence at the scene with several State's witnesses.  *See* 18 RR 48 (defense counsel cross-examining Keisha Atkins on whether King and others put cigarette butts in ashtray of Berry's truck); *id.* at 136 (testimony of FBI agent elicited on cross-

examination by defense counsel that he cannot determine when DNA is deposited on an item); 20 RR 45 (testimony of FBI agent elicited on cross-examination by defense counsel that it cannot be determined from DNA analysis when cigarette was smoked and that DNA could remain on cigarette for long period of time if kept in a cool, dry place, such as ashtray of car); *id.* at 120 (testimony Heather Hough elicited on cross-examination by defense counsel that items found at the scene, such as King's lighter, could have fallen from truck during struggle with Mr. Byrd); *id.* at 164 (testimony of Lewis Berry on cross-examination by defense counsel that King smoked in Shawn's truck when riding to work, but that he could not recall whether King used ashtray). Defense counsel reiterated this flaw in the State's case during closing argument. *See* 22 RR 38-40. King has pointed to no other source of information or evidence available to counsel *at the time of trial* to further support his theory.

Second, King asserts that trial counsel failed to present to the jury, the possibility that the sandals with Mr. Byrd's DNA on them were Lewis Berry's, not King's. Petition at 261. This assertion is also refuted by the record. Keisha Atkins admitted on cross-examination by defense counsel that she could not say whether a particular pair of sandals identified by the State as King's were in fact his; rather, she could only say they looked like his sandals. 18 RR 32-33. She testified further that Lewis Berry also lived in

King's apartment—where the identified sandals were found.  *Id.* at 33.  And defense counsel elicited testimony from one of the FBI agents that Lewis Berry's driver's license was found in King's apartment.  *Id.* at 91.  That same agent also testified that there was not much of a difference between the size 91/2 sandal (King's shoe size) and the size 10 sandal (Lewis Berry's shoe size).  *Id.* at 90; 126-27; 131-32.  Tommy Faulk also testified on cross-examination by defense counsel that Lewis Berry sometimes lived in King's apartment and kept clothes, shoes and other personal items there.  19 RR 254-55.  Again, defense counsel revisited this flaw during closing argument:

> And they found the sandals, more than one pair.  I know one thing that I remember in this about the sandals was old Lewis said, you know I wear a size 11 and my brother wears a size 9 and a half and those bigger ones were John's.  But you know when you look at all those photographs, all these people are about the same.  I guarantee you Lewis Berry's footprint is not a size 11 on that print, on that shoe thing that the State took or the FBI took.

22 RR 40.  And as with his other condemnations, King has pointed to no other source of information *available at the time of trial* to further support his theory.[31]

---

[31]    It is also important to note the Lewis Berry was investigated as a suspect because he had lived in the apartment and because some of the shoes were consistent with his shoe size.  Berry gave a statement about his whereabouts on the night of the murder, and agents talked to other witnesses who corroborated his statement.  Berry also volunteered to take a DNA test, which established that his DNA was not connected to any evidence at the scene.  He was ultimately eliminated as a suspect.  18 RR 134-36.

Third, King contends that trial counsel failed to present his version of events as contained in a self-serving statement he has since authored, apparently in response to a civil wrongful death lawsuit filed by Mr. Byrd's family.  Petition at 261-62.  But he fails to identify anything that existed at the time of trial, except for his statements to the media—which *were* before the jury.  *See* SX 105.  Further, as set out below, the state habeas court specifically found this statement to completely incredible.

Fourth, King argues that while his letter to Brewer could be construed as an admission of guilt, it could also be construed as an innocuous comment. Petition at 262-63. In this letter, King wrote:

> As for the clothes they took from the apt. I do know that one pair
> of shoes they took were Shawn's dress boots with blood on them,
> as well as pants with blood on them.  As far as the clothes I had
> on, I don't think any blood was on my pants or sweat shirt, but I
> think my sandals may have had some dark brown substance on
> the bottom of them.

SX 104.   It was certainly reasonable for trial counsel to conclude that bringing additional attention to this letter by arguing for an alternative interpretation could strain their credibility with the jury beyond its natural bounds.

Fifth, King argues that trial counsel did not attempt to rebut the State's theory that his racist beliefs translated into racial violence.  Petition at 263.  But counsel *did* argue in rebuttal on this point.  *See* 22 RR 36, 43, 46.

King also cites to the affidavits of his father, Ronald King, and Claudia Womack that trial counsel were never interested in verifying either King's version of events or his alibi.  Petition at 264; *see also* PX 24-25.  But the record belies this assertion.  And the state court habeas court reasonably rejected it. In an affidavit filed during the first state habeas proceedings, lead counsel Sonny Cribbs confirmed that King never gave him sufficient information to permit him to locate the alleged alibi witness:

> Just before trial or at the beginning of trial, Mr. King told us that he remembered seeing a young white person sitting out smoking on or near the steps of the apartment complex when he came back to the apartment with Brewer, Berry, and Mr. Byrd on the night of the offense.  We sent two investigators out to the apartment complex in an attempt to locate this unknown person, although Mr. King had no other information about his identity. The investigators searched the entire complex area, checked with every apartment, and found no one who could recall having seen Mr. King return that night nor who could possibly identify any young person matching the description given by Mr. King living or visiting anyone in the apartment complex.

SHCR-01 at 144.  Based on that affidavit, the state habeas court entered the following findings and conclusions:

> 78.   The Court has reviewed trial counsel Haden Cribb's affidavit, including his averments regarding the attempt to locate [King's] unnamed alibi witness, ....  As set forth above, the Court is familiar with Mr. Cribbs, finds him to be a credible witness, and finds the statements in his affidavit to be worthy of belief.
>
> 79.   The Court notes that [King] has refused to verify his application for writ of habeas corpus and that he has presented no evidence to this Court to support his claims

that an alibi witness exists and that counsel should have located that witness.

80. The Court acknowledges and adopts the holding of the Court of Criminal Appeals regarding this factual issue: "[King] did not allege what further investigation counsel should have conducted, who his alleged alibi witness was, or how an alibi defense could have been persuasive given the physical evidence and [King's] own statements connecting him with the crime." *King v. State*, 29 S.W.3d [at] 569 [].

81. The Court finds, based upon the Court of Criminal Appeals' holding that [King's] assertion regarding an unidentified alibi witness—without any assertion regarding the substance of that witness'[s] testimony—is insufficient to demonstrate that such a witness'[s] testimony would have been material.

82. In addition, the Court is aware of [King's] *pro se* response (filed July 5, 2000 in this Court) to a civil petition for damages filed by James Byrd's survivors against [King] and his co-defendants in this Court in Cause Number 21973. The Court takes judicial notice of [King's] response in that case (although by taking notice of the *pro se* response the Court does not accept as true any of the assertions made therein) and finds that, although [King] changed his story in that response from the story that he gave to the Dallas Morning News before trial (which was admitted as [SX] 105 and quoted in part in *King v. State*, 29 S.W.3d [at] 560-62 []) and added into his story for the first time allegations about a fourth man involved in picking up [Mr. Byrd], [King] never named the fourth man, instead referring to him throughout as "John Doe." The Court notes that the fourth man described in [King's] June 2000 civil response does not match the location or circumstances of the unnamed witness of whom, according to the affidavit of Mr. Cribbs, [King] advised trial counsel shortly before trial.

83.   The Court finds that there is no evidence before this Court regarding the identity of [King's] alleged "alibi" witness, nor is there evidence before this Court which would permit any person to locate this alibi witness.

84.   The Court finds that there is no evidence before this Court that [King] ever made known to trial counsel—before, during, or after trial—the identity or location of any alleged "alibi" witness.

85.   The Court finds that trial counsel made diligent efforts at trial to locate the witness who [King] advised them might exist.

86.   The Court finds that trial counsel rendered reasonably effective assistance in attempting to locate the purported witness with the scant information provided by [King].

SHCR-01 at 193-94. The state habeas court then concluded that counsel King has failed to prove counsel's efforts, gauged within the totality of counsel's representation, were less than adequate to afford him constitutionally effective assistance of counsel. *Id.* at 195 (¶¶87-90). This rejection was certainly reasonable on this record.[32]

Finally, in support of this claim, King provides a letter from Lawrence Brewer stating that King was not involved in Mr. Byrd's kidnaping and murder. *See* Petition at 264; PX 38. Aside from the fact that nothing

---

[32]   Even now, King has failed to even allege what theoretical prejudice any of his attorney's actions in attempting to locate this witness may have caused him; specifically, King has failed to even allege that the witness was capable of being located—certainly he has not produced this witness even today—nor has he even guessed what the witness's testimony might have been, nor has he even speculated regarding how that testimony might have been helpful. And this is necessarily fatal to this part of the claim. *See Day*, 566 F.3d at 538.

~ 72 ~

indicates that Brewer would have been willing, much less able, to testify at King's trial,[33] this "admission" on Brewer's part is in direct conflict with the testimony at his own capital murder trial that he, King and Shawn Berry (and no one else) were present when Mr. Byrd was murdered.   *See* Attachment A.   As such, Brewer's recantation is patently incredible. *See Spence v. Johnson*, 80 F.3d 989, 1003 (5th Cir. 1996) (reiterating that "recanting affidavits and witnesses are viewed with extreme suspicion by the courts[]" (internal quotation marks and citation omitted)); *Drew v. Scott*, 28 F.3d 460, 463 (5th Cir. 1994) (finding "little confidence" in co-defendant's "posentencing truth experience" because he had nothing to lose).

On this record, King has wholly failed to show how counsel was constitutionally ineffective.   Indeed, all of the plausible evidence/innuendo identified by King was, in fact, before the jury.   The jury simply chose not to credit it.

For these reasons, King is not entitled to federal habeas relief on this claim.

---

[33]   Again, this is necessarily fatal to this part of Kings' claim.   *Day*, 566 F.3d at 538. Indeed, it is hardly likely that Brewer would have testified at King's trial given that his own trial was still months away.

### III.   No Error Arose from the Trial Court's Denial of Counsel's Motion to Withdraw. (Claim III)

King acknowledges that this Court has previously granted the Director's motion for summary judgment and denied federal habeas relief on this claim.  *See* Petition at 308; *see also* DE 64 at 17; DE 65 at 2.

### IV.   The Holding of *Dawson v. Delaware*[34] Was Not Violated by the Admission of Evidence Regarding King's Racist Views and Beliefs. (Claim IV)

By this claim, King asserts that his First and Fourteenth Amendment rights were violated by the admission at trial (both guilt/innocence and punishment) of evidence of his racist beliefs, including tattoos, personal writings and membership in the Confederate Knights of America.  Petition at 309-19.  This claim is both procedurally barred and without merit.

This claim was raised in King's second and successive state writ, which the Court of Criminal Appeals determined was an abuse of the writ.  *Ex parte King*, No. 49,391-02, Order at 2 (citing Tex. Code Crim. Proc. art. 11.071, § 5).  Section 5 has long been held as an independent and adequate procedural bar to federal habeas relief.   *See, e.g., Emery v. Johnson*, 139 F.3d 191, 195-96 (5th Cir. 1997); *Fearance v. Scott*, 53 F.3d 633, 642 (5th Cir. 1995). And King cannot establish either cause and prejudice or a fundamental miscarriage of

---

[34]     503 U.S. 159 (1992).

~ 74 ~

justice in order to avoid application of the bar.[35]  *See Coleman v. Thompson*, 501 U.S. 722, 750 (1991). In any event, as discussed below, this claim is without merit.

This claim fails on the merits because, unlike *Dawson*, where the defendant's affiliation was not related to any issue at trial, here, evidence of King's racist beliefs was intertwined with the facts and circumstances of his crime and highly relevant to establishing motive and identifying King as a perpetrator of the crime.[36]  Moreover, the evidence was probative of future dangerousness, and, thus, wholly permissible under *Dawson*.

