**UNITED STATES DISTRICT COURT**                    **EASTERN DISTRICT OF TEXAS**

| | | |
|---|---|---|
| JOHN WILLIAM KING, | § | |
| | § | |
| Petitioner, | § | |
| | § | |
| *versus* | § | CIVIL ACTION NO. 1:01-CV-435 |
| | § | |
| DIRECTOR, TDCJ-CID, | § | |
| | § | |
| Respondent. | § | |

## MEMORANDUM AND ORDER

Petitioner John William King ("King"), an inmate confined in the Texas prison system, seeks a writ of habeas corpus pursuant to 28 U.S.C. § 2254. King is challenging his capital murder conviction and death sentence imposed by the 1st Judicial District Court of Jasper County, Texas, in Cause Number 8869, in a case styled *The State of Texas v. John William King*. The Director argues that the claims remaining before the court are procedurally barred. Having reviewed the submissions of the parties, the state court record, and the applicable law, the court is of the opinion the petition should be denied, and a certificate of appealability should not be issued.

I.      Procedural History

King was sentenced to death for the murder of James Byrd, Jr. The offense took place on June 7, 1998. Based on the jury's answers to the special issues set forth in Article 37.071 of the Texas Code of Criminal Procedure, the trial court sentenced King to death on February 25, 1999. The Texas Court of Criminal Appeals ("TCCA") affirmed the conviction. *King v. State*, 29 S.W.3d 556 (Tex. Crim. App. 2000). King did not file a petition for a writ of certiorari.

While the direct appeal was pending, King filed an application for a writ of habeas corpus in state court. The state habeas court entered findings of fact and conclusions of law recommending that relief be denied. The TCCA denied the application without written order. *Ex parte King*, No. WR-49,391-01 (Tex. Crim. App. June 20, 2001) (unpublished order).

The present proceeding began on June 28, 2001. Most of the claims presented by King were not presented to the state courts. On March 29, 2006, the court granted the Director's motion for summary judgment with respect to the grounds for relief that had been exhausted. The court granted King's motion to hold the case in abeyance while he presented his remaining claims to the state court system. His second state application was dismissed as an abuse of the writ without consideration of the merits of the claims pursuant to Tex. Code Crim. Proc. Art. 11.071 § 5(c). *Ex parte King*, No. WR-49,391-02, 2012 WL 3996836 (Tex. Crim. App. Sept. 12, 2012).

King returned to this court and filed an amended petition (#75) on January 21, 2013. The Director filed an answer (#77) on April 22, 2013. King filed a reply (#89) on August 20, 2013.

II.    Factual Background

The TCCA discussed the factual background of the crime as follows:

The evidence at trial showed the following: George Mahathy, a life-long acquaintance of the victim, James Byrd, Jr., saw him at a party on Saturday night, June 6, 1998. Byrd left the party around 1:30 or 2:00 in the morning. Byrd asked Mahathy for a ride home, but Mahathy was riding home with someone else. As Mahathy was leaving the party, he saw Byrd walking down the road towards home, which was about a mile from the party. Steven Scott, who had known Byrd for several years, also saw him walking down the road that night. After arriving home a few minutes later, at around 2:30 a.m., Scott saw Byrd pass by in the back of an old model, step-side pickup truck painted primer-gray. Three white people were riding in the cab of the truck.

On June 7, 1998, police officers responded to a call to go to Huff Creek Road in the town of Jasper. In the road, in front of a church, they discovered the body of an African–American male missing the head, neck, and right arm. The remains of pants and

underwear were gathered around the victim's ankles. About a mile and a half up the road, they discovered the head, neck, and arm by a culvert in a driveway.

A trail of smeared blood and drag marks led from the victim's torso to the detached upper portion of the victim's body and continued another mile and a half down Huff Creek Road and a dirt logging road. A wallet found on the logging road contained identification for James Byrd, Jr., a Jasper resident. Along the route, police also found Byrd's dentures, keys, shirt, undershirt, and watch. At the end of the logging road, the trail culminated in an area of matted-down grass, which appeared to be the scene of a fight. At this site and along the logging road, the police discovered a cigarette lighter engraved with the words "Possum" and "KKK," a nut driver wrench inscribed with the name "Berry," three cigarette butts, a can of "fix-a-flat," a compact disk, a woman's watch, a can of black spray paint, a pack of Marlboro Lights cigarettes, beer bottles, a button from Byrd's shirt, and Byrd's baseball cap.

The following evening, police stopped Shawn Berry for a traffic violation in his primer-gray pickup truck. Behind the front seat, police discovered a set of tools matching the wrench found at the fight scene. They arrested Berry and confiscated the truck. DNA testing revealed that blood spatters underneath the truck and on one of the truck's tires matched Byrd's DNA. In the bed of the truck, police noticed a rust stain in a chain pattern and detected blood matching Byrd's on a spare tire.

Six tires that were on or associated with Berry's truck were examined. Three of the four tires on the truck were of different makes. Tire casts taken at the fight scene and in front of the church where the torso was found were consistent with each of these tires. An FBI chemist detected a substance consistent with fix-a-flat inside one of the six tires.

Shawn Berry shared an apartment with Lawrence Russell Brewer and [King]. Police and FBI agents searched the apartment and confiscated [King's] drawings and writings as well as clothing and shoes of each of the three roommates. DNA analysis revealed that the jeans and boots that Berry had been wearing on the night of the murder were stained with blood matching Byrd's DNA. An analyst with the FBI lab determined that a shoe print found near a large blood stain on the logging road was made by a Rugged Outback brand sandal. [King] owned a pair of Rugged Outback sandals and had been seen wearing them on the evening of the murder. Shawn Berry also owned a pair of Rugged Outback sandals that were a half size different from [King's]. One of the pairs of these sandals confiscated from the apartment bore a blood stain matching Byrd's DNA. A Nike tennis shoe with the initials "L.B." in the tongue also was stained with blood matching Byrd's.

DNA analysis was also conducted on three cigarette butts taken from the fight scene and logging road. DNA on one of the cigarette butts established [King] as the major contributor, and excluded Berry and Brewer as contributors, but could not exclude Byrd as a minor contributor. Brewer was the sole contributor of DNA on the second cigarette

butt. The third cigarette butt revealed DNA from both a major and minor contributor. Shawn Berry was established as the major contributor of DNA on the third cigarette butt; however, [King], Brewer, and Byrd were all excluded as possible minor contributors of the additional DNA.

Tommy Faulk testified that Berry, Brewer, and [King] frequented his home and had played paintball in the woods behind his trailer. Police conducted a search of these woods and found a large hole covered by plywood and debris. Underneath the cover, they discovered a 24–foot logging chain that matched the rust imprint in the bed of Berry's truck.

The State presented evidence of [King's] racial animosity, particularly towards African–Americans. Several witnesses testified about how [King] refused to go to the home of an African–American and would leave a party if an African–American arrived. In prison, [King] was known as the "exalted cyclops" of the Confederate Knights of America ("CKA"), a white supremacist gang. Among the tattoos covering [King's] body were a woodpecker in a Ku Klux Klansman's uniform making an obscene gesture; a "patch" incorporating "KKK," a swastika, and "Aryan Pride"; and a black man with a noose around his neck hanging from a tree. [King] had on occasion displayed these tattoos to people and had been heard to remark, "See my little nigger hanging from a tree."

A gang expert reviewed the writings that were seized from the apartment and testified that [King] had used persuasive language to try to convince others to join in his racist beliefs. The writings revealed that [King] intended to start a chapter of the CKA in Jasper and was planning for something big to happen on July 4, 1998. The expert explained that to gain credibility [King] would need to do something "public." He testified that leaving Byrd's body in the street in front of a church—as opposed to hiding it in one of the many wooded areas around town—demonstrated that the crime was designed to strike terror in the community.

[King] neither testified nor made a formal statement to police. But he sent letters concerning the night of the murder to the Dallas Morning News and to Russell Brewer while he and Brewer were in jail awaiting trial. The following portion of the letter to the Dallas Morning News was read into the record:

> Given a description as to the whereabouts of the dirt trail where an alleged beating of the deceased occurred, it's essential to acknowledge the fact that Shawn Berry co-inherited a small tract of land adjacent to the tram road, which he visited quite frequently.
>
> Therefore, the fact that my cigarette lighter with "Possum" inscribed upon it was found near the scene of the crime, along with other items—i.e., several hand tools with "Berry" inscribed on them, a compact disk belonging to Shawn Berry's brother Lewis, and my girlfriend's watch,

as well as items of the deceased—are all verified facts implicating that these items could have fallen from Shawn Berry's truck during a potential struggle with the deceased while on the tram road.

However, unacknowledged facts remain, that I, along with Russell Brewer and Lewis Berry, had been borrowing Shawn Berry's truck to commute to and from an out-of-town land clearing job each day. My girlfriend's watch was kept in Shawn Berry's truck for us to keep track of the time. Lewis Berry had brought along several of his C.D.s for our listening pleasure during our hourly drive each morning and evening, which he had a tendency to leave in his brother's truck.

Furthermore, the aforementioned cigarette lighter had been misplaced a week or so prior to these fraudulent charges that have been brought against Russell Brewer and me. This, so forth, does not prove the presence of my girlfriend, Lewis Berry, Russell Brewer nor myself at the scene of the crime, verifiably only the owners of the property in question.

* * *

Several statements and the theories against Shawn Berry, Russell Brewer, and myself, John W. King, for a prospective motive in this hard crime have been presented to the public. Against the wishes of my attorney, I shall share with you objective facts and my account of what happened during the early morning hours of June 7th, 1998.

After a couple of hours of drinking beer and riding up and down rural roads adjacent to Highway 255 off Highway 63, looking for a female's home, who were expecting Shawn Berry and Russell Brewer, Berry though [*sic*] frivolous anger and fun at first, begun [*sic*] to run over area residents' mail boxes and stop signs with his truck due to negligence in locating the girl's residence.

Becoming irate with our continued failure to locate the female's house, Shawn Berry's behavior quickly became ballistic as he sped through area residents' yards in a circular manner and made a racket with his truck's tailpipes managing to sling our ice chest from the back of his truck several times.

During his little conniption fit, Shawn Berry then stopped just ahead of a mailbox on Highway 255, took a chain from the back of his truck, wrapped it around the post of the mailbox, and proceeded to uproot and drag the mailbox east on Highway 255, stopping yards short of the Highway 63 north intersection, where he then removed his chain, replaced

it, and continued to drive to a local convenience store, Rayburn Superette, to try to call the female who was expecting him and Brewer.

Fortunately no one answered at the girl's house and after repeated requests from me, as well as complaints from Russell Brewer, of a throbbing toe he injured during a recovery of our ice chest, Shawn Berry then agreed to take us to my apartment.

Shawn Allen Berry, driving with a suspended license and intoxicated, while taking Russell Brewer and me home those early morning hours, decided to stop by a mutual friend of ours home located on McQueen Street to inquire as to what the residents and his brother Lewis Berry were doing. On our way there, we passed a black man walking east on Martin Luther King Drive, whom Shawn Berry recognized and identified as simply Byrd, a man he befriended while incarcerated in the Jasper County Jail and, Berry stated, supplied him with steroids.

Shawn Berry then proceeded to stop his truck approximately 10 yards ahead of this individual walking in our direction, exit his vehicle, and approach the man. After several minutes of conversation, Shawn Berry returned to the truck and said his friend was going to join us because Berry and Byrd had business to discuss later and, thus, Byrd climbed into the back of Shawn Berry's truck and seated himself directly behind the cab.

While continuing on to our friend's residence where supposedly Lewis Berry was to be, we noticed there were neither lights on nor signs of activity in the trailer as we approached. We decided to proceed on to my apartment; but contrary to Russell Brewer's and my request, Shawn Berry drove to and stopped at another local convenience store, B.J's Grocery, just east of the Jasper city limits. Shawn Berry then asked Russell Brewer if he could borrow 50 to $60 because he needed a little extra cash to replenish his juice, steroid supply.

After Brewer gave Shawn Berry the remainder of what money he had to return to Sulphur Springs, Texas, on, Berry asked if Russell Brewer and I could ride in the back of the truck and let his friend sit up front to discuss the purchase and payment of more steroids for Shawn Berry. Russell Brewer and I obliged on the condition Berry take us to my apartment without further delay, which, after a brief exchange of positions, he did.

Once we arrived at my apartment, Shawn Berry informed Russell Brewer and me that he was leaving so that he could take Byrd to get the steroids and then home. [He] asked if Brewer or I [c]ould bring a small

cooler of beer down for him and his friend along with a bottle of bourbon Berry had bought a few days prior.

Russell Brewer and I went up to my apartment and began to fill a small cooler with approximately six to eight beers. Realizing I left my wallet and cigarettes in Shawn Berry's truck, I opted to bring the cooler back down to Berry. After retrieving my wallet, but unable to locate my cigarettes, I then returned upstairs to my apartment, into my bedroom, and proceeded to call an ex-girlfriend before retiring to bed in the predawn hours of June 7th, 1998.

A portion of the note [King] wrote to Brewer was as follows:

As for the clothes they took from the apt. I do know that one pair of shoes they took were Shawn's dress boots with blood on them, as well as pants with blood on them. As far as the clothes I had on, I don't think any blood was on my pants or sweat shirt, but I think my sandals may have had some dark brown substance on the bottom of them.

\* \* \*

Seriously, though, Bro, regardless of the outcome of this, we have made history and shall die proudly remembered if need be…. Much Aryan love, respect, and honor, my brother in arms…. Possum.

Dr. Tommy Brown, a forensic pathologist, testified that he received Byrd's head, neck, and arm separately from the main torso. The autopsy revealed extensive injuries all over Byrd's body. Nearly all of Byrd's anterior ribs were fractured. He suffered "massive brush burn abrasions" over most of his body. Both testicles were missing and gravel was found in the scrotal sac. Both knees and part of his feet had been ground down, his left cheek was ground to the jawbone, and his buttocks were ground down to the sacrum and lower spine. Some of his toes were missing and others were fractured. Large lacerations of the legs exposed muscle. But his brain and skull were intact, exhibiting no lacerations, fractures, or bruises.

Brown concluded that the lacerations and abrasions around Byrd's ankles were consistent with the ankles having been wrapped by a chain and that the abrasions all over Byrd's body were consistent with him being dragged by his ankles over a road surface. Red regions around the area where Byrd's upper and lower body separated indicated that Byrd's heart was still pumping and that he was alive when his body was torn apart by the culvert. Therefore, Brown determined that the cause of death was separation of the head and upper extremity from the rest of the body. Some of the wound shapes and patterns indicated that Byrd was conscious while he was being dragged and was trying to relieve the intense burning pain by rolling and swapping one part of his body for another. Also,

the absence of injuries to Byrd's brain and skull suggested that he was trying to hold his head up while being dragged.

*King v. State*, 29 S.W.3d at 558-62 (footnotes omitted).  The TCCA found that the evidence was legally sufficient to prove that King murdered Byrd in the course of committing or attempting to commit kidnapping.  *Id.* at 563-64.  The TCCA rejected King's claim that the evidence was insufficient to show that he was a party to the offense.  *Id.* at 564-65.  Moreover, the Court held that there was no "manifest injustice" in the conviction.  *Id.* at 565.

III.    <u>Grounds for Relief</u>

King presents the following grounds for relief:

1.    King's trial and appellate attorneys were ineffective for the following reasons:

    a.    presenting through their own expert Dr. Quijano and allowing the State to present through Dr. Gripon a false, misleading and incoherent expert's framework for the first special issue of "future dangerousness";

    b.    failing to present the motion for a change of venue adequately;

    c.    failing to make an opening argument;

    d.    making totally ineffective and harmful final arguments during both phases of the trial;

    e.    failing to present any viable case during the punishment phase of the trial;

    f.    failing to object to the unqualified and erroneous testimony on tattoos by a local police officer;

    g.    failing to object to the unqualified and inaccurate testimony of "gang expert" William Knox;

    h.    failing to object to prosecutorial misconduct, trial error, and hearsay;

    I.    failing to investigate and present mental health information;

    j.    failing to challenge flawed testimony by the coroner, Dr. Tommy Brown;

    k.    failing to urge his motion to withdraw adequately;

    l.    failing to object to punishment phase "future dangerousness" testimony of Dr. Edward Gripon; and

    m.    cumulative error.

2.    Trial counsel's deficient performance in not presenting a viable defense of King's actual innocence constitutes ineffective assistance of counsel.

3.     The trial court violated King's rights under the Sixth and Fourteenth Amendments to the United States Constitution when it denied his request for different trial counsel and trial counsel's motion to withdraw.

4.     King's rights under the First and Fourteenth Amendments were violated by the admission of evidence during both phases of his trial relating to his abstract beliefs, since there was not a sufficient "nexus" between his beliefs and the crime.

5.     The admission of unreliable and unscientific testimony about the likelihood of King's future dangerousness violated King's rights under the Eighth and Fourteenth Amendments.

6.     The Texas special sentencing issues deprived King of his Sixth and Fourteenth Amendment rights to have a jury determine, beyond a reasonable doubt, every fact that operated to increase the punishment authorized.

7.     The State's introduction of evidence of unconvicted offenses and the jury's consideration of that evidence violated King's rights under the Sixth, Eighth and Fourteenth Amendments.

8.     Due to pervasive and extensive pre-trial publicity, King's trial was conducted in a prejudicial atmosphere that made the trial process inherently unfair and deprived him of due process.

9.     The totality of the prejudicial circumstances and atmosphere surrounding the trial deprived King of his Fifth, Sixth, Eighth, and Fourteenth Amendment rights and violated his right to due process of law.

10.    King was deprived of his right to a fair trial in violation of his rights under the Sixth, Eighth, and Fourteenth Amendments when the trial court refused to grant his motion for a change of venue despite overwhelming prejudice against him in Jasper.

11.    King was denied meaningful access to the courts and due process of law in state post-conviction proceedings and was denied competent counsel for his initial state habeas proceedings by unconstitutional state court action.

12.    King's trial attorneys were ineffective in not obtaining and/or using a confidential expert to examine their client for purposes of both the guilt/innocence and punishment phases of the trial.

13.    King's jury was fundamentally biased against him due to errors of the trial court in death-qualifying the jury.

14. The State's failure to disclose a deal made with a prosecution witness undermines confidence in the reliability of the verdict.

15. Tex. Code Crim. Proc. Art. 37.071 (e) & (g)'s prohibition against informing jurors that a single holdout juror will cause the imposition of a life sentence violated King's rights under the Eighth and Fourteenth Amendments.

16. King was denied the right to the effective assistance of appellate counsel in violation of the Sixth, Eighth, and Fourteenth Amendments.

17. In view of the many different capital sentencing schemes that have been in operation in Texas in recent years, the Texas death penalty has been arbitrarily imposed and, thus, is unconstitutional under the Eighth Amendment and Equal Protection Clause of the Fourteenth Amendment.

18. The death penalty, at least as presently administered in Texas, is cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments.

19. Lethal injection is cruel and unusual punishment under the Eighth Amendment.

20. Trial counsel were operating under a conflict of interest in violation of King's rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments.

21. The cumulative effect of the errors during King's trial denied him the right to due process under the Fourteenth Amendment.

In the previous memorandum opinion (#64), the court granted the Director's motion for summary judgment on sub-claim "I" of King's first claim, his third claim, his eleventh claim, and the first sub-claim of his twelfth claim. The court granted King's motion to hold the case in abeyance while he presented the remaining claims and sub-claims to the appropriate state court. The TCCA subsequently dismissed the application containing these claims and sub-claims as an abuse of the writ without consideration of the merits of the claims pursuant to Tex. Code Crim. Proc. Art. 11.071 § 5(c). For the remainder of this memorandum, the court shall refer to such claims collectively as King's remaining claims.

IV.    Exhaustion and Procedural Bar

The Director correctly observes that none of the remaining claims was exhausted at the time the petition was filed.  He argues the claims should be rejected as procedurally barred in light of the TCCA's decision dismissing the subsequent application as an abuse of the writ.