As the Fifth Circuit observed in *Boyle v. Johnson*,

> While there is no "*per se* barrier to the admission of evidence concerning one's beliefs and associations at sentencing simply because those beliefs and associations are protected by the First Amendment," the government may not admit such evidence indiscriminately.  *Dawson* [], 503 U.S. [at] 165 [].  The Supreme Court has explicitly held that in order for such evidence to be admissible, it must be sufficiently related to the issues involved.

93 F.3d 180, 183 (5th Cir. 1996) (parallel citations omitted).

---

[35]  *Martinez* cannot apply to this claim because by its terms, it only applies to underlying claims of ineffective assistance of trial counsel.  132 S. Ct. at 1318. Here, King cannot assert that trial counsel were ineffective because, as he admits, many objections were made regarding this evidence.  Petition at 309 (citing 17 RR 241; 18 RR 62, 210). To the extent he argues that ineffective assistance of appellate counsel can serve as cause, *see* Petition at 311-12, *that* claim is also procedurally barred, and King cannot overcome *that* bar.

[36]  Defense counsel's repeated objections to evidence of this nature were overruled by the trial court based on its written "Findings Pertaining to Extraneous Transactions."  *See* CR 216.

Nonetheless, the *Dawson* Court held that evidence of a criminal defendant's association with the Aryan Brotherhood was irrelevant to any sentencing issue; thus, its admission for purposes of punishment violated the defendant's First and Fourteenth Amendment rights.   Because both the murder victim and the defendant were white, the defendant's membership in a white supremacist organization was not relevant to any possible motive for murder.  503 U.S. at 166.  Further, the Aryan Brotherhood evidence did not establish that the group advocated violence against any particular group; rather, it consisted solely of a stipulation that Dawson was a member.  Thus, it "proved nothing more than Dawson's abstract beliefs." *Id.* at 165-66.

By contrast, King's racist beliefs were inextricably bound up with issues relevant to both his guilt/innocence and sentence in this racially-motivated crime.  The evidence was highly probative of, and thus admissible regarding, King's participation in Mr. Byrd's kidnaping and murder; it established that King was not just an casual bystander, unaware of what was going on.  At the very least, he was a party to the horrible and brutal kidnaping and murder.  As such, the evidence did not violate *Dawson*'s principles because it was clearly relevant to issues that were before the jury.

The instant case is more analogous to *Boyle*, where the Fifth Circuit held that evidence a capital defendant's sexual habits and drawings was relevant to establish a motive for the sexual assault and kidnaping of which

Boyle was accused. 93 F.3d at 185 n.9. Just as in *Boyle*, King's personal writings were used to demonstrate his violent racial hatred and, thus, a potential motive for this seemingly senseless murder. Therefore, the admission of this evidence—clearly relevant to issues at trial—did not violate the Constitution. *See Griffith v. Quarterman*, 196 F.App'x. 237, 241 (5th Cir. 2006) (where petitioner's experts "hypothesized that Griffith would no longer present a future danger to society in prison because he would no longer have access to women, evidence that Griffith would continue to be a sexual predator was certainly relevant to the issue of future dangerousness"); *Miller-El v. Johnson*, 261 F.3d 445, 455 (5th Cir. 2001) (holding that evidence association with Moorish Science Temple was "inextricably intertwined" with conviction and sentence and relevant to issue of identity, thus admission did not violate *Dawson*), *reversed on other grounds, Miller-El v. Cockrell*, 537 U.S. 322 (2003) (*Miller-El I*); *Fuller v. Johnson*, 114 F.3d 491, 497-98 (5th Cir. 1997) (distinguishing *Dawson* on grounds that prosecution "did not merely stipulate that Fuller was in the Aryan Brotherhood. It introduced evidence that Fuller was a member of a gang that had committed unlawful or violent acts, including homicides, multiple stabbings, drug dealing, and aggravated assaults[]"); *Watts v. Quarterman*, 448 F.Supp.2d 786, 812-13 (W.D. Tex. 2006) ("In contrast to the circumstances of *Dawson*, evidence of petitioner's intense racial animus against Hispanics and Anglos was relevant to rebut the

~ 77 ~

defense's contention that petitioner's assaults on Hispanic inmates and threats against Anglo guards while petitioner was in pretrial detention were all instances of self-defense undertaken by petitioner as a result of petitioner's fear of assault by inmates who were acting at the behest of the Mexican Mafia prison gang."); *see also O'Neal v. Delo*, 44 F.3d 655, 661 (8th Cir. 1995) (holding that evidence of white defendant's membership in Aryan Brotherhood was probative of motive in murder of black man, thus its admission did not violate *Dawson*).

Further references to King's racist beliefs at the punishment trial merely underscored the events leading up to the crime. And at punishment, the jury is permitted to consider any evidence properly before it at the guilt/innocence trial. *See Granviel v Estelle*, 655 F.2d 673, 675 (5th Cir. 1981) ("[T]he jury in answering the special issues may properly consider all the evidence adduced during both the guilt and punishment phases of the trial."). And again, evidence of King's racial hatred, particularly the violent views expressed in his personal writings, was certainly relevant to the future dangerousness special issue. *Boyle*, 93 F.3d at 185 & n.7 (holding that evidence of capital defendant's violent obsession with sex was relevant to issue of future dangerousness and, thus, did not violate *Dawson*).

For these reasons, King is not entitled to federal habeas relief on this claim.

~ 78 ~

## V.   The Admission of Testimony Regarding King's Future Dangerousness Did Not Violate the Constitution.  (Claim V).

Again, King challenges Dr. Gripon's testimony during the punishment trial as to future dangerousness.  Petition at 320-76.  But as discussed below, this claim is both procedurally barred and without merit.

First, this claim was dismissed as abuse of the writ.  *Ex parte King*, No. 49,391-02, Order at 2.  As such, this claim is procedurally barred from federal habeas review.   To the extent King suggests *Martinez* applies here, *see* Petition at 321, such is incorrect because *Martinez* only applies to underlying claims of ineffective assistance of trial counsel.  And if he is arguing that his ineffective-assistance-of-appellate-counsel claim should serve as cause, again, that argument must fail.  First, *Martinez*, by its very terms, does not apply to that claim.  Second, *that* claim is itself procedurally barred, and King cannot overcome *that* procedural bar.

*Martinez* aside, the record also indicates that counsel made no objection to the proffered testimony on the basis presented to this Court. Thus,  the  issue  was  not  persevered  for  appeal  under  the  Texas contemporaneous objection rule.  *See* Tex. R. App. P. 33.1(a) (requiring that, as a prerequisite for obtaining appellate review, record must show that complaint by timely objection stating grounds with "sufficient specificity" to make trial court aware of complaint); *see also McGinn v. State*, 961 S.W.2d

~ 79 ~

161, 166 (Tex. Crim. App. 1998) ("It is axiomatic that error is forfeited when the complaint on appeal differs from the complaint at trial."); *Bell v. State*, 938 S.W.2d 35, 54 (Tex. Crim. App. 1996) ("An objection stating one legal basis may not be used to support a different legal theory on appeal.") (citation omitted). Consequently, even if this Court were to conclude that Article 11.071, Section 5, was inadequate to bar King's claim, it is nonetheless defaulted by his failure to comply with Texas's contemporaneous objection rule. *See Hogue v. Johnson*, 131 F.3d 466, 494-96 (5th Cir. 1997) (concluding that claim was defaulted where state court application of abuse bar was inadequate but where, if the state court had not found the application abusive, it would have found the claim barred by contemporaneous objection rule); *see also Stryon v. Johnson*, 262 F.3d 438, 453-54 (5th Cir. 2001) (holding Texas's contemporaneous objection rule operates as procedural bar to federal habeas review). In any event, as discussed below, this claim is entirely without merit.

Dr. Gripon testified at the punishment trial that based on his examination of King's tattoos, writings, the facts of the murder, the injuries suffered by Mr. Byrd, and various reports relating to the instant offense, as well as King's history, he believed King would be a future danger. 24 RR 45-50. On cross-examination, Dr. Gripon conceded that he had not personally interviewed King and that he could not predict anything with 100 percent

certainty. *Id.* at 54. He also told that the jury that he agreed with the APA that psychiatrists are no better suited than anyone else to predict future danger. *Id.* Finally, Dr. Gripon admitted that his ability to assess a defendant's mental status is limited when he has not conducted a face-to-face interview. *Id.* at 56.

In *Barefoot v. Estelle*, the petitioner argued that similar evidence of future dangerousness was unreliable and that it was error to introduce the answers to hypothetical questions by someone who had not personally examined the defendant. 463 U.S. at 896-906. The Supreme Court disagreed, holding that the failure of an expert to interview a criminal defendant went to the expert's credibility not to the admissibility of his testimony. *Id.* at 904 (citation omitted). Moreover, the Court specifically refused to convert the APA's condemnation of psychiatric predictions of future dangerousness. *Id.* at 899; *see also Estelle v. Smith*, 451 U.S. 454, 473 (1981) (stating that the Court was in "no sense disapproving of the use of psychiatric testimony bearing on future dangerousness").

King challenges the continuing viability of *Barefoot* after the Court issued its opinion in *Daubert v. Merrell Dow*.[37] *Daubert*, which pertains to the federal rules of evidence, held that scientific testimony must be relevant

---

[37]   *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993).

and reliable to be admissible.  509 U.S. at 589.  Specifically, "the trial judge must determine at the outset … whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue."  *Id.* at 592.  This two-pronged inquiry also applies to the admissibility of scientific testimony under the Texas rules of evidence.  *See Jordan v. State*, 928 S.W.2d 550, 553-55 (Tex. Crim. App. 1996).  Here, King argues that Dr. Gripon's testimony did not satisfy *Daubert*'s relevancy requirement because his prediction as to future dangerousness was based on nothing more than common sense, and that *Barefoot* does not take into account this requirement.   Therefore, any argument that Dr. Gripon's testimony was admissible under *Barefoot* fails given subsequent precedent.

Importantly, King offers no case law to suggest that *Barefoot* did not survive *Daubert*.  And indeed, the Fifth Circuit has declined to "undercut *Barefoot*," despite a similar argument that it had been implicitly overruled by *Daubert*.  *Tigner v. Cockrell*, 264 F.3d 521, 526-27 (5th Cir. 2001) (holding that such a claim would be *Teague*-barred).[38]  In any event, the Fifth Circuit has held that psychiatric testimony regarding a defendant's potential for future dangerousness based on a set of hypothetical facts is admissible.  *Little v. King*, 162 F.3d 855, 862-63 (5th Cir. 1998).  *Little* specifically addressed the admissibility of similar psychiatric testimony and held that

---

[38]      *Teague v. Lane*, 489 U.S. 288 (1989).

*Barefoot* had already disposed of the claim that the testimony was unreliable. *Id.* at 863.

In support of his argument that *Barefoot* is no longer good law, King devotes many pages to a discussion of Judge Garza's concurring opinion in *Flores v. Johnson*, wherein he wrote that psychiatric testimony predicting future dangerousness does not pass the *Daubert* test. 210 F.3d 456, 464-65 (5th Cir. 2000); *see* Petition at 332-43. Of course, a concurring opinion is not the law of the circuit, and indeed, the majority responded to Judge Garza's concerns:

> Our colleague expresses concern over the admissibility of expert testimony regarding the issue of future dangerousness. Flores has been ably represented on this appeal and counsel have not claimed that the judgment should be reversed because this testimony was admitted in the state trial. And properly so. It is clear that an error was not of constitutional magnitude under the settled law of the Supreme Court and this court. It is the inescapable fact that a lay jury is asked to judge future dangerousness. We cannot then reject as constitutionally infirm the admission into evidence of the same judgment made by a trained psychiatrist.

210 F.3d at 457 n.1. Thus, the admission of Dr. Gripon's testimony, even if erroneous, does not raise a constitutional claim in this circuit.