The analysis of King's claims should begin with a discussion of the exhaustion requirement.  State prisoners bringing petitions for a writ of habeas corpus are required to exhaust their state remedies before proceeding to federal court unless "there is an absence of available State corrective process" or "circumstances exist that render such process ineffective to protect the rights of the applicant."  28 U.S.C. § 2254(b)(1).  In order to exhaust properly, a state prisoner must "fairly present" all of his claims to the state court.  *Picard v. Connor*, 404 U.S. 270, 275 (1971).  In Texas, all claims must be presented to and ruled upon the merits by the TCCA.  *Richardson v. Procunier*, 762 F.2d 429, 432 (5th Cir. 1985).  When a petition includes claims that have been exhausted along with claims that have not been exhausted, it is called a "mixed petition," and historically federal courts in Texas have dismissed the entire petition for failure to exhaust.  *See, e.g.*, *Galtieri v. Wainwright*, 582 F.2d 348, 355 (5th Cir. 1978) (en banc).

The exhaustion requirement, however, was profoundly affected by the procedural default doctrine that was announced by the United States Supreme Court in *Coleman v. Thompson*, 501 U.S. 722 (1991).  The Court explained the doctrine as follows:

> In all cases in which a state prisoner has defaulted his federal claims in state court pursuant to an independent and adequate state procedural rule, federal habeas review of the claims is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice.

*Id.* at 750. As a result of *Coleman*, unexhausted claims in a mixed petition are ordinarily dismissed as procedurally barred. *Fearance v. Scott*, 56 F.3d 633, 642 (5th Cir.), *cert. denied*, 515 U.S. 1153 (1995). *See also Finley v. Johnson*, 243 F.3d 215, 220 (5th Cir. 2001). Such unexhausted claims are procedurally barred because if a petitioner attempted to exhaust them in state court, they would be barred by Texas abuse-of-the-writ rules. *Fearance*, 56 F.3d at 642. The procedural bar may be overcome by demonstrating either cause and prejudice for the default or that a fundamental miscarriage of justice would result from the court's refusal to consider the claim. *Id.* (citing *Coleman*, 501 U.S. at 750-51). Dismissals pursuant to abuse of writ principles have regularly been upheld as a valid state procedural bar foreclosing federal habeas review. *See Moore v. Quarterman*, 534 F.3d 454, 463 (5th Cir. 2008); *Hughes v. Quarterman*, 530 F.3d 336, 342 (5th Cir. 2008), *cert. denied*, 556 U.S. 1239 (2009); *Coleman v. Quarterman*, 456 F.3d 537, 542 (5th Cir. 2006), *cert. denied*, 549 U.S. 1343 (2007).

In the case at bar, the TCCA dismissed all of King's remaining claims as an abuse of the writ without consideration of the merits of the claims pursuant to Tex. Code Crim. Proc. Art. 11.071 § 5(c). Until just recently, the remaining claims would have undoubtedly been dismissed as procedurally barred in light of the decision by the TCCA dismissing them as an abuse of the writ. The Supreme Court, however, opened the door slightly for a showing of cause and prejudice to excuse the default in *Martinez v. Ryan*, 132 S. Ct. 1309 (2012) and *Trevino v. Thaler*, 133 S. Ct. 1911 (2013). In *Martinez*, the Supreme Court answered a question left open in *Coleman*: "whether a prisoner has a right to effective counsel in collateral proceedings which provide the first occasion to raise a claim of ineffective assistance at trial." 132 S. Ct. at 1315. These proceedings were referred to as "initial-review collateral proceedings." *Id.* The Court held:

Where, under state law, claims of ineffective assistance of trial counsel must be raised in an initial-review collateral proceeding, a procedural default will not bar a federal habeas court from hearing a substantial claim of ineffective assistance of counsel at trial if, in the initial-review collateral proceeding, there was no counsel or counsel in that proceeding was ineffective.

*Id.* at 1320.

The Supreme Court extended *Martinez* to Texas in *Trevino*. Although Texas does not preclude appellants from raising ineffective assistance of trial counsel claims on direct appeal, the Court held that the rule in *Martinez* applies because "the Texas procedural system - as a matter of its structure, design, and operation - does not offer most defendants a meaningful opportunity to present a claim of ineffective assistance of trial counsel on direct appeal." *Trevino*, 133 S. Ct. at 1921. The Court left it to the lower courts to determine on remand whether Trevino's claim of ineffective assistance of counsel was substantial and whether his initial state habeas attorney was ineffective. *Id.*

The United States Court of Appeals for the Fifth Circuit has summarized the rule announced in *Martinez* and *Trevino* as follows:

To succeed in establishing cause to excuse the procedural default of his ineffective assistance of trial counsel claims, [petitioner] must show that (1) his underlying claims of ineffective assistance of trial counsel are "substantial," meaning that he "must demonstrate that the claim[s] ha[ve] some merit," *Martinez*, 132 S. Ct. at 1318; and (2) his initial state habeas counsel was ineffective in failing to present those claims in his first state habeas application. *See id.*; *Trevino*, 133 S. Ct. at 1921.

*Preyor v. Stephens*, 537 F. App'x 412, 421 (5th Cir. 2013), *cert. denied*, 134 S. Ct. 2821 (2014).

"Conversely, the petitioner's failure to establish the deficiency of either attorney precludes a finding of cause and prejudice." *Sells v. Stephens*, 536 F. App'x 483, 492 (5th Cir. 2013), *cert. denied*, 134 S. Ct. 1786 (2014). The Fifth Circuit recently reaffirmed this basic approach in *Reed*

*v. Stephens*, 739 F.3d 753, 774 (5th Cir.), *cert. denied*, 135 S. Ct. 435 (2014). The Fifth Circuit has also reiterated that a federal court is barred from reviewing a procedurally defaulted claim unless a petitioner shows both cause and actual prejudice. *Hernandez v. Stephens*, 537 F. App'x 531, 542 (5th Cir. 2013), *cert. denied*, 134 S. Ct. 1760 (2014). To show actual prejudice, a petitioner "must establish not merely that the errors at his trial created a *possibility* of prejudice, but that they worked to his *actual* and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *Id.* (citations omitted) (emphasis in original).

All of King's remaining claims must be dismissed as procedurally barred unless he can satisfy the rule announced in *Martinez* and *Trevino*.

V.     Discussion and Analysis

A.     Ineffective Assistance of Counsel

King's first ground for relief involves allegations of ineffective assistance of trial and appellate counsel. He includes thirteen sub-claims. Sub-claim "I" was rejected in the court's previous memorandum opinion. All of the remaining sub-claims are procedurally barred in the absence of a showing of cause and prejudice. The rule announced in *Martinez* and *Trevino* provides for a possible showing of cause and prejudice with respect to substantial claims of ineffective assistance of trial counsel, but the rule does not extend to claims of ineffective assistance of appellate counsel. The Fifth Circuit has specifically declined to extend *Martinez* to ineffective assistance of appellate counsel claims. *Reed*, 739 F.3d at 778 n.16. Thus King's claims alleging ineffective assistance of appellate counsel are procedurally barred.

The ineffective assistance of trial counsel claims are governed by the standard set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). *See Martinez*, 132 S. Ct. at 1318 (applying the

*Strickland* framework). *Strickland* provides a two-pronged standard, and a petitioner bears the burden of proving both prongs. 466 U.S. at 687. Under the first prong, he must show that counsel's performance was deficient. *Id.* To establish deficient performance, he must show that "counsel's representation fell below an objective standard of reasonableness," with reasonableness judged under professional norms prevailing at the time counsel rendered assistance. *Id.* at 688. "Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. . . . A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight." *Id.* at 689 (citations omitted). "Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Id.* (internal quotation marks omitted). Under the second prong, the petitioner must show that his attorney's deficient performance resulted in prejudice. *Id.* at 687. To satisfy the prejudice prong, the habeas petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694. An ineffective assistance of counsel claim fails if a petitioner cannot satisfy either the deficient performance or prejudice prong; a court need not evaluate both if he makes an insufficient showing as to either. *Id.* at 697.

Most recently, the Supreme Court discussed the difficulties associated with proving ineffective assistance of counsel claims as follows:

> "Surmounting *Strickland*'s high bar is never an easy task." *Padilla v. Kentucky*, 559 U.S. 356, 371, 130 S. Ct. 1473, 1485, 176 L. Ed. 2d 284 (2010). An ineffective-assistance claim can function as a way to escape rules of waiver and forfeiture and raise issues not presented at trial, and so the *Strickland* standard must be applied with scrupulous care, lest "intrusive post-trial inquiry" threaten the integrity of the very adversary process the right to counsel is meant to serve. *Strickland*, 466 U.S. at 689–90, 104 S. Ct. at 2065-66. Even under *de novo* review, the standard for judging counsel's representation is a most deferential one. Unlike a later reviewing court, the attorney observed the relevant proceedings, knew of materials outside the record, and interacted with the client, with opposing counsel, and with the judge. It is "all too tempting" to "second-guess counsel's assistance after conviction or adverse sentence." *Id.* at 689, 104 S. Ct. at 2065; *see also Bell v. Cone*, 535 U.S. 685, 702, 122 S. Ct. 1843, 152 L. Ed. 2d 914 (2002); *Lockhart v. Fretwell*, 506 U.S. 364, 372, 113 S. Ct. 838, 122 L. Ed. 2d 180 (1993). The question is whether an attorney's representation amounted to incompetence under "prevailing professional norms," not whether it deviated from best practices or most common custom. *Strickland*, 466 U.S. at 690, 104 S. Ct. at 2066.

*Harrington v. Richter*, 562 U.S. 86, 105 (2011). In a separate opinion issued on the same day, the Court reiterated that the "question is whether an attorney's representation amounted to incompetence under 'prevailing professional norms,' not whether it deviated from the best practices or most common custom." *Premo v. Moore*, 562 U.S. 115, 122 (2011) (citing *Strickland*, 466 U.S. at 690).

1(a).   Counsel presented through their own expert Dr. Quijano and allowed the State to present through Dr. Gripon a false, misleading, and incoherent expert's framework for the first special issue of "future dangerousness"

King initially alleges that his trial attorneys were ineffective for presenting and allowing a false, misleading, and incoherent expert's framework for the first special issue of "future dangerousness." The claim relates to both his expert, Dr. Quijano, and the State's expert, Dr. Gripon. In support of the claim, he cites portions of an affidavit provided by Dr. Mark

Cunningham, his current expert. King uses Cunningham's affidavit as a means to second guess the methodologies used by Doctors Quijano and Gripon. He faults counsel for allegedly failing to rebut Dr. Gripon's testimony and, presumably, for failing to replace Dr. Quijano's allegedly flawed analysis with the approach set forth in Dr. Cunningham's affidavit. In his reply to the answer, King complains that counsel failed to put forth at least a minimal effort to present the "future dangerousness" issue in a way that could be deemed strategical or tactical.

In response, the Director observes that the Fifth Circuit "has repeatedly held that complaints of uncalled witnesses are not favored in federal habeas review because the presentation of testimonial evidence is a matter of trial strategy and because allegations of what a witness would have stated are largely speculative." *Day v. Quarterman*, 566 F.3d 527, 538 (5th Cir. 2009). The Director asserts that counsel effectively cross-examined Dr. Gripon, particularly with respect to his failure to conduct a face-to-face interview with King, his inability to predict future violence with 100 percent certainty, and the fact that he, as a psychiatrist, is no better than anyone else in predicting future behavior. 24 RR 54-56.[1] The Director further argues that counsel effectively rebutted Dr. Gripon's testimony with the testimony of Dr. Quijano, who testified that King's potential for future dangerousness must be assessed in the appropriate context, that is, in prison. *Id.* at 82, 92. Dr. Quijano testified that if sentenced to life, King would not be eligible for parole until the age of 64, when the probability of future dangerousness would be very low. *Id.* at 83. The Director asserts that King is simply incorrect in claiming that trial counsel avoided the issue of future dangerousness altogether. *See* Amended Petition (#75) at 227. He argues that counsel's handling of the future dangerousness special issue fell within the bounds of reasonableness and

_____

[1] "RR" refers to the trial transcript, preceded by the volume number and followed by the page number(s).

acceptable performance. Furthermore, given the horrific nature of Mr. Byrd's murder, King could not demonstrate that counsel was constitutionally ineffective such that "[t]he likelihood of a different result [is] substantial, not just conceivable." *Richter*, 562 U.S. at 112 (citation omitted).

The court finds the Director's arguments to be persuasive. Counsel effectively cross-examined Dr. Gripon. Dr. Gripon acknowledged that psychiatrists have no special talent for predicting future dangerousness. 24 RR 54. He acknowledged that no one could predict future dangerousness with 100 percent certainty. *Id.* He acknowledged that he had not conducted an independent investigation and that his opinion was based on the materials provided to him by the District Attorney and FBI. *Id.* He acknowledged that an actual interview would have been the best way to base conclusions. *Id.*

The record also shows that counsel effectively rebutted Dr. Gripon's testimony with testimony from Dr. Quijano. Dr. Quijano, formerly the chief psychologist for the prison system, testified extensively about King's potential for future dangerousness. *Id.* at 92. He testified about the measures at TDCJ's disposal for insuring that inmates would not pose a threat in prison. *Id.* at 92-107. He testified that age was the best predictor of future dangerousness. *Id.* at 100. As correctly pointed out by the Director, Dr. Quijano testified that King would not be eligible for release until the age of 64, and that the probability of 64 year old person committing an act of violence was very low.

Counsel extensively questioned both experts. His questioning of the experts did not fall below an objective standard of reasonableness. In another death penalty case involving Dr. Quijano, the Fifth Circuit found that trial counsel pursued a reasonable trial strategy in presenting

Dr. Quijano's testimony in mitigation for the proposition that a capital murder defendant could be safely controlled in prison, that he would not pose a threat, and that jurors should thus vote against the imposition of the death penalty. *Anderson v. Quarterman*, 204 F. App'x 402, 406 (5th Cir. 2006), *cert. denied*, 549 U.S. 1249 (2007). Trial counsel's use of the same line of defense in the present case was appropriate and consistent with the approach taken by attorneys in other capital cases. He pursued a reasonable trial strategy in presenting Dr. Quijano as a witness on the issue of future dangerousness. King has not shown that counsel's representation fell below an objective standard of reasonableness or amounted to incompetence under prevailing professional norms. He also failed to show that, but for counsel's unprofessional errors, the result of the proceeding would have been different. He did not satisfy either *Strickland* prong in order to show ineffective assistance of trial counsel. The first ineffective assistance of counsel claim lacks merit.

It is further noted that King's current counsel regularly files petitions that include allegations that trial counsel was ineffective for failing to present a "coherent" claim of future dangerousness. The Fifth Circuit rejected the argument as procedurally barred in *Shields v. Dretke*, 122 F. App'x 133, 147 (5th Cir.), *cert. denied*, 545 U.S. 1160 (2005). The Fifth Circuit rejected the argument on the merits in *Coble v. Quarterman*, 496 F.3d 430 (5th Cir. 2007). The following discussion was provided in *Coble*:

> Coble also argues that trial counsel failed to present a coherent theory regarding mitigation evidence in order to persuade the jury to answer "no" to the second special issue question. Coble argues that counsel's closing argument was ineffective, counsel ineffectively cross-examined the State's expert on the point of future dangerousness, and counsel should have presented a statistical theory related to whether Coble, as an older man with an extended prison term, represented a continuing threat. Many of the factors that make up this "coherent theory" were presented at trial. . . . At its base, Coble's current challenge is to the strategy employed by trial counsel. Such a challenge does not establish ineffective assistance. *See Yarborough v. Gentry*, 540 U.S. 1, 5-6, 124 S. Ct. 1, 157 L. Ed.

2d 1 (2003) ("[C]ounsel has wide latitude in deciding how best to represent a client, and deference to counsel's tactical decisions in his closing presentation is particularly important because of the broad range of legitimate defense strategy at that stage. . . . Judicial review of a defense attorney's summation is therefore highly deferential-and doubly deferential when it is conducted through the lens of federal habeas."). Coble's indictment of trial counsel's cross-examination of the State's expert is equally meritless. Coble presented experts who testified that Coble would not be a threat and he challenged the State's expert on recidivism of "passion killers." Coble's desire to have a specific defense theory presented does not amount to ineffective assistance on federal habeas review. *Johnson v. Cockrell*, 301 F.3d 234, 239 (5th Cir. 2002) (quoting *Strickland*, 466 U.S. at 689, 104 S. Ct. 2052) ("[C]ourts must 'indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.'").

*Id*. at 437 (footnotes omitted). The Fifth Circuit's analysis is equally applicable to the present case. Trial counsel presented a sound trial strategy on the issue of future dangerousness. King's tactic in the present ground for relief is nothing more than an argument that an alternative defensive theory should have been employed, but his desire to have a specific defense theory presented does not satisfy his burden of showing ineffective assistance of trial counsel. This type of approach is inconsistent with his burden on federal habeas review. The issue before the court is whether trial counsel's representation fell below an objective standard of reasonableness, and King has not satisfied his burden on this issue. King's first ineffective assistance of trial counsel claim lacks merit. Since King has not demonstrated that his first ground for relief has at least some merit, he has not shown that the claim is substantial, as required by the Supreme Court in *Martinez* and *Trevino*. Since the first ineffective assistance of trial counsel claim lacks merit, King likewise failed to show that his initial state habeas counsel was ineffective in failing to present the claim in the first state habeas application. Finally, King failed to show actual prejudice. He did not satisfy his burden in order to overcome the procedural default regarding his first ineffective assistance of counsel claim; thus, the claim is procedurally barred.

1(b). <u>Defense counsel were ineffective in failing to adequately present their motion for a change of venue</u>

King next alleges that his attorneys were ineffective because they failed to present their motion for change of venue adequately. He acknowledges that his attorneys filed a motion for a change of venue and that the trial court heard the motion, but he describes the presentation of the motion as "a perfunctory affair." He notes that only two witnesses testified very briefly, and they just stated that they did not think that he could receive a fair trial in Jasper. 3 RR 9-26. King observes that Mr. Randy Walker, his first court-appointed attorney, testified that people in other counties could care less about "the effect this crime has had on the reputation of this community; and [they] . . . would care less about how this crime may affect Jasper economically in the future." *Id.* at 22. His impression was that there was a "real anger in this community about this crime." *Id.* at 26. By comparison, the prosecution called five witnesses. King complains that his attorneys did not even offer any argument on the motion for change of venue. *Id.* at 70.

In comparison, King discusses the efforts of the defense team in co-defendant Russell Brewer's trial. It was noted that "extensive media reports show the slaying tarnished Jasper's image and the only way to clear the community's reputation is to find those accused guilty."[2] The district attorney responded to all the pre-trial publicity by agreeing to a change of venue, saying that it was "the smart thing to do."[3] King argues that, in comparison, not agreeing to the change of venue in his case was "the dumb thing to do." He notes that the prosecutor "decided to give in to Barlow's [Brewer's attorney] request for a new venue when it became apparent that the

---

[2]*Beaumont Enterprise*, April 27, 1999, at 6A (attached to petition as Exhibit 14).

[3]*Beaumont Enterprise*, April 29, 1999, at 1A (attached to petition as Exhibit 14).

Beaumont-based defense attorney would continue to hammer away on the issue."[4]  King complains that no such "hammering" was done by his attorney.  He argues that given the degree of publicity that existed in Jasper, and the animosity towards him because of the unwanted publicity the crime had visited upon the town, there was no way he could have obtained a fair trial there.

The record shows, however, that King's trial attorneys filed a motion for a change of venue that was accompanied by the affidavits of two Jasper County residents stating that the defendant could not obtain a fair and impartial trial due to "widespread, inflammatory and prejudicial publicity."  CR 92-98.[5]  Counsel was able to obtain a hearing on the motion.  Counsel presented two witnesses who testified that they believed that King could not obtain a fair trial in Jasper County due to the current attitude in the community about the case.  3 RR 9-28.  Counsel also submitted a joint exhibit containing all the local and statewide newspaper accounts of the case up to the time of the hearing.  *Id.* at 7-8.  The Director acknowledges that the record reveals that counsel had a difficult time locating witnesses who were willing to testify favorably for the defense.  *Id.* at 28.  Several of the witnesses that counsel had lined up to testify either were unable to testify or did not show up.  *Id.* at 17, 29.  Nonetheless, the record shows that counsel, in fact, pursued the issue.  The description of counsel's effort "as a perfunctory affair" misrepresents the record.