Regardless, Texas courts have repeatedly found psychiatric predictions of future dangerousness to be admissible. Prior to *Daubert*, the Court of Criminal Appeals wrote that, under *Barefoot*, "[i]t is settled in this State that psychiatric expert testimony of a defendant's future dangerousness may be

based solely on hypothetical questions, without the benefit of an examination of the defendant." *Cook v. State*, 858 S.W.2d 467, 475 (Tex. Crim. App. 1993) (citations omitted); *see also McBride v. State*, 862 S.W.2d 600, 610 (Tex. Crim. App. 1993) ("This Court has long recognized that a trial court may admit, *for whatever value it may have to a jury*, psychiatric testimony concerning the defendant's future behavior at the punishment phase of a capital murder trial." (emphasis in original)); *Fuller v. State*, 829 S.W.2d 191, 195 n.1 (Tex. Crim. App. 1992) ("Indeed, we have even held, without dissent, that objection to Dr. Grigson's expert testimony on this issue would amount to a futile act." (citation omitted)).  Since *Daubert*, the Court of Criminal Appeals has continued to hold that such testimony is admissible.  *Nenno v. State*, 970 S.W.2d 549, 560-62 (Tex. Crim. App. 1998); *Griffith v. State*, 983 S.W.2d 282, 288 (Tex. Crim. App. 1998).  In *Nenno*, for example, the court found expert testimony of future dangerousness both admissible under Texas Rule of Evidence 702 *and* compatible with the principles announced in *Daubert*.  970 S.W.2d at 560-62.

King's reliability and relevancy arguments falter given the above precedent.  As noted above, the Fifth Circuit has already held that *Barefoot* forecloses any claim of unreliability.  *Little*, 162 F.3d at 863.  Further, in *Barefoot*, the Supreme Court took note of the potential for unreliability in predicting future dangerousness; however, the Court found that any

reliability problems could be corrected when the defendant presents his side of the case, as occurred here.   463 U.S. at 899-901; *see also* 24 RR 80-107 (testimony of defense expert Dr. Quijano).

Likewise, Dr. Gripon's testimony was relevant despite the fact that it was based solely on common sense.   In *Jurek v. Texas*, Justice Stevens, noting the difficulty of predicting future danger, stated, "The fact that such a determination is difficult, however, does not mean that it cannot be made. Indeed, predictions of future criminal conduct is an essential element in many of the decisions rendered throughout our criminal justice system."   428 U.S. 262, 275 (1976).   Barely a decade later, *Barefoot* established that expert testimony pertaining to the issue of future dangerousness was relevant.   463 U.S. at 898-99 ("If the jury may make up its mind about future dangerousness unaided by psychiatric testimony, jurors should not be barred from hearing the views of the State's psychiatrists along with opposing views of the defendant's doctors.").

For all these reasons, King is not entitled to federal habeas relief on this claim.

VI-VII.    The *Apprendi*/*Ring*[39] Holdings Do Not Require that the State
Disprove the Mitigation Special Issue Beyond a Reasonable
Doubt.  Nor Do They Disallow the Introduction of Extraneous
Offenses in Support of the Future Dangerousness Special Issue.
(Claims VI-VII)

In two separate allegations, King contends (1) that the Constitution

requires the State to disprove the mitigation special issue beyond a

reasonable doubt, Petition at 377-404, and (2) that *Apprendi*/*Ring* disallows

the introduction of extraneous offenses.  Petition at 405-16.  In the first place,

both of these claims are procedurally defaulted as they were dismissed as

abuse of the writ.  *Ex parte King*, No. 49,391-02, Order at 2.  To the extent

King argues ineffective assistance of appellate counsel as cause, such is

fruitless. *Martinez* only applies to procedurally defaulted claims of ineffective

assistance of *trial* counsel.   And even if *Trevino* were to hold that ineffective-

assistance-of-appellate-counsel claims could serve as cause, King must still

overcome the bar applied to *that* claim.  And he cannot do that.  In any event,

these claims are entirely foreclosed by Fifth Circuit precedent; as such they

must be denied.  *See Druery v. Thaler*, 647 F.3d 535, 546-47 (5th Cir. 2011)

(citing *Rowell v. Dretke*, 398 F.3d 370, 378 (5th Cir. 2005)); *see also Blue v.*

*Thaler*, 665 F.3d 647, 668-69 (5th Cir. 2011); *Paredes v. Quarterman*, 574

---

[39]    *Apprendi v. New Jersey*, 530 U.S. 466 (2000) (holding that any fact that
necessarily increases punishment must be determined by a jury); *Ring v. Arizona*,
536 U.S. 584 (2002) (holding that *Apprendi* applies to capital sentencing trials).

F.3d 281, 292 (5th Cir. 2009); *Avila v. Quarterman*, 560 F.3d 299, 315 (5th Cir. 2009); *Brown v. Dretke*, 419 F.3d 365, 376-77 (5th Cir. 2005).

## VIII-X.   King's Constitutional Rights Were Not Violated by the Pre-Trial Publicity Surrounding His Trial. (Claims VIII-X)

In the next three interrelated claims, King contends that his Constitutional rights were violated because the trial was held in Jasper County, where Mr. Byrd was kidnaped and murdered and where the pretrial publicity created such a prejudicial atmosphere it was impossible to receive a fair trial.  Petition at 417-23 (pre-trial publicity deprived King of due process of law (claim VIII)), 424-26 ("totality of prejudicial circumstances … deprived King of … due process" (claim IX)), 447-61 (trial court erred in denying motion for change of venue (claim X)).  But as discussed below, these claims are procedurally barred, and in any event, they are without merit.

As with most of the claims raised in the instant petition, these three claims were dismissed as an abuse of the writ.  *Ex parte King*, No. 49,391-02, Order at 2.  King asserts *Martinez* as cause, but none of these claims alleges ineffective assistance of trial counsel; rather King asserts that state habeas counsel was ineffective for failing to raise them.  This is not enough under *Martinez*.  132 S. Ct. at 1318.  With respect to only one claim, claim IX, does King come close to asserting ineffective assistance of appellate counsel.  *See* Petition at 434.  But again, this is not enough under *Martinez* because

*Martinez*, by its terms, only applies to underlying claims of *trial* counsel. 132 S. Ct. at 1318. And to the extent King is asserting his ineffective-assistance-of-appellate-counsel claim as cause, he cannot establish cause and prejudice with respect to *that* claim. In any event, King simply cannot show that any of these claims has any merit.

The Sixth Amendment provides that a criminal defendant "shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district where in the crime shall have been committed … [.]" The failure to provide such a trial is a denial of due process. *Irvin v. Dowd*, 366 U.S. 717, 722 (1961). However, the Constitution does not require that jurors be completely ignorant of the facts and issues to be tried. *Dobbert v. Florida*, 432 U.S. 282, 301 (1977); *Murphy v. Florida*, 421 U.S. 794, 800 (1975) (citation omitted)). Even extensive community knowledge about the crime and the defendant is not sufficient to violate constitutional guarantees. *Dobbert*, 432 U.S. at 303; *see also Skilling v. United States*, 130 S. Ct. 2896, 2914-915 (2010) ("Prominence does not necessarily produce prejudice, and juror *impartiality*, we have reiterated, does not require *ignorance*." (emphasis in original and citation omitted)).

> In these days of swift, widespread and diverse methods of communication, an important case can be expected to arouse the interest of the public in the vicinity, and scarcely any of those best qualified to serve as jurors will not have formed some impression or opinion about as to the merits of the case. This is

> particularly true in criminal cases.   To hold that the mere
> existence of any preconceived notion as to the guilt or innocence
> of an accused, without more, is sufficient to rebut the
> presumption of a prospective juror's impartiality would be to
> establish an impossible standard.   It is sufficient if the juror can
> lay aside his impression or opinion and render a verdict based on
> the evidence presented in court.

*Irvin*, 366 U.S. at 722-23 (citation omitted).

To that end, King must demonstrate that "the trial atmosphere [was] 'utterly corrupted by press coverage.'"  *Dobbert*, 432 U.S. at 303. (quoting *Murphy*, 421 U.S. at 798).   In determining whether a constitutional guarantee has been violated, this Court must presume that the jurors were impartial unless and until King establishes, under the totality of the circumstances, that the trial setting was inherently prejudicial or the jury selection process permits an inference of actual prejudice.  *Murphy*, 421 U.S. at 803.   A reviewing court must take into account the degree and kind of publicity surrounding a case; "'each case must turn on its specific facts.'" *Calley v. Callaway*, 519 F.2d 184, 205 (5th Cir. 1975) (quoting *Marshall v. United States*, 360 U.S. 310, 312 (1959), and citations omitted).

King, however, wants the presumption of prejudice as established in *Rideau v. Louisiana*, 373 U.S. 723 (1963).  Petition at 422-23; *see also id.* at 436-40.   The *Rideau* rule of presumed prejudice is applicable "where a petitioner adduces evidence of inflammatory, prejudicial pretrial publicity that so pervades or saturates the community as to render virtually

impossible a fair trial by an impartial jury drawn from that community[.]"
*Willie v. Maggio*, 737 F.2d 1372, 1386 (5th Cir. 1984) (internal quotation
marks and citation omitted); *see also Murphy*, 421 U.S. at 798-99; *Moore v.
Johnson*, 225 F.3d 495, 504-05 (5th Cir. 2000).

In *Rideau*, a film of the defendant's interrogation *and confession* was
shown to an estimated 97,000 of the 150,000 residents of Calcasieu Parish,
Louisiana, within a three-day period two weeks before trial.  373 U.S. at 724-
25.  As the Supreme Court explained, the potential jury pool "heard, not once
but three times, a 'trial' of Rideau in a jail, presided over by a sheriff, where
there was no lawyer to advise Rideau of his right to stand mute."  *Id.* at 727.
This has been the only time the Supreme Court has reversed a state court
conviction on the basis of presumed prejudice deriving solely from pretrial
publicity.  *See Mayola v. State of Alabama*, 623 F.2d 992, 997-98 (5th Cir.
1980) (noting that because virtually every case of any consequence will be the
subject of at least some press attention, the *Rideau* principle of presumed
prejudice is rarely applicable (internal quotation marks and citation
omitted)); *see also Skilling*, ("A presumption of prejudice, our decisions
indicate, attends only the extreme case."); *United States v. Haldeman*, 559
F.2d 31, 61 n.32 (D.C. Cir. 1976) (noting that although the Supreme Court
has employed the "vehicle or rhetoric of presumptive prejudice" to overturn
other convictions, each of these cases  has either "turned on factors other

than (or in addition to) pretrial publicity or (has actually) involved the Court in an examination to determine whether the trial was in fact unfair[]").

Without acknowledging *his role* in creating pretrial publicity, King describes just some of the news coverage of the case.[40]  Petition at 418-19; *see also id.* at 457; PX 14.  It certainly cannot be denied that the publicity was indeed extensive throughout Texas, the nation and even the world.  *See* 3 RR 14 ("I mean, every news channel in the world was here just about it[.]"), 19 (witness testimony that he had seen stories about the murder on CNN), 42 (testimony of Jasper County Sheriff Billy Ernest Rowles, Sr., that anytime he went anywhere in Texas or out of state, "people talk to [me] about this case"), 53 (witness testimony that articles had appeared in the San Antonio and Dallas newspapers) 61 (testimony of probation officer Harold Lee Kennedy that he was in Arkansas when this crime happened, "heard it on the nationwide news" and that he has been asked about it in Marshall and New Braunfels); *see also* Exhibit 1 to hearing on motion for change of venue; PX 14.  But as noted in the State's response to King's motion for change of venue, "the publicity in Jasper County [was] less inflammatory and prejudicial than media accounts in the rest of the state."  CR 105; *see also* 3 RR 24-25 (noting

---

[40]    Against the advice of counsel, King granted several interviews with media representatives.  3 RR 4.  On several occasions, he also sent letters to the Jasper and Beaumont papers, which each newspaper then published.  *See* PX 14 at 681, 708, 711, 725.

that the media in Dallas, Houston and Austin reported specific information about King's tattoos and the white supremacist gang he belonged to, while the media in Jasper and Beaumont had not).   Indeed, a review of Exhibit 14 starkly establishes this; the vast majority of the articles were about racism generally, and the articles about the crime itself were largely factual in nature. *See Skilling*, 130 S. Ct. at 2916 ("[A]lthough the news stories about Skilling were not kind, they contained no blatantly prejudicial information of the type readers or viewers could not reasonably be expected to shut from sight.   Rideau's dramatically staged admission of guilt, for instance was likely imprinted indelibly in the mind of anyone who watched it." (citation omitted)).