The Director appropriately points out that King once again failed to identify any additional witness that trial counsel was remiss for not presenting.  As was previously noted, the Fifth Circuit "has repeatedly held that complaints of uncalled witnesses are not favored in federal habeas

[4]*Jasper Newsboy*, May 5, 1999, at 1A (attached to petition as Exhibit 14).

[5]"CR" refers to the Clerk's Record, followed by the page number(s).

corpus review because the presentation of testimonial evidence is a matter of trial strategy and because allegations of what a witness would have stated are largely speculative." *Day*, 566 F.3d at 538. The Court went on to explain that "to prevail on an ineffective assistance claim based on counsel's failure to call a witness, the petitioner must name the witness, demonstrate that the witness was available to testify and would have done so, set out the content of the witnesses proposed testimony, and show that the testimony would have been favorable to the particular defense." *Id.* (citations omitted). In the present case, King merely complains that counsel did not "hammer away on the issue." He offered nothing other than conclusory allegations and bald assertions, which are insufficient to support a petition for a writ of habeas corpus. *See Miller v. Johnson*, 200 F.3d 274, 282 (5th Cir. 2000); *Koch v. Puckett*, 907 F.2d 524, 530 (5th Cir. 1990); *Ross v. Estelle*, 694 F.2d 1008, 1011 (5th Cir. 1983).

The Director also persuasively argues that King cannot show harm on this issue. He notes that King focused on the fact that co-defendant Lawrence Russell Brewer was able to obtain a change of venue. Brewer's trial was conducted six months after King's trial. Despite the change of venue, Brewer was found guilty of capital murder and sentenced to death. The change of venue did not make any difference. In comparison, co-defendant Shawn Allen Berry's motion for a change of venue was likewise denied, but he received a life sentence. *Berry v. State*, No. 09-00-061-CR, 2001 WL 726273 (Tex. App. - Beaumont April 5, 2001, pet. ref'd). There is no evidence that venue made any difference. King has not shown prejudice because he did not receive a change of venue.

It is further noted that the requirement of prejudice in the context of a direct challenge to the denial of a change of venue, as opposed to an ineffective assistance of counsel claim, was

discussed in *Busby v. Dretke*, 359 F.3d 708 (5th Cir.), *cert. denied*, 541 U.S. 1087 (2004). Prejudice sufficient to warrant a change of venue cannot be presumed by virtue of pretrial press coverage, and a petitioner is not entitled to relief due to the denial of a change of venue absent proof that jurors were actually biased against him. *Id.* at 725-26. There must be a showing that the trial atmosphere was "utterly corrupted" by press coverage. *Id.* at 725. King did not make the requisite showing.

Overall, with respect to the second ineffective assistance of counsel claim, King failed to show that counsel's representation fell below an objective standard of reasonableness or that it amounted to incompetence under prevailing professional norms. Further, he failed to show that, but for counsel's unprofessional errors, the result of the proceeding would have been different. He did not satisfy either *Strickland* prong in order to show ineffective assistance of trial counsel. His second ineffective assistance of counsel claim lacks merit. Since King has not demonstrated that it has at least some merit, he has not shown that the claim is substantial, as required by the Supreme Court in *Martinez* and *Trevino*. King likewise failed to show that his initial state habeas counsel was ineffective in failing to present the claim in the first state habeas application. Finally, he failed to show actual prejudice. He did not satisfy his burden in order to overcome the procedural default on his second ineffective assistance of counsel claim; thus, the claim is procedurally barred.

1(c). <u>Failure of defense counsel to make an opening statement</u>

King next alleges that his trial attorneys were ineffective for failing to make an opening statement after a short and devastating opening statement by the prosecutor. In support of the

claim, King provides nothing more than a statement by an author who observed, "[i]t seems to say there is no defense."[6]

The Fifth Circuit has long held that the decision of whether to present an opening statement falls squarely within "the zone of trial strategy." *Gillard v. Scroggy*, 847 F.2d 1141, 1147 (5th Cir. 1988), *cert. denied*, 488 U.S. 1019 (1989); *Murray v. Maggio*, 736 F.2d 279, 283 (5th Cir. 1984). *See also Martinez v. Dretke*, 426 F. Supp. 2d 403, 468-69 (W.D. Tex. 2006) (where petitioner has alleged no specific facts showing how his attorney's failure to make an opening statement prejudiced him and where evidence was "overwhelming," there was no "reasonable probability that, but for the failure of petitioner's trial counsel to make an opening statement …, the outcome of the guilt-innocence phase of petitioner's trial would have been different."). King has the burden of demonstrating both deficient performance and resultant prejudice. *Strickland*, 466 U.S. at 687. He failed to satisfy either prong. Instead, he offered nothing other than conclusory allegations and bald assertions, which are insufficient to support a petition for a writ of habeas corpus. *See Miller*, 200 F.3d at 282; *Koch*, 907 F.2d at 530; *Ross*, 694 F.2d at 1011. In his reply to the answer, King asserted that his arguments on this issue were not just "conclusory," but he went no further than to argue that this ground for relief was just a pattern of deficient representation. Both his ground for relief and reply were conclusory.

Overall, with respect to the third ineffective assistance of counsel claim, King failed to show that counsel's representation fell below an objective standard of reasonableness or that it amounted to incompetence under prevailing professional norms. He likewise failed to show that, but for counsel's unprofessional errors, the result of the proceeding would have been different.

---

[6]King, Joyce, *Hate Crime: The Story of a Dragging in Jasper, Texas* (2002) at 118.

He did not satisfy either *Strickland* prong in order to show ineffective assistance of trial counsel. His third ineffective assistance of counsel claim lacks merit. Since King has not demonstrated that it has at least some merit, he has not shown that the claim is substantial, as required by the Supreme Court in *Martinez* and *Trevino*. King likewise failed to show that his initial state habeas counsel was ineffective in failing to present the claim in the first state habeas application. He also failed to show actual prejudice. King did not satisfy his burden in order to overcome the procedural default on his third ineffective assistance of counsel claim; thus, the claim is procedurally barred.

1(d).   The defense attorneys gave totally ineffective and harmful final arguments during both phases of the trial

King argues in his next ground for relief that the final arguments given by his attorneys were totally ineffective, extremely perfunctory, and could only have given the idea that they were just going through the motions. He stresses that the guilt phase argument covered only a little more than twenty pages. 22 RR 22-46. He argues that there was no "coherent" theory advocated, no attempt to attack the weaknesses of the State's theory that this was a racially-motivated crime, nor any attempt to induce reasonable doubt by arguing the evidence.

King asserts that his attorney's argument during the punishment phase of the trial was even worse. King notes that his attorney called only two witnesses. His father was called as a witness, who asked the jury for mercy. He asserts that his other witness, Dr. Quijano, offered very limited and flawed testimony that was not helpful at all. He argues that the following statement by counsel highlighted the weakness of their case: "I've spent half the night trying to come up with something that I think might be meaningful to you." 22 RR 17. King notes that his attorney told the jury that his one expert said they "only have one point . . . on mitigation . . . the theory of the

older you get while you're confined, the less likely you are to commit any kind of act.  He's told you that's all he had."  *Id.* at 19.  King claims that the argument confirmed the virtual acquiescence of the defense to a death sentence.  He notes that his attorney stated that the prosecutor had done "a good job" in showing how the other mitigating factors did not apply, again emphasizing the weakness of their case.  *Id.*  He added that his second attorney's argument was equally ineffective, mainly a reiteration of his theme that the prison had made him a racist, and generalized discussions of the death penalty and the Bible.

In response, the Director observes that King cannot "manufacture deficient performance by selectively extracting phrases from trial counsel's closing argument and mischaracterizing them."  *Dowthitt v. Johnson*, 230 F.3d 733, 750 (5th Cir. 2000), *cert. denied*, 532 U.S. 915 (2001).  He argues that King is attempting to do exactly that.  He asserts that when examining the arguments in context, trial counsels' arguments at both the guilt/innocence and punishment phases were effective, especially considering that counsel was defending their client "in the face of a very bad set of facts."  *Id.* at 751 (internal quotation marks omitted).

The Director's argument is persuasive in light of a thorough review of the record.  During the guilt/innocence phase of the trial, counsel initially focused on the State's evidence concerning whether a kidnapping had taken place by driving home the point that there was absolutely no evidence establishing that James Byrd had been restrained.  22 RR 26-32.  It should be noted that the aggravating element which raised the offense from murder to capital murder was the charge that the offense occurred "in the course of committing the offense of kidnapping."  CR 242.  If the jury had believed that there was no kidnapping, then the aggravating element making the case capital murder would not have been satisfied.  The argument was appropriate in an effort to

persuade the jury to convict King of the lesser-included offense of murder, as opposed to capital murder. Counsel also highlighted weaknesses in the State's circumstantial evidence case, including the fact that one of the cigarette butts found at the scene with King's DNA on it could have come from the ashtray in Shawn Berry's truck. Counsel also noted that the sandals with Byrd's DNA on them were consistent with Lewis Berry's shoe size, as opposed to King's shoe size. 22 RR 38-40. Counsel further stressed that the testimony regarding King's tattoos was largely a matter of interpretation and that his tattoos had nothing to do with whether King was guilty of capital murder. *Id.* at 42-46, 30.

During the punishment phase of the trial, counsel recounted that King had not been a racist when he went to prison and that he was merely a product of prison society. 25 RR 21, 24. Counsel pointed out King's lack of violent criminal behavior apart from James Byrd's murder. Most importantly, counsel focused on Dr. Quijano's testimony that King would likely spend his sentence in administrative segregation and, with a life sentence, would have to serve at least forty years before being eligible for parole. *Id.* at 20. Counsel argued that the jury was "probably going to punish him more with a life sentence than . . . with the death penalty." *Id.* Counsel also noted the pain experienced by King's father, whose emotional, heart-wrenching testimony (24 RR 125-33) was perhaps the most compelling part of the punishment phase of the trial. 25 RR 21-24. While these arguments might not be the choices King or his current habeas counsel would have made, it simply cannot be said that these arguments were somehow constitutionally deficient. *See Richter*, 562 U.S. at 105. King has not shown that his attorneys' closing arguments during either the guilt/innocence phase or the punishment phase fell below an objective standard of reasonableness.

The court further finds that the Director's focus on *Dowthitt* is appropriate. In that case, the Fifth Circuit offered the following assessment of counsel's closing argument:

> Dowthitt cannot manufacture deficient performance by selectively extracting phrases from trial counsel's closing argument and mischaracterizing them. While we would not endorse every aspect of trial counsel's statements, nevertheless, taken in full context, those statements for the most part were beneficial because they went toward demonstrating that Dowthitt's actions were not deliberate and that he did not present a continuing danger. Furthermore, we note we have held that counsel's acknowledgment of aspects of the case can be a proper "effort to bolster credibility with the jury." *Kitchens v. Johnson*, 190 F.3d 698, 704 (5th Cir. 1999). We will not second guess such strategic decisions under the teaching of *Strickland*.

230 F.3d at 751 (internal footnotes omitted). More recently, the Fifth Circuit reiterated that counsel's statements made during closing arguments "were part of a reasoned tactical decision and that such strategic decisions should not be second guessed under the teaching of *Strickland*." *Pape v. Thaler*, 645 F.3d 281, 292 (5th Cir. 2011), *cert. denied*, 132 S. Ct. 1100 (2012).

King's attorney at trial reasonably argued that King should not be convicted of capital murder because of the lack of evidence of kidnapping. He reasonably challenged the State's case in order to give rise to reasonable doubt. During the sentencing phase of the trial, counsel focused on Dr. Quijano's testimony to cast doubt on whether King would be a continuing danger. Finally, the focus on King's father's testimony was appropriate to evoke some sympathy for King. Counsel's choices in closing must be viewed as reasoned trial strategy, which may not be second guessed by this court.

Overall, with respect to the fourth ineffective assistance of counsel claim, King failed to show that counsel's representation fell below an objective standard of reasonableness or that it amounted to incompetence under prevailing professional norms. He likewise failed to show that, but for counsel's unprofessional errors, the result of the proceeding would have been different.

He did not satisfy either *Strickland* prong in order to show ineffective assistance of trial counsel. King's fourth ineffective assistance of counsel claim lacks merit. Since King has not demonstrated that it has at least some merit, he has not shown that the claim is substantial, as required by the Supreme Court in *Martinez* and *Trevino*. King likewise failed to show that his initial state habeas counsel was ineffective in failing to present the claim in the first state habeas application. Finally, King failed to show actual prejudice. He did not satisfy his burden in order to overcome the procedural default on his fourth ineffective assistance of counsel claim; thus, the claim is procedurally barred.

1(e).  The complete failure of the defense to present any viable case during the punishment phase of the trial

King next argues that his attorneys' performance during the punishment phase of the trial was a complete abdication of their responsibility to him. He again notes that only two people were called and stresses that the entire defense occupied only fifty-nine pages of transcript. 24 RR 75-134. Of these, forty-one pages were direct examination. King once again criticizes Dr. Quijano's testimony and cites, as an alternative, Dr. Cunningham's affidavit. He complains that there was a total failure to humanize him to the jury, although such claim misrepresents the facts in light of his father's testimony. He criticizes the State's evidence compiled during the first state habeas proceedings that rested heavily on an affidavit by King's trial attorney, Sonny Cribbs, which he describes as self-serving and false. He rejects Cribbs' claim that he had talked to family members. He complains that the defense was unable to counter Dr. Gripon's damaging testimony.

The Director, in response, asserts that the claim is nothing more than a "rehash" of the first ineffective assistance of counsel claim, 1(a), which lacks merit for reasons explained therein. He also observes that King's claim that counsel "failed to present any viable claim at the

punishment phase of the trial" was raised and rejected during the first state habeas proceedings. *See* SHCR-01 at 187-191 (¶¶ 47-91). He notes that Cribbs submitted an affidavit stating that he conducted an extensive investigation into King's childhood and background and obtained numerous health opinions in an unsuccessful attempt to mitigate the brutality of James Byrd's murder. The Director opines that there was not anything that could have possibly mitigated this crime; nonetheless, a viable punishment case was presented through the testimony of Dr. Quijano and the compelling testimony of King's father. The Director further argues that King failed to show that the state court's rejection of the claim during the first state habeas proceedings was objectively unreasonable.

In analyzing this claim, the court notes that the parties mixed together claims that were presented in two separate state habeas corpus proceedings. The claim presented in the first state habeas corpus proceeding was decided on the merits, while the claim presented in the second state proceeding was rejected as an abuse of the writ. Different standards apply depending on whether a claim was presented in the first or second state habeas corpus proceeding. In the first state habeas corpus proceeding, King argued that his attorney "failed to properly investigate matters in support of mitigation." The claim focused on the efforts of Sonny Cribbs to develop a mitigation defense in behalf of King. King modified his ground for relief in the present petition claiming that his attorney failed to present a viable defense during the punishment phase of the trial. King's first state application for a writ of habeas corpus did not mention Dr. Cunningham. Since the ground for relief was modified, the present ground for relief was stayed in order to give King the opportunity to submit it to the Texas Court of Criminal Appeals.

To the extent that King is arguing that his attorney failed to investigate matters properly in support of mitigation, his claim was fully developed in the first state habeas proceeding. The trial court found Cribbs to be credible and accepted his statements as true. The finding was made that Cribbs was not ineffective with respect to this claim. The Director appropriately observed that King did not satisfy his burden under 28 U.S.C. § 2254(d) of showing that the state court findings on this issue resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States, or resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceedings. King may not relitigate a claim adjudicated on the merits, subject to the exceptions in § 2254(d). *Richter*, 562 U.S. at 98. To the extent that King is attempting to challenge Cribbs' affidavit with new affidavits that were not presented in the first state habeas corpus proceeding, such "evidence later introduced in federal court is irrelevant." *Cullen v. Pinholster*, 563 U.S. 170, 184 (2011).

To the extent that King is once again challenging Dr. Quijano's testimony, the Director appropriately characterized the ground for relief as a rehash of claim 1(a), which lacks merit for reasons previously explained.

The precise issue raised by King at this time is whether counsel was ineffective for failing to present a viable defense during the punishment phase of the trial. King has not shown that the defense presented by counsel during the punishment phase of the trial, consisting of the testimony of his father and Dr. Quijano, fell below an objective standard of reasonableness or that it amounted to incompetence under prevailing professional norms. At best, he showed that additional evidence could have been presented, but he did not satisfy his burden under *Strickland*

of showing that counsel's representation was deficient. He likewise failed to show that, but for counsel's unprofessional errors, the result of the proceeding would have been different. He did not satisfy either *Strickland* prong in order to show ineffective assistance of trial counsel. King also failed to show that his state habeas counsel was ineffective in failing to present the additional aspects of the claim, such as Dr. Cunningham's affidavit, in the first state habeas application. King's fifth ineffective assistance of counsel claim lacks merit. Since King has not demonstrated that it has at least some merit, he has not shown that the claim is substantial, as required by the Supreme Court in *Martinez* and *Trevino*. King likewise failed to show that his initial state habeas counsel was ineffective in failing to present the claim in the first state habeas application. Finally, King failed to show actual prejudice. He did not satisfy his burden in order to overcome the procedural default on his fifth ineffective assistance of counsel claim; thus, the claim is procedurally barred.

    1(f).    <u>Failure to object to the unqualified and erroneous testimony on tattoos by a local police officer</u>

King next complains that Rich Ford, a sergeant with the Jasper Police Department, was allowed to testify as an expert on the meaning of tattoos even though he had no academic or professional qualifications. He notes that Ford testified about the meaning of a "baphomet" ("used as a worshiping type symbol, satan"). 18 RR 209. Ford interpreted the lightning bolts as the "signs of the S.S." or sons of satan. *Id.* at 212. He testified as to the "patch" of the Confederate Knights of America, and the K.K.K. triangle. *Id.* at 214. He discussed the swastika and "Aryan pride." *Id.* at 215. King complained that Ford was allowed to call a tattoo "an evil-looking figure." *Id.* at 216. Another figure was likewise termed "an evil-looking figure." *Id.* at 217. Another was termed a "[d]emonic-looking figure." *Id.* at 218. He identified a picture of a man

as that of Anton LaVey, founder of the church of satan. *Id.* at 219. Ford testified as to the meaning of the "SS" and those on King's head. *Id.* at 213. Ford further testified that the pentagram can "be satanic or wicca, which is witchcraft." *Id.* at 220. King provided an affidavit from Roy Birnbaum, the artist who created the vast majority of the tattoos, who asserted that the tattoos "had no racial meaning whatsoever, and it was not intended to be racist. King did not know what I was going to put on before it was done."

The record reveals that Ford explained to the jury the meaning of the tattoos based on his training and research. Defense counsel had no reason to object since most of Ford's observations could have been made by anyone viewing King's tattoos. Counsel was not required to make frivolous or futile motions or objections. *Johnson*, 306 F.3d at 255; *Koch*, 907 F.2d at 527. On the other hand, when Ford went a step further and started to render an opinion about the existence of a connection between satanic cults and hate or racist groups, defense counsel did lodge an objection, which was overruled. 19 RR 21. The Director persuasively argues that counsel objected when an objection was appropriate.

The record further reveals that counsel effectively cross-examined Sgt. Rich Ford. Ford acknowledged that the tattoos "could have several different interpretations." *Id.* at 5. He acknowledged that in the prison environment, tattoos are more often a means of survival and protection. *Id.* at 8-10. With respect to a tattoo looking like Anton LaVey, Ford acknowledged that the picture also resembled a character portrayed in one of King's comic books. *Id.* at 10-11. Ford also admitted that the symbol which he identified as a "baphomet" could also be found on the Congressional Medal of Honor. *Id.* at 13-24.