In addition to the general type of publicity that surrounded the crime, the *Skilling* Court also found that the "size and characteristics of the community in which the crime occurred," the lapse between the surge of news stories and the trial itself, and the fact that Skilling was actually acquitted on several of the counts weighed against a presumption of prejudice.   130 S. Ct. at 2915-916.   On this record, then, it is likely an even split between factors that weigh against the presumption and those that weigh in favor it.

In any event, as stated above, the constitutional standard of fairness only requires that the defendant "have a panel of impartial, 'indifferent' jurors" who base their decision solely on the evidence produced in court; it

does not require jurors to be wholly ignorant of the case. *Mayola*, 623 F.2d at 998 (quoting *Murphy*, 421 U.S. at 799-800). "We cannot expect jurors to live in isolation from the events and news of concern to the community in which they live." *Calley*, 519 F.2d at 205. Thus, "it remains open to the defendant to demonstrate 'the actual existence of such an opinion in the mind of the juror as will raise the presumption of partiality.'" *Murphy*, 421 U.S. at 800 (citation omitted). King certainly has not done this; indeed, he cannot do this on this record.

The voir dire in this case demonstrates that issues of potential prejudice on the part of prospective jurors were fully vetted by defense counsel, 6-16 RR, and King has entirely failed to show that he was deprived of an impartial jury. *See Dobbert*, 432 U.S. at 303 (declining to presume prejudice where petitioner "has directed us to no specific portions of the record, in particular the voir dire examination of the jurors, which would require a finding of constitutional unfairness as to the method of jury selection or as to the *character of the jurors actually seated*[]" (emphasis added)); *see also Calley*, 519 F.2d at 206 ("The critical issue is the actual or probable effect of the pretrial publicity on the trial itself and, more precisely, *on those who sat in judgment* of Calley." (emphasis added)). King's reliance on the inflammatory statements made by veniremembers who were excused, Petition at 448-52, then, is to no avail. And he points to no statement by any

member of his jury or the two alternates that even suggests any one of them
was unduly prejudiced by any of the pretrial publicity.  Indeed, he cannot.
*See* 8 RR 5 (Larry Pedigo: had no opinion (based on what he "read, heard,
hearsay, rumor and otherwise") that would influence his verdict; "absolutely"
important to decide the case "strictly on facts and evidence, not the media"),
53-54 (Karen Durmon: "I think, in my opinion, that everyone has formed an
opinion based on hearsay; but until you have the facts, you can't form that
final opinion[;]" could set aside any previously formed opinion and be a fair
juror), 76, 82 (Karen Flowers: "As a matter of fact, I really realized the other
day I know very little about it actually[;]" nothing, not peer pressure or
anything else would influence her verdict), 86, 97 (Leslie Ross: "I'd have to
know the facts before I can make an opinion[;]" "I believe I could weigh the
facts that's given from this seat before I made that kind of decision."); 9 RR
81, 95 (Deborah Watson: "I suppose I probably heard just about everything
anybody else has.  It's been in the newspapers and on the television. … I
don't really feel like I've been influenced[;]" has not "preconceived what the
right thing has to be done"), 177-78, 188 (Tony Biggs:  "I tried not to pay a
whole lot of attention to what you hear because …  I've heard a lot; but as far
as what actually, the facts of the case, you can't go by what you hear[;]" would
vote according to the evidence not the will of the community); 10 RR 41, 45
(Henry Bullock:  has not formed any opinion that would influence his verdict;

will follow the evidence "regardless of what the community wants"); 11 RR 74, 81 (Lurlene Doyle:  has not formed any opinion because she has not "really kept up with it"; "It's sort of, I guess, bothered me and I just sort of left it alone[;]" "pretty independent" and will not be swayed by what the community wants); 12 RR Rayford Eberlan 50-51 ("I don't want anybody serving time if they don't deserve it.  I don't want any guilty people going free, and I don't want any innocence people serving time.  So, I just have to be honest with you.  I don't pay attention to it."), 65-66, 69 (Kimble Morgan: has not formed any opinion because "[u]p until the time I was summoned, I basically couldn't even tell you, you know, in this particular case, the accuseds' names.  I really haven't followed[;]"  will decide the case "on facts and evidence and nothing else"); 14 RR 56, 62 (Mary Bean: has not formed any opinions; would not be influenced by any of demonstrations and the like; would base her verdict on the evidence, not what the community wants), 103 (Joe Collins:  "Well, at first, I kind of had had a base from the news and everything else, I kind of based everything on that there.  But, I mean, after a while just listening and trying to listen to everything, I feel … I mean they haven't proven anything yet, way I see it right now.").[41]

---

[41]    *See also* 15 RR 30-31 (Martha Stevens, alternate:  "I'll stand my ground whether anybody else believes what I believe or not[;]" "[a]fter a while you just kind of skip over it in the newspapers.  But I only was interested at the point where all the outsiders were coming in.  My dad is 84 years old, and he was living in the

The trial court, along with the prosecutor and defense counsel, observed the demeanor of each of the seven women and five men who ultimately sat in judgment of King.  They were all free to believe that these twelve people could set any opinions they may have formed, ignore any peer pressure and decide the case solely on the evidence admitted during trial. *See Patton v. Yount*, 467 U.S. 1025, 1036 (1984) (juror partiality "is plainly one of historical fact:  did a juror swear that he could set aside any opinion he might hold and decide the case on the evidence, and should the juror's protestation of impartiality have been believed") (citation omitted); *Wainwright v. Witt*, 469 U.S. 412, 429 n.9 (1985) ("[T]he manner of the juror while testifying is oftentimes more indicative of the real character of his opinion than his words.  That is seen [by the trial court] below, but cannot always be spread upon the record."); *see also Ruiz v. Quarterman*, 460 F.3d 638, 646 (5th Cir. 2006) ("A stranger to the trial reading the bare transcript is left with incomplete sentences and elliptic answers with no reconciling theme.  Yet one present at trial may well have quite a different picture.  Inflection of voice and body movements of each case member, absent from the

---

general area.  So, I did pay a lot of attention at that time, you know, basically about what was going on with regard to them, the militants and whatnot."), 72-73, 75, 78 (David Douglas, alternate:  "So, I have got some pretty strong opinions on it.  I think I can go through, however, and sort through the evidence. … I believe I can base my opinions on the evidence, yes[;]" has not read anything since the initial instruction from the trial judge; could put aside "anything [he had] read, heard, seen, or talked about" and be fair and impartial).

transcript, are present at trial."); *cf. Celestine v. Blackburn*, 750 F.2d 353, 361 (5th Cir. 1984) ("juror's testimony that he could "decide the case on the evidence, …, [] presume [the defendant] innocent until proven otherwise, and to vote for the death penalty only if the facts justified it" supported trial counsel's decision not to challenge him).

While King is likely correct in his assertion that the community of Jasper was generally enraged by this atrocious crime, it must be assumed that any reasonable person, anywhere, confronted with the facts of this case, would be enraged as well. Further, pointing to the sheer amount of press coverage alone does simply cannot create a presumption of prejudice, and that is all King has really done.[42] *See Bassett v. Dutton*, 402 F.2d 263 (5th Cir. 1968) (declining to overturn conviction despite alleged "massive, pervasive, and prejudicial publicity" solely on the basis of the articles in question, without proof of the degree of their influence, if any). Considering the entire record before this Court, it simply cannot be said that King's "trial

---

[42]     King's contention that that the media "assumed [his] guilt and played up the sensationalistic race-hate angle of the story," and that he was "demonized and portrayed as a vicious racist filled with hatred," Petition at 419, is simply not borne out by the record that was before the trial court, the Court of Criminal Appeals or the record that is before this Court.  Indeed, the articles submitted by King come primarily from the Jasper and Beaumont newspapers, *see* PX 14, and as discussed during the hearing on change of venue, were far less vitriolic than those stories coming out of other cities.  In any event, the record establishes that the jurors who sat in judgment of King were unaffected by the onslaught of publicity and could render a verdict based solely on the evidence before them.

atmosphere … [w]as utterly corrupted by press coverage." *Dobbert*, 432 U.S. at 303.

For all of these reasons, these claims must fail.

## XI.   King's Attack on the State Habeas Procedures Has No Basis in the Constitution.  (Claim XI)

By this claim, King alleges that he was denied meaningful access to the courts and competent counsel for his initial state habeas proceeding.  Petition at 462-91.  He acknowledges that this Court has already granted summary judgment in favor of the Director as to this claim, *see* Petition at 492, *see also* DE 64 at 18; DE 65 at 2, but he reasserts it in light of *Martinez*.  *Martinez* does not help him.

*Martinez* did not create any new constitutional right, either to state habeas proceedings or to the effective assistance counsel for such proceedings.  Rather, *Martinez* only created an *equitable* remedy for those petitioners whose first opportunity to allege that trial counsel was ineffective came during the post-conviction process.  And as discussed above, the Fifth Circuit has already recognized that this is not the case in Texas.

That aside, the Fifth Circuit has long held that infirmities in state habeas proceedings do not constitute grounds for federal habeas relief.  *See e.g.*, *Rudd v. Johnson*, 256 F.3d 317, 319-20 (5th Cir. 2001); *Beazley*, 242 F.3d at 271.  This is so "because an attack on the state habeas proceeding is an

attack on a proceeding collateral to the detention itself and not the detention itself." *Rudd*, 256 F.3d at 320 (citation omitted).

For these reasons, this claim must be denied.

## XII.   Defense Counsel Were Not Ineffective for Failing to Hire an Expert Pursuant to *Ake v. Oklahoma*.[43] (Claim XII)

King next complains that defense counsel were constitutionally ineffective because they failed to use confidential defense psychiatric experts under *Ake* to examine King for purposes of the punishment trial.[44]  Petition at 492-506.   However, this claim is both procedurally barred and wholly without merit.

This claim was dismissed as an abuse of the writ.   *Ex parte King*, No. 49,391-02, Order at 2.   As such, it procedurally barred from federal habeas review.   And regardless of whether *Martinez* is found to apply to the instant claim, it is entirely without merit.

As an initial matter, King seems to be arguing to this Court that counsel was *per se* ineffective for using a psychologist, rather than a psychiatrist, as his mental health expert at trial.   But no evidence is before this Court from either the trial or any post-conviction proceedings that King

---

[43]     470 U.S. 71 (1985).

[44]     An *Ake* claim was also raised with respect to the guilt/innocence trial, but as King acknowledges (Petition at 492), this Court has already granted summary judgment in favor of the Director on that claim.   *See* DE 64 at 18-19; DE 65 at 2.

had or has any mental disorder which would have raised the issue of sanity.

Indeed, the psychologist who did testify at trial on King's behalf, Dr. Quijano,

explained that King had no mental disorder, and this, he testified further,

meant that King would pose less of future danger than an inmate diagnosed

with a mental disorder as that might cause irrational reactions.  24 RR 88-89.

King has not shown the need for the additional psychiatric expert assistance

he now claims counsel failed to obtain; thus, he has failed to raise any issue

before this Court.