Defense counsel further called Ford's testimony into question when cross-examining Matthew Hoover. Hoover testified that the "SS" tattoos did not derive a racist meaning within the prison system. *Id.* at 84. Hoover further explained that the Aryan Brotherhood, a white prison gang, did not hold any satanic beliefs and that pentagram tattoos were common in prison. *Id.* at 85.

Defense counsel also called a witness to counter Ford's testimony. John Mosley explained that he had drawn some of King's tattoos, and that several of the tattoos identified by Ford as indicative of white supremacist beliefs had no particular significance in prison. 21 RR 74-76. It is again noted that King attached an affidavit from Roy Birnbaum to his petition in an effort to show how counsel should have countered Ford's testimony, but Birnbaum's affidavit presented the same type of evidence provided by Mosley. Any testimony that Birnbaum could have provided would have been largely cumulative. Mosley also testified that inmates get tattoos to intimidate other inmates, thus reducing the likelihood that they will be the victim of assault. *Id.* at 77-78.

Overall, defense counsel effectively cross-examined Ford. He objected when an objection was appropriate, and he countered Ford's testimony when cross-examining another witness and by presenting a defense witness. Counsel's representation on this issue did not fall below an objective standard of reasonableness and was not deficient. Furthermore, King has not shown prejudice, particularly since Ford's testimony was largely inconsequential. *See Gonzales v. Quarterman*, 458 F.3d 384, 394-95 (5th Cir. 2006) (tattoo evidence was not "critical to conviction" and "open to interpretation" thus no "reasonable probability that the result of the trial would have changed with expert testimony or argument challenging the meaning of the tattoos"). The sixth ineffective assistance of counsel claim lacks merit. Since King has not demonstrated that

the ground for relief has at least some merit, he has not shown that the claim is substantial, as required by the Supreme Court in *Martinez* and *Trevino*. King likewise failed to show that his initial state habeas counsel was ineffective in failing to present the claim in the first state habeas application. Finally, King failed to show actual prejudice. He did not satisfy his burden in order to overcome the procedural default on his sixth ineffective assistance of counsel claim; thus, the claim is procedurally barred.

1(g). <u>Failure to object to the unqualified and inaccurate testimony of "gang expert" William Knox</u>

The seventh ineffective assistance of trial counsel claim is akin to the previous claim. This time King alleges that counsel was ineffective for failing to object to unqualified and inaccurate "gang" testimony by William Knox. King stresses that Knox was allowed to testify about gangs without being qualified as an expert regarding gangs. He observes that Knox only had a bachelor's degree and had only risen to the level of a police officer investigator with the Houston Police Department after fifteen years of service. He complains that counsel failed to object to King's qualification as a gang expert. He complains that Knox concluded that it was King's intent to form a gang or group in Jasper. 20 RR 97. Furthermore, Knox testified that King would have had to "do something that would draw the attention of the community to the concept of whatever group that he's organizing. And often that involves some kind of crime and needs to be public, a public crime." *Id.* at 98. King complains that Knox testified without objection that the crime scene was consistent with an initiation practice, where the leader would be present and possibly participate to show that he could commit the crime. *Id.* Knox thought it was significant that "the body was left in a very public open space. It was designed to strike terror in the community, I think." *Id.* at 99.

36

The record reveals that Knox's qualifications were, in fact, fully developed during the trial. He testified that he owned a company called Cutting Edge Communications, which provides consulting work for law enforcement and education in the community on gangs. *Id.* at 90. He testified he had been a police officer in Houston for 15 years and previously served in the United States Air Force. *Id.* He testified that he graduated from the University of Houston and regularly investigated gangs in the 1980s. *Id.* at 90-91. He had also been to seminars on gangs and had been published. *Id.* at 91-92. He testified that he had testified many times about gangs. *Id.* at 92. The record shows that defense counsel objected to Knox's anticipated testimony with regard to gang membership and extraneous offenses, which was overruled. *Id.* at 90. King's allegation that counsel did not make any objections lacks any basis in fact. Counsel's representation was not deficient for failing to object to Knox's anticipated testimony. Furthermore, given the wealth of other evidence demonstrating King's violent racial hatred and his intention of starting a free world chapter of the Confederate Knights of America, most significantly from his own personal writings, Knox's testimony was largely cumulative. King has not shown that he was prejudiced by counsel's representation with respect to Knox's testimony. The seventh ineffective assistance of counsel claim lacks merit. Since King has not demonstrated that it has at least some merit, he has not shown that the claim is substantial, as required by the Supreme Court in *Martinez* and *Trevino*. King likewise failed to show that his initial state habeas counsel was ineffective in failing to present the claim in the first state habeas application. Finally, King failed to show actual prejudice. He did not satisfy his burden in order to overcome the procedural default on his seventh ineffective assistance of counsel claim; thus, the claim is procedurally barred.

1(h).   <u>Failure of defense attorneys to object to prosecutorial misconduct, trial error and hearsay</u>

King next alleges that there "were numerous instances of trial error that were not objected to by the defense." The Director persuasively argues, in response, that none of the alleged trial errors were objectionable.

King initially complains that counsel failed to object to the erroneous introduction of evidence of co-defendant Lawrence Russell Brewer's tattoos, as they were irrelevant. 18 RR 223-24. The Director appropriately notes that this evidence actually shifted the focus of attention from King to Brewer. Counsel may have had a valid strategic reason for not objecting to the evidence since it gave the jury the opportunity to view someone other than King as the instigator of the racially motivated murder. The Supreme Court recently stressed that federal habeas relief must be denied if there is any "reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Richter*, 562 U.S. at 105.

King also alleges that counsel was ineffective for failing to object to hearsay elicited by the prosecution. He complains that counsel failed to object to hearsay about what prison officials told Rich Ford, the Jasper detective, regarding the meaning of tattoos. 18 RR 220. He complains that counsel failed to object to Ford's testimony of what another man told him that the tattoos meant. *Id*. at 221. On the other hand, counsel objected when the same testimony was offered about Brewer's tattoos, and the objection was sustained. *Id*. at 225. King argues that his attorney should have likewise objected to the testimony regarding his tattoos. Ford's testimony, however, merely discussed his investigation regarding the meaning of King's tattoos. It is questionable whether a hearsay objection would have been sustained. Nonetheless, King has not shown that the failure to object amounted to deficient performance or that he was in any way prejudiced by

the failure to object given the relative insignificance of the meaning of the tattoos. *Cf. Woodfox v. Cain*, 609 F.3d 816-17 (5th Cir. 2010) ("Because the testimony was cumulative of other evidence, we cannot hold that but for counsel's failure to object, the results of the trial would have been different."); *Burnett v. Collins*, 982 F.2d 922, 930 (5th Cir. 1993) ("failure to object to leading questions and the like is generally a matter of trial strategy as to which we will not second guess counsel."). Moreover, as was previously noted with respect to Claim 1(f), the Fifth Circuit has opined that tattoo evidence was not "critical to conviction" and "open to interpretation;" thus, there was no "reasonable probability that the result of the trial would have changed with expert testimony or argument challenging the meaning of the tattoos." *Gonzales*, 458 F.3d at 394-95.

King next complains that the trial court's discussion regarding parole and good time was confusing. He argues that counsel should have objected to the trial court's confusing instructions. However, the jury instruction was consistent with the law as it was at that time. *See, e.g.*, *Johnson v. Quarterman*, 294 F. App'x 927, 931-32 (5th Cir. 2008), *cert. denied*, 556 U.S. 1107 (2009). He has not shown that counsel had any basis for objecting to the instruction even though it may have been confusing. He has not shown that counsel's representation was deficient on this matter or that he was prejudiced.

King also complains that counsel failed to object to the trial court's definition of reasonable doubt: "proof of such a convincing character that you would be willing to rely and act on it without hesitation in the most important of your own affairs." 25 RR 7. He asserts that the Supreme Court disapproved of this type of language in *Sullivan v. Louisiana*, 508 U.S. 275 (1993), although he also admits that the language was not held to be unconstitutional. His latter statement essentially is an admission that the claim lacks merit and that he cannot show prejudice.

The complaint lacks merit for the additional reason that the Fifth Circuit has examined this precise phrase and found that it was proper. *See United States v. MacHauer*, 403 F. App'x 967, 969 (5th Cir. 2010). Counsel had no reason to make a frivolous objection. The claim lacks merit.

King also alleges that counsel was ineffective with respect to prosecutorial misconduct where the prosecutor referred to a cleared space as a "fight scene" without any evidence that there had been a fight there. 17 RR 131; 17 RR 121; 17 RR 127. He acknowledges that defense counsel subsequently clarified that the "fight scene" was pure speculation and that there was no testimony that someone observed fighting. 17 RR 145. He, nonetheless, argues that counsel should have objected to the use of the phrase.

The record reveals that the phrase "fight scene" was first employed during the testimony of Tommy Robinson, an investigator for the Jasper County Sheriff's Department. Robinson described the area where the victim's body was found as follows:

> It was an area about 30 yards in diameter roughly, grassy area that had been trampled down, scuffed through. And looked like possibly an area of a fight scene or something to this effect, where the grass was beaten down and even some underbrush broken.

17 RR 121. Robinson, as opposed to the prosecutor, was the first person to employ the phrase "fight scene." King misrepresented the record in attributing the phase to the prosecutor and characterizing it as prosecutorial misconduct. Trial counsel, nonetheless, effectively cross-examined Robinson, who acknowledged that he did not see anyone fighting and that his description of the area as a "fight scene" was based on what he had seen or "felt out there." *Id.* at 145. King has not shown that his attorney's handling of this matter fell below an objective standard of reasonableness or was in any way deficient. Furthermore, relief should be denied because King failed to show prejudice.

King next complains about the prosecutor's closing arguments in the guilt/innocence phase of the trial, wherein the prosecutor stated that "the defendants came out of hell like the illustration in the comic book, and they dumped the victim in front of a church 'to show their defiance of God, to show their defiance of Christianity and to show their defiance of everything that most people in this country stand for and in this State and in this Country.'" 22 RR 22. He argues that the statement improperly injected religion into the trial and was an adverse comment on his non-Christian beliefs. He asserts that the adverse comments on his religious beliefs were improper as they had no relevance and were unduly inflammatory. *See, e.g.*, *People v. Wood*, 488 N.E.2d 86, 89 (N.Y. 1985) (reversible error for prosecutor to attempt to impeach a defense expert by insinuating that his decision to affirm rather than swear to the truth of his testimony somehow affected his credibility).

In response, the Director appropriately observes that the arguments were the product of reasonable inferences from, and summations of, the evidence presented at trial and were therefore not objectionable. *See, e.g.*, *Cantu v. State*, 842 S.W.2d 667, 690 (Tex. Crim. App. 1992) (counsel is afforded wide latitude in drawing inferences from the record as long as they are reasonable and offered in good faith). He notes that the argument was the product of a reference to a drawing out of King's own notebook. *See* State's Exhibit 42. The full argument was as follows:

> This is a baphomet with three riders coming out of it, which amounts to three robed riders coming straight out of hell; and that's exactly what there was that night. Instead of a rope, they used a chain, and instead of horses, they were using a pickup truck. And, ladies and gentlemen, the satanic part of that comes in that after they drag this poor man and tore his body to pieces, they dropped it right in front of a Church and a cemetery to show their defiance of God, to show their defiance of Christianity and to show their defiance of everything that most people in this country stand for and most people of this State and in this Country.

22 RR 22. The Director argues that King has not shown how counsel's failure to object, assuming he should have, to this one portion of the State's closing argument prejudiced him in any way.

The standard for granting habeas corpus relief because of prosecutorial misconduct is "the narrow one of due process, and not the broad exercise of supervisory power." *Darden v. Wainwright*, 477 U.S. 168, 181 (1986). It is well established under Texas law that proper jury argument must fall within one of the following categories: (1) summary of the evidence, (2) reasonable deduction from the evidence, (3) in response to argument of opposing counsel, and (4) plea for law enforcement. *Borjan v. State*, 787 S.W.2d 53, 55 (Tex. Crim. App. 1990). Improper remarks by a prosecutor "are a sufficient ground for habeas relief only if they are so prejudicial that they render the trial fundamentally unfair." *Hughes v. Quarterman*, 530 F.3d 336, 347 (5th Cir. 2008) (citations omitted). "Such unfairness exists only if the prosecutor's remarks evince either persistent and pronounced misconduct or . . . the evidence was so insubstantial that (in probability) but for the remarks no conviction would have occurred." *Id.* "The relevant question is whether the prosecutor's comments so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Id.* (citing *Darden*, 477 U.S. at 181).

The language employed by the prosecutor in this case was similar to the language used by a prosecutor in *Drew v. Collins*, 964 F.2d 411 (5th Cir. 1992), *cert. denied*, 509 U.S. 925 (1993). In that case, the prosecutor used the terms "sadistic killer," "macho man," "rolling torture chamber" and "chamber of execution." 964 F.2d at 419. The Fifth Circuit found that the comments were grounded in the record and that the prosecutor was not asserting his own credibility as to the foundation of the witnesses. *Id.* The Fifth Circuit opined that the language was inflammatory but also found that the comments referred to evidence in the record and thus did

not violate due process. *Id.* In a more recent case, the Fifth Circuit assumed that referring to a defendant as "the devil" was improper, but the use of the term in isolation did not render the trial fundamentally unfair. *United States v. Whittington*, 269 F. App'x. 388, 410-11 (5th Cir. 2008).

In the present case, the terms employed by the prosecutor may have been inflammatory, but they related to evidence in the record. King's own drawing provided the basis for the closing argument. The fact that Byrd's body was left in front of a church was also part of the record. The prosecutor was not obliged to ignore the facts of this case simply because they included an element of religion. The prosecutor's comments did not deny King due process.

It is again noted that this claim was included as part of King's ineffective assistance of trial counsel claim, as opposed to a stand-alone claim of prosecutorial misconduct. King did not, however, develop the ineffective assistance of trial counsel aspects of the claim. He did not show that his attorney had any reason to object to the prosecutor's comments. He did not show that his attorney's representation was deficient or that he was prejudiced by such deficient representation.

Overall, with respect to each sub-claim under Claim 1(h), King has not satisfied either *Strickland* prong. He did not show deficient representation or prejudice. The eighth ineffective assistance of counsel sub-claim lacks merit. Since King has not demonstrated that it has at least some merit, he has not shown that the claim is substantial, as required by the Supreme Court in *Martinez* and *Trevino*. King likewise failed to show that his initial state habeas counsel was ineffective in failing to present the claim in the first state habeas application. Finally, King failed to show actual prejudice. He did not satisfy his burden in order to overcome the procedural default on his eighth ineffective assistance of counsel claim; thus, the claim is procedurally barred.

1(I).    Failure of the defense attorneys to investigate and present mental health information

King alleges in his ninth ineffective assistance of trial counsel claim that his trial attorneys were ineffective for failing to investigate and present mental health information.  It is noted that the court discussed this claim on the merits in the previous memorandum opinion (#64) and granted the Director's motion for summary judgment as to the claim.  This issue was fully developed during the initial state habeas corpus proceedings.  Trial counsel stated in an affidavit that he asked a forensic psychologist to evaluate King, and after the psychologist did so, he told counsel that he saw no evidence of mental illness.  Counsel also stated that King denied having any mental illness and no members of his family gave any indication that King had any form of mental illness.  Based upon this evidence, the state trial court found that counsel's performance was not deficient.  The trial court further found that even had counsel conducted a more thorough job of investigating his mental state, there was no reasonable probability that the result in the guilt-determination or punishment-determination phases of the trial would have been different.  The TCCA adopted the findings and denied relief.  King has not shown, as required by 28 U.S.C. § 2254(d), that the State court findings resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States, or resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceedings.  Thus, he is not entitled to federal habeas corpus relief, and the Director was properly granted summary judgment as to this claim.

1(j).    Defense counsel failed to challenge flawed testimony by the coroner Dr. Tommy Brown

King next alleges that his trial counsel was ineffective for failing to challenge the testimony of coroner Dr. Tommy Brown.  He notes that Dr. Brown testified that the victim was alive and conscious when he was being dragged and that Byrd attempted to shift his body to alleviate the pain.  Dr. Brown testified that the victim was alive and conscious until he hit a culvert, when the lethal wounds occurred.  21 RR 45.  Dr. Brown added that the victim was probably alive when his head,  right arm, and shoulder were separated.  *Id.* at 53.  He noted that there were no severe drag marks on Byrd's head, which led him to conclude that the victim was conscious most of the time he was being dragged.  *Id.* at 58.  Dr. Brown thought he was alive and conscious for the two and one-half miles he was dragged until he hit the culvert.  *Id.* at 60.  King argues that this testimony was critical, both as to the nature of the wounds and the nature of the crime of kidnapping.  King points out that this testimony was challenged during the trial of co-defendant Shawn Berry.  Dr. Lloyd White, the Nueces County medical examiner, was employed to testify in Berry's behalf.  King contends that if his attorney had likewise challenged Dr. Brown's testimony, then the result of his trial would have also resulted in a life sentence.

The Director, on the other hand, notes flaws in King's claim.  He initially characterizes it as nothing more than speculation, which is sufficient for denying relief.  *Richter*, 562 U.S. at 111-12.  He also argues that Dr. White's testimony was not beneficial.  Dr. White testified that he could not determine, as Dr. Brown had, whether the victim was conscious when he was dragged behind Berry's truck, but he agreed with Dr. Brown that the victim was alive until he hit

the culvert and was decapitated.[7]  Furthermore, even if King could somehow prove that the victim was already dead when he was chained to the pickup, even though all expert testimony was to the contrary, the requisite kidnapping was accomplished before the dragging.  The evidence showed that King and his co-defendants restrained the victim, first by deception and then by force, with the requisite intent to hold him in a place where he was not likely to be found, which was the logging road, for the purpose of causing him bodily injury, and that in restraining him, they also intended to prevent his liberation by using deadly force.  The Director appropriately argues that it would have been reasonable trial strategy for trial counsel to avoid presenting a defense expert who agreed with the State's expert that the victim was alive when he was chained to the pickup and then dragged down the dirt and gravel logging road.

Counsel's duty to investigate included seeking out and interviewing potential witnesses. *Lockhart v. McCotter*, 782 F.2d 1275, 1282 (5th Cir. 1986); *Williams v. Beto*, 354 F.2d 698, 703 (5th Cir. 1965).  To succeed on the claim, however, a petitioner must show that had counsel investigated the claim he would have found witnesses to support the defense, that such witnesses were available, and had counsel located and called these witnesses, their testimony would have been favorable and they would have been willing to testify on his behalf.  *Alexander v. McCotter*, 775 F.2d 595, 602 (5th Cir. 1985); *Gomez v. McKaskle*, 734 F.2d 1107, 1109-10 (5th Cir.), *cert. denied*, 469 U.S. 1041 (1984).

In the present case, King alleges that his attorney should have called Dr. White, or some other expert, as a rebuttal witness.  The Director persuasively argues, however, that it was

---

[7]*See* WR-49,391-02, Petitioner's Exhibit 22, testimony of Dr. Lloyd White in *State v. Berry*, Jasper County No. 8871.

reasonable trial strategy for trial counsel to avoid presenting a defense expert who agreed with the State's expert. Dr. White's testimony supported Dr. Brown's testimony as to cause of death and the nature of kidnapping. Furthermore, Shawn Berry was likewise convicted of capital murder, although he received life imprisonment, and his conviction was affirmed despite challenges to the sufficiency of the evidence. *Berry v. State*, No. 09-00-061-CR, 2001 WL 726273 (Tex. App. - Beaumont 2001, pet. ref'd). King has not shown that counsel's representation was deficient for failing to call Dr. White or some other expert as a rebuttal witness. He likewise failed to show prejudice. He did not satisfy either *Strickland* prong. The tenth ineffective assistance of counsel claim lacks merit. Since King has not demonstrated that it has at least some merit, he has not shown that the claim is substantial, as required by the Supreme Court in *Martinez* and *Trevino*. King likewise failed to show that his initial state habeas counsel was ineffective in failing to present the claim in the first state habeas application. Finally, King failed to show actual prejudice. He did not satisfy his burden in order to overcome the procedural default on his tenth ineffective assistance of counsel claim; thus, the claim is procedurally barred.