Additionally, in his affidavit submitted during the first state habeas

proceedings, lead counsel Cribbs explained:

> During my preparation for trial I made diligent efforts to discover
> and develop any evidence of mental illness, insanity, or mental
> defects which might have excused Mr. King from criminal
> responsibility or mitigated punishment.  I tried without success
> to obtain favorable psychiatric evidence.  I talked to several
> personal friends who are psychiatrists or psychologists who do
> not wish to become involved in this case.  I was able to obtain the
> services of Dr. Curtis Wills, a forensic psychologist from the
> Wilmington Institute, who has had vast experience in criminal
> defense and prosecution mental health evaluations, and has
> testified in both state and federal courts, to interview Mr. King
> and render an opinion regarding his mental condition.  Dr. Wills
> could only advise me that Mr. King was intelligent, able to
> converse regarding his circumstances and showed no evidence of
> any insanity, mental illness or any mental disability.  Mr. King
> also denied that he had any mental disability on which I could
> base a claim of insanity or mitigation.  In preparing for trial we
> searched for and interviewed Mr. King's natural mother, sisters,
> natural father, step-father, step-sister and [talked] on numerous
> occasions with his adoptive father, Ronald King, and numerous
> friends.  All but his adoptive father and some friends were

essentially hostile to Mr. King; and all but the adoptive sister, his adoptive father and some friends refused to testify and refused to offer any testimony that might be helpful at all to him and none of the people I interviewed gave any indication that Mr. King had any insanity or mental illness. All of the family members I talked to indicated that Mr. King had been pampered and protected as [a] child, that he had not been abused, and that he had been protected from the negative consequences of his actions by his adoptive family.  I checked his school records, reviewed available history pertaining to his adoptive parents and natural parents, and talked personally to Texas Department of Criminal Justice employees and fellow inmates who had associated with Mr. King; I did not uncover any evidence in any of these interviews that I believed, in my professional judgment, could be helpful to Mr. King's defense.  I eventually obtained the services of Dr. Walter Quijano, a forensic psychologist with significant criminal experience, to testify on Mr. King's behalf.  He and two associates did an extensive examination of Mr. King and also found no evidence of insanity, mental illness or mental disability.  Dr. Quijano testified on Mr. King's behalf on punishment.  After interviewing Dr. Wills, we felt that any evidence from Dr. Wills on punishment would not be helpful at all and he was not used.

SHCR-01 at 141-44.  Counsel's affidavit reflects that he was diligent in investigating the feasibility of raising an insanity defense or other mental health defense in the instant case and that he was factually unable to raise such a defense in the absence of any evidence that King's mental state was questionable.  *See* SCHR-01 at 188 (¶54) ("The Court finds from all of the evidence produced at trial, from the Court's own observations and review of [King's] letters and *pro se* pleadings filed in this Court, and from the affidavit of Mr. Cribbs regarding his additional investigation that [King] had no mental disorder that would render him incompetent to stand trial, that

[King] is at least of normal intelligence, and that [King] has not demonstrated any mental illness or disability that would mitigate his moral blameworthiness for this offense."), (¶57) ("The Court finds that trial counsel was reasonably effective in refraining from attempting to raise an insanity defense at trial in light of the lack of evidence to support such a defense."), (¶58) ("The Court finds that trial counsel used defense testimony regarding [King's] lack of mental illness to his advantage at the punishment stage and that such use was a reasonable exercise of trial strategy."), (¶59) ("The Court finds that [King] has failed to present any evidence, or even make any specific assertions, that defense mental health experts consulted by trial counsel were inadequate or incompetent in any way.").

This is *not* a situation where defense counsel was on notice of the defendant's past institutionalization and conducted "*no* investigation of any kind" into competency. *Cf. Bouchillon v. Collins*, 907 F.2d 589, 596-97 (5th Cir. 1990) (emphasis added). Indeed, this is quite the opposite case as the record indicates little more than depression and *possible* bi-polar disorder. Further, counsel has no duty to "believe that another psychiatrist might reach a different conclusion" where the initial evaluation "was consistent with counsel's own perception and observation of the defendant." *Clark*, 19 F.3d at 964; *see also Dowthitt*, 230 F.3d at 748 (holding that "trial counsel was not deficient by not canvassing the field to find a more favorable expert").

Moreover, the record affirmatively reflects that counsel—as a matter of reasonable trial strategy—was determined to keep the State and its psychiatric experts from examining King, presumably because King is intelligent, had no mitigating mental or social history that would excuse his behavior, and because—as the record reflects—King is an extreme racist with violent views on race relations.  The record reflects that trial counsel filed at least six motions to obtain as much assistance from the trial court as possible to prohibit the State and its experts from communicating with King or examining him regarding sanity or future dangerousness, particularly without counsel present to advise him and buffer his contact with the State. *See* CR 64, 69, 74, 76, 78, 99; *see also* SHCR-01 at 188 (¶56).  The trial court eventually granted all of these motions, CR 146, 148, 150-52, 157, and as a result, the State's expert, Dr. Gripon, testified at punishment without the benefit of having interviewed King.  24 RR 44-53.

In light of the mental health evaluations obtained by counsel in his preparation for trial, seeking to present expert psychiatric testimony would have done nothing to assist King's defense; indeed, it likely would have harmed it.  Strategic decisions of this nature are presumptively reasonable and not deficient within the meaning of *Strickland* and its progeny.  *See Crane v. Johnson*, 178 F.3d 309, 313-15 (5th Cir. 1999) (holding that counsel was not ineffective for deciding against an expert because counsel believed

that the State would find out that an expert had been appointed and decide to present damaging evidence of future dangerousness in rebuttal); *Williams v. Collins*, 16 F.3d 626, 634 (5th Cir. 1994) (same).   Moreover, the presentation or non-presentation of evidence through experts is purely a matter of trial strategy.   *Yohey v. Collins*, 985 F.2d 222, 228 (5th Cir. 1993); *Smith v. Black*, 904 F.2d 950, 979 (5th Cir. 1990).

Finally, in support of his claim, King offers the psychological evaluation of Dr. Richard Peek (PX 19) and records from his prior incarcerations in Jefferson County Residential Services and TDCJ (PX 20). But even if this evidence is taken into account, it does little more than establish King might have been depressed around the time he and his cohorts brutally murdered Mr. Byrd and that *might have been* suffering from bi-polar disorder (a purely speculative guess on the part of Dr. Peeks). Thus, even it is assumed that counsel is deficient for failing to discover and/or present it, King certainly cannot establish that had the jury heard evidence that he suffered from bipolar disorder and had (allegedly) attempted suicide on more than one occasion, he would have been sentenced to life in prison rather than death. *See Richter*, 131 S. Ct. at 792; *Wiggins*, 539 U.S. at 534; *see also Smith v. Quarterman*, 471 F.3d 565, 570 (5th Cir. 2006) ("*Strickland* does not require counsel to investigate every conceivable line of mitigating evidence no matter how unlikely the effort would be to assist the defendant at sentencing.  …

Nor does *Strickland* require defense counsel to present mitigating evidence at sentencing in every case." (internal quotation marks and citation omitted)). Thus, this claim must fail.

## XIII.  King Cannot Establish that Any Violation of *Witherspoon*[45] Occurred During the Selection of His Jury. (Claim XIII)

King next claims that the trial court's granting of the State's challenges for cause or the denial of the defense's challenge for cause resulted in the seating of a biased jury.  Petition at 507-12.  However, with respect to all but one of the prospective jurors, this claim is procedurally barred.  In any event, this claim is entirely without merit.

Like many other claims before this Court, the claims regarding Nicholaus Fountain, Larry Pedigo, Jo Marie Jones, Larry DeLord, Bartley Rhodes, Craig S. Harding, Steven Wheeler, and James Nobles were dismissed as abuse of the writ.[46]  *Ex parte King*, No. 49,391-02, Order at 2.  And Texas's abuse-of-the-writ doctrine is well-established as an independent and adequate bar to federal habeas relief.  *See, e.g., Emery*, 139 F.3d at 195-96; *Fearance*, 53 F.3d at 642.  King cannot establish either cause and prejudice or a fundamental miscarriage of justice in order to avoid application of the

[45]    *Witherspoon v. Illinois*, 391 U.S. 510 (1968).

[46]    To the extent King's claim regarding James Mallett was dismissed as an abuse of the writ, the Director does not argue it is procedurally defaulted because, as discussed below, that claim was raised and rejected on the merits during direct appeal.

~ 105 ~

bar.[47]  *See Coleman*, 501 U.S. at 750. In any event, as discussed below, these claim are without merit.

*Wainwright v. Witt* holds that a prospective juror may be excused for cause because of his views on capital punishment when "the juror's views would 'prevent or substantially impair the performance of the his duties as a juror in accordance with his instructions and his oath.'"  469 U.S. at 424 (quoting *Adams v. Texas*, 448 U.S. 38, 45 (1980)); *see also Witherspoon*, 391 U.S. at 523 n.21 ("[N]othing we say today bears upon the power of the State to execute a defendant sentenced to death by a jury from which the only veniremen who were in fact excused for cause were those who made it unmistakably clear … that their attitude toward the death penalty would prevent them from making an impartial decision as to the defendant's guilt.").  The state court has explained further, "A veniremember is challengeable for cause if her beliefs against capital punishment would prevent or substantially impair the performance of her duties as a juror in accordance with the court's instructions and the juror's oath." *Blue v. State*, 125 S.W.3d 491, 496 (Tex. Crim. App. 2004) (citing *Colburn v. State*, 966 S.W.2d 511, 517 (Tex. Crim. App. 1998)).

---

[47]    *Martinez* cannot apply to this claim because by its terms, it only applies to underlying claims of ineffective assistance of trial counsel.  132 S. Ct. at 1318.  But to the extent King asserts ineffective assistance of appellate counsel cause, that, too fails.  *Martinez* does not apply to such claims, and King cannot overcome the procedural bar that applies to *that* claim.

This standard does not require that bias be proven with "unmistakable clarity," but the trial court is assigned "the difficult task of distinguishing between prospective jurors whose opposition to capital punishment will not allow them to apply the law or view the facts impartially and [prospective] jurors who, though opposed to capital punishment, will nevertheless conscientiously apply the law to the facts adduced at trial." *Id.* at 421, 424. And like the trial judge who must evaluate the prosecutor's credibility as to a race-neutral explanation when a *Batson*[48] challenge has been made,  the evaluation of a juror's "state of mind based on demeanor and credibility lies peculiarly within the trial judge's province."   *Miller-El I*, 537 U.S. at 339 (internal quotation marks and citations omitted; footnote added).

### A.    James Edward Mallett

King's claim regarding Mr. Mallett was raised and rejected on direct appeal, and as shown below, King has not shown that the state court's rejection was objectively unreasonable.

The testimony in question is as follows:

Q.    Is your belief such that under no circumstances at all can you sit on jury that would impose the death penalty?

A.    I'd rather not.

---

48    *Baton v. Kentucky*, 476 U.S. 79 (1986).

~ 107 ~

Q.    We really need an unequivocal answer on it.  Can you serve on a jury that would impose a death penalty, or is it something you just can't do?

A.    According to God's word, I wouldn't want to do it.

Q.    Well, you put it in "I wouldn't want to do it," which leaves the opening that you might be able to do it; and I need an unequivocal answer one way or the other.  Could you do it?

A.    No, I wouldn't want to sit on it.

Q.    Does that mean you can't do it?

A.    That means that I wouldn't want to at all.  Now, the life sentence or two life sentences, I'll agree with that.

Q.    If you sat as a juror and 11 people were in favor of answering the issues in a way that would result in a death penalty and you were the 12th person, would you go with life? Would you go against 11?  What would you do?

A.    Well, if I state what I said, I'd have to go against.

Q.    You'd go against the death penalty?

A.    Yes, sir.

***

Q.    No matter how bad the crime, no matter what was done, your religious beliefs are such that you just cannot impose the death penalty?

A.    That's right.

8 RR 23-25.  Defense counsel then tried to rehabilitate Mallett, but ultimately, he was unsuccessful:

Q.     … [W]ould you always answer that question no, regardless of what you felt the evidence was or what the State proved, in order that the defendant would not be given the death penalty every time, regardless of the evidence?

A.     I don't know.

Q.     Well, that's what we've got to know because you're the only person that can answer that, Mr. Mallet; and there's some people here that never will answer a question yes … regardless of what the evidence is … [.] But we've got to know.

A.     Well, I still don't believe in capital punishment.

Q.     Well, it's not really whether you believe in capital punishment.  Will you follow the law?

A.     I'll do my best.

Q.     And if you follow the law and you answer those questions, you answer the questions yes or no; or would you always answer the questions in a way that would always inflict [a] life sentence rather than the death penalty?