1(k). <u>Counsel failed to adequately urge his motion to withdraw</u>

King next alleges that his trial counsel was ineffective for failing to urge his motion to withdraw as counsel adequately. King states that he wrote a letter to the trial court asking that his court-appointed attorney be replaced on November 23, 1998. King explained that his attorney was "in disagreement of my innocence" and had acknowledged to him on several occasions that he planned "to do no more in my defense than try and ensure that I do not receive the death sentence."

The record reveals that counsel filed a motion to withdraw on January 6, 1999. In support of the motion, counsel stated that the two attorneys "have an irreconcilable conflict of interest with the defendant which requires their removal from the case." On January 11, 1999, two weeks before jury selection was scheduled to begin, counsel brought the motion to the trial court's attention. Counsel presented the motion as follows:

> Judge, I have filed a motion to withdraw based on some, I guess, some personality conflicts with Mr. King, where he and I and he and Mr. Shaw and Beverly and Brack Jones and myself have been unable to talk to him. I was going to go by -- and I didn't plan on this hearing today -- and talk to him today. I had made arrangements to talk to his dad this afternoon and was going by the jail this evening.
>
> It makes it extremely difficult for us to prepare. We're prepared to talk to some witnesses, and I gave him the witness list the other day and the evidence list. But if he doesn't want to talk to me, we're going to have to do it anyway. It might be just to protect the record and protect him on an appeal even. We're asking the Court at this time to allow us to withdraw, the Court grant a continuance and appoint him another attorney. I think that's what he wants to do.

5 RR 4-5. King argued that the presentation of the motion was "perfunctory" and implied that his attorney was "just going through the motions in filing the motion." He argued that his attorney's representation was deficient and that counsel would not have been required to remain as his attorney if he had presented the motion adequately.

King's request for different counsel was fully discussed on direct appeal. The TCCA discussed the issue as follows:

> [King's] first two points of error concern his request for different trial counsel. In his first point of error, [King] complains that the trial court denied his requests for appointed counsel to withdraw and for the court to appoint new counsel. In his second point of error, [King] contends that he was denied the effective assistance of counsel because counsel failed to introduce any evidence in support of his motion to withdraw.

Two weeks before jury selection was scheduled to begin, C. Haden Cribbs filed a motion to withdraw as [King's] counsel. At a hearing held January 11, 1999, counsel explained to the court that he and [King] were experiencing personality conflicts and that [King] would not speak with him. [King] then informed the court that he had sent the court three identical letters explaining why he wanted different counsel. In these letters, [King] expressed his dissatisfaction with counsel's failure to provide him with updates and certain other unspecified information. [King] also stated that defense counsel "is in disagreement of my innocence, and on several occasions, has acknowledged that he plans to do no more in my defense than try to ensure that I do not receive a death sentence." [King] contends that these letters demonstrate good cause for switching counsel.

The letters are the only indication in the record that [King] was dissatisfied with counsel's performance. Towards the end of the hearing, [King] agreed to meet with counsel later to discuss the case. Further, at a lengthy pre-trial hearing conducted December 14, 1998, [King] mentioned nothing about wanting different counsel.

The trial court has discretion to determine whether counsel should be allowed to withdraw from a case. However, the right to counsel may not be manipulated so as to obstruct the judicial process or interfere with the administration of justice. Further, personality conflicts and disagreements concerning trial strategy are typically not valid grounds for withdrawal. A trial court has no duty to search for counsel agreeable to the defendant.

The record reflects that by the time the motion to withdraw was filed on January 11, 1999, counsel had worked on the case for several months, reviewed most of the discovery, and filed more than thirty pre-trial motions. Given the amount of work counsel had already invested in the case, substitution of counsel could have necessitated delay of the trial. Moreover, although [King] was given the opportunity at the hearing to expand on his reasons for dissatisfaction with counsel, [King] failed to do so and simply referred the trial court to his letters. Given these circumstances, [King] has not shown that the trial court abused its discretion in refusing the motion to withdraw.

Similarly, [King] has not demonstrated ineffective assistance of counsel for failing to present evidence to support the motion for withdrawal. As noted above, counsel's motion to withdraw was premised on [King's] unwillingness to cooperate. When [King] agreed during the hearing to meet with counsel, counsel apparently determined not to pursue his motion further—especially since no basis was given to withdraw except personality conflicts. Nor has [King] indicated how counsel's alleged failure to pursue the motion to withdraw undermined confidence in the jury's verdict. Accordingly, [King] has demonstrated neither that counsel's performance deviated from prevailing professional norms nor that counsel's

continued representation prejudiced his trial. [King's] first and second points of error are overruled.

*King*, 29 S.W.3d at 565-66 (footnotes and internal citations omitted). The TCCA discussed this issue in terms of both trial error and ineffective assistance of counsel and rejected King's allegations.

In the present petition, King adds a new wrinkle to his ineffective assistance of counsel claim by asserting that counsel failed to urge adequately the motion to withdraw. The TCCA rejected this new argument as an abuse of the writ. The Sixth Amendment provides criminal defendants with a right to counsel, but the "right to counsel of choice does not extend to defendants who require counsel be appointed to them." *United States v. Gonzalez-Lopez*, 548 U.S. 140, 151 (2006). The Fifth Circuit has characterized complaints about not receiving a different court appointed attorney as amounting to "garden-variety ineffective assistance claims." *United States v. Rincon*, 223 F. App'x 331, 332 (5th Cir. 2007). Counsel was undoubtedly aware that King was not entitled to a new attorney just because of a conflict of personality or disagreements between him and his client. *See Solis v. State*, 792 S.W.2d 95, 100 (Tex. Crim. App. 1990). King has not shown that there was a legitimate basis under the law for him to receive a new or different attorney. He has not shown that counsel's representation was deficient for failing to urge the motion with greater enthusiasm. The claim is conclusory and does not support a petition for a writ of habeas corpus. *See Miller*, 200 F.3d at 282; *Koch*, 907 F.2d at 530; *Ross*, 694 F.2d at 1011. King likewise failed to show that he was prejudiced by trial counsel's alleged failure to urge the motion to withdraw with greater enthusiasm. The ineffective assistance of counsel claim lacks merit. Since King has not demonstrated that it has at least some merit, he has not shown that the claim is substantial, as required by the Supreme Court in *Martinez* and *Trevino*.

King likewise failed to show that his initial state habeas counsel was ineffective in failing to present the claim in the first state habeas application. Finally, King failed to show actual prejudice. He did not satisfy his burden in order to overcome the procedural default on his eleventh ineffective assistance of counsel claim; thus, the claim is procedurally barred.

1(l). <u>Failure of defense counsel to object to punishment phase "future dangerousness" testimony of Dr. Edward Gripon</u>

King next alleges that trial counsel was ineffective for failing to object to Dr. Edward Gripon's "future dangerousness" testimony during the sentencing phase of the trial. He notes that Dr. Gripon did not personally examine him. Instead, his testimony was based upon the reports and records compiled in this case. Based upon the reports and records, Dr. Gripon testified that King should be sentenced to death because he was a future danger to society. King complains that counsel did not object to Dr. Gripon's expertise, credentials, ability to make such predictions or his methodology.

In many ways, the present ineffective assistance of trial counsel claim is a repeat discussion of Claim 1(a), which was rejected. It is further noted that King's current counsel made similar complaints about Dr. Gripon's testimony in *Shields v. Dretke*, 122 F. App'x 133 (5th Cir.), *cert. denied*, 545 U.S. 1160 (2005). The Fifth Circuit rejected the complaint as follows:

> Dr. Gripon based his psychiatric opinion on future dangerousness on the records that related to Shields and Paula Stiner's murder. Even though we are somewhat troubled by the absence of a personal interview of Shields by Dr. Gripon, we cannot say that counsel was ineffective in failing to make a *Daubert* objection to Dr. Gripon's testimony. Our review of the record demonstrates that Dr. Gripon adequately established his expert credentials, which included prior testimony as to the future dangerousness of a perpetrator on between twelve to eighteen occasions. We have also noted our awareness of no clearly established law that prevents a psychiatrist from basing his opinion on the records of the case and the psychiatric records of the perpetrator. Shields has established no prejudice here.

*Id.* at 153. The Fifth Circuit's observations are equally applicable to the present case. Dr. Gripon has regularly testified as an expert regarding the future dangerousness of defendants based on reports and records, without interviewing the defendants. The Fifth Circuit has accepted such testimony. Counsel had no basis to object to Dr. Gripon's testimony. King has not shown that his trial counsel's representation was deficient. He has not established prejudice. The twelfth ineffective assistance of counsel claim lacks merit. Since King has not demonstrated that it has at least some merit, he has not shown that the claim is substantial, as required by the Supreme Court in *Martinez* and *Trevino*. King likewise failed to show that his initial state habeas counsel was ineffective in failing to present the claim in the first state habeas application. Finally, King failed to show actual prejudice. He did not satisfy his burden in order to overcome the procedural default on his twelfth ineffective assistance of counsel claim; thus, the claim is procedurally barred.

### 1(m).  Cumulative errors of counsel rendered his trial unfair

King finally alleges that he is entitled to federal habeas corpus relief based on cumulative errors of counsel. However, because all of King's ineffective assistance of trial counsel claims lack merit, he has failed to show that he was denied due process as a result of cumulative errors. *United States v. Moye*, 951 F.2d 59, 63 n.7 (5th Cir. 1992); *Derden v. McNeel*, 978 F.2d 1453, 1454 (5th Cir. 1992), *cert. denied*, 508 U.S. 960 (1993). In another case involving King's current counsel, the Fifth Circuit rejected a cumulative error claim as follows:

> Coble claims that cumulative error merits habeas relief. Federal habeas relief is only available for cumulative errors that are of constitutional dimension. *Livingston v. Johnson*, 107 F.3d 297, 309 (5th Cir. 1997); *Yohey*, 985 F.2d at 229. As previously discussed, none of Coble's ineffective assistance claims establish ineffective assistance under *Strickland*. Coble has not identified errors of

> constitutional dimension.  Accordingly, we cannot say that the state habeas court's
> rejection of Coble's cumulative error claim was objectively unreasonable.

*Coble*, 496 F.3d at 440.  In the present case, King has not identified any error(s) of constitutional

dimension.  Furthermore, the Director appropriately observed that the Fifth Circuit has specified

that "[m]eritless claims or claims that are not prejudicial cannot be cumulated, regardless of the

total number raised." *Westley v. Johnson*, 83 F.3d 714, 726 (5th Cir. 1996) (citing *Derden*, 978

F.2d at 1461).  King is not entitled to relief on his cumulative error claim.

In conclusion with respect to all of the ineffective assistance of counsel sub-claims

presented in ground for relief number one, King has not shown (1) that his underlying claims of

ineffective assistance of trial counsel are "substantial," meaning that he must demonstrate that the

claims have some merit, and (2) that his initial state habeas counsel was ineffective in failing to

present those claims in his first state habeas application.  He also failed to show actual prejudice.

He failed to satisfy his burden in order to overcome the procedural default.  Consequently, apart

from claim 1(I), all of the sub-claims included in his first ground for relief are procedurally

barred.  With respect to claim 1(I), as noted in the court's previous memorandum, King failed to

satisfy his burden under 28 U.S.C. § 2254(d) in order to obtain relief.  Overall, King has not

shown that he is entitled to relief with respect to any of his claims contained in ground for relief

number one.

B.    Ineffective Assistance of Counsel and Actual Innocence

In ground for relief number 2, King presents another ineffective assistance of trial counsel

claim, which is also discussed in terms of actual innocence.  King alleges that trial counsel was

ineffective for failing to present a viable defense of actual innocence.  In analyzing the second

ground for relief, the court initially notes that allegations of ineffective assistance of counsel and

actual innocence are distinct issues that must be treated separately. *See Rocha v. Thaler*, 626 F.3d 815, 823 (5th Cir. 2010) (declined the invitation to treat actual innocence and ineffective assistance of counsel claims synonymously), *cert. denied*, 132 S. Ct. 397 (2011). Thus each issue will be discussed separately, starting with the ineffective assistance of counsel claim.

King argues that trial counsel was ineffective in failing to challenge the State's evidence against him and failing to present any effective challenge to the prosecution's version of the victim's death. He specifically complains that counsel failed to challenge the evidence regarding the sandals with a drop of the victim's blood on them, sandals that purportedly did not belong to him. King also complains that counsel failed to explain that people besides himself had access to his "Possum" lighter on the night of the murder. He also complains that counsel failed to point out obvious inconsistencies in the State's theory of the case and logical gaps in their reasoning, including the alleged motive for the crime. He complains that counsel failed to investigate and present his version of events, and his alibi, as he did not testify at trial. He finally complains that counsel failed to show the jury that he was "actually innocent of this notorious and horrific crime."

The Director argues that the ground for relief is both procedurally barred and wholly without merit. He notes that the claim was presented to the TCCA and dismissed as an abuse of the writ without consideration of the merits of the claim pursuant to Tex. Code Crim. Proc. Art. 11.071 § 5(c). He adds, however, that a portion of the claim regarding counsel's efforts to locate an alibi witness was raised and rejected during the first state habeas proceedings and on direct appeal. He argues that the *Martinez/Trevino* rule does not help because the claim is not

substantial. He further argues that because the actual innocence claim lacks merit, it cannot serve as a gateway through which the procedurally defaulted claims can pass.

It is again noted that the issue of ineffective assistance of trial counsel is a separate issue from actual innocence. *Rocha*, 626 F.3d at 823. The procedural bar discussion in Section IV of this memorandum opinion, including the discussion of the *Martinez/Trevino* rule, governs the analysis of King's ineffective assistance of trial counsel claim. King initially complains that trial counsel failed to "explain" the presence of a cigarette butt with his DNA on it at the crime scene. The record establishes, however, that trial counsel explored the possibility that the evidence did not necessarily indicate King's presence at the scene with several of the State's witnesses. Counsel cross-examined Keisha Atkins on whether King and others placed cigarette butts in the ashtray of Berry's truck. 18 RR 48. Counsel elicited testimony from F.B.I. Agent Tim Brewer on cross-examination clarifying that it could not be determined when DNA was deposited on the cigarette butt. *Id.* at 136. Counsel thoroughly and effectively cross-examined Frank Samuel Baechtel, a forensic examiner in the F.B.I.'s DNA analysis unit, concerning the DNA evidence. Baechtel admitted there was no way to determine when the cigarette was smoked. 20 RR 45. He added that the length of time someone's DNA on a cigarette butt would last was the product of how it was kept. *Id.* Counsel cross-examined Lewis Berry about whether King smoked in Shawn Berry's truck. *Id.* at 164. Lewis Berry testified that King smoked in the truck, although he did not recall whether King used the ashtray. *Id.* Counsel went on to point out these flaws in the State's case during closing arguments. 22 RR 38-40.

The Director appropriately observes that King failed to point to another source of information or evidence available to counsel at the time of trial to further support his claim. To

succeed on the claim, King must show that had counsel investigated the claim he would have found witnesses to support the defense, that such witnesses were available, and had counsel located and called these witnesses, their testimony would have been favorable and they would have been willing to testify on his behalf. *Alexander*, 775 F.2d at 602; *Gomez*, 734 F.2d at 1109-10. The failure to produce some evidence from an uncalled witness severely undermines a claim of ineffective assistance. *Sayre v. Anderson*, 238 F.3d 631, 636 (5th Cir. 2001). Conclusory claims are insufficient to entitle a habeas corpus petitioner to relief. *Woods*, 870 F.2d at 288; *Schlang*, 691 F.2d at 799. King does nothing more than present a bald and conclusory claim that counsel "failed to present any effective challenge to the prosecution's version of the victim's death." The claim lacks merit.

King also complains that counsel failed to present to the jury the possibility that the sandals found in his apartment with the victim's blood on them actually belonged to Lewis Berry, as opposed to King. The assertion is refuted by the record. Keisha Atkins admitted on cross-examination by defense counsel that she could not say whether a particular pair of sandals identified by the State belonged to King; instead, she could only say that they looked like King's sandals. 18 RR 32-33. She further testified that Lewis Berry stayed sometimes at King's apartment. *Id.* at 33. Counsel elicited information from FBI Agent Kenneth Kempf acknowledging that Lewis Berry's driver's license was found in King's apartment. *Id.* at 91. Kempf also testified that there was not much difference in size between the sandals wore by King and Lewis Berry. *Id.* at 90, 126-27, 131-32. King's friend Tommy Faulk acknowledged when he was cross-examined by defense counsel that Lewis Berry sometimes lived in King's apartment and kept clothes, shoes and other personal items there. 19 RR 254-55. Defense counsel also

cross-examined Lewis Berry, who testified that the bigger sandals belonged to King.  20 RR 160.

Counsel revisited this flaw in the State's case during closing arguments as follows:

> They searched the apartment and found things from Lawrence Brewer there, Lewis Berry there, Shawn Berry there, and Bill King.  And they found sandals, more than one pair.  I know one thing that I remember in this about the sandals was [what] old Lewis said, you know, I wear size 11 and my brother wears a size 9 and a half and those bigger ones were John's.  But you know when you look at all those photographs, all these people are about the same.  I guarantee you Lewis Berry's footprint is not a size 11 on that print, on that shoe thing that the State took or the FBI took.

22 RR 40.  The Director appropriately points out that King presents no other source of information or witnesses available at the time of trial to further support this alternative theory.

King next complains that counsel failed to challenge the State's argument that his statements to the media were false.  He insists that his statements were not false.  The record reveals that King's letter to the media was tendered into evidence by the State, and counsel had no objection to the letter being admitted into the record.  20 RR 119.  King's letter was quoted on pages 4-7 of this memorandum opinion and discussed in the opinion issued by the TCCA.  The letter was the one instance where King's side of the story was told at trial.  It was not subjected to cross-examination.  Counsel's representation was effective in allowing King's side of the story to be presented in this manner.  With respect to the specific complaint, King has not identified where the State argued that the contents of the statements were false, and he failed to show how and when counsel should have objected.  Once again, King has made a conclusory claim that does not provide a basis for federal habeas corpus relief.

King next complains about how his letter to co-defendant Brewer was handled by his attorney.  King made the following comments in the letter:

> As for the clothes they took from the apt. I do know that one pair of shoes they took were Shawn's dress boots with blood on them, as well as pants with blood on them. As far as the clothes I had on, I don't think any blood was on my pants or sweat shirt, but I think my sandals may have had some dark brown substance on the bottom of them.

State's Trial Exhibit 104. The TCCA characterized the letter as an admission of guilt. *King*, 29 S.W.3d at 565. King argues that the letter could have been easily construed as merely a denial that there was blood on his clothes as he was not present. He complains that the alternative interpretation was never mentioned by the defense. Nonetheless, the letter was in the record. It was subject to interpretation. One interpretation was that it could be viewed as an admission of guilt. The Director persuasively argues that it was reasonable for trial counsel to conclude that bringing additional attention to the letter by arguing for an alternative interpretation could strain their credibility with the jury beyond natural bounds.

King next complains that counsel did not attempt to rebut the State's theory that his racial animosity supplied a motive for murder. The Director correctly argues that counsel did argue this point in rebuttal. Counsel, in fact, argued that just because King had made racial slurs did not mean that he committed the act of racial violence. *See* 22 RR 36, 43, 46. Trial counsel argued that the State had presented nothing more than a circumstantial case focusing on tattoos and racial animosity.