A.     Well, I'd rather see anybody get life than death. … That's just strictly - - nobody made up my mind on that.

Q.     … If you won't answer those questions the way the law is presented or the way you think it is or you'd always answer them in a certain way to result in a life sentence, that's fine, too.  If that's what it is or not, we need you to answer.

A.     Well, I still - - like I said, I just believe in a life sentence. The answer to the death sentence is no.

8 RR 27-28.

The trial court's decision to grant the State's challenge for cause and

the Court of Criminal Appeals' finding that Mallett was properly excluded,

*King v. State*, 29 S.W.3d at 568, were reasonably based on the record. Indeed, the trial court observed Mallet's demeanor and was free to believe his statements that he could not (and would not) impose the death penalty in this case. *See Patton*, 467 U.S. at 1036; *Wainwright*, 469 U.S. at 429 n.9; *see also Ruiz*, 460 F.3d at 646.

For these reasons, this claim must be denied.

### B.    Nicholaus Dwayne Fountain

Initially, King's allegation regarding Mr. Fountain is procedurally barred because it was dismissed as an abuse of the writ. *See Ex parte King*, No. 49,391-02, Order at 2.   And as discussed above, such stands a well-established procedural bar to federal habeas review unless King shows either cause and prejudice or a fundamental miscarriage of justice.   This he has not done, and again, *Martinez* does not apply to this claim.   King's ineffective-assistance-of-appellate-counsel claim, petition at 510, is also of no avail because he cannot show cause and prejudice to overcome the procedural bar that applies to *that* claim.   But regardless of the procedural bar, as discussed below, this claim is entirely without merit.

The relevant portion of Mr. Fountain's voir dire is as follows:

Q.    … The death penalty, you say you don't believe in it.  You say, I don't know if I could actually bring myself to use it. How do you feel about the death penalty?  Can you sit on a jury that would impose the death penalty or not?

A.   I believe I could consider it; but as far as using it, I don't know.

Q.   I'm sorry.  I just didn't understand that answer.

A.   I could consider using it, but personally I don't believe in it.

Q.   Okay, sir.  Now, I understand that we all have thoughts that we're not even certain ourselves just exactly what we're thinking; but I need you to try, if you will, to be unequivocal, to give us a direct answer.  In your mind, if you sat on a jury and you felt like the facts of a particular case warranted a death penalty, are your feelings such that you simply could not vote answers that would result in a death penalty, or not?

A.   No.

Q.   You can't do it?

A.   Huh-uh.

Q.   No set of circumstances, just your beliefs would prohibit you from imposing the death penalty under any set of circumstances?

A.   Correct.

8 RR 50-51.  The State then challenged Mr. Fountain for cause "on the basis of 102 fever and feelings about the death penalty."  *Id.* at 51.  Defense counsel did not object, and the challenge was granted.  *Id.* at 51-52.

The record is clear, then, that there were two reasons for the State's challenge for cause: Mr. Fountain's fever and his feeling about the death penalty.  While the trial court did not say which ground the challenge was being sustained on, there is nevertheless an implicit factual finding of bias.

*Witt* makes clear that a trial judge is not required to write out in a separate memorandum, his specific findings on each juror excused.   469 U.S. at 430. Moreover, where the record is silent as to the standard employed by a state trial judge, he is presumed to have applied the correct standard.  *Id.* at 432.

For these reasons, this claim must be denied.

### C.   Larry Pedigo, Jo Marie Jones, Larry DeLord, Bartley Rhodes, Craig S. Harding, Steven Wheeler, and James Nobles[49]

Like the claim regarding veniremember Fountain, above, this claim, too is procedurally barred.   And neither *Martinez* nor King's claim alleging ineffective assistance of appellate counsel can overcome that bar because there is simply no merit to this claim.

Each of these veniremembers was found to be qualified, and King challenges each such finding.  Petition at 507-09.  But implicit in each finding by the trial court is a factual finding of the absence of bias.  Moreover, as explained above, the law requires that jurors hearing capital murder trials be able to assess the death penalty if they believe the facts and the evidence warrant it.  Each of these jurors testified that they could and would, unlike Mr. Mallett and Mr. Fountain.

For all these reasons, this claim must fail.

---

[49]   Mr. Pedigo was the only one of these veniremembers who actually sat on King's jury.

## XIV. King Cannot Establish that the State Violated *Brady's*[50] Mandates Regarding Witness Matthew Hoover. (Claim XIV)

King next alleges that the State violated *Brady's* mandates when it failed to disclose that State's witness Matthew Hoover was given a deal in exchange for his testimony.  Petition at 512-23. His sole evidentiary support for this claim is his own self-serving statement in an answer he apparently filed in response to a wrongful death lawsuit filed by Mr. Byrd's family.  *See* PX 23.

As an initial matter, this claim is procedurally barred from federal habeas review because the Court of Criminal Appeals dismissed it as an abuse of the writ.  *Ex parte King*, No. 49,391-02, Order at 2.  Texas's absuse-of-the-writ statute has long been held to be an independent and adequate bar to federal habeas review. *See*, *e.g.*, *Emery*, 139 F.3d at 195-96; *Fearance*, 53 F.3d at 642. And King cannot establish either cause and prejudice or a fundamental miscarriage of justice in order to avoid application of the bar.[51] *See Coleman*, 501 U.S. at 750. In any event, as discussed below, this claim is without merit.

---

[50]     *Brady v. Maryland*, 363 U.S. 83 (1963).

[51]     *Martinez* cannot apply to this claim because by its terms, it only applies to underlying claims of ineffective assistance of trial counsel.  132 S. Ct. at 1318.

To establish a due process violation arising from the State's failure to disclose material exculpatory evidence, King must demonstrate that (1) the prosecution suppressed evidence; (2) the evidence was favorable to him; and (3) the evidence was material either to guilt or punishment. *Brady*, 373 U.S. at 87. *Brady*'s disclosure requirements extend to materials that may be used to impeach a witness. *Strickler v. Greene*, 527 U.S. 263, 282 n.21 (1999). The prosecution, however, has no duty "to make a complete and detailed accounting to defense counsel of all investigatory work done." *Blackmon v. Scott*, 22 F.3d 560, 565 (5th Cir. 1994) (citations omitted). Finally, evidence is constitutionally "material" "only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different" *United States v. Bagley*, 473 US. 667, 682 (1985); *see also Miller v. Dretke*, 404 F.3d 908, 913-16 (5th Cir. 2005) (emphasizing the "reasonable probability" prerequisite to materiality). "The mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial, does not establish 'materiality' in the constitutional sense." *United States v. Agurs,* 427 U.S. 97, 109-10 (1976). Rather, the suppression must undermine confidence in the outcome of the trial. *Kyles v. Whitley*, 514 U.S.419,434 (1995).

King simply cannot establish that the State withheld evidence of a deal—to the extent one even existed—from him.  Indeed, the "four felony

drug charges" King claims were the subject of the alleged deal did not even arise until months *after* Hoover testified at King's trial.  *See* Attachment B.[52] But even if King could establish that there was a deal that the State did not tell defense counsel about, he simply cannot establish materiality.  He cannot show that but for the jurors being told about any deal, they would have found King not guilty of the horrific murder of Mr. Byrd.  It is also important to note that defense counsel's cross-examination of Hoover was useful in rebutting the testimony of Officer Ford regarding the meaning of King's tattoos.  *See* 19 RR 84, 85.  Given that, it seems contradictory that King know questions Hoover's credibility.

In any event, as discussed above, King simply cannot establish materiality.  Hoover was not the only witness to testify about King's racist

---

[52]    Attachment B contains Matthew Hoover's criminal history obtained from PublicData.com.  It indicates that Hoover is currently incarcerated in the Missouri Training Center for Men under a sentence for a total of nine charges.  On April 18, 2000, more than a year after King's trial, Hoover was sentenced on four separate charges:  possession of drug paraphernalia (five-year sentence), manufacture of a controlled substance (seven-year sentence), and two counts of possession of a controlled substance.  The sentences appear to run concurrently.  On October 27, 2000, more than a year and a half after King's trial, Hoover was sentenced for five additional offenses:  second-degree burglary (seven-year sentence), stealing (seven-year sentence), first-degree drug trafficking (twelve-year sentence), and unlawful use of a weapon (five-year sentence).  These sentences also appear to be running concurrently.  While these records do not indicate the date of arrest for these charges, NCIC reports indicate that Hoover was arrested on these charges on May 1999, two to three months *after* King's trial.  But due to restrictions on the use of NCIC reports, undersigned counsel has submitted the PublicData.com information instead.

views, and King's own writings established that he wanted to start a branch of the Confederate Knights of America and how he wanted to do this.  Thus, claim must be denied.

## XV.   Texas's "12/10" Rule Has Long Been Held Constitutional.  (Claim XV)

King next challenges Texas's "12/10" rule, arguing that it violates the Constitution as explained in *Mills v. Maryland*.[53] Petition at 524-37.  But this claim is both procedurally barred and wholly without merit.

As a preliminary matter, this claim was dismissed as an abuse of the writ.  *Ex parte King*, No. 49,391-02, Order at 2.  As cause, King asserts that he was denied effective assistance of counsel on direct appeal, *see* Petition at 537, but that claim, too, is procedurally barred. *See* Section XVI, below. And King cannot overcome *that* procedural bar.   Regardless, this claim is foreclosed by well-established Supreme Court and Fifth Circuit precedent.

Neither the Eighth Amendment nor the Fourteenth Amendment necessitates a jury instruction regarding the consequences of a jury's inability to reach a unanimous verdict during capital sentencing hearings, as the Fifth Circuit has repeatedly held. *See*, *e.g.*, *Druery*, 647 F.3d at 542-45.  But even if this claim had merit—and was not procedurally barred—the Fifth Circuit has also repeatedly held that a claim challenging Texas's "12/10" rule is

---

[53]     486 U.S. 367 (1988).

*Teague*-barred. *See, e.g., id.* at 545; *Alexander v. Johnson*, 211 F.3d 895, 897 (5th Cir. 2000).

For these reasons, this claim must fail.

## XVI. King Was Not Deprived of Constitutionally Effective Assistance of Counsel on Appeal. (Claim XVI)

King next challenges the effectiveness of appellate counsel.  Petition at 538-47.  But like most of the other claims raised in the instant petition, it, too, is procedurally barred. *Ex parte King*, 49,391-02, Order at 2 (citing Tex. Code Crim. Proc. art. 11.071, § 5). And *Martinez* does not help King overcome that bar because it strictly applies to claims that *trial* counsel were ineffective.  132 S. Ct. at 1318.  Even if the Supreme Court extends *Martinez* when it decides *Trevino*, King still cannot overcome the procedural bar. Whether King can overcome any procedural bar, however, is of no moment. Ultimately, this claim is entirely without merit.

The Supreme Court has long held that "[i]t is not required that an attorney argue every conceivable issue on appeal.  Indeed, it is his professional responsibility to choose among potential issues, according to his judgment as to their merit and his tactical approach." *Jones v. Barnes*, 463 U.S. 745, 750 (1983) (internal quotation marks and citation omitted); *see also Burger v. Kemp*, 483 U.S.776, 784 (1987) (decision not to raise "lesser culpability" argument on appeal was strategically sound where client was

~ 117 ~

party who had actually killed victim and where argument had been rejected by state supreme court).  As the Fifth Circuit has explained, "Counsel need not raise every nonfrivolous ground on appeal, but should instead present '[s]olid, meritorious arguments based on directly controlling precedent.'" *Schaetzle v. Cockrell*, 343 F.3d 440, 445 (5th Cir. 2003) (quoting *United States v. Williams*, 183 F.3d 458, 463 (5th Cir. 1999)).  Thus, such a claim is judged under the *Strickland* standard.  *See Smith v. Robbins*, 528 U.S. 259, 285 (2000) (citing *Smith v. Murray*, 477 U.S. 527, 535-46 (1986)); *see also Schaetzle*, 343 F.3d at 444.  Under *Strickland*, King must establish both deficient performance and resultant prejudice.  466 U.S. at 687-88, 690. Importantly, failure to prove either deficient performance or resultant prejudice will defeat an ineffective-assistance-of-counsel claim, making it unnecessary to examine the other prong.  *Id.* at 687.