Overall, with respect to these issues that are subject to the procedural bar, King has not shown that his trial attorney's representation was deficient or that he was prejudiced due to such deficient representation. The ineffective assistance of trial counsel claim lacks merit. Since King has not demonstrated that it has at least some merit, he has not shown that the claim is substantial, as required by the Supreme Court in *Martinez* and *Trevino*. King likewise failed to show that his

58

initial state habeas counsel was ineffective in failing to present the claim in the first state habeas application. Finally, King failed to show actual prejudice. He has not satisfied his burden in order to overcome the procedural default on this ineffective assistance of trial counsel claim.

The Director appropriately notes that an additional aspect of the present ground for relief was actually presented in the first state application for a writ of habeas corpus. King complained that trial counsel was never interested in verifying either his version of events or his alibi. In support of this claim, he cited affidavits from Ronald King, his father, and Claudia Womack. This issue was fully developed during the first state habeas corpus proceeding. King's trial attorney, Sonny Cribbs, provided an affidavit that included the following statement:

> Just before trial or at the beginning of trial, Mr. King told us that he remembered seeing a young white person sitting out smoking on or near the steps of the apartment complex when he came back to the apartment with Brewer, Berry, and Mr. Byrd on the night of the offense. We sent two investigators out to the apartment complex in an attempt to locate this unknown person, although Mr. King had no other information about his identity. The investigators searched the entire complex area, checked with every apartment, and found no one who could recall having seen Mr. King return that night nor could possibly identify any young person matching the description given by Mr. King living at or visiting anyone in the apartment complex.

SHCR-01 at 144.[8]

Upon review of the state application, the record and affidavit, the state trial court entered the following findings of fact and conclusions of law:

> 78.    The Court has reviewed trial counsel Haden Cribb's affidavit, including his averments regarding the attempt to locate [King's] un-named alibi witness, (State's Writ Exhibit D, p. 5). As set forth above, the Court is familiar with Mr. Cribbs, finds him to be a credible witness, and finds the statements in his affidavit to be worthy of belief.

---

[8]"SHCR-01" refers to the Clerk's Record compiled during the first habeas corpus proceeding in state court, followed by the page number.

79.     The Court notes that [King] has refused to verify his application for writ of habeas corpus and that he has presented no evidence to this Court to support his claims that an alibi witness exists and that counsel should have located the witness.

80.     The Court acknowledges and adopts the holding of the Court of Criminal Appeals regarding this factual issue: "[King] did not allege what further investigation counsel should have conducted, who his alleged alibi witness was, or how an alibi defense could have been persuasive given the physical evidence and [King's] own statements connecting him with the crime," *King v. State*, 29 S.W.3d 556, 569 (Tex. Crim. App. 2000).

81.     The Court finds, based upon the Court of Criminal Appeals' holding, that [King's] allegation regarding an un-identified alibi witness - without any assertion regarding the substance of the witness' testimony - is insufficient to demonstrate that such a witness' testimony would have been material.

82.     In addition, the Court is aware of [King's] *pro se* response (filed July 5, 2000 in this Court) to the civil petition for damages filed by James Byrd's survivors against [King] and his co-defendants in this Court in cause number 21973. The Court takes judicial notice of [King's] response in that case (although by taking notice of the *pro se* response the Court does not accept as true any of the assertions made therein) and finds that, although [King] changed his story in that response from the story that he gave to the Dallas Morning News before trial (which was admitted as State's Exhibit 105 and quoted in part in *King v. State*, 29 S.W.3d 556, 560-62 (Tex. Crim. App. 2000)) and added into his story for the first time allegations about a fourth man involved in picking up the victim, [King] never named that fourth man, instead referring to him throughout as "John Doe." The Court notes that the fourth man described in [King's] June 2000 civil response does not match the location or circumstances of the un-named witness of whom, according to the affidavit of Mr. Cribbs, [King] advised trial counsel shortly before or during trial.

83.     The Court finds that there is no evidence before this Court regarding the identity of [King's] alleged "alibi" witness, nor is there any evidence before this Court which would permit any person to locate this alibi witness.

84.     The Court finds that there is no evidence before this Court that [King] ever made known to trial counsel - before, during, or after trial - the identity or location of any alleged "alibi" witness.

85.     The Court finds that trial counsel made diligent efforts at trial to locate the witness who [King] advised them might exist.

86.	The Court finds that trial counsel rendered reasonably effective assistance in attempting to locate the purported witness with the scant information provided by [King].

SHCR-01 at 193-94.  The trial court went on to find that King failed to prove that trial counsel's representation on this issue was deficient or that he was prejudiced by such deficient representation.  *Id.* at 195.  The TCCA subsequently denied the first state application for a writ of habeas corpus without written order.  This aspect of King's second ground for relief should be denied because he has not shown, as required by 28 U.S.C. § 2254(d), that the State court findings resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States, or resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceedings.

Overall, King has not shown that his ineffective assistance of trial counsel claim contained in the second ground for relief has any merit.

King complicates this claim somewhat by including allegations of actual innocence.  In evaluating this argument, it is again noted that a federal habeas claim is procedurally defaulted when the state court has based its rejection of the claim on a state procedural rule that provides an adequate basis for relief, independent of the merits of the claim.  *Coleman*, 501 U.S. at 729-32.  "[A] federal court will not entertain a procedurally defaulted constitutional claim in a petition for habeas corpus absent a showing of cause and prejudice to excuse the default."  *Haley*, 541 U.S. at 388.  Under a narrow exception to this rule, courts will review such a claim without a showing of cause and prejudice "when the habeas applicant can demonstrate that the alleged constitutional error has resulted in the conviction of one who is actually innocent of the underlying offense or,

in the capital sentencing context, of the aggravating circumstances rendering the inmate eligible for the death penalty." *Id.* A claim of actual innocence is "'not itself a constitutional claim, but instead a gateway through which a habeas petitioner must pass to have his otherwise barred constitutional claim considered on the merits.'" *Schlup v. Delo*, 513 U.S. 298, 315 (1995) (quoting *Herrera v. Collins*, 506 U.S. 390, 404 (1993)). *See also Rocha*, 626 F.3d at 824. This basic principle was recently reaffirmed by the Supreme Court in *McQuiggin v. Perkins*, 133 S. Ct. 1924, 1931 (2013), and by the Fifth Circuit in *Burton v. Stephens*, 543 F. App'x 451, 458 (5th Cir. 2013).

In his reply to the answer, King asserts that he is bringing both a "freestanding" claim of actual innocence and a "gateway" claim of actual innocence, but the Supreme Court has never recognized a "freestanding" claim of actual innocence. *McQuiggin*, 133 S. Ct. at 1931. Moreover, the Fifth Circuit has regularly rejected freestanding claims of actual innocence. *See Coleman v. Thaler*, 716 F.3d 895, 908 (5th Cir. 2013) (citations omitted). King has not shown any Supreme Court or Fifth Circuit authority recognizing a freestanding claim of actual innocence; thus, he has not shown a basis for relief using this argument.

In both *McQuiggin* and *Rocha*, the petitioners were trying to overcome procedural problems by arguing actual innocence in order to have their ineffective assistance of counsel claims considered on the merits. In *Rocha*, the Fifth Circuit stressed that a petitioner must make a "sufficient gateway showing of actual innocence to justify having his federal habeas claim considered on the merits." 626 F.3d at 825 (citing *House v. Bell*, 547 U.S. 518, 522 & 553-54 (2006)). Prior to *Martinez/Trevino*, the only way King would have been able to have the present ground for relief considered on the merits would have been by passing through the actual

innocence gateway, but *Martinez/Trevino* provided him with a second opportunity to have the claim considered on the merits. Nonetheless, as was previously explained, he failed to satisfy the cause and prejudice exception provided by *Martinez/Trevino*. Thus the question remaining before the court is whether King has made a sufficient gateway showing of actual innocence.

The Supreme Court has stressed that the burden of showing actual innocence is extraordinary:

> To establish the requisite probability, the petitioner must show that it is more likely than not that no reasonable jury would have convicted him in light of the new evidence. The petitioner thus is required to make a stronger showing than that needed to establish prejudice. At the same time, the showing of "more likely than not" imposes a lower burden of proof than the "clear and convincing" standard required under *Sawyer*. The *Carrier* standard thus ensures that petitioner's case is truly "extraordinary."

*Schlup*, 513 U.S. at 327.

The Supreme Court has further illuminated the standard enunciated in *Schlup*. "First, although '[t]o be credible' a gateway claim requires 'new reliable evidence - whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence - that was not presented at trial,' [*Schlup*, 513 U.S.] at 324, 115 S. Ct. 851, the habeas court's analysis is not limited to such evidence." *House*, 547 U.S. at 537. The "habeas court must consider 'all the evidence,' old and new, incriminating and exculpatory, without regard to whether it would necessarily be admitted under 'rules of admissibility that would govern at trial.'" *Id.* at 538 (quoting *Schlup*, 513 U.S. at 327-28). Then, "[b]ased on this total record, the court must make 'a probabilistic determination about what reasonable, properly instructed jurors would do.'" *Id.* (quoting *Schlup*, 513 U.S. at 329).

Second, "the *Schlup* standard is demanding and permits review only in the 'extraordinary' case." *House*, 547 U.S. at 538 (quoting *Schlup*, 513 U.S. at 327). Although in the vast majority of cases, claims of actual innocence are rarely successful, "the *Schlup* standard does not require absolute certainty about the petitioner's guilt or innocence." *Id.* Instead,

> A petitioner's burden at the gateway stage is to demonstrate that more likely than not, in light of the new evidence, no reasonable juror would find him guilty beyond a reasonable doubt - or, to remove the double negative, that more likely than not any reasonable juror would have a reasonable doubt.

*Id.* Finally, the Supreme Court explained that "the gateway actual-innocence standard is 'by no means equivalent to the standard of *Jackson v. Virginia*, 442 U.S. 307, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1970),' which governs claims of insufficient evidence." *Id.* (quoting *Jackson*, 442 U.S. at 330). Instead, "[b]ecause a *Schlup* claim involves evidence the jury did not have before it, the inquiry requires the federal court to assess how reasonable jurors would react to the overall, newly supplemented record." *Id.* This may include consideration of "the credibility of the witnesses presented at trial." *Id.* at 537-38 (quoting *Jackson*, 442 U.S. at 330).

More recently, the Fifth Circuit discussed the type of evidence that must be presented in order to satisfy the actual innocence standard:

> Proving such a claim is daunting indeed, requiring the petitioner to show, as a factual matter, that he did not commit the crime of conviction. The petitioner must support his allegations with new, reliable evidence that was not presented at trial and must show that it was more likely than not that no reasonable juror would have convicted him in the light of the new evidence. Such new, reliable evidence may include, by way of example, exculpatory scientific evidence, credible declarations of guilt by another, trustworthy eyewitness accounts, and certain physical evidence.

*McGowen v. Thaler*, 675 F.3d 482, 499-500 (5th Cir. 2012), *cert. denied*, 133 S. Ct. 648 (2012) (internal quotation marks and citations omitted).

In the present case, King submitted an affidavit from Samuel Rae,[9] his natural father, who indicated that King had expressed a desire before the murder to move to Georgia and work with him. King argues that the affidavit undercuts the State's theory about the motive for the murder, including his alleged desire to begin a chapter of the Confederate Knights of America in Jasper. King also submitted a letter from co-defendant Lawrence Brewer[10] stating that King was not involved.

The Director responded by noting that nothing in the letter indicates that Brewer would have been willing, much less able, to testify at King's trial. Moreover, this "admission" on Brewer's part is in direct conflict with the testimony at Brewer's own capital murder trial that he, King and Shawn Berry (and no one else) were present when the victim was murdered. The Director argues that Brewer's recantation is patently incredible. *See Spence v. Johnson*, 80 F.3d 989, 1003 (5th Cir.), *cert. denied*, 519 U.S. 1012 (1996); *Drew v. Scott*, 28 F.3d 460, 463 (5th Cir.), *cert. denied*, 512 U.S. 1266 (1994).

The core evidence that was before the jury that found King guilty was discussed by the TCCA as follows:

> To summarize, the State presented several items of evidence that connect [King] to Byrd's murder: (1) DNA evidence from a cigarette butt at the crime scene - indicating [King's] presence during the murder, (2) DNA evidence on [King's] sandals - linking [King] to Byrd's injuries, (3) [King's] false statements to the media - indicating consciousness of guilt and an attempt to cover up the crime, (4) [King's] letter to Brewer - which could be construed as an admission that [King] participated in the crime, and (5) [King's] racial animosity - which supplies a motive for murder.

*King*, 29 S.W.3d at 565.

---

[9]*See* Reply Brief at 149; Reply Exhibit J.

[10]*See* Petitioner's Amended Petition, Exhibit 38 (Letter by Lawrence Russell Brewer, dated June 7, 2003).

The additional evidence presented by King to support his actual innocence claim was his father's affidavit and Brewer's letter. However, neither Rae's affidavit nor Brewer's letter satisfies the extraordinarily high standard discussed in *Schlup*. Rae's affidavit provides nothing more than an inference that King at one time had thoughts about moving to Georgia to work with his father, but it did not provide an alibi. It did not undercut the State's evidence about King's motive for the murder. Similarly, Lawrence Russell Brewer's rambling fifty page letter, entitled "Coup de Grace," is of questionable value. For one thing, it was prepared five years after Mr. Byrd's death and four years after Brewer was convicted. *See Komolafe v. Quarterman*, 246 F. App'x 270, 272 (5th Cir. 2007), *cert. denied*, 552 U.S. 1168 (2009) (credibility of affidavit was mitigated by the fact that it was submitted eight years after the petitioner's conviction). Furthermore, the letter is internally inconsistent and in direct conflict with the evidence presented at Brewer's trial. *Id. See also Graves v. Cockrell*, 351 F.3d 143, 153 (5th Cir. 2003) (*Schlup* is not satisfied with a recanting affidavit containing numerous contradictory statements). Moreover, at this juncture, the letter is particularly suspect since Brewer cannot be cross-examined because he has been executed. The Fifth Circuit has stressed that "recanting affidavits and witnesses are viewed with extreme suspicion by the courts." *Spence*, 80 F.3d at 1003 (citing *May v. Collins*, 955 F.2d 299, 314 (1992)). In *Drew*, the Court stated that it had "little confidence in [a co-defendant's] postsentencing truth experience because he had nothing to lose by incriminating himself after receiving a 60-year sentence." 28 F.3d at 463. The state court's findings were cited for the proposition that "[i]t is not unusual for one of two convicted accomplices to assume the entire fault and thus exculpate his codefendant by the filing of a recanting affidavit or other statement." *Id.* The Fifth Circuit concluded that even if the affidavits were accepted as true,

66

"these statements would not undermine our confidence in the jury's verdict in the least." *Id.* This court is of the same opinion with respect to King's evidence supporting his actual innocence claim. Rae's affidavit and Brewer's letter are of little value. His other affidavits, such as the statements by Dr. Mark Cunningham and Roy Birnbaum, are no better. Considering all the evidence, both old and new, incriminating and exculpatory, King has not shown that it is more likely than not that no reasonable juror would have voted to find him guilty beyond a reasonable doubt. The actual innocence claim lacks merit. He has not satisfied the extraordinary gateway showing required in order to have any of his remaining claims considered on the merits.

Overall, with respect to the second ground for relief, King has shown neither cause and prejudice nor actual innocence in order to overcome the procedural bar. With respect to the evidence that was properly presented to the state courts in the first state habeas corpus proceeding, King has not shown, as required by 28 U.S.C. § 2254(d), that the State court findings resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States, or resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceedings. Finally, the second ground for relief should also be denied because it lacks merit.

C.    Remaining Claims

Grounds for relief three through twenty-one may be grouped into two broad categories. Three of the claims were previously dismissed on summary judgment (#64), and the rest are subject to the procedural bar.

3.    The trial court violated King's rights under the Sixth and Fourteenth Amendments when it denied his request for different trial counsel and denied trial counsel's motion to withdraw

King's third ground for relief is a freestanding claim that the trial court violated his rights under the Sixth and Fourteenth Amendments when it denied his request for different trial counsel and denied trial counsel's motion to withdraw. The ground for relief was one of the three claims rejected in the previous memorandum opinion. It should be recalled that it was also rejected in the current memorandum when presented in the context of an ineffective assistance of trial counsel claim in claim 1(k). King has not shown that he is entitled to relief based on ground for relief number three.

4.    King's rights under the First and Fourteenth Amendments were violated by the admission of evidence during both phases of his trial, relating to his abstract beliefs without a sufficient "nexus" to the crime, contrary to *Dawson v. Delaware*[11]

The fourth ground for relief relates to the evidence regarding King's abstract beliefs, racism, alleged affiliation with a group called the Confederate Knights of America, and writings and reading materials. He argues that the introduction of this evidence violated his rights under the First Amendment, denied him due process, and biased the jury against him. The ground for relief was rejected by the TCCA as an abuse of the writ. In an effort to overcome the procedural bar, King argues in his amended petition that the dismissal of the claim on procedural grounds was

---

[11]503 U.S. 159 (1992).

due to the failure of initial state habeas counsel to raise it in the first state habeas petition. He did not add anything to the argument in his reply to the answer. His argument does not satisfy the *Martinez*/*Trevino* rule. More specifically, he failed to show that (1) his underlying claims of ineffective assistance of trial counsel are substantial, and (2) his initial state habeas counsel was ineffective in failing to present those claims in his first state habeas application. King has not satisfied his burden in order to overcome the procedural bar.

5. The admission of unreliable and unscientific testimony of "future dangerousness" violated King's rights under the Eighth and Fourteenth Amendments to the United States Constitution

The fifth ground for relief is yet another complaint about Dr. Gripon's testimony. King presented similar complaints in the context of his ineffective assistance of trial counsel claims in claims 1(a) and 1(l). The present ground for relief was rejected by the TCCA as an abuse of the writ. In an effort to overcome the procedural bar, King argues in his amended petition that the dismissal of the claim on procedural grounds was due to the failure of initial state habeas counsel to raise it in the first state habeas petition. His excuse, however, does not satisfy the *Martinez*/*Trevino* rule, which requires him to show that (1) his underlying claims of ineffective assistance of trial counsel are substantial, and (2) his initial state habeas counsel was ineffective in failing to present those claims in his first state habeas application. In his reply, he attempts to satisfy the *Martinez*/*Trevino* rule by renewing his ineffective assistance of trial counsel claim, but such claim lacks merit for reasons previously explained in conjunction with claims 1(a) and 1(l). King has not satisfied his burden in order to overcome the procedural bar.

6.     The Texas "special issues" deprived King of his Sixth and Fourteenth Amendment rights to have a jury determine, beyond a reasonable doubt, every fact that operates to increase the punishment authorized, as required by *Apprendi v. New Jersey*[12] and *Ring v. Arizona*[13]

7.     The State's introduction of unconvicted offenses and the sentencer's consideration of that evidence violated King's Sixth, Eighth and Fourteenth Amendment rights and was contrary to the holding in *Apprendi* and *Ring*

The sixth and seventh grounds for relief relate to *Apprendi* and *Ring*. The Supreme Court held that, except for prior convictions, "any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." *Apprendi*, 530 U.S. at 490. The Supreme Court extended *Apprendi* to facts giving rise to capital punishment in *Ring*, 536 U.S. at 589. The sixth and seventh grounds for relief were rejected by the TCCA as an abuse of the writ. King did not show cause and prejudice for the default or that a fundamental miscarriage of justice would occur if the court did not consider the claim on the merits. He has not satisfied his burden in order to overcome the procedural bar.

King acknowledges that his claims are contrary to Fifth Circuit law. *See Brown v. Dretke*, 419 F.3d 365, 377 (5th Cir. 2005); *Vega v. Johnson*, 149 F.3d 354, 359 (5th Cir. 1998). The Director supplemented the list of cases rejecting the argument with the following recent cases: *Druery v. Thaler*, 647 F.3d 535, 546-47 (5th Cir. 2011), *cert. denied*, 132 S. Ct. 1550 (2012); *Paredes v. Quarterman*, 574 F.3d 281, 292 (5th Cir. 2009), *cert. denied*, 562 U.S. 1203 (2011). Most recently, the Fifth Circuit reiterated that the *Apprendi* and *Ring* arguments have repeatedly been rejected and, furthermore, they do not apply retroactively to cases on collateral review.