King can demonstrate neither deficient performance nor prejudice.  In support of his claim, King merely lists the claims raised in the instant petition, asserting that appellate counsel was ineffective for not raising them on direct appeal.  *See* Petition at 539-40.  But as established herein, these claims are all either foreclosed by precedent or unsupported (or even belied) by the record.  Thus, this claim must fail.

## XVII. The Application of Different Capital-Sentencing Schemes in Texas in *Penry I*s[54] aftermath Has Not Resulted in the Arbitrary and Capricious Imposition of the Death Penalty, Either Generally or in King's Case. (Claim XVII)

By this claim, King contends that his death sentence violates the Eighth and Fourteenth Amendments because Texas has employed at least six different capital-sentencing schemes since the early 1970s. Petition at 548-56. As discussed below, this claim is procedurally barred and meritless.

Because this claim was dismissed as abuse of the writ, *see Ex parte King*, No. 49,391-02, Order at 2, it is procedurally barred from federal habeas review unless King can overcome the bar.  And that he cannot do.  *Martinez* is not applicable here because it only applies to allegations of ineffective assistance of trial counsel.  And to the extent he suggests his ineffective-assistance-of-appellate-counsel claim, *see* Petition at 552, that is of no avail. It, too, is procedurally barred, and King cannot overcome *that* bar.  In any event, this claim is patently frivolous.

King's own allegations reflect that there have been only *two* statutory capital-sentencing schemes in effect in Texas in the post-*Furman* era. For those offenses committed prior to September 1, 1991, the special issues formerly codified at Texas Code of Criminal Procedure Article 37.071(b)— asking about deliberateness, future dangerousness and provocation—were

---

[54]    *Penry v. Lynaugh*, 492 U.S. 302 (1989) (*Penry I*).

applied.[55]  For those offense committed after September 1, 1991—like King's––the jury is asked to decide whether a defendant would be a future danger and whether there are any mitigating circumstances that would have resulted in the imposition of a life sentence rather than the death penalty.

Any differences between the statutory schemes is a permissible consequence of the legitimate legislative decision to amend the statute in the wake of *Penry I*.  It does not render sentences under either statutory scheme unconstitutionally arbitrary.[56]  The variations in supplemental mitigation instructions that have been given do not reflect that similarly situated capital defendants are disparately treated and arbitrarily sentenced.[57]  The Supreme Court has stated that where the sentencer's finding of aggravating circumstances is a separate and distinct determination, that determination

---

[55]    For any trials  or retrials occurring after August 29, 1993, the three former special issues are given, along with the mitigation special issue.  *See* Tex. Code Crim. Proc. art. 37.0711.

[56]    Aside from the 1991 and 1993 amendments to Texas Code of Criminal Procedure Article 37.071, King cites only to examples of supplemental mitigation instructions given in attempt to accommodate the *Penry I* decision.

[57]    In any event, even if King demonstrated that a handful of defendants received a grant of mercy, which the State denies, such occasional acts of grace would not render the remaining sentences unconstitutional.  *Gregg v. Georgia*, 428 U.S. 153, 196-97 (1976) (joint opinion); *see also Zant v. Stephens*, 462 U.S. 862, 875-76 (1983).  Further, because King is among those who received the mitigation special instruction, it is difficult to surmise how he could demonstrate that he was prejudiced by any alleged arbitrary action.

rationalizes the death sentence.[58]  *Pulley v. Harris*, 465 U.S. 37, 50 (1984) (citing *Zant v. Stephens*, 462 U.S. at 875-76).  And even with respect to the constitutionally-mandated narrowing, the Court has not authorized the review of state court decisions to ascertain whether an aggravating circumstance has been consistently applied.  *See Arave v. Creech*, 507 U.S. 463, 477 (1993); *see also Spaziano v. Florida*, 468 U.S. 447, 464 (1984) (recognizing each individual state's ability to craft its own capital-sentencing procedures).

The logical extension of King's argument is that constitutional error occurs when two capital defendants are convicted under two independent and constitutionally adequate, but different, statutes.   Such a rule would invalidate all prior (and constitutionally valid) convictions and all subsequent (and still constitutionally valid) convictions any time a state legislature amends its sentencing laws.  Certainly, the Constitution does not require such an absurd result.  And in reviewing a similar claim, the Fifth Circuit has suggested, without deciding, that such a claim "would not likely overcome the bar of *Teague v. Lane* or survive a review on its merits[.]"  *Hicks v. Johnson*, 186 F.3d 634, 637 (5th Cir. 1999) (ultimately denying certificate of

---

[58]    In Texas, the jury's verdict that the defendant is guilty of capital murder constitutes its finding of the existence of an aggravating circumstance or circumstances. *See Jurek*, 428 U.S. at 270-74 (joint opinion).

appealability based on procedural bar arising from Hicks's failure to raise claim in state court).

Finally, King's trial occurred in 1999, almost eight years after the effective date of the legislative amendments to Texas's capital-sentencing scheme. Even assuming there was a period of time when it could be said that Texas's scheme ran the risk of producing arbitrary results, that time has long since passed. King has not demonstrated that Texas's capital-scheme is applied arbitrarily, much less that it was applied arbitrarily to him. As such, this claim is without merit and must be denied.

## XVIII.    The Death Penalty Is Sound Punishment. (Claim XVIII)

King argues that the death penalty, as currently administered in Texas, violates the Eighth Amendment's prohibition against cruel and unusual punishment. Petition at 557-60. As discussed below, this claim is both procedurally barred and meritless.

Because this claim was dismissed as abuse of the writ, *see Ex parte King*, No. 49,391-02, Order at 2, it is procedurally barred from federal habeas review unless King can overcome the bar. And that he cannot do. *Martinez* is not applicable here because it only applies to allegations of ineffective assistance of trial counsel. And to the extent he suggests his ineffective-assistance-of-appellate-counsel claim as cause, Petition at 560, that is of no

avail.  It, too, is procedurally barred, and King cannot overcome *that* bar.  In any event, this claim is patently frivolous.

King appears to rely on two alternative legal theories to support his contention that Texas's death-penalty scheme, and by implication, all such schemes, are unconstitutional.  First, he contends that the death penalty is cruel and unusual because it is inconsistent with "evolving standards of decency that mark the progress of a maturing society."  Petition at 557.  Second, he relies on Justice Blackmun's dissent to the denial of certiorari review in *Callins v. Collins*[59] to support his argument that all death-penalty schemes are unconstitutional "because they are the product of paradoxical constitutional commands:  on the one hand, jurors must be free to consider any and all types of constitutionally relevant mitigating evidence[60], while, on the other hand, there must be 'structured discretion' in sentencing as required by *Furman*."  Petition at 559.[61]  As discussed below, neither of these theories supports King's claim.

---

[59]     510 U.S. 1141 (1994).

[60]     *See Eddings v. Oklahoma*, 455 U.S. 104 (1982); *Lockett v. Ohio*, 438 U.S. 586 (1978) (plurality op.);

[61]     King also appears to challenge the death penalty based on alleged racial discrimination in its assessment in Texas.  *See* Petition at 559-60.  King's citation to studies showing "that a capital murder of a white person is as much as five times more likely to receive a death sentence that a person who murders a black" is puzzling given the facts of this case.  In any event, the Supreme Court rejected such an argument, concluding that a similar study of Georgia's death penalty at most

"It is apparent from the text of the Constitution itself that the existence of capital punishment was accepted by the Framers." *Gregg*, 428 U.S. at 177.[62]   Indeed, in two recent cases, the Court has taken up—directly— challenges to the death penalty, and each time, the Court has upheld its constitutionality. *See Baze v. Rees*, 535 U.S. 35 (2008) (upholding Kentucky's three-drug protocol for lethal injection); *Kansas v. Marsh*, 548 U.S. 163 (2006) (upholding Kansas's death penalty scheme which requires the imposition of the death penalty where the jury was in equipoise as to aggravating and mitigating circumstances).   Indeed, the *Baze* Court specifically reiterated the constitutionality of the death penalty:   "The Eighth Amendment to the Constitution, applicable to the States through the Due Process Clause of the Fourteenth Amendment, …, provides that '[e]xcessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments

---

indicated a discrepancy that appeared to correlate with race, not a constitutionally significant risk of racial bias affecting the capital-sentencing process itself, and thus did not establish a violation of the Eighth Amendment. *McCleskey v. Kemp*, 481 U.S 279, 313 (1987).   This aspect of his challenge to the death penalty is also frivolous because King is Caucasian; thus, he has no basis on which to make this challenge.   Such is not the same as a *Batson* claim where the defendant is permitted to stand in the shoes of a veniremember who was (allegedly) discriminated against.

[62]   *See also Callins v. Collins*, 510 U.S. 1141 (Scalia, J., concurring in the denial of certiorari) ("The Fifth Amendment provides that 'no person shall be held to answer for a capital … crime, unless on a presentment or indictment of a Grand Jury … nor be deprived of life with due process of law.'   This clearly permits the death penalty to be imposed, and establishes beyond doubt that the death penalty is not one of the 'cruel and unusual punishments' prohibited by the Eighth Amendment.").

inflicted.'   We begin with the principle, settled by *Gregg*, that capital punishment is constitutional." 553 U.S. at 47.

The *Gregg* Court further rejected a claim that the death penalty violates "evolving standards of decency" based in part on the fact that thirty-five legislatures had enacted capital-sentencing schemes in *Furman*'s wake.[63] *Id.* at 187.   Moreover, the Supreme Court has held—repeatedly—that the Texas death-penalty scheme in particular satisfies the Eighth Amendment. *See*, *e.g.*, *Penry v. Johnson*, 532 U.S. 782, 803 (2001) (*Penry II*) (citing with approval current statue, under which King was sentenced); *Jurek*, 428 U.S. at 269-71.[64]   The scheme both genuinely narrows the class of death-eligible defendants, thus guarding against the arbitrary and capricious imposition of the death penalty, and provides for individualized sentencing based on the character of the individual defendant and the circumstances of the crime.[65] As such, this claim must fail.

---

[63]    Currently, thirty-three states, the federal government and the military allow for the death penalty.

[64]    Even *Abdul-Kabir v. Quaterman*, approved of the former Texas scheme—prior to the addition of the mitigation special issue—because it "provided an adequate vehicle for the evaluation of mitigating evidence offered to disprove deliberateness or future dangerousness."  550 U.S. 233, 256 (2007). And it at least impliedly approves of the current scheme, under which King was tried and convicted and sentenced to death.  *Id.* at 238 n.2; *see also id.* at 246-56.

[65]    While recognizing the dichotomy between the seemingly at odds *Furman* and *Lockett-Eddings* principles of Eighth Amendment jurisprudence, *see McCleskey*, 481 U.S. at 304, the Supreme Court has repeatedly cited the Texas scheme as an

## XIX.  Texas's Lethal Injection Protocol Does Not Violate the Constitution. (Claim XIX)

King next argues that Texas's use of lethal injection, specifically the old three-drug protocol, violates the Eighth Amendment's prohibition against cruel and unusual punishment.  Petition at 561-75.  For several reasons, this claim must be denied.

Initially, this claim is procedurally barred because it was dismissed as an abuse of the writ.  *Ex parte King*, No. 49,391-02, Order at 2.    It well-settled that Texas's abuse-of-the-writ doctrine is an independent and adequate bar to federal habeas relief.  *See, e.g., Emery*, 139 F.3d at 195-96; *Fearance*, 53 F.3d at 642. And King cannot establish either cause and prejudice or a fundamental miscarriage of justice in order to avoid application of the bar.[66]  *See Coleman*, 501 U.S. at 750. In any event, as discussed below, this claim is without merit.