---

[12] 530 U.S. 466 (2000) (holding that any fact that necessarily increases punishment must be determined by a jury).

[13] 536 U.S. 584 (2002) (holding that *Apprendi* applies to capital sentencing trials).

*White v. Thaler*, 522 F. App'x 226, 234 (5th Cir. 2013) (citing *Teague v. Lane*, 489 U.S. 288 (1989), *cert. denied*, 134 S. Ct. 907 (2014)).  Like the situation in *White*, King was convicted years before the issuance of the decisions in *Apprendi* and *Ring*.  Relief is unavailable.  Despite the case law being clearly against him, King still included the claims in his petition.  He specified that he raised these issues to preserve them for review.  Nonetheless, the court simply lacks authority to grant relief on these claims.

8. <u>Due to pervasive and extensive pre-trial publicity, King's trial was conducted in a prejudicial atmosphere that made the trial process inherently unfair and deprived him of due process</u>

9. <u>The totality of the prejudicial circumstances and atmosphere surrounding the trial deprived King of his Fifth, Sixth, Eighth and Fourteenth Amendment rights and violated his right to due process of law</u>

10. <u>King was deprived of his right to a fair trial in violation of his rights under the Sixth, Eighth, and Fourteenth Amendments when the trial court refused to grant his motion for a change of venue despite overwhelming prejudice against him in Jasper</u>

Claims eight through ten concern the pre-trial publicity surrounding the offense and the trial court's failure to grant King a change of venue.  The claims were dismissed by the TCCA as an abuse of the writ.  King has not shown cause and prejudice for the default or that a fundamental miscarriage of justice would occur if the court does not consider the claim on the merits.  In the amended petition, King merely argues the dismissal of the claims on procedural grounds was due to the failure of his initial state habeas counsel to raise them in his first state habeas petition.  The Director appropriately notes that King does not claim ineffective assistance of trial counsel in order to benefit from the holdings in *Martinez* and *Trevino*.  In his reply to the answer, King adds an ineffective assistance of trial counsel claim in an effort to bring the grounds for relief within the scope of the *Martinez*/*Trevino* rule.  It should be recalled, however, that King presented a

71

pretrial publicity claim in the context of an ineffective assistance of trial counsel in claim 1(c), but he failed to show that his trial counsel was ineffective and the claim was rejected. The reasoning is equally applicable to the present grounds for relief. Claims eight through ten should be dismissed because King has not satisfied his burden to overcome the procedural bar.

11. <u>King was denied meaningful access to the courts and due process of law in state post-conviction proceedings and was denied competent counsel for his initial state habeas proceedings by unconstitutional state court action</u>

The eleventh ground for relief was rejected in the court's previous memorandum opinion. King acknowledges in his amended petition that this claim was among those that were dismissed. The court's previous decision was issued before the Supreme Court announced the decisions in *Martinez* and *Trevino*. To the extent that circumstances have changed as a result of those decisions, the present opinion takes into account the decisions announced in *Martinez* and *Trevino*. Nonetheless, as discussed throughout this opinion, these cases do not provide him with any basis for relief.

12. <u>King's attorneys were ineffective in not obtaining and/or using a confidential defense psychiatric expert under *Ake v. Oklahoma*[14] to examine their client for purposes of both guilt/innocence and punishment phases of the trial</u>

In the twelfth ground for relief, King asserts that his attorneys knew or should have known that an insanity or diminished mental capacity defense was a viable option, but his attorneys were allegedly ineffective for making very little or no attempt to have him evaluated on a confidential basis, as they were entitled to under *Ake v. Oklahoma*. "In *Ake*, the Supreme Court held that, upon request, a trial court must appoint a psychiatrist for an indigent defendant if a defendant demonstrates to the trial judge that his sanity at the time of the offense is to be a significant factor

---

[14] 470 U.S. 68 (1985).

at trial and, in the context of a capital sentencing proceeding, when the state presents psychiatric evidence of the defendant's future dangerousness." *Woodward v. Epps*, 580 F.3d 318, 331 (5th Cir. 2009) (citing *Ake*, 470 U.S. at 82-83), *cert. denied*, 559 U.S. 1071 (2010)). King acknowledged that this claim, as it relates to the guilt/innocence phase of the trial, was rejected in the court's previous order granting summary judgment in favor of the Director. He was permitted to return to state court to exhaust the claim as it relates to the punishment phase of the trial. The TCCA dismissed the subsequent application for a writ of habeas corpus as an abuse of the writ. For reasons that will hereinafter be explained, King has not satisfied his burden of overcoming the procedural bar based on the *Martinez/Trevino* rule.

The ground for relief lacks merit in several respects. The Director appropriately observes that it appears that King is arguing, in part, that counsel was *per se* ineffective for using a psychologist, rather than a psychiatrist, as his mental health expert at trial. The court rejected this aspect of King's claim in the previous memorandum opinion. *See, e.g.*, *Hogan v. Estelle*, 537 F.2d 238, 238 (5th Cir. 1976), *cert. denied*, 429 U.S. 1065 (1977). The Director further notes that there is no evidence before the court from either the trial or any post-conviction proceedings that King had or has any mental disorder that would have raised the issue of sanity. Indeed, the psychologist who testified at trial on King's behalf, Dr. Quijano, explained that King had no mental disorder, and this, he testified further, meant that King would pose less of a future danger than an inmate diagnosed with a mental disorder, as that might cause irrational reactions. 24 RR 88-89. The Director persuasively argues that King has not shown the need for an additional psychiatric expert; thus, the claim lacks merit.

The claim also lacks merit because of the development of the issue during the first state habeas proceeding, although the issue there specifically concerned the guilt/innocence phase of the trial. Defense counsel Sonny Cribbs submitted an affidavit during the first state habeas corpus proceedings, wherein he discussed his efforts to investigate King's mental health as follows:

> During my preparation for trial I made diligent attempts to discover and develop any evidence of mental illness, insanity, or mental defects which might have excused Mr. King from criminal responsibility or mitigated punishment. I tried without success to obtain favorable psychiatric evidence. I talked to several personal friends who are psychiatrists or psychologists who did not wish to become involved in this case. I was able to obtain the services of Dr. Curtis Wills, a forensic psychologist from the Wilmington Institute, who has had vast experience in criminal defense and prosecution mental health evaluations, and has testified in both state and federal courts, to interview Mr. King and render an opinion regarding his mental condition. Dr. Wills could only advise me that Mr. King was intelligent, able to converse regarding his circumstances and showed no evidence of any insanity, mental illness or any mental disability. Mr. King also denied to me that he had any mental disability on which I could base a claim of insanity or mitigation. In preparing for trial we searched for and interviewed Mr. King's natural mother, sisters, natural father, step-sister and on numerous occasions with his adoptive father, Ronald King, and numerous friends. All but his adoptive father and some friends were essentially hostile to Mr. King; and all but the adoptive sister, his adoptive father and some friends refused to testify and refused to offer any testimony that might be helpful at all to him and none of the people I interviewed gave any indication that Mr. King had any insanity or mental illness. All of the family members I talked to indicated that Mr. King had been pampered and protected as [a] child, that he had not been abused, and that he had been protected from the negative consequences of his actions by his adoptive family. I checked his school records, reviewed available history pertaining to his adoptive parents and natural parents, and talked personally to Texas Department of Criminal Justice employees and fellow inmates who had associated with Mr. King; I did not uncover any evidence in any of these interviews that I believed, in my professional opinion, could be helpful to King's defense. I eventually obtained the services of Dr. Walter Quijano, a forensic psychologist with significant criminal experience, to testify on Mr. King's behalf. He and two associates did an extensive examination of Mr. King and also found no evidence of insanity, mental illness or mental disability. Dr. Quijano testified on Mr. King's behalf at punishment. After interviewing Dr. Wills, we felt that any evidence from Dr. Wills on punishment would not be helpful at all and he was not used.

SHCR-01 at 141-44.

The state trial court subsequently issued the following findings regarding King's mental

health:

49.  The Court finds that [King] has specifically conceded that he is not raising a claim of denial of expert assistance under *Ake v. Oklahoma*, 470 U.S. 68, 105 S. Ct. 1087, 84 L. Ed. 2d 53 (1985).

50.  The Court finds that [King] has made no complaint regarding his expert Dr. Quijano's qualification to testify as an expert in assessing future dangerousness.

51.  The Court finds that Dr. Quijano was well-qualified to assist defense counsel in this regard, having served as the director of psychiatric services and chief psychologist for the Texas Department of Criminal Justice and having testified in over 90 capital murder cases for both the State and the defense. (RR 24:76-80).

52.  The Court has reviewed the affidavit of defense counsel Haden Cribbs as an exhibit to the State's response to the application for writ of habeas corpus. (State's Writ Exhibit D). The Court is familiar with Mr. Cribbs, finds that Mr. Cribbs is a credible witness, and finds the statements in the affidavit to be worthy of belief, and accepts the statements contained in the affidavit as true and correct.

53.  The Court finds that there is no evidence before the Court from the trial record or other sources that [King] had or has any significant mental disorder which, if true, would raise the issue of his sanity.

54.  The Court finds from all of the evidence produced at trial, from the Court's own observations of [King] and review of [King's] letters and *pro se* pleadings filed in this Court, and from the affidavit of Mr. Cribbs regarding his additional investigation that [King] had no mental disorder that would render him insane or incompetent to stand trial, that [King] is of at least normal intelligence, and that [King] has not demonstrated any mental illness or disability that would mitigate his moral blameworthiness for this offense.

55.  The Court finds that trial counsel obtained and utilized reasonably competent expert assistance to evaluate [King's] mental status and assist in his defense. (See State's Writ Exhibit D, pp. 2-5).

56.  The Court finds that trial counsel made diligent efforts to prevent the State and its experts from interrogating or examining [King] and that these efforts were a reasonable exercise of trial strategy. (CR: 64, 69, 74, 76, 78, 99).

57.     The Court finds that trial counsel was reasonably effective in refraining from attempting to raise an insanity issue at trial in light of the lack of any evidence to support such a defense.

58.     The Court finds that trial counsel used defense testimony regarding [King's] lack of mental illness to his advantage at the punishment stage and that such use was a reasonable exercise of trial strategy. (RR24: 88-90).

59.     The Court finds that [King] has failed to present any evidence, or even make any specific assertions, that the defense mental health experts consulted by trial counsel were inadequate or incompetent in any way.

60.     The Court finds that trial counsel was diligent in investigating [King's] background in an attempt to find any favorable evidence to use at punishment. (State's Writ Exhibit D, pp. 3-4).

SHCR-01 at 188-89. The TCCA subsequently denied the first state application for a writ of habeas corpus without written order. As was noted in the previous memorandum opinion, the portions of this ground for relief that were exhausted should be denied because King has not shown, as required by 28 U.S.C. § 2254(d), that the State court findings resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States, or resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceedings.

Even though this claim as it relates to the punishment phase of the trial was not specifically raised in the first state habeas corpus proceeding, the substance of the claim was developed. Mr. Cribbs' discussion regarding his efforts to discover and develop any evidence of mental illness, insanity or mental defects applies equally to both the guilt/innocence and punishment phases of the trial. Counsel fulfilled his duty to conduct an investigation regarding mitigating evidence in order to "discover *all reasonably available* mitigating evidence." *Wiggins v. Smith*, 539 U.S. 510, 524

(2003) (emphasis in original). Counsel found no evidence of insanity, mental illness or mental disability. This is not a situation where defense counsel was on notice of a defendant's past institutionalization and conducted "no investigation of any kind" into competency. *Cf. Bouchillon v. Collins*, 907 F.2d 589, 596-97 (5th Cir. 1990). Counsel had no duty to "believe that another psychiatrist might reach a different conclusion" where the initial evaluation "was consistent with counsel's own perception and observation of the defendant." *Clark v. Collins*, 19 F.3d 959, 964 (5th Cir.), *cert. denied*, 513 U.S. 966 (1994).

It is again noted that the present ground for relief is specifically based on *Ake*. King alleges that his trial attorneys were ineffective in not obtaining and/or using a confidential psychiatric expert. In light of the mental health evaluations obtained by counsel in his preparation for trial, any effort to have a psychiatrist appointed would have done nothing to assist in King's defense and counsel's decision came within the scope of well informed, strategic decisions, that cannot be second-guessed. *Crane v. Johnson*, 178 F.3d 309, 314 (5th Cir.), *cert. denied*, 528 U.S. 947 (1999).

It should also be recalled that King specifically denied that he was bringing a claim under *Ake* in the first state habeas corpus proceeding and that the trial court issued a finding that he was not bringing a claim under *Ake*. King, nonetheless, added a claim under *Ake* when he filed the present petition. King is being somewhat disingenuous in arguing in the present proceeding that he is entitled to relief under *Ake*.

In an effort to overcome the procedural bar, King argues in the amended petition that the dismissal of the claim on procedural grounds was due to the failure of initial state habeas counsel to raise it in the first state habeas application. His excuse, however, does not satisfy the

*Martinez/Trevino* rule, which requires him to show that (1) his underlying claims of ineffective assistance of trial counsel are substantial, and (2) his initial state habeas counsel was ineffective in failing to present those claims in his first state habeas application. In his reply to the answer, King states nothing more than the Director's argument that the claim is procedurally barred is no longer valid in light of *Trevino*. The excuse offered in his reply is conclusory. He has not satisfied his burden in order to overcome the procedural bar. The twelfth ground for relief is procedurally barred.

13. King's jury was fundamentally biased against him due to errors of the trial court in death-qualifying the jury in violation of *Witherspoon v. Illinois*[15] and *Morgan v. Illinois*[16]

In his thirteenth ground for relief, King argues that the jury was fundamentally biased against him because of errors of the trial court in death-qualifying the jury. He specifically argues that prospective jurors were erroneously excluded for cause because of their opposition to the death penalty, in violation of *Witherspoon*, while others were kept on the jury who should have been excluded due to their bias in favor of the death penalty, in violation of *Morgan*. In support of the claim, he cites the record with respect to the following prospective jurors: James Edward Mallett, Nicholaus Dwayne Fountain, Larry Pedigo, Herman Marie Rawls, Jo Marie Jones, Larry DeLord, Bartley Rhodes, Craig S. Harding, Steven Wheeler and James Nobles.

The Supreme Court has held that prospective jurors may be excluded for cause if they "would automatically vote against the imposition of capital punishment without regard to any evidence that might be developed at the trial of the case before them, or . . . that their attitude

---

[15]391 U.S. 510 (1969).

[16]504 U.S. 719 (1992).

toward the death penalty would prevent them from making an impartial decision as to the defendant's guilt." *Witherspoon*, 391 U.S. at 522 n.21. "A prospective juror, however, may not be excluded for cause simply because he may be hesitant in his ability to sentence a defendant to death." *Knight v. Quarterman*, 186 F. App'x 518, 535 (5th Cir. 2006) (internal citations omitted). Conversely, in *Morgan*, the Supreme Court held that prospective jurors who state that they will vote for the death penalty without regard to mitigating evidence should be disqualified for cause because they have formed an opinion concerning the merits of the case without basis in evidence presented at trial. *Id.* at 738-39. The Fifth Circuit has "stated that *Morgan* only involves the narrow question of whether, in a capital case, jurors must be asked whether they would automatically impose the death penalty upon conviction of the defendant." *Trevino v. Johnson*, 168 F.3d 173, 183 (5th Cir.), *cert. denied*, 527 U.S. 1056 (1999) (citation omitted).

In the present case, prior to the second state habeas corpus proceeding, King only challenged the exclusion of James Edward Mallett, which was raised on direct appeal. The TCCA provided the following discussion in overruling the point of error:

> In his third point of error, [King] claims that the trial court erred in sustaining the State's challenge for cause to remove venireman James Edward Mallet because the record viewed as a whole does not show that Mallet's views against capital punishment would prevent or substantially impair the performance of his duties as a juror in accordance with his instruction and oath. During voir dire, Mallett, in response to the State's examination, stated that he was unwilling to impose the death penalty. The following is the relevant part of the State's examination of Mallett:

>> [PROSECUTOR]: Is your belief such that under no circumstances at all can you sit on a jury that would impose a death penalty?

>> A: I'd rather not.

>> Q: We really need an unequivocal answer on it. Can you serve on a jury that would impose a death penalty, or is it something you just can't do?

A: According to God's word, I wouldn't want to do it.

Q: Well, you put in "I wouldn't want to do it," which leaves the opening that you might be able to do it; and I need an unequivocal answer one way or the other. Could you do it?

A: No, I wouldn't want to sit on it.

Q: Does that mean you can't do it?

A: That means that I wouldn't want to at all. Now, the life sentence or two life sentences, I'll agree with that.

Q: If you sat as a juror and 11 people were in favor of answering the issues in a way that would result in a death penalty and you were the 12th person, would you go with the life? Would you go against 11? What would you do?

A: Well, if I state what I said, I'd have to go against.

Q: You'd go against the death penalty?

A: Yes, sir.

* * *

Q: No matter how bad the crime, no matter what was done, your religious beliefs are such that you just cannot impose the death penalty?

The defense then attempted to rehabilitate Mallet, detailing the procedure for imposing the death penalty and the special issues to be answered by the jury. Mallett indicated that he might be able to answer these questions truthfully and follow the law but ended his questioning with an unequivocal answer that he would always vote against the death penalty. The relevant portion of the voir dire exchange follows:

[DEFENSE COUNSEL]: … [W]ould you always answer that question no, regardless of what you felt the evidence was or what the State proved, in order that the defendant would not be given a death penalty every time, regardless of evidence?

A: I don't know.

80

Q: Well, that's what we've got to know because you're the only person that can answer that, Mr. Mallet; and there's some people that never will answer a question yes ... regardless of what the evidence is.... But we've got to know.

A: Well, I still don't believe in the capital punishment.

A: Well, it's not really whether you believe in capital punishment. Will you follow the law?

A: I'll do my best.

Q: And if you follow the law and you answer those questions, you answer the questions yes or no; or would you always answer the questions in a way that would always inflict life sentence rather than the death penalty?

A: Well, I'd rather see anybody get life than death.

* * *

That's just strictly—nobody made up my mind on that.

Q: ... If you won't answer those questions the way the law is presented or the way you think it is or you'd always answer them a certain way to result in a life sentence, that's fine, too. If that's what it is or not, we need you to answer.

A: Well, I still—like I said, I just believe in a life sentence, not a death sentence. The answer to the death sentence is no.

Over [King's] objection, the trial court sustained the State's challenge for cause.

A juror may not be challenged for cause based on his views about capital punishment unless those views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath. In reviewing the trial court's decision to dismiss a venireman upon a sustained challenge for cause, considerable deference is given to the trial court because it is in the best position to evaluate the venireman's demeanor and responses. In reviewing the trial court's action, we ask whether the totality of the voir dire testimony supports the court's finding that the prospective juror is unable to follow the law as instructed and reverse only if a clear abuse of discretion is evident. When the potential juror's answers are vacillating, unclear or contradictory, particular deference is accorded to the trial court's decision.

Here, the voir dire record supports the trial court's ruling. Although Mallett indicated that he would do his best to follow the law, he unequivocally stated that "[t]he answer to the death sentence is no." According appropriate deference to the trial court's decision, we hold that the court did not abuse its discretion in sustaining the State's challenge for cause. [King's] third point of error is overruled.

*King*, 29 S.W.3d at 567-68 (internal footnotes omitted). The prospective juror was properly excluded for cause because he unequivocally stated that he would not impose the death penalty. The decision by the TCCA complied with *Witherspoon*. King does not have any basis for federal habeas corpus relief because Mallett was excluded for cause.