---

exemplary accommodation of both principles, in part because it effectively insulates the eligibility decision and selection decisions from one another.  *See, e.g., Franklin v. Lynaugh*, 487 U.S. 164, 182 (1988); *Johnson v. Texas*, 509 U.S. 350, 373 (1993); *Lowenfield v. Phelps*, 484 U.S. 231, 245-46 (1988);  *Zant v. Stephens*, 462 U.S. at 875-76 n.13; *Adams v. Texas*, 448 U.S. at 46.

[66]      *Martinez* cannot apply to this claim because by its terms, it only applies to underlying claims of ineffective assistance of trial counsel.  132 S. Ct. at 1318.  To the extent King might argue that ineffective assistance of appellate counsel can serve as cause, *that* claim is also procedurally barred, and King cannot overcome *that* bar.

In *Baze*, the Supreme Court determined that the three-drug protocol used by Kentucky did not violate the Constitution.   535 U.S. at 62 ("Throughout our history, whenever a method of execution has been challenged in this Court has cruel and unusual, the Court has rejected the challenge.   Our society has nonetheless steadily moved to more humane methods of carrying out capital punishment.   The firing squad, hanging, the electric chair, and the gas chamber have each in turn given way to more humane methods, culminating in today's consensus on lethal injection. … The broad framework of the Eighth Amendment has accommodated progress toward more humane methods of execution, and our approval of a particular method in the past has not precluded legislatures from taking the steps they deem appropriate, in light of new developments, to ensure humane capital punishment  There is no reason today's decision will be any different.").   And the Fifth Circuit has recognized that Texas's three-drug protocol is "substantially similar" to the Kentucky protocol.   *See Raby v. Livingston*, 600 F.3d 552, 561-62 (5th Cir. 2010).[67]

---

[67]   To the extent King claims that no Texas court "has held an evidentiary hearing on lethal injection," Petition at 594, he is nearly wrong. Limited discovery was permitted by the district court in *Raby v. Livingston*, 2008 WL 4763677 (S.D. Tex. 2008), but was halted when the Supreme Court issued its opinion in *Baze*. *See Raby*, 600 F.3d at 554-55.   The Fifth Circuit then held that permitting further discovery and/or an evidentiary hearing would violate *Baze*'s safe harbor provision. *Id*. at 561-62.

All of that aside, however, Texas has recently amended its lethal injection protocol to a single-drug protocol.   And the Fifth Circuit has recognized that this, too, survives *Baze*.  *See Thorson v. Epps*, 701 F.3d 444, 447 n.3 (5th Cir. 2012).

For all these reasons, this claim must fail.

## XX.  No Conflict of Interest Arose from the Media Rights Contract Entered into by Defense Counsel. (Claim XX)

King next contends that defense counsel were operating under an actual conflict of interest arising from a media rights contract entered into the day he was sentenced to death. Petition at 576-86. As discussed below, this claim is both procedurally barred and meritless.

Because this claim was dismissed as abuse of the writ, *see Ex parte King*, No. 49,391-02, Order at 2, it is procedurally barred from federal habeas review unless King can overcome the bar.  And that he cannot do.  *Martinez* is not applicable here because it only applies to allegations of ineffective assistance of trial counsel.[68]  In any event, this claim is not without merit.

First, given that the contract was not entered into until *after the representation had ended*, King has failed to demonstrate that any conflict arose from it.  The execution of literary and media rights fee arrangements between attorneys and their clients *during the pendency of a representation*

---

[68]     The Fifth Circuit has "assume[d] without deciding that *Martinez* applies to conflict-of-interest claims."  *Sepulvado*, 707 F.3d at 555 & n.10.

has been uniformly denounced by courts, scholars and organizations of the bar.  *See Beets v. Scott*, 65 F.3d 1258, 1273 n.19 (5th Cir. 1995) (en banc) (citing *United States v. Hearst*, 638 F.2d 1190 (9th Cir. 1980)); Mark R. McDonald, *Literary-Rights Fee Arrangements in California: Letting the Rabbit Guard the Carrot Patch of Sixth Amendment Protection and Attorney Ethics?*, 24 Loy. L. A. Rev. 365 (1991); American Bar Ass'n, Model Code of Professional Responsibility, DR 5-104(B); American Bar Ass'n Model Rules of Professional Conduct, Rule 1.8(d)).   And the Texas Disciplinary Rules of Professional Conduct provide that

> Prior to the conclusion of all aspects of the matter giving rise to the lawyer's employment, a lawyer shall not make or negotiate with a client, prospective client, or former client giving the lawyer literary or media rights to a portrayal or account based in substantial part on information relating to the representation.

Tex. Disciplinary R. Prof'l Conduct 1.08(c).  But the agreement here does not suffer the same flaw.

In *Beets*, the Fifth Circuit noted that "a media rights contract is offensive because it may encourage counsel to misuse the judicial process for the sake of his enrichment and publicity-seeking[.]"  65 F.3d at 1273; *see also* Tex. Disciplinary R. Prof'l Conduct 1.08(c) cmt. 4 ("Measures suitable in the representation of the client may detract from publication value of an account of representation.").  In a case like this, where the agreement did not exist

~ 129 ~

until the trial was over, there is no basis to infer that counsel's performance at trial was somehow compromised by the agreement.[69]

Moreover, the arrangement clearly was not part of any fee or a condition of accepting the case, given that trial counsel represented King pursuant to a court appointment.  Indeed, the agreement provided that any proceeds from the media rights would be divided equally, one-third going to each of King's two trial attorneys and Kings' father.  Thus, it is likely that the agreement was entered into, as set forth, for "the mutual benefit of the parties."  For a share of the proceeds, King's trial attorneys would essentially act as agents with regard to the media rights.  And King's father would receive a share of the proceeds as well as the benefit of having someone more qualified act as agent in promoting those rights.[70]  Thus, the contract simply did not create an conflict of interest.

Second, if the contract could be said to have retroactively created a conflict of interest, the Fifth Circuit has held that the *Strickland* framework applies, rather than the presumed-prejudice framework of *Cuyler v.*

---

[69]   In *Beets*, the petitioner had signed a contract transferring all literary and media rights in her case to her attorney's son.  She did this shortly after her trial commenced and after negotiations fell through to obtain the attorney's fees from Beets's children.  65 F.3d at 1261-262.

[70]   While King repeatedly asserts that his trial attorneys "coerced" him into signing the contract, *see* Petition at 576, there is absolutely nothing in the record to support that assertion, and, in fact, the terms of the agreement itself belie that assertion.  *See* PX 37.

*Sullivan.*[71] *Beets*, 65 F.3d at 1272. As explained above, King has failed to demonstrate that he was prejudiced by any action or inaction of defense counsel. Particularly with regard to counsel's handling of King's "version of events" and mental health evidence, which King claims was adversely affected by the media rights contract, *see* Petition at 576-77, 578, 586, trial counsel explained the efforts that were taken in these areas and the tactical reasons for the decisions they made in the affidavit submitted during the first state habeas proceedings. *See* SHCR-01 140-45.

Finally, even if *Sullivan* applied, King cannot show that counsel's performance was adversely affected by the alleged conflict. 446 U.S. at 348 (holding that prejudice will only be presumed where (1) counsel is "actively representing conflicting interests," and (2) "an actual conflict of interest adversely affected his lawyer's performance[]"); *see also Mickens v. Taylor*, 535 U.S. 162, 172 n.5 (2002). As to what constitutes an "adverse effect," the Fifth Circuit has explained that such "may be established with evidence that 'some plausible alternative defense strategy or tactic' could have been pursued, but was not because of the conflict impairing counsel's performance." *Perillo v. Johnson*, 205 F.3d 775, 781 (5th Cir. 2000). Although the *Perillo* court acknowledged that an actual conflict may exist if, for example, an attorney is placed in the situation of cross examining a

---

[71]    446 U.S. 335 (1980).

former client, the court explained that "in keeping with the requirement for an actual, as opposed to a mere hypothetical or possible conflict, this Court has also held that something more must be shown to demonstrate that the inherent potential for conflict actually moved into the realm of actual conflict." *Id.* at 801-02.  Here, the record simply does not demonstrate that the contract induced trial counsel to compromise their zealous representation of King in favor of their own pecuniary interest.  Counsel was charged with the near impossible task of defending a remorseless killer.  The crime with which he was charged was one of the most notorious and heinous in Texas history.  Its brutality cannot be overstated.   Under these circumstances, counsel's representation was certainly—and at the very least— constitutionally effective.

For all these reasons, this claim must fail.

## XXI. The Cumulative Error Doctrine Does Not Entitle King to Relief. (Claim XXI).

In his final claim for relief, King contends that even if no single error is significant enough to warrant reversal of his conviction, the cumulative effect of all the errors together is enough.  Petition at 587-90.  As an initial matter, this claim is procedurally barred because it was dismissed as an abuse of the writ.  *Ex parte King*, 49,391-02, Order at 2.  Texas's  abuse-of-the-writ doctrine has long been held to be an independent and adequate bar to federal

habeas relief.  *See, e.g., Emery*, 139 F.3d at 195-96; *Fearance*, 53 F.3d at 642. And King cannot establish either cause and prejudice or a fundamental miscarriage of justice in order to avoid application of the bar. *See Coleman*, 501 U.S. at 750. In any event, as discussed below, this claim is without merit.

As discussed above, none of King's claims have any merit; therefore, there can be no cumulative effect.   Noting that cumulative error is an infinitely expandable concept, and that granting habeas relief for aggregated non-constitutional errors may too easily conflict with established limits on the scope of federal habeas relief, the Fifth Circuit has pointed that such claims are not favored. *See Derden v. McNeel*, 978 F.2d 1453, 1457-458 (5th Cir. 1992) (also noting, "[o]ur research has revealed only two cases in which federal habeas relief was granted because of an accumulation of trial court errors[]").  The court then required that any such claim refer to errors in the trial court of constitutional dimension and that the errors complained of must not have been procedurally barred on federal habeas review. *Id.* at 1458; *see also Coble*, 444 F.3d at 355 ("Federal habeas relief is only available for cumulative errors that are of constitutional dimension." (citing *Livingston*, 107 F.3d at 309)); *Westley*, 83 F.3d at 726 (holding that "[m]eritless claims or claims that are not prejudicial [or claims that are procedurally barred] cannot be cumulated, regardless of the total number raised" (citation omitted)). Finally, the federal habeas court must review the record as a whole to

determine whether errors more likely than not caused a suspect verdict. *Derden*, 978 F.2d at 1458.

These requirements in themselves preclude the consideration of most of King's claimed errors, even if those errors *were* found to have merit. In any case, however, none of the alleged errors could have cumulatively caused a suspect verdict because the individual claims wholly lack merit. And because they individually lack merit, they also cumulatively lack merit. Therefore, King is not entitled to federal habeas relief on this claim.

## CONCLUSION

For the foregoing reasons—and considering the totality of the record— the State respectfully requests that this Court deny King's petition for federal habeas relief.

Respectfully submitted,

GREG ABBOTT
Attorney General of Texas

DANIEL T. HODGE
First Assistant Attorney General

DON CLEMMER
Deputy Attorney General
For Criminal Justice

EDWARD L. MARSHALL
Chief, Criminal Appeals Division

~ 134 ~

*Counsel of Record

s/ Fredericka Sargent
*FREDERICKA SARGENT
Assistant Attorney General
Criminal Appeals Division
Texas Bar No. 24027829
P.O. Box 12548, Capitol Station
Austin, Texas 78711
Tel: (512) 936-1600
Fax: (512) 320-8132
e-mail:
fredericka.sargent@oag.state.tx.us

ATTORNEYS FOR RESPONDENT

**CERTIFICATE OF SERVICE**

I hereby certify that on Monday, April 22, 2013, I electronically filed the foregoing document with the clerk of the court for the U.S. District Court, Eastern District of Texas, using the electronic case filing system of the court. The electronic case filing system sent a "Notice of Electronic Filing" to the following attorney of record who has consented in writing to accept this Notice as service of this document by electronic means:

A. Richard Ellis
75 Magee Drive
Mill Valley, CA 94941
a.r.ellis@att.net


     s/  Fredericka Sargent
FREDERICKA SARGENT
Assistant Attorney General

~ 136 ~