King's appellate attorney focused solely on *Witherspoon*. He did not raise any errors based on *Morgan*. King did not raise any complaints about Nicholaus Dwayne Fountain, Larry Pedigo, Herman Marie Rawls, Jo Marie Jones, Larry DeLord, Bartley Rhodes, Craig S. Harding, Steven Wheeler and James Nobles until he filed the second state application for a writ of habeas corpus. The TCCA dismissed the second state application as an abuse of the writ. In his amended petition, King does not show cause and prejudice for the default or that a fundamental miscarriage of justice would occur if the court does not consider the claim on the merits. In an effort to overcome the procedural bar, King merely argues in the amended petition that the TCCA's dismissal of the subsequent writ on procedural grounds was due to the failure of appellate counsel to raise it on direct appeal. In his reply to the answer, he states only that "[t]he procedural default arguments have been presented *supra*." *See* Reply at 188. His reply is conclusory. His argument for overcoming the procedural bar does not satisfy the *Martinez*/*Trevino* rule, which requires him to show that (1) his underlying claims of ineffective assistance of trial counsel are substantial, and (2) his initial state habeas counsel was ineffective in failing to present those claims in his first state

habeas application. King has not satisfied his burden in order to overcome the procedural bar. Consequently, the claim is procedurally barred.

14. <u>The State's failure to disclose a deal made with a prosecution witness undermines confidence in the reliability of the verdict in violation of *Brady v. Maryland*[17]</u>

King alleges in his fourteenth ground for relief that the State violated *Brady* by failing to disclose that the State's witness Matthew Hoover was given a deal in exchange for his testimony. King notes that Hoover was a Texas prison inmate. Hoover testified during the guilt/innocence phase of the trial that King's nickname was "Possum," about King's racist views, and about King's plan to kidnap and kill an African-American.

Under *Brady*, "the suppression by the prosecution of evidence favorable to an accused . . . violates due process where the evidence is material either to guilt or punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 87. *Brady* concerned a defendant's right to a fair trial. *Oman v. Cain*, 228 F.3d 616, 620 (5th Cir. 2000). In order to prevail on a *Brady* claim, the Fifth Circuit has required a petitioner to show that (1) the prosecution suppressed evidence, (2) the evidence was favorable to the defense, and (3) the evidence was material to his guilt or innocence. *Mahler v. Kaylo*, 537 F.3d 494, 499 (5th Cir. 2008) (citations omitted). Evidence is material only when there exists a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. *Id.* at 500. "Evidence is not 'suppressed' if the defendant either knew, or should have known of the essential facts permitting him to take advantage of any exculpatory evidence." *Rector v. Johnson*, 120 F.3d 551, 560 (5th Cir. 1997). The State is not obligated under *Brady* to disclose evidence that is

---

[17]363 U.S. 83 (1963).

available from other sources. *Id.* at 559. Finally, a *Brady* claim may not be premised on mere speculation. *Murphy v. Johnson*, 205 F.3d 809, 814 (5th Cir. 2000); *Hughes v. Johnson*, 191 F.3d 607, 629-30 (5th Cir. 1999).

The Director argues that King failed to show a *Brady* violation. He observes that King's sole evidentiary support for the claim is his own self-serving statement, which he filed in response to a wrongful death lawsuit filed by the Byrd family. He argues that King's *Brady* claim should be dismissed as speculative. Moreover, to counter the self-serving statement presented by King, the Director submits an attachment listing Hoover's criminal history showing that he is currently serving time in Missouri and that he was arrested on the charges associated with these convictions two or three months after he testified in the King case. The Director also notes that Hoover was not the only person who testified about King's racist view. He argues that King cannot show materiality. The Director persuasively argues that King has not satisfied his burden of showing a *Brady* violation.

Even though the fourteenth ground for relief is conclusory and devoid of merit, it should primarily be rejected because it is procedurally barred. The ground for relief was not raised in state court until the second state application for a writ of habeas corpus. The TCCA dismissed the second state application as an abuse of the writ. In an effort to overcome the procedural bar, King merely argues that the dismissal of the claim on procedural grounds was due to the failure of initial state habeas counsel to raise it in the first state habeas petition. The Director correctly observes that the *Martinez*/*Trevino* rule does not apply since King has not shown an underlying claim of ineffective assistance of trial counsel. In his reply to the answer, King states only that "[t]he procedural default arguments have been presented *supra*." *See* Reply at 192. Once again,

his reply is conclusory. King has not shown cause and prejudice for the default or that a fundamental miscarriage of justice would occur if the court does not consider the claim on the merits. King has not satisfied his burden in order to overcome the procedural bar.

15. Article 37.071(e) & (g)'s prohibition against informing jurors that a single holdout juror will cause the imposition of a life sentence violated King's rights under the Eighth and Fourteenth Amendments to the United States Constitution

King's fifteenth ground for relief concerns Texas' "12-10" rule, which purportedly violates *Mills v. Maryland*, 486 U.S. 367 (1988). "In *Mills*, the Supreme Court held that the Eighth Amendment was violated because the jury instructions may have precluded the jury from considering mitigating evidence unless all twelve jurors agreed that a particular circumstance was supported by the evidence." *Miller v. Johnson*, 200 F.3d 274, 288 (5th Cir. 2000) (citing *Mills*, 486 U.S. at 384). The Fifth Circuit has held "that *Mills* is not applicable to the capital sentencing scheme in Texas." *Id.* "Under the Texas system, all jurors can take into account any mitigating circumstance. One juror cannot preclude the entire jury from considering a mitigating circumstance." *Id.* at 288-89 (citing *Jacobs v. Scott*, 31 F.3d 1319, 1329 (5th Cir. 1994)). A full discussion of the "12-10" rule is unnecessary since the Fifth Circuit has repeatedly rejected challenges to Texas' capital sentencing provisions based on *Mills*. *See, e.g.*, *Druery v. Thaler*, 647 F.3d 535, 542-43 (5th Cir. 2011); *Parr v. Thaler*, 481 F. App'x 872, 878-79 (5th Cir. 2012); *Adams v. Thaler*, 421 F. App'x 322, 335 (5th Cir. 2011). Relief based on *Mills* is unavailable.

The fifteenth ground for relief should primarily be rejected, however, because it is procedurally barred. It was not raised in state court until the second state application for a writ of habeas corpus. The TCCA dismissed the second state application as an abuse of the writ. King has not shown cause and prejudice for the default or that a fundamental miscarriage of justice

would occur if the court does not consider the claim on the merits. In an effort to overcome the procedural bar, King merely argues in the amended petition that the TCCA's dismissal of the subsequent writ on procedural grounds was due to the failure of appellate counsel to raise it on direct appeal. In his reply, he states nothing more than his "procedural default arguments have been presented *supra*." *See* Reply at 194. His argument for overcoming the procedural bar does not satisfy the *Martinez/Trevino* rule, which requires him to show that (1) his underlying claims of ineffective assistance of trial counsel are substantial, and (2) his initial state habeas counsel was ineffective in failing to present those claims in his first state habeas application. King has not satisfied his burden in order to overcome the procedural bar. The claim is procedurally barred and devoid of merit.

16.  King was denied the right to effective assistance of appellate counsel in violation of the Sixth, Eighth and Fourteenth Amendment to the United States Constitution

King's sixteenth ground for relief is an ineffective assistance of appellate counsel claim. He raised the ineffective assistance of appellate counsel claim for the first time in his second state application for a writ of habeas corpus, which was denied by the TCCA as an abuse of the writ. He has not shown show cause and prejudice for the default or that a fundamental miscarriage of justice would occur if the court does not consider the claim on the merits. In an effort to overcome the procedural bar, King merely argues in the amended petition that the claim should have been raised in the first application for a writ of habeas corpus. The Director correctly notes that the *Martinez/Trevino* rule does not apply under these circumstances. The Fifth Circuit has specifically declined to extend *Martinez/Trevino* to ineffective assistance of appellate counsel claims. *Reed*, 739 F.3d at 778 n.16. In reply, King merely states that his "procedural default arguments have been presented *supra*." *See* Reply at 195. His argument for overcoming the

procedural bar does not satisfy the *Martinez/Trevino* rule, which requires him to show that (1) his underlying claims of ineffective assistance of trial counsel are substantial, and (2) his initial state habeas counsel was ineffective in failing to present those claims in his first state habeas application. Consequently, the claim is procedurally barred.

17. <u>In view of the many different capital sentencing schemes that have been in operation in Texas in recent years, the Texas death penalty has been arbitrarily imposed and, thus, is unconstitutional under the Eighth Amendment and Equal Protection Clause of the Fourteenth Amendment</u>

King's seventeenth ground for relief is a rather novel argument for having the Texas death penalty procedures declared unconstitutional. He discusses the changes in the Texas death penalty statutes over the last forty years and argues that such changes clearly show that the death penalty has been arbitrarily imposed and is thus unconstitutional under the Eighth Amendment and the Equal Protection Clause of the Fourteenth Amendment. The Western District of Texas rejected a similar complaint about the Texas death penalty statutes that included no fact specific allegations and concluded that it was "little more than a facial attack on the validity of the Texas capital sentencing scheme." *Moore v. Quarterman*, 526 F. Supp. 2d 654, 716 (W.D. Tex. 2007), *c.o.a. denied*, 534 F.3d 454 (5th Cir. 2008). The recent history of the changes in the death penalty scheme were reviewed. It was noted that the petitioner had not identified any Supreme Court precedent which casts any doubt on the validity of the current Texas capital sentencing special scheme. *Id.* It was further found that the claim was foreclosed by the *Teague*[18] non-retroactivity doctrine. *Id.* at 717.

---

[18]*Teague v. Lane*, 489 U.S. 288 (1989).

The analysis employed by the Western District of Texas is persuasive. King has not cited any Supreme Court precedent that casts doubt on the Texas capital sentencing scheme. The ground for relief lacks merit. The ground for relief should primarily be rejected, however, for a more basic reason. The present ground for relief was one of the many grounds raised for the first time in the second state application for a writ of habeas corpus, which was rejected by the TCCA as an abuse of the writ. King has not shown cause and prejudice for the default or that a fundamental miscarriage of justice would occur if the court does not consider the claim on the merits. In an effort to overcome the procedural bar, King argues in the amended petition that the TCCA's dismissal of the subsequent writ on procedural grounds was due to the failure of appellate counsel to raise it on direct appeal. In his reply to the answer, he merely argues that his "procedural default arguments have been presented *supra*." *See* Reply at 199. King's excuse does not satisfy the *Martinez/Trevino* rule. More specifically, King has not shown that (1) his underlying claims of ineffective assistance of trial counsel are substantial, and (2) his initial state habeas counsel was ineffective in failing to present those claims in his first state habeas application. He has not satisfied his burden in order to overcome the procedural bar. The seventeenth ground for relief is procedurally barred.

18.  The Death Penalty, at least as presently administered in Texas, is cruel and unusual under the Eighth and Fourteenth Amendments to the United States Constitution

King's eighteenth ground for relief is a variation of his previous claim. He argues once again that the death penalty constitutes cruel and unusual punishment, at least as applied in Texas. The present ground for relief was one of the many grounds for relief raised for the first time in the second state application for a writ of habeas corpus, which was rejected by the TCCA as an abuse of the writ. King has not shown cause and prejudice for the default or that a fundamental

miscarriage of justice would occur if the court does not consider the claim on the merits. In an effort to overcome the procedural bar, King merely argues in the amended petition that the TCCA's dismissal of the subsequent writ on procedural grounds was due to the failure of appellate counsel to raise it on direct appeal. He argues that his appellate counsel was ineffective for failing to raise the claim on direct appeal. In his reply to the answer, he simply states that his "procedural default arguments have been presented *supra*." *See* Reply at 201. His excuse does not satisfy the *Martinez/Trevino* rule. King has not shown that (1) his underlying claims of ineffective assistance of trial counsel are substantial, and (2) his initial state habeas counsel was ineffective in failing to present those claims in his first state habeas application. The eighteenth ground for relief is procedurally barred.

19.  Lethal injection is cruel and unusual punishment under the Eighth Amendment to the United States Constitution

King next argues that the use of lethal injection constitutes cruel and unusual punishment. The Supreme Court has rejected the argument. *Baze v. Rees*, 535 U.S. 35 (2008). It has regularly been rejected by the Fifth Circuit. *Whitaker v. Livingston*, 732 F.3d 465 (5th Cir.), *cert. denied*, 134 S. Ct. 417 (2013); *Raby v. Livingston*, 600 F.3d 552 (5th Cir. 2010); *Kelly v. Lynaugh*, 862 F.2d 1126, 1135 (5th Cir. 1988), *cert. denied*, 492 U.S. 925 (1989). The claim lacks merit.

The ground for relief should primarily be rejected because it is procedurally barred. It was one of the many grounds raised for the first time in the second state application for a writ of habeas corpus, which was rejected by the TCCA as an abuse of the writ. King has not shown cause and prejudice for the default or that a fundamental miscarriage of justice would occur if the court does not consider the claim on the merits. In an effort to overcome the procedural bar, King argues in the amended petition that the TCCA's dismissal of the subsequent writ on procedural

grounds was due to the failure of appellate counsel to raise it on direct appeal.  In his reply to the answer, King once again states only that his "procedural default arguments have been presented *supra*."  *See* Reply at 203.  His excuse does not satisfy the *Martinez/Trevino* rule.  More specifically, he failed to show that (1) his underlying claims of ineffective assistance of trial counsel are substantial, and (2) his initial state habeas counsel was ineffective in failing to present those claims in his first state habeas application.  The nineteenth ground for relief is procedurally barred.

        20.     <u>Trial counsel were operating under a conflict of interest in violation of King's Fifth, Sixth, Eighth, and Fourteenth Amendment rights</u>

King next argues that his trial attorneys operated under a conflict of interest because they signed a literary and media rights agreement on the day he was sentenced to death.  The Director notes that counsel did not enter into the agreement until after the trial was over and after their representation had ended.  Consequently, there was no violation of any ethical rules.

The ground for relief should primarily be rejected because it is procedurally barred.  It was one of the many grounds raised for the first time in the second state application for a writ of habeas corpus, which was rejected by the TCCA as an abuse of the writ.  King has not shown cause and prejudice for the default or that a fundamental miscarriage of justice would occur if the court does not consider the claim on the merits.  In an effort to overcome the procedural bar, King argues in the amended petition that the TCCA's dismissal of the subsequent writ on procedural grounds was due to ineffective assistance of state habeas counsel for failing to raise it in the first state application for a writ of habeas corpus.  In his reply to the answer, King states only that his "procedural default arguments have been presented *supra*."  *See* Reply at 204. His excuse does not satisfy the *Martinez/Trevino* rule.  More specifically, he failed to show that (1) his underlying

claims of ineffective assistance of trial counsel are substantial, and (2) his initial state habeas counsel was ineffective in failing to present those claims in his first state habeas application. King has not satisfied his burden in order to overcome the procedural bar.

> 21.    The cumulative effect of the errors at Mr. King's trial denied him of due process under the Fourteenth Amendment

King's final claim is that he is entitled to federal habeas corpus relief due to cumulative errors. The claim is akin to the ground for relief that he raised to complete his broad based ineffective assistance of trial counsel claim (Claim 1(m)). In another case involving King's current counsel, the Fifth Circuit rejected a similar cumulative error claim as follows:

> Coble claims that cumulative error merits habeas relief. Federal habeas relief is only available for cumulative errors that are of constitutional dimension. *Livingston v. Johnson*, 107 F.3d 297, 309 (5th Cir. 1997); *Yohey*, 985 F.2d at 229. As previously discussed, none of Coble's ineffective assistance claims establish ineffective assistance under *Strickland*. Coble has not identified errors of constitutional dimension. Accordingly, we cannot say that the state habeas court's rejection of Coble's cumulative error claim was objectively unreasonable.

*Coble*, 496 F.3d at 440. In the present case, King has not identified any error(s) of constitutional dimension. Furthermore, the Fifth Circuit has specified that "[m]eritless claims or claims that are not prejudicial cannot be cumulated, regardless of the total number raised." *Westley*, 83 F.3d at 726 (citing *Derden*, 978 F.2d at 1461). King is not entitled to relief on his cumulative error claim.

Even though the ground for relief lacks merit, it should be rejected primarily because it is procedurally barred. It was one of the many grounds raised for the first time in the second state application for a writ of habeas corpus, which was rejected by the TCCA as an abuse of the writ. King does not show cause and prejudice for the default or that a fundamental miscarriage of justice would occur if the court does not consider the claim on the merits. He did not satisfy his burden in order to overcome the procedural bar.

VI.     Discovery/Evidentiary Hearing

King filed a motion for leave to conduct discovery and a motion for an evidentiary hearing. His current attorney routinely files such motions as part of an effort to show cause and prejudice or actual innocence. *See, e.g., Haynes*, 526 F.3d at 195-96; *Shields*, 122 F. App'x at 155. The following analysis was employed by the Fifth Circuit in rejecting counsel's complaints about being denied a hearing:

> To obtain a hearing, Shields would have to show either a factual dispute which, if resolved in his favor, would entitle him to relief or a factual dispute that would require development in order to assess a claim. . . . Shields procedurally defaulted on the majority of his claims. As such, we are barred from considering those claims.

*Shields*, 122 F. App'x at 155 (citations omitted). The analysis is equally applicable to the present case. King has not shown a factual dispute which, if resolved in his favor, would entitle him to relief or a factual dispute that requires development in order to assess the claim. All of King's claims raised in his amended petition are subject to the procedural bar, and he has not satisfied his burden in order to overcome the procedural bar. He has not shown that he is entitled to discovery or an evidentiary hearing.

VII.    Certificate of Appealability

Furthermore, King is not entitled to the issuance of a certificate of appealability. An appeal may not be taken to the court of appeals from a final order in a habeas corpus proceeding "unless a circuit justice or judge issues a certificate of appealability." 28 U.S.C. § 2253(c)(1)(A). Although King has not yet filed a notice of appeal, the court may address whether he would be entitled to a certificate of appealability. *See Alexander v. Johnson*, 211 F.3d 895, 898 (5th Cir. 2000) (A district court may *sua sponte* rule on a certificate of appealability because "the district

court that denies a petitioner relief is in the best position to determine whether the petitioner has made a substantial showing of a denial of a constitutional right on the issues before the court. Further briefing and argument on the very issues the court has just ruled on would be repetitious.").

A certificate of appealability may issue only if a petitioner has made a substantial showing of the denial of a constitutional right. 28 U.S.C. § 2253(c)(2). The Supreme Court fully explained the requirement associated with a "substantial showing of the denial of a constitutional right" in *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). In cases where a district court rejected a petitioner's constitutional claims on the merits, "the petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Id.*; *Henry v. Cockrell*, 327 F.3d 429, 431 (5th Cir. 2003). "When a district court denies a habeas petition on procedural grounds without reaching the petitioner's underlying constitutional claim, a COA should issue when the petitioner shows, at least, that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." *Id.*

In this case, reasonable jurists could not debate the denial of King's § 2254 petition on substantive or procedural grounds, nor find that the issues presented are adequate to deserve encouragement to proceed. *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003) (citing *Slack*, 529 U.S. at 484). Accordingly, the court finds that King is not entitled to a certificate of appealability as to his claims.

VIII.    Conclusion

In summary, the present memorandum opinion concerns the claims that King presented to the TCCA in his second state application for a writ of habeas corpus. The TCCA dismissed the second application as an abuse of writ pursuant to Tex. Code Crim. Proc. Art. 11.071 § 5(c). King has not shown cause and prejudice or actual innocence in order to overcome the procedural bar. As such, the claims remaining before the court are procedurally barred. To the extent that some aspects of the amended petition included claims that were properly exhausted when the original petition was filed, King failed to satisfy his burden under § 2254(d) for obtaining relief. The petition should be denied. It is therefore

**ORDERED** that the petition for a writ of habeas corpus is **DENIED**, and the case is **DISMISSED** with prejudice. It is further

**ORDERED** that a certificate of appealability is **DENIED**. It is finally

**ORDERED** that all motions by either party not previously ruled upon are **DENIED**.

SIGNED at Beaumont, Texas, this 23rd day of June, 2016.


_____
MARCIA A. CRONE
UNITED STATES DISTRICT JUDGE

